IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. _____ |
| v. | ) ) | |
| Adam Potter and Business Insurance Holdings, LLC, | ) ) ) | |
| Defendants. | ) ) | |

## COMPLAINT

## PRELIMINARY STATEMENT

Plaintiffs, The American Institute for Chartered Property Casualty Underwriters, and The Institutes, LLC (collectively, "The Institutes"), by and through their counsel, bring this action against Defendants Adam Potter ("Potter") and Business Insurance Holdings, LLC ("BI") (collectively, "Defendants"). The Institutes are non-profit entities that purchased certain businesses from Defendant Potter and now commence this action to remedy Defendants' breaches of the restrictive covenants set forth in an asset purchase agreement as more fully defined below. As such, The Institutes brings this action for: (1) breach of contract; (2) tortious interference with prospective economic relations; (3) unjust enrichment; and (4) declaratory relief.

## THE PARTIES

1.      Plaintiff, The American Institute for Chartered Property Casualty Underwriters, is a Pennsylvania non-profit corporation with its principal place of business in Pennsylvania.

2.      Plaintiff, The Institutes, LLC, is a Pennsylvania limited liability company with its principal place of business at 720 Providence Road, Malvern, Pennsylvania. The Institutes, LLC,

is a wholly-owned subsidiary of The American Institute for Chartered Property Casualty Underwriters, which is its sole member.

3.      Upon information and belief, Defendant Potter is a citizen of the State of Connecticut and resides at 7 Nawthorne Road, Old Greenwich, Connecticut, 06870-2115.  In the alternative, upon information and belief, Defendant Potter is a citizen of the State of New York and resides at 155 Three Mile Harbor Hog Creek Road, East Hampton, New York, 11937.

4.      Upon information and belief, Defendant Business Insurance Holdings, LLC, is a Florida limited liability company with its principal place of business in Illinois, and its sole member is Defendant Potter.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C § 1332 because there is complete diversity of citizenship among the parties and the amount in controversy, on information and belief, exceeds $75,000.

6.      This Court also has personal jurisdiction over the defendants because the contract at issue (defined below) contains a choice of law and jurisdiction provision, where the parties expressly agreed that any disputes thereunder must be brought in the state and federal courts of Delaware. For this reason, venue is also proper in this Court.

## ALLEGATIONS APPLICABLE TO ALL CLAIMS

### The Asset Purchase Agreement

7.      The Institutes is a leading provider of professional education activities related to risk management and property-casualty insurance, serving the educational, networking, research, and training needs of insurance professionals and the general public throughout the country.

8.     On or about June 1, 2018, The Institutes entered into an Asset Purchase Agreement ("the Purchase Agreement") with Claims Pages, LLC, a Florida limited liability company ("CP"); C&E MGMT and Planning, Inc., a Florida corporation ("C&E"); CLM Group, Inc., a Florida corporation ("CLM"); Defendant Potter; and Moxie HC, LLC, a Florida limited liability company ("Moxie").

9.     At the time of the Purchase Agreement, Moxie owned 100% of the membership interests in CP and 100% of the issued and outstanding capital stock of CLM. Defendant Potter owned 100% of the issued and outstanding capital stock of C&E.

10.    Upon information and belief, Defendant Potter also owned, and still currently owns all of the membership interests of Defendant BI.

11.    The Purchase Agreement defines The Institutes as "the Buyer" and CP, CLM, and C&E as "the Sellers." The Purchase Agreement further defines the "Selling Parties" to include CLM, CP, and C&E, together with Defendant Potter and Moxie.

12.    The Institutes has paid Defendant Potter $17,329,098 to date and an additional payment of approximately $2,000,000 may be owed to Defendant Potter in accordance with the terms of the Purchase Agreement, as the purchase price for substantially all of the assets of CP, C&E, and CLM.

13.    At the time of the agreement, CP was engaged in the business of providing reference information for insurance claims adjusters.

14.    At the time of the agreement, C&E was engaged in the business of identifying and securing conference and event locations, hotel contracts, and outside locations.

15.    At the time of the agreement, CLM was engaged in the business of operating as a national trade association for the insurance claims and litigation management industries.

3

16.     After the close of the Purchase Agreement, The Institutes assumed control of all of the operations of CLM and, currently, CLM is only used as a trade name. For ease of reference throughout the Complaint, references to CLM shall refer to the trade name of the organization as operated by The Institutes.

17.     As more fully described in the Purchase Agreement, "the CLM Business" is defined as follows:

> A professional association in the insurance industry with more than 45,000 professionals in the claims resolutions and litigation management industries, offering different types of memberships, with local chapters across the United States. CLM members benefit from events, continuing education and a wide variety of industry resources, including a job board, media kits, on-line training program for new hires and dispute resolution program for insurance companies. CLM offers the following products and services:
>
> 1.     Claims College creates and teaches courses for the College's eleven specialty schools; issues certificates, and CCP/ACP designations.
>
> 2.     Litigation Management Institute (LMI) is a certification program for Certified Litigation Management Professional (CLMP), and will also be offering a second designation titled LMI2 as an advanced course.
>
> 3.     CLM Tracker tracks and renews adjuster's continuing education and licenses, including an auto-renewal function.
>
> 4.     Universal Claims Certificate (UCC) is scheduled to launch on July 1, 2018.  The UCC was developed with the most stringent requirements and regulations for each state. The UCC includes a pre-certification course and examination. Mandatory pre-licensing courses and exams will be waived for states that recognize the UCC. Registration and payment of state fees will be managed by a single, centralized system that connects to state systems.
>
> 5.     Annual Conference is an annual event for professionals in the claims and litigation management industries, featuring educational sessions and networking.

6.       <u>Specialty Conferences</u> including: Retail, Restaurant and Hospitality, Workers Compensation, Midwest, Management and Professional Liability, Construction, Claims College, Cyber Summit, Southeast, LMI, and Chief Claims Officer Summit.

7.       <u>Magazines</u> including (both digital and print formats): CLM Magazine, clmmag, theclm.org, Professional Times Magazine, and Construction Claims Magazine

8.       <u>Chapter Events</u> Local networking and educational events are held around the country each year. These events are provided at no cost to the attendees and offer a combination of an educational session and a networking event

9.       <u>Webinars</u> Hosts webinar topics, ranging from Alternative Dispute Resolution to Workers' Compensation issues, presented by claims, litigation and insurance professionals

10.       <u>Training Sessions</u> Hands-on training sessions all approved for adjuster CE credits

11.       <u>CLM Wiki</u> Repository of valuable claims handling resources organized by state, including claims and legal resources, and construction rip and tear cases.

18.       As indicated on its website at all times relevant, CLM's Fellows and Members "represent a wide variety of corporations, insurance companies, third party administrators, industry service providers and law firms." Its Fellows are "industry professionals who participate in claims and litigation management (corporate counsel; risk, claims and litigation managers; adjusters and service providers; etc.)." Its Members "are outside defense counsel."

19.       Accordingly, the CLM community and its target audience include, without limitation, individuals involved in all facets of insurance, from risk managers to claims handlers to outside counsel to brokers.

20.       The CLM Business as defined in the Purchase Agreement includes various products and services ranging from an annual conference to various other conferences offered throughout the year. The definition of the CLM Business is not limited to any specific topics.

21.     Collectively, the businesses of CP, C&E, and CLM are defined in the Purchase Agreement as the "Sellers' Businesses."

22.     Section 6.12(a) of the Purchase Agreement prohibits the Selling Parties (which includes Defendant Potter) and any of their affiliated companies (which includes Defendant BI), from conducting any activities that are competitive with any of the Sellers' Businesses conducted as of the Closing Date for a period of five years following the Closing Date (Section 6.12(a) is hereinafter referred to as "the Non-Compete").

23.     In full, Section 6.12(a) provides:

> During the period beginning on the Closing Date and ending the fifth (5th) anniversary of the Closing Date (the "Non-Compete Period"), each Selling Party covenants and agrees not to, and shall cause its Affiliates not to, directly or indirectly, and anywhere in the United States, conduct, manage, operate, engage in or have an ownership interest in any business or enterprise engaged in any activities that are otherwise competitive with any of the Sellers' Businesses as conducted as of the Closing Date, except that during the Non-Compete Period any Selling Party, or any other party listed on Schedule 6.12, may undertake the activities set forth on Schedule 6.12 attached hereto (collectively, the "Permitted Activities").

24.     Thus, Defendant Potter, and any of his affiliated companies, such as Defendant BI, are prohibited during the five year Non-Compete Period from engaging in any activities that compete with the CLM Business.

25.     As an accommodation to Defendant Potter, who wanted to continue operating Defendant BI's business, The Institutes agreed to carve out certain enumerated "Permitted Activities" in which the Selling Parties could engage during the Non-Compete Period. These activities are set forth on Schedule 6.12 to the Purchase Agreement. This list of "Permitted Activities" strictly enumerates the activities that Defendant BI can do without violating the Non-Compete.

26.     "Permitted Activities" are specifically defined, in relevant part, as certain business operations of Defendant BI, owned by Defendant Potter. Specifically, Defendant BI is defined in Schedule 6.12 as follows:

> a news and information source for executives concerned about risk and the impact on their business, including risk managers, insurers, brokers and other providers of insurance products and services. Business Insurance delivers in-depth analysis on new and emerging risks, case studies of successful programs, market intelligence on trends, and guidance on how to capitalize on opportunities and overcome challenges. Business Insurance covers core risk management and insurance areas such as property/casualty insurance, captive insurance and other alternative risk transfer vehicles, and enterprise risk management.

27.     The Schedule further delineates the specific products and services that Defendant BI provides and that The Institutes agreed would fall within the definition of Permitted Activities. Such products and services include various magazines, websites, webinars, e-newsletters and alerts, a Women to Watch Foundation, and a Diversity and Inclusion Institute.

28.     The Schedule of Permitted Activities also expressly limits the events offered by Defendant BI as of the Closing Date, as follows:

> Events and Award Programs as follows:
> 1.    World Captive Forum
> 2.    U.S. Insurance Awards
> 3.    Break Out Awards
> 4.    Innovation Awards
> 5.    Risk Management Roundtable: invitation only roundtable meeting of senior-level risk managers to discuss hot topics), and
> 6.    Women to Watch (EMEA and USA).

29.     As set forth in Schedule 6.12, Defendant BI's defined business as of the Closing Date does not include conferences or seminars on industry-specific topics, such as cannabis or intellectual property, nor any conferences relating to claims and litigation management, as the

parties agreed that Defendant Potter and his affiliated companies, including Defendant BI, would not engage in any such activities during the Non-Compete Period.

30.     To further protect The Institutes, Defendant Potter agreed that Defendant BI would not conduct any activity (such as a conference) enumerated as a "Permitted Activity" if that event was focused on claims and litigation management professionals. Specifically, Schedule 6.12 provides that:

> on or after the Closing Date, none of the Selling Parties is permitted to, and each shall cause its Affiliates not to (and the following are excluded from Permitted Activities):
>
> 1.     Work/create/develop/offer/promote educational content related to claims and litigation management, unless in partnership with CLM and CP.
>
> 2.     Produce live delivery, such as events, networking, seminars, award programs, and conferences targeted to claims and litigation management professionals.
>
> 3.     Undertake any involvement with newsletters, publications, emails, communication, sponsorships, research papers with cannot directly be targeted for claims and litigation professionals.
>
> 4.     Target or create information that relates to the CP business.

31.     Therefore, read together, under the entire Purchase Agreement, Defendant Potter could engage in a Permitted Activity only if the content did not relate to claims and litigation management and he did not target claims and litigation management professionals. For example, Defendant Potter could still conduct the five conferences listed under "Events and Awards Programs," so long as those conferences did not target or include content related to claims and litigation management professionals.

32.     These exceptions for claims and litigation management content and professionals apply only to the Permitted Activities.

33.     These exceptions do not apply to the main Non-Compete in Section 6.12(a) of the Purchase Agreement.

34.     Thus, if Defendant Potter did provide educational content at a conference on cannabis, for example, while he owned CLM, Section 6.12(a) prohibits him from providing educational content or holding a similar conference after the Closing Data because such activity is not listed as a Permitted Activity under Schedule 6.12.

35.     Accordingly, when Schedule 6.12 is read in conjunction with the Non-Compete provision in Section 6.12(a) of the Purchase Agreement, Defendants are prohibited from offering or promoting any educational content that extends beyond the offerings provided by Defendant BI as of the Closing Date and that competes with the CLM Business of offering events and conferences to claims and litigation management professionals.

36.     In addition to the Non-Compete, Section 6.12(b) of the Purchase Agreement also contains a covenant against solicitation of Sellers' customers or other business relations (Section 6.12(b) is hereinafter defined as "the Non-Solicitation").

37.     Specifically, Section 6.12(b) provides as follows:

> With the exception of Permitted Activities, during the Non-Compete Period, each Selling Party shall not, and shall cause its Affiliates not to, directly or indirectly, call-on, solicit or induce, or attempt to solicit or induce, any customer or other business relation of Buyer for the provision of products or services related to any of Sellers' Businesses or in any other manner that would otherwise interfere with the business relationship between Buyer and its customers and other business relations.

38.     As discussed further below, upon information and belief, Defendants have violated the Non-Solicitation by calling upon at least one significant sponsor of the CLM Business for purposes of sponsoring the C&H Conference.

**Defendants' Breach of the Non-Compete Provision**

39.     Before entering into the Purchase Agreement, Defendant BI was not in the business of offering and promoting conferences relating to claims and litigation management, and its business was limited to those activities enumerated in Schedule 6.12.

40.     To accommodate Defendant Potter's request to continue operating Defendant BI, The Institutes agreed to allow Defendants to engage in those Permitted Activities specifically enumerated on Schedule 6.12 during the Non-Compete Period. Those Permitted Activities do not include conferences that are not delineated specifically.

41.     Schedule 6.12 further provides that if Defendants choose to engage in any of the enumerated Permitted Activities, they could only do so subject to the strict limitation that they are not related to claims and litigation management and are not directed toward claims and litigation management professionals.

42.     In the year that has transpired since entering into the Purchase Agreement, it has become clear that Defendant Potter never intended to limit Defendant BI's activities under the terms of the Non-Compete. Rather, it appears that he is using his knowledge of the industry, and leveraging the experience he gained while he owned Sellers' Businesses, to build Defendant BI as an alternative and competitor to CLM, in direct contravention of the Non-Compete.

43.     In or around late July 2019, The Institutes became aware that Defendant BI is offering, promoting and producing claims and litigation management conferences that are in direct violation of the Purchase Agreement.

44.     Specifically, The Institutes learned that Defendant BI is offering and actively promoting a Cannabis & Hemp Conference ("the C&H Conference") and an Intellectual Property Conference ("the IP Conference") (collectively, "the BI Conferences"), scheduled for October 24-25, 2019 and October 24, 2019, respectively, at the New York Marriott Marquis, as described more fully on its website (*see* https://www.businessinsurance.com/section/events).

45.     These conferences are not identified as Permitted Activities under Schedule 6.12.

46.     Defendant BI describes the C&H Conference as a "new conference centered on cannabis insurance and risk management" for insurance and cannabis industry professionals "grappling with complex coverage and liability issues."

47.     Upon information and belief, as of the filing of this Complaint, the C&H Conference has approximately 200 registrants and on-line registration is closed.

48.     BI describes the IP Conference as an exploration of "business exposure" resulting from intellectual property that aims to educate insurance professionals about "risk management and insurance strategies to protect intellectual property assets" and identify "established and new insurance protections" available to insurance professionals.

49.     The BI Conferences are a clear breach of Defendant Potter's obligations under the Non-Compete, as set forth more fully below.

50.     Immediately upon learning of the BI Conferences, The Institutes sent Defendant Potter a letter on July 29, 2019, notifying him that the conferences constituted a breach of the Purchase Agreement and demanding that they be cancelled by July 31, 2019.

51.     Defendants refused to cancel the conferences in dispute.

52.     The Institutes sent a follow up letter to Defendant Potter on August 12, 2019, and repeated its demand that Potter cancel the BI Conferences by August 15, 2019.

53.     Defendant Potter responded to the August 12, 2019 letter on August 20, 2019, in a letter which reaffirmed Defendants' refusal to cancel the conferences and offered the following purported compromises that do nothing to alleviate their breach of the Non-Compete: (1) Defendants have added a statement on the landing page for the C&H Conference, stating that "This Conference was not developed and is not intended for claims and litigation management professionals"; (2) Defendants modified one of the session titles for the C&H Conference to indicate that it does not address claims; and (3) Defendants will not knowingly allow any claims and litigation management professionals to attend the conference.

54.     These minor, semantic revisions do not change the fact that the BI Conferences are in direct contravention of the Non-Compete, as set forth in the following paragraphs.

**The BI Conferences Focus on Topics Related to Sellers' Businesses as of Closing**

55.     As an initial matter, as set forth above, any conference offered by Defendants that competes with Sellers' Businesses or is not included in the enumerated Permitted Activities is a violation of the Non-Compete.

56.      However, Defendants' conduct is even more egregious because the BI Conferences clearly focus on issues that were clearly within the Sellers' Businesses on the Closing Date of the Purchase Agreement.

57.     Specifically, the BI Conferences focus on topics that have been addressed by CLM and that relate directly to – and therefore compete directly with – the CLM Business.

58.     A core feature of the CLM Business is to provide educational conferences and other live delivery events, for the benefit of its member community, which consists of corporate counsel, risk managers, claims managers, litigation managers, adjusters, brokers, service providers, and defense counsel, as well as other industry professionals.

59.     Schedule A to the Purchase Agreement more fully describes the CLM Business as "a professional association in the insurance industry with more than 45,000 professionals in the claims resolutions and litigation management industries, offering different types of memberships, with local chapters across the United States. CLM members benefit from events, continuing education and a wide variety of industry resources, including a job board, media kits, on-line training program for new hires and dispute resolution program for insurance companies."

60.     Although Schedule A provides examples of some of CLM's offerings, it does not limit the CLM Business to any specific topic.

61.     The broad definition of the CLM Business was intentional, as CLM offers conferences on a wide range of topics, as indicated by a review of CLM's conference archives.

62.     For example, at CLM's 2015 Annual Conference, a panel of CEOs presented on the current state of the insurance industry, the latest product innovations, and their views on the future; it was not limited by any specific topic.

63.     Also in 2015, CLM organized panels to present on trending topics ranging from 3D printing and emerging technologies to the transportation of hazardous commodities, as well as more traditional topics, such as managing risk in contract drafting and health care-related risks and trends.

64.     Accordingly, given the broad nature of the CLM Business and the types of education it offers to its member community, any conference offered by Defendants that relates in any way to the business conducted by the Selling Businesses as of the Closing Date violates the Non-Compete.

65.     For instance, during a 2015 Medical Legal Summit, CLM developed and presented a session entitled "Marijuana in Workers' Compensation – Medical and Legal

Challenges" and described the session as a discussion about "new and evolving difficulties" posed by the "legalization of both medical and recreational marijuana."

66.     During its 2016 Annual Conference, CLM offered a session titled "Municipal Law – Clearing the Smoke on Medical Marijuana in Employment," which addressed issues arising with the legalization of marijuana around the country.

67.     CLM offered at least eight other presentations between 2014 and 2017 addressing cannabis-related topics.

68.     In fact, in May 2018 – just weeks before the Purchase Agreement was finalized – CLM and BI jointly offered a Workers Compensation Conference which featured a session titled, "Discussions and Trends Around Workers Compensation and Medical Marijuana."

69.     Therefore, Defendants were clearly aware that CLM programs regularly and for several years included cannabis-related topics.

70.     Further, fully aware of Defendant BI's involvement in the May 2018 conference, Defendant Potter voluntarily relinquished the right to continue offering cannabis-related conferences by agreeing to the Non-Compete, for which he was paid handsomely.

71.     The description of the C&H Conference on the BI website states, "[w]ith medical marijuana legal in 32 states and D.C. and recreational marijuana legal in 12 U.S. jurisdictions," the C&H Conference aims to examine the risks to the insurance industry resulting from the legalization of marijuana. Further, it provides that "the rise of cannabis as an alternative pain medication will have significant implications for the workers compensation sector."

72.     Accordingly, the C&H Conference is a clear breach of the Non-Compete since the topic of insurance risk related to marijuana had been addressed by CLM prior to the Closing Date.

**The Non-Compete Prohibits Defendants from Conducting Conferences on So-Called Pre-Loss Issues**

73.     Before entering into the Purchase Agreement, CLM regularly discussed and presented on "pre-loss" issues at its conferences and other events.

74.     For example, a 2015 CLM presentation about cybersecurity explained the "steps businesses, law firms and the insurance industry must take to . . . avoid cyber liability."

75.     Another 2015 CLM presentation at its Retail, Restaurant & Hospitality Conference focused on tips for identifying risks and preventing losses at major entertainment and marketing events.

76.     During the 2016 Annual Conference, CLM again offered a session on avoiding cyber liability called the "Cyber-Attack Preparedness Toolbox."

77.     At CLM's 2016 Midwest Conference, it offered a session titled "Whistle While You Work: How to Prevent Activity Leading to Whistleblowing Actions and Protect the Healthcare Organization."

78.     Designing programs and presenting on such "pre-loss" risk avoidance and loss prevention techniques evidences CLM's longstanding appreciation of "pre-loss" issues as a core function of every claims and litigation management professional's responsibilities.

79.     Therefore, the Non-Compete clearly prohibits Defendants from conducting conferences on so-called "pre-loss" issues.

**Defendants' *Ad Hoc* Efforts to Change the Description of the C&H Conference do not Change the Fact that the Conference Violates the Non-Compete**

80.    When The Institutes placed Defendants on notice of their breach of the Non-Compete, both of the agendas for the BI Conferences included sessions focused on claims, confirming that the conferences offer claims and litigation management content.

81.    For instance, the C&H Conference originally promoted a session on "Cannabis Claims: A Peek Down the Rabbit Hole" to be delivered by a Claims Manager and Claims Supervisor.

82.    Similarly, the IP Conference promoted a session titled "Innovation Track Session: Claims." Another IP Conference session is titled "General Session: Mitigation," which would appear to relate to post-claim and litigation management issues.

83.    In an attempt to cure this obvious breach, and only after The Institutes placed them on notice, Defendants have recently changed the title of the claims session in the C&H Conference, such that it is now titled "Cannabis Exposure: A Peek Down the Rabbit Hole." A comparison of the description of the session as it appeared originally and as it appears now quickly reveals the transparency of Defendants' attempt to hide their true intentions.

84.    As originally promoted, the Cannabis claims session was described on BI's website as follows:

> The cannabis claims experience is often difficult to evaluate due to rapidly emerging risks in a highly regulated industry and lack of access to significant data. This panel of experienced cannabis claims professionals will attempt to shed light on the type, frequency and severity of cannabis claims to date, and what these claims will look like in the future.

85.    In response to The Institutes' objections, the Cannabis "exposure" session is now described on BI's website as:

> The cannabis exposure is often difficult to evaluate due to rapidly
> emerging risks in a highly regulated industry and lack of access to
> significant data. This panel of experienced cannabis professionals
> will attempt to shed light on the various cannabis exposures to
> date, and how these will involve [sic] in the future.

86.     As is clear, it is essentially the same session, addressing the same topic, and appealing to the same target audience. Simply substituting "exposure" for "claim" and referring amorphously to "professionals" does not change the substance of the presentation.

87.     Upon information and belief, the majority of registrants for the C&H Conference signed up before Defendant BI made these changes to the conference description.

88.     No corresponding change has been made to the IP Conference sessions, which still constitute a blatant violation of the Non-Compete.

89.     Accordingly, the BI Conferences violate the Non-Compete.

## Defendants' Breach of the Non-Solicitation Provision

90.     The website for the C&H Conference lists as the event's "founding partner" a major law firm that is also a significant sponsor of the CLM Business, a fact well known to Defendant Potter.

91.     Upon information and belief, Defendant Potter contacted the law firm and solicited and/or induced it to serve as the founding partner of the conference.

92.     Such contact is a direct violation of the non-solicitation restrictions in Section 6.12(b) of the Purchase Agreement.

93.     When considered in conjunction with the violations of the Non-Compete as detailed above, it becomes abundantly clear that Defendant Potter is deliberately attempting to compete with the CLM Business through his ownership of Defendant BI.

### Remedies Available Under the Purchase Agreement

94.     Section 6.12(d) of the Purchase Agreement provides:

> Each Selling Party [including Defendant Potter] acknowledges and agrees that the provisions of this Section 6.12 are reasonable and necessary to protect the legitimate business interests of [The Institutes] and its investment in the Acquired Assets.  Each Selling Party shall not contest that [The Institutes'] remedies at law for any breach or threat of breach by any Selling Party or any of its affiliates of the provisions of this Section 6.12 will be inadequate, and that [The Institutes] shall be entitled to seek an injunction or injunctions to prevent breaches of the provisions of this Section 6.12, without proving actual damages, and to enforce specifically such terms and provisions, in addition to any other remedy to which [The Institutes] may be entitled at law or equity. . . .

95.     Section 9.2(a) of the Purchase Agreement gives The Institutes the right to indemnification from Defendant Potter, including the recovery of any and all Losses, such as attorneys' fees and any expenses and costs incurred by The Institutes in connection with enforcing its rights thereunder.

96.     Section 10.3 of the Purchase Agreement provides that the Purchase Agreement "shall be governed by and construed in accordance with the laws of the State of Delaware, and the Parties irrevocably submit to the exclusive jurisdiction of the federal and state courts located in New Castle County, Delaware for resolution of any disputes hereunder . . . ."

97.     As a direct result of Defendants' conduct in violation of the restrictive covenants, The Institutes faces future losses of customers and sponsors, loss of good will, loss of revenues, and dilution and confusion in the marketplace.

98.     Further, The Institutes has incurred costs and retained counsel to investigate and remedy Defendants' conduct.

99.     Defendants' actions reflect their blatant disregard for contractual and legal obligations and evinces intent to continue with these violations.

100.     The Institutes will suffer immediate and irreparable harm if Defendants' actions are not temporarily, preliminarily, and/or permanently enjoined.

## COUNT I
### Breach of Contract

101.     The Institutes repeats, realleges, and incorporates by reference the prior allegations of this Complaint, as if fully set forth herein.

102.     The Institutes and Defendant Potter entered into the Purchase Agreement with the express understanding that The Institutes, through CLM, would continue to offer conferences directed towards claims and litigation management professionals, and that Defendants would not compete with such services for a period of five years after closing.

103.     In organizing and promoting the BI Conferences, Defendants have breached the restrictive covenants of the Purchase Agreement.

104.     As the direct and proximate result of Defendants' conduct as aforesaid, The Institutes has suffered and, if Defendants' conduct is not stopped, will continue to suffer, immediate and irreparable injury and significant damages in an amount to be proven at trial, which upon information and belief will be far in excess of $75,000.

105.     Because The Institutes' remedy at law is inadequate, The Institutes seeks, in addition to damages, preliminary, and permanent injunctive relief to recover and protect its legitimate business interests.

106.     The Institutes is further entitled to injunctive relief against Defendants and all those acting in concert or participation with them, remedying their past improper conduct, and preventing such conduct in the future.

107.     The Institutes will suffer immediate and irreparable harm if the requested injunctive relief is not granted.

108.     The Institutes' business is reliant on its business reputation and its ability to maintain and grow its member community in a competitive market and will continue to suffer irreparable harm absent injunctive relief.

109.     The Institutes has a substantial likelihood of success on the merits because of Defendants' blatant and willful violation of the restrictive covenants of the Purchase Agreement.

110.     Plaintiff has been damaged by all of the foregoing, and is entitled to its damages, in an amount to be determined at trial.

## COUNT II
## Tortious Interference

111.     The Institutes repeats, realleges, and incorporates by reference the prior allegations of this Complaint, as if fully set forth herein.

112.     Defendants were and are aware of the business relationships between The Institutes and its customers and sponsors, and in particular, the strong relationship that CLM has developed with its constituent claims and litigation management professionals.

113.     The Institutes has a reasonable expectation that the CLM's business relationships will continue and that it will continue to be the leading provider of educational services to its target market.

114.     By virtue of their attempt to offer conferences that directly compete with the CLM's past, current, and future offerings, Defendants have knowingly and intentionally interfered with the CLM's existing and prospective contractual and business relationships.

115.     The interference by Defendants with the CLM's existing and prospective business relationships was and is not legally justified.

116.    The interference with the CLM's existing and prospective business and contractual relationships is continuing and intentional and has proximately resulted and/or will proximately result in damage to the CLM, including the loss of its customers and sponsors, sales income, and damage to business reputation and good will and other damages, which up on information and belief will be far in excess of $75,000.

117.    Unless Defendants are restrained and enjoined from unlawfully interfering with the CLM's business relationships, Plaintiffs will suffer immediate and irreparable harm for which there is no adequate remedy at law.

## COUNT III
## Unjust Enrichment

118.    The Institutes repeats, realleges, and incorporates by reference the prior allegations of this Complaint, as if fully set forth herein.

119.    By using their knowledge of the claims and litigation management industry, and particularly the knowledge gained by Defendant Potter through his association with the Sellers' Businesses, Defendants have unfairly gained a competitive advantage over Plaintiffs.

120.    As a result of their conduct, Defendants have been unjustly enriched at the expense of Plaintiffs.

121.    As a direct and proximate result of Defendants' unjust enrichment, Plaintiffs have suffered and will continue to suffer damages.

## COUNT IV
## Declaratory Relief

122.    The Institutes repeats, realleges, and incorporates by reference the prior allegations of this Complaint, as if fully set forth herein.

123.    The Institutes have paid Defendant Potter $17,329,098 to date as the purchase price and an additional payment of approximately $2,000,000 may be owed to Defendant Potter in accordance with the terms of the Purchase Agreement.

124.    However, as all parties to the Purchase Agreement have an implied duty of good faith and fair dealing, a further payment to Defendant Potter is not warranted while he is in breach of the restrictive covenants of the Purchase Agreement.

125.    Accordingly, as a result of Defendant Potter's violation of the restrictive covenants, The Institutes seeks a declaration that Defendant Potter has violated the terms of the Agreement and that it is entitled to an offset of the sums still owed under the Agreement in an amount equal to the damages caused by Defendant Potter's conduct, which upon information and belief will be far in excess of $75,000.

### REQUEST FOR RELIEF

WHEREFORE, having alleged this Complaint against Defendants, The Institutes prays that the Court award the following relief:

(a)    Temporary, preliminary, and permanent orders requiring Defendants and all those persons and entities acting in concert and participation with them to refrain from presenting any further conferences or other offerings that compete with Sellers' Businesses in violation of the terms of the Purchase Agreement;

(b)    Temporary, preliminary, and permanent relief ordering Defendants, under penalty of perjury, to identify in writing all individuals and/or entities with whom they have engaged to present any other conferences or other offerings that might be considered as competing with any of Sellers' Businesses;

(c)     Judgment against Defendants for damages in excess of $75,000 for their breach of the restrictive covenants in the Purchase Agreement, said amount to be proven at trial;

(d)     Judgment against Defendants for damages in excess of $75,000 for their tortious interference, said amount to be proven at trial;

(e)     Judgment against Defendants for damages in excess of $75,000 for their unjust enrichment, said amount to be proven at trial;

(f)     A declaration that Defendant Potter has violated the terms of the Purchase Agreement; and

(g)     Such other and further relief as this Court deems just and equitable.

COZEN O'CONNOR

By:  _/s/ Barry Klayman_____
Barry M. Klayman, Esq. (DE 3676)
1201 North Market Street
Suite 1001
Wilmington, DE 19801
Tel: 302-295-2035
Fax: 215-701-2209
E-mail: bklayman@cozen.com

David J. Walton, Esq. (*pro hac vice to be filed*)
Matthew J. Siegel, Esq. (*pro hac vice to be filed*)
Cozen O'Connor
1650 Market Street
Suite 2800
Philadelphia, PA 19103
dwalton@cozen.com
msiegel@cozen.com

*Attorneys for Plaintiffs*

DATED: August 28, 2019.