# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC, | ) ) ) ) | Civ. A. No. 1:19-cv-01600-RGA |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| Adam Potter and Business Insurance Holdings, Inc., | ) ) ) | |
| Defendants. | ) | |

## OPENING POST-TRIAL BRIEF OF PLAINTIFFS
## THE AMERICAN INSTITUTE FOR CHARTERED PROPERTY
## <u>CASUALTY UNDERWRITERS AND THE INSTITUTES, LLC</u>

Barry M. Klayman, Esq. (#3676)
**COZEN O'CONNOR**
1201 North Market Street, Suite 1001
Wilmington, DE 19801
Tel: (302) 295-2035
Fax: (215) 701-2209
Email: bklayman@cozen.com
*Attorneys for Plaintiffs, The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC*

OF COUNSEL:
Robert W. Hayes (Admitted *Pro Hac Vice*)
Matthew J. Siegel (Admitted *Pro Hac Vice*)
COZEN O'CONNOR
1650 Market Street, Suite 2800
Philadelphia, PA 19103

July 15, 2022

**Table of Contents**

Page

PRELIMINARY STATEMENT ......................................................1

BACKGROUND FACTS ...........................................................4

ARGUMENT ..................................................................8

I.     THE UNDISPUTED FACTS ESTABLISH DEFENDANTS' PAST, ONGOING, AND FUTURE BREACHES OF THE APA ............................8

     A.     The BIH Conferences Violated the Non-Compete As Interpreted By The Court...............................................................9

          1.     The Conferences Provided Claims Content and Were Targeted, in Part, to Claims and Litigation Professionals. ........................9

     B.     Defendants' Assistance in the Formation of ClaimsX Violated the Non-Compete. ....................................................13

     C.     Defendants Violated the Non-Solicitation Provision of the APA ......14

II.     "CONTENT RELATED TO CLAIMS AND LITIGATION MANAGEMENT" INCLUDES RISK MANAGEMENT............................16

III.     THE APA PROHIBITS DEFENDANTS FROM COMPETING WITH ANY OF THE PRODUCTS AND SERVICES IDENTIFIED IN SCHEDULE A OTHER THAN PERMITTED ACTIVITIES .....................19

IV.     THE INSTITUTES ARE ENTITLED TO MONETARY DAMAGES AND INJUNCTIVE RELIEF .................................................23

     A.     The Institutes Did Not Receive the Benefit of the Bargain. ...............23

     B.     In Addition to Money Damages, The Institutes are Entitled to Injunctive Relief Prohibiting Defendants from Engaging in Competitive Activities for Five Years. ...............................30

     C.     The Institutes are Entitled to Attorneys' Fees and Expert Witness Fees Pursuant to the Specific Language in Article IX of the APA. ............33

     D.     The Institutes Are Entitled to Pre- and Post-Judgment Interest.........34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Homepatient, Inc. v. Collier*,
  2006 WL 1134170 (Del. Ch. April 19, 2006) ....................................................8

*Chicago Bridge & Iron Co., N.V. v. Westinghouse Electric Co. LLC*,
  166 A.2d 912 (Del. 2016) ...............................................................21, 22

*D.L. Anderson's Lakeside Leisure Co., Inc. v. Anderson*,
  757 N.W.2d 803 (Wis. 2008)................................................................26

*Greenstar, LLC v. Heller*,
  934 F. Supp.2d 672 (D. Del. 2013)............................................................24, 34

*Leaf Invenergy Co. v. Invenergy Renewables LLC*,
  210 A.3d 688 (Del. 2019) ...................................................................27

*In re Live Concert Antitrust Litig.*,
  863 F. Supp.2d 966 (C.D. Cal. 2012) .........................................................30

*Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc.*,
  2021 WL 1592473 (Del. Ch. Ct. 2021) .....................................................26, 30

*McLachlan v. Wilmington Dry Goods Co.*,
  22 A.2d 851 (Del. Super. 1941)..............................................................27

*MicroStrategy Inc. v. Acacia Rsch. Corp.*,
  2010 WL 5550455 (Del. Ch. Dec. 30, 2010)....................................................20

*Mobile Diagnostics, Inc. v. Lindell Radiology, P.A., C.A.*,
  1985 WL 189241 (Del. Super. Aug. 9, 1985) ..................................................34

*Montg. Cellular Holding Co., Inc. v. Dobler*,
  880 A.2d 206 (Del. 2005) ...................................................................35

*Raymond v. Board of Public Works, C.A.*,
  1990 WL 63829 (Del. Super. May 8, 1990).....................................................35

*Siga Technologies, Inc. v. PharmAthene, Inc.*,
  132 A.3d 1108 (Del. 2015) .................................................................24

*In re Southern Peru Copper Corp. Shareholder Deriv. Litig.*,
   52 A.3d 761 (Del. Ch. 2011) ...............................................................30

*Spicer, Trustee for Estate of Brady v. Maxus Healthcare Partners,*
   *LLC,*
   616 S.W.3d 59 (Tex. App. Ct. 2020).....................................................27

*Stonewall Ins. Co. v. E.I. du Pont de Nemours & Co.*,
   996 A.2d 1254 (Del. 2010) ...................................................................34

*Tristate Courier and Carriage, Inc.*, 2004 WL 835886 (Del. Ch. April
   15, 2004) ................................................................................................31

*WSP, Inc. v. Wyo. Steel Fabricators & Erectors, Inc.*,
   158 P.3d 651 (Wyo. 2007)......................................................................27

**Statutes**

6 Del. C. § 2301(a)..............................................................................................35

## PRELIMINARY STATEMENT

The evidence overwhelmingly establishes multiple breaches of the noncompetition and non-solicitation provisions of the Asset Purchase Agreement ("APA"), pursuant to which Plaintiffs, The American Institute for Chartered Property Casualty Underwriters and The Institutes, LLC ("The Institutes"), acquired CLM Group, Inc. ("The CLM"), Claims Pages, Inc. and C&E MGMT, Inc. (now Business Insurance Holdings, Inc. ("BIH")).

Defendant, Adam Potter ("Potter") and BIH, admitted presenting claims content at specialty conferences and webinars first offered in October 2019 and resumed doing so in the second half of 2021. The APA's noncompetition provisions clearly and unambiguously prohibited Defendants from doing so. It does not matter if it were impossible to present specialty conferences to risk managers without discussing claims experience. Defendants are bound by terms to which they voluntarily agreed regardless of how intrusive compliance may be. The whole point of the acquisition was that Potter would no longer compete and that BIH's competition would be limited to those activities expressly stated in the APA.

Potter also admits to soliciting Wilson Elser to serve as the exclusive law firm sponsor of BIH's Cannabis & Hemp ("C&H") Conference. At the time, Wilson Elser was a CLM sponsor. BIH then continued to solicit Wilson Elser to sponsor

1

subsequent specialty conferences and webinars.  Those solicitations violated the non-solicitation provision found in Section 6.12(b) of the APA.

BIH also directly assisted Potter's sister, Sydney Posner, in establishing ClaimsXchange ("ClaimsX") as a rival trade association in the insurance business for claims and litigation management professionals, which offers specialty conferences that directly compete with the CLM for attendees, sponsors and speakers.  BIH offered free subscriptions to Business Insurance to new ClaimsX members and provided ClaimsX with initial administrative support services.  BIH benefitted from its contributions to ClaimsX in the form of access to ClaimsX's membership database, which BIH then incorporated into its own mailing list for use in targeting claims and litigation management professionals for its own offerings.

Additionally, the APA's restrictive covenants were not merely prohibitory. They also required Potter to affirmatively ensure that his affiliates complied with their proscriptions.  He breached those obligations by failing to require Beacon Intercontinental Group, Inc. ("Beacon") to cause BIH to comply with the APA's restrictive covenants after the acquisition, so he cannot raise as a defense that BIH's violations of the restrictive covenants occurred after he sold the Company.

A final injunction is necessary to enforce compliance with the APA.  As The Institutes never received the benefit of these restrictive covenants, the injunction

should extend five years from its entry.  The Institutes are also entitled to an award of attorneys' fees, experts' fees, and other costs under Article IX of the APA.

The Institutes should furthermore receive benefit of the bargain damages.  As the Court recognized in denying BIH's *Daubert* Motion, benefit of the bargain damages are a fundamental measure of the losses resulting from a contract breach. A non-breaching party is entitled to the difference between the benefit it would have received if the breaching party had fulfilled its contractual obligations and the benefit it received from the performance actually delivered.  Here, in the asset purchase context, it is the difference between what a reasonable purchaser would have paid for the intangible assets of The CLM Group's ongoing business if defendants honored the restrictive covenants and did not compete and what would have been paid for those assets in the face of competition from what Christine Meyer characterized as the "next-best competitor."  Tr. at 456:25-457:1.

There is no doubt that the purchase price for The CLM in the face of competition would have been lower.  Pete Miller testified that The Institutes would not have purchased The CLM Group if it knew defendants would compete.  *Id.* at 46:6-15; 64:4-65:2.  As explained by Dr. Meyer, well-settled economic theory establishes that competition will diminish The CLM's market share, which impairs value.  *Id. at* 461:4-466:14.  The fact that it may be difficult to quantify that loss should not serve as a basis to deny The Institutes' compensation for that loss.

3

## BACKGROUND FACTS

Potter created The CLM.  It evolved from focusing on the development of ethical billing standards to be the preeminent association of insurance industry professionals working to control risk and address claims.  Tr. 155:16-164:1.  The CLM is unique in its focus upon fostering dialogue and information sharing among professionals involved in the entire claim lifecycle.  Blume Dir., Tr. at 179:9-13.  To that end, CLM's fellows encompass risk managers, claims managers and adjusters, executives with broad responsibilities, third-party administrators, and service providers.  *Id.* at 118:13-19; 165:2-167:10. The CLM also offers membership to attorneys representing the insurance industry.  *Id.; see also* 118:23-119:5; 438:4-12.

One of the services CLM offers are specialty conferences on subjects of emerging or recurring interest to the insurance industry.  It also hosts webinars presented by insurance industry professionals.  Beyond education, specialty conferences foster networking.  As Anne Blume, former CEO of CLM, testified: "You are speaking with other people, both before and after the session about not only the content … but other things as well. You have the opportunity to engage in a dialogue with the other members." Tr. at 179:9-13. Specialty conferences are a primary funding source for The CLM through registration fees and sponsorships by entities seeking to market attendees.  *Id.* at 167:25-168:25.  Further, Potter created

C&E to generate commissions from booking venues and blocks of hotel rooms for specialty conferences and other events. *Id.* at 573:9-574:2.

After he developed the CLM, Potter acquired the publisher of Business Insurance ("BI"). BI is a preeminent publication read by a broad segment of the insurance industry. Potter expanded BI into offering events (such as the Diversity and Inclusion Summit) and award programs (*e.g.*, Woman To Watch). It also co-sponsored several specialty conferences and events with the CLM.

In 2018, The Institutes approached Potter about collaborating with The CLM. The Institutes are a nonprofit entity that offers programs through which those involved in the industry may earn a certification as a chartered claims or underwriting professional. The Institutes believed there were synergies between its programs and the CLM's education programs for claims and litigation professionals. That overture led to an agreement for The Institutes to acquire the majority of the CLM Group's assets.

A fundamental provision of the APA was a broad noncompetition and non-solicitation provision. As The Institutes grew to understand Potter's involvement with BI and its collaborations with the CLM, a key issue became the extent of BI's post-acquisition competition. The Institutes initially sought to require BIH to discontinue all competitive activities. *See* Tr. at 116:3-117:24. Ultimately, the parties defined the existing competitive activities in which BI could engage subject

5

to the caveat that they may not involve claims and litigation management content or target claims and litigation management professionals. *See* P-14, Schedule 6.12.

Potter subsequently consolidated BI into C&E which then changed its name to BIH. Within seven months of the acquisition, Potter began planning for BI to offer a series of specialty conferences on an annual basis. He instructed BI's staff to develop topics for these conferences. *Id.* at 241:3-242:14. They initially settled on a cannabis and hemp and intellectual property conference and began planning and marketing those conferences. Potter directly solicited the Wilson Elser law firm -- a CLM sponsor -- to serve as the exclusive sponsor of the cannabis and hemp conference. Tr. at 247:4-250:9; P-45; P-46.

Potter also set up another of his companies, Waggy, to earn commissions by booking venues and hotel room blocks for the conferences. Tr. at 246:2-18. That was, of course, the role C&E played within The CLM Group. With BI serving the same function as Claims Pages (publishing industry magazines and newsletters), Potter essentially recreated The CLM Group within a year of selling its assets.

In the summer of 2019, Potter entered into negotiations with Steven Acunto to sell BIH to Beacon, another publisher of insurance industry literature. During the course of these negotiations, The Institutes learned of the C&H and IP conferences and sent a cease and desist letter. Potter advised Acunto of this demand, but assured him that it was without basis and that, in any event, the noncompetition provisions

applied to BIH only while he owned it.  Tr. 271:23-273:1.  Shortly before the execution of a September 1, 2019, Stock Purchase Agreement for the sale of BIH to Beacon, The Institutes commenced this action.

While the APA affirmatively required Potter to cause his affiliates to comply with its restrictive covenants, the Stock Purchase Agreement contained no limitations on BIH's ability to compete after the acquisition.  To the contrary, Potter represented that the noncompetition provisions did not apply to BIH and indemnified Beacon for any claims The Institutes may assert against it.  *See* Tr. at 770:9-772:5.

With full knowledge of The Institutes' claims, Acunto incredibly never asked to review the restrictive covenants, The Institutes demand letter or their Complaint. Instead, he just blithely proceed with the C&H Conference because of the adverse public relations that may be generated by cancelling it.  Tr. at 819:6-824:17.  Acunto also caused BIH to assist The CLM's former Chief Relationship Officer (Sydney Posner) to establish the ClaimsXchange as a rival professional association of claims and litigation management professionals to The CLM.  BIH, *inter alia,* gave free limited time subscriptions to new ClaimsX members and provided administrative services to the fledgling organization.  Tr. 222:20-25; 310:6-14; P-102.

Under Beacon, BIH also continued to expand its specialty conference offerings.  While COVID disrupted those plans (and the entire industry), BIH offered virtual conferences and webinars during the Pandemic and created a market

presence.  With the Pandemic hopefully easing, BIH has offered new long term care and cybersecurity annual conferences and intends to expand its offerings.

All of these actions violated the APA's restrictive covenants.

## ARGUMENT

I. **THE UNDISPUTED FACTS ESTABLISH DEFENDANTS' PAST, ONGOING, AND FUTURE BREACHES OF THE APA**

To be enforceable, restrictive covenants must (1) meet general contract law requirements, (2) be reasonable in scope and duration, both geographically and temporally, (3) advance a legitimate economic interest of the party enforcing the covenant, and (4) survive a balance of the equities." *Am. Homepatient, Inc. v. Collier*, 2006 WL 1134170, *2 (Del. Ch. April 19, 2006).  The existence of none of these factors is disputed.[1]  Instead, both Potter and BIH claim to have complied with the APA's restrictive covenants.  But, defendants admit to offering claims analysis in their specialty conferences – a core function of the CLM.  Their entire compliance defense is grounded in a distortedly narrow interpretation of the restrictive covenants.  That interpretation has already been rejected.

A. **The BIH Conferences Violated the Non-Compete As Interpreted By The Court.**

---

[1] Nor could they be.  The CLM competes nationally and a five year term is customary in multi-million dollar acquisitions. Potter and BIH were uniquely situated to compete against The Institutes because of Potter's prior control of CLM and his ownership of BIH.  The key terms of the restrictive covenants were heavily negotiated and were based on definitions of the relevant businesses that were drafted by Potter himself.

8

### 1. The Conferences Provided Claims Content and Were Targeted, in Part, to Claims and Litigation Professionals.

In ruling on the Cross-Motions for Summary Judgment, the Court rejected defendants' distorted interpretation of the non-compete. *See* D.I. 304. Recognizing that the APA defined the CLM's business to include specialty conferences, the Court held that a conference violates the non-compete if it provides content related to claim and litigation management and/or if it is targeted to claims and litigation management professionals. *See id.* at PageID#6076. While The Institutes maintain that even the Court's interpretation of the restrictive covenants is too narrow, defendants clearly violated those covenants even as so interpreted.

Acunto admitted that BIH's series of cannabis and hemp, long term care and cybersecurity conferences all of necessity involved claims content. Tr. at 294:25-295:21. And, Potter admitted that BIH's conferences compete, at least indirectly, with The CLM's conferences for sponsorships. *See id.* at 663:3-664:18. Moreover, the evidence demonstrated that defendants violations were broader than either Acunto or Potter were willing to admit. Notably, the evidence establishes that:

- The Cannabis and Hemp Session materials specifically referenced claims, including "fire claims," "theft claims," "product liability," and "CBD claims", and "professional liability" and "Civil RICO Litigation" (*id.* at 429:9-20 and P-23);
- Conference attendees touted the claims session: "as part of the claims underwriting team that handles these products, these seminars are few and far between"; "I enjoy[ed] the forms panel and the claims trends panel as that pertains to what I do." Tr. at 431:3-18 and P-97.

9

- The cancelled IP conference was slated to have a session entitled "Taking The Mystery Out of IP Insurance Claims" (*see* Tr. at 341:15-342:11 and P-24);

- The LTC webinar, presented by a Wilson Elser litigation attorney, featured a discussion about "claims arising in the long-term care setting" and "what types of high incidents of claims would happen at such facilities, like slips and falls" (Tr. at 344:5-18 and P-32);

- The Long Term Care Conference, which Wilson Elser also sponsored, "was marketed to address slips and falls, which are the number one injury claim, abuse and neglect ...and litigation trends and trial experiences," and Kenner agreed that those topics interest to claims and litigation management professionals (Tr. at 346:9-347:7; 347:8-11 and P-28);

- The Cyber Security addressed how companies should respond to cyber security events, which Mr. Kenner confirmed would be a post-loss [i.e., claim-related]" (*see id.* at 349:6-350:20 and P-26).

When Tina Pernie, CLM's former Chief Operating Officer, first learned of the C&H Conference, she believed it competed with The CLM, stating: "in terms of looking at the website, my initial reaction at the time is, Oh, there's claims content on here.... it seemed as though it was kind of encroaching on CLM's educational content," *id.* at 327:6-13, and it competed against CLM's "targeted marketing." *Id.* at 328:1-7. Pernie stated that BIH had never presented claims content at any of its events, so "seeing a claims track suddenly . . . pop up at a Business Insurance event seemed as though it was encroaching in, you know, kind of our -- it's the CLM's area." *Id.* at 328:17-329:4.

BIH's use of claims professionals at these conferences further demonstrates the claims content. One of the panelists for the so-called "exposure" session at the C&H conference manages cannabis claims for Golden Bear Insurance, and another

was a claims supervisor at Canopius (a cannabis insurer). *Id.* 421:12-423:15.[2]  And the cyber webinar was presented by the co-chair of the "Insurance Recovery and Counseling Practice" at a large law firm and by the "Chief Claims Officer" at an insurance company.  *See id.* at 349:6-350:20.

The conferences also targeted claims and litigation management professionals.  As early as April 17, 2019, Potter contemplated a special, discounted pricing structure for risk managers and "insurance company folks (underwriters/claims)."  *See* Tr. at 403:18-23.  Katie Kett testified that no effort was made to exclude claims professionals and that the claims session would certainly interest claims professionals.  *See id.* at 404:5-8; 409:4-15.

And, to promote the conference, Defendants used the marketing list from its lead conference sponsor—Wilson Elser, a law firm in the claims and litigation management industry—to attract attendees.  *See* Tr. at 400:6-20.  This marketing list is no doubt intended to reach Wilson Elser's potential clients (i.e., insurance claims professionals who might hire the firm to handle their cannabis claims) and Potter knew full well that Wilson Elser worked with claims professionals. *See id.* at 638:5-12.  Nevertheless, there is zero evidence that Potter informed Wilson Elser that claims people were not the target audience.

---

[2] Kenner agreed that several of the LTC conference speakers practice in the claims and litigation management industries.  *See id.* at 348:5-22.

Further, at least seven[3] claims and litigation management professionals attended the conference and Mr. Miller's unrebutted testimony establishes that at least 15 individuals and 40 companies that were CLM members or sponsors attended and/or sponsored the conference. *See id.* at 50:9-23; 354:13-355:14. And, as Mr. Kenner testified, once someone is on BIH's mailing list, that person receives invitations for subsequent events, and there is no attempt to cull the list to make sure that BIH is not reaching out to claims professionals for future conferences. Simply put, if someone attended the cannabis conference, they would be on the list to receive marketing for future events. *See* Tr. at 354:13-355:14. Therefore, there is every expectation that the number of claims professionals being solicited will continue to snowball and grow exponentially with each violation of the APA.

Even Mr. Acunto acknowledged (perhaps unintentionally) that the conference was targeted to claims professionals. Asked what panels at that conference were targeted to claims and litigation management professionals," Mr. Acunto stated: "None of them and all of them." Tr. at 788:15-21. More generally, he was asked to what extent does having claims professionals as BIH subscribers or advertisers drive the content at BIH conferences, he replied: "A hundred percent. I mean, why would

---

[3] Though Defendants will likely argue that seven out of more than 200 attendees is an insignificant number, it must be remembered that this conference was the first of its kind for BIH, so attracting seven claims professionals was significant.

we offer anything that they wouldn't be interested in?" Tr. at 780:2-8. That is not compliance with the APA. And putting aside the attendees, just inviting claims professionals to serve on panels at conferences is targeting such professionals.

### B. Defendants' Assistance in the Formation of ClaimsX Violated the Non-Compete.

Potter conceded that he set up a meeting between BIH and his sister, Ms. Posner, to form a venture that competed with The Institutes. Though he did not participate in the subsequent meeting, Potter was well aware of what was happening. As confirmed by BIH, Potter introduced Posner to Acunto and suggested they work on a project together – a project that Potter knew would be a joint venture. *See* P-86 (Sep. 26, 2019, email where Acunto recaps meeting he just had with Potter and references meeting with Posner "re JV"); Tr. at 835:18-836:1 (Acunto testifying "JV" means joint venture, which manifested as ClaimsX). Simply by facilitating that partnership, he enabled, rather than prevented, his Affiliate, BIH, to compete with The Institutes and interfere with their business relations.

That partnership was further solidified in an October 2, 2019, email exchange between Acunto and Posner, in which Acunto said that he was "interested … in the concept that you have developed and will look to find ways to [collaborate]." *See* P-90; Tr. at 303:20-304:7. Less than two weeks later, on October 15, 2019, Acunto sent Posner a memorandum that identified ClaimsX's purpose as "serving the best interests of the insuring public, insurers, claims professionals, and attorneys and

other individuals participating in the fair resolution of insurance claims," and identifying various planned conferences and events. *See* Tr. 305:19-25; P-93. Whether Acunto was aware at the time that BIH was bound by the non-compete is immaterial; the fact is that BIH was entering into a partnership with an organization that was set up specifically to compete with CLM.

The strategic partnership between ClaimsX and BIH extended to BIH offering subscriptions to new ClaimsX members without charge. *See* Tr. at 309:16-311:7. BIH also provided ClaimsX with initial administrative support and services. *See* P-102. While Posner informed Acunto on December 30, 2019, that ClaimsX no longer needed BIH's assistance in that regard, she affirmed that ClaimsX would "continue a strategic partnership with BIH" and "continue to grow BI's subscriber base [and] advertise BI to new audiences through [ClaimsX] events and communication." *See* P-102. BIH was advertised online as ClaimsX's strategic partner until at least August 4, 2021. *See* Tr. at 357:14-22; P-27.

## C. Defendants Violated the Non-Solicitation Provision of the APA

Potter, on behalf of BIH, violated the non-solicitation provision of the APA when he contacted the Wilson Elser law firm to be a sponsor for the C&H conference. BIH then compounded that violation by enlisting Wilson Elser as a sponsor for several of its subsequent conferences and webinars and using its mailing list to target claims and litigation management professionals.

14

Ms. Blume testified that a Wilson Elser lawyer told her Potter initially called Wilson Elser with the idea for the conference. *See* Tr. at 199:4-7; 200:10-12. While Potter does not dispute that he called Wilson Elser, he claims he did so to ask what they knew about the cannabis industry and whether a conference would be successful. *Id.* at 247:21-248:1. To suggest he only called for information is a distinction without a difference; calling Wilson Elser and saying he was planning a new specialty conference on cannabis was a solicitation of the firm's involvement.

Potter also claims that he was permitted to solicit Wilson Elser because, at the time of the APA, Wilson Elser was a CLM sponsor, not a sponsor of The Institutes (i.e., the "Buyer" as defined in the APA). However, once the APA closed and CLM became a part of The Institutes, all of CLM's customers and sponsors became customers and sponsors of The Institutes. *See id.* at 251:20-252:2. Thus, when he reached out to Wilson Elser, Potter solicited a customer and sponsor of The Institutes in violation of Section 6.12(b) of the APA. And BIH's continued association with Wilson Elser as a sponsor and/or presenter at the various events cited above constitutes further breaches of Section 6.12(b).

## II.   "CONTENT RELATED TO CLAIMS AND LITIGATION MANAGEMENT" INCLUDES RISK MANAGEMENT

Although "claims and litigation management" and "claims and litigation management professionals" are not defined in the APA, the trial testimony clearly established that they should be interpreted broadly.   "Claims and litigation

management" means content on the prevention, handling, defense of claims or litigation or subjects that inherently involve those topics. "Claims and litigation management professionals" means anyone whose responsibilities involve any of those areas, including those with responsibility for risk management. Thus, when BIH puts on a conference risk management and "pre-loss" topics of interest only to risk managers, it is still providing content related to claims and litigation management, which is squarely within the definition of the CLM Business.

Nevertheless, Defendants want this Court to draw an arbitrary line between "pre-loss" and "post-loss" content and argue that as long as information relates to "pre-loss" activity and is presented to risk managers, brokers, TPAs, etc., it is not claims-related. The APA however, speaks of no such distinction and there was ample testimony at trial that content related to "claims and litigation management" runs the gamut from pre-loss planning to post-loss administration.

Tina Pernie confirmed that "claims administration" involves both pre- and post-loss considerations. Tr. at 315:9-18 (testifying "the claims administration piece can start at ...the risk mitigation phase" and includes "loss and then it goes in the post-loss.") Similarly, "litigation management" can begin before a loss ever occurs. As Ms. Pernie explained:

> it's a pretty wide stoke of things that can fall into litigation management. So managing the actual litigation on claims that are happening, meaning the work that's being done, the expenses, finding

16

the right panel counsel, managing them. I think it's kind of a wide swath.

*Id.* at 316:21-317:1.  Moreover:

> There's some litigation management that has to -- has to occur pre-loss, because you have to know who your panel counsel are. You have to have established billing guidelines.  You have to potentially have a system through which they're going to submit their bills once it becomes a loss. So there is kind of a pre or preparatory phase of litigation management.

*Id.* at 317:13-20.  Mr. Miller explained that "part of claims litigation, claims … is to say: How do I avoid them…? [I]f I get a claim, a rational question to me would be: Well, can I avoid this claim? So, that's a pre-loss sort of activity."  *Id.* at 30:17-21.

Thus, the concept of claims and litigation management does not relate solely to "post-loss" related activities and no such arbitrary distinction is made in the APA. This makes sense because the CLM's membership is and was comprised of, among others, professional risk managers.  *Id.* at 318:18-25.  Further, "while risk manager is not in the name of CLM, which has changed over the years, they are listed specifically on the website under the membership category of fellow as one of the subcategories." *Id.* at 325:23-326:1.  Ms. Blume testified that when she resigned, CLM had "just shy of 3,000 people" who identified themselves as risk managers or people involved in risk management.  *Id.* at 167:5-10.

In fact, according to Ms. Pernie, the target audience for CLM educational events included everyone in the risk management lifecycle, including not only the

members, but "claims professionals, risk management professionals, litigation management professionals, brokers." *Id.* at 320:7-321:10.  And prior to the sale of CLM to The Institutes, CLM provided risk management content to its members.  *See id.* at 324:16-24.  Ms. Blume said that CLM's specialty conferences "frequently" addressed pre-claim issues, citing examples such as sessions on "identifying and insuring and handling environmental risks pre-construction," "cyber security and how to prevent such problems," and "preventing whistleblower claims in health care organizations." *Id.* at 174:16-25.

Defendants' argument that the Permitted Activities allow BIH to provide "pre-loss" education to risk managers is simply not supported by the record given the testimony cited above.  Teaching risk managers, and the insurance industry as a whole, about the claims landscape and litigation trends is precisely what The CLM has always done.

## III. THE APA PROHIBITS DEFENDANTS FROM COMPETING WITH ANY OF THE PRODUCTS AND SERVICES IDENTIFIED IN SCHEDULE A OTHER THAN PERMITTED ACTIVITIES

The APA bars competition with or solicitation of relationships relating to "Sellers' Businesses."  Once again, the Court previously held that Sellers' Businesses constitute, of relevance here, conferences with claims content or targeted to claims and litigation content, so that Defendants were prohibited from engaging in any such activities.  But, that limitation too narrowly defines Seller's Businesses

and ignores that the APA prohibits competing with the Seller's Businesses, not just engaging in the exact same businesses.  As set forth previously, The Institutes has established that defendants repeatedly violated the noncompetition and non-solicitation provisions even under the Court's interpretation.  Nevertheless, The Institutes addresses the scope of the non-competition provision because it impacts the scope of the injunctive relief sought and to the extent there is any question as to defendants' liability.

Sellers' Businesses is defined to have the "meaning set forth in the [APA's] preamble", which defines The CLM's Business as "operating as a national trade association for the claims and litigation management industries, as more specifically set forth in Schedule A[.]" P-13, at p. 45, Preamble, at 1.  Schedule A recognizes that CLM is a "professional association in the **insurance industry** with more than 45,000 professionals in the claims resolutions and litigation management industries" and thereafter lists specific "products and services" The CLM offers.  P-14.

One category of those products and services is "Specialty Conferences.  That reference is to a broad category of services, and is not limited by content or to whom they are targeted.  Another product and service is hosting "webinar topics" on a "rang[e]" of issues, "presented by claims, litigation and insurance professionals." *Id.* The description of webinars contains its own limiting language -- they must be presented by claims, litigation or insurance professionals.  Given this express

limitation, the parties certainly would have expressly stated any other limitations they intended.

Several identified products and services are expressly limited to those provided to claims and litigation management professionals.  *See e.g*, "Annual Conference," defined as "an annual event for professionals in the claims and litigation management industries."  If the parties intended Specialty Conferences be similarly limited, they would have expressly so stated in describing that service. *MicroStrategy Inc. v. Acacia Rsch. Corp.*, 2010 WL 5550455, at *7 (Del. Ch. Dec. 30, 2010) ("The use of different language in the two sections shows the parties knew how to cover [an issue more broadly] when that was their intent.").

Reference to claims and litigation management content and targeting claims and litigation management professionals is made only in the carve outs from Permitted Activities in Schedule 6.12-1.  Those limitations apply to the scope of the Permitted Activities, not to the noncompetition provisions.   Further, as the noncompetition provisions prohibit only competitive activities, it would have been unnecessary to create exceptions for "Permitted Activities" if they were not competitive.   And, after the carve-outs from Permitted Activities, only events providing content other than claims and litigation management and targeting professionals in other insurance fields remain, so those types of events must be deemed competitive.  Beyond that, the description of Business Insurance's services

demonstrates that its competitive activities extend to the insurance industry as a whole. *See e.g.*, P-14, Schedule 6.12-1.

The reference in the preamble to The CLM as a trade association for claims and litigation management professionals should not limit the broad definition of its products and services in Schedule A. In *Chicago Bridge & Iron Co., N.V. v. Westinghouse Electric Co. LLC*, 166 A.2d 912 (Del. 2016), the Supreme Court of Delaware held that to give "sensible life to a real world contract, courts must read the specific provisions of the contract in light of the entire contract ...especially [] when the contract at issue involves a definitive acquisition agreement addressing the sale of an entire business." *Id*. at 913-14. The Court ruled that the Court of Chancery erroneously interpreted an acquisition agreement's provisions for a "True-Up" of the purchase price to permit a purchaser to challenge the accuracy of financial statements provided to the purchaser pre-closing. It concluded that, in reading the agreement in that manner:

> [T]he Court of Chancery rendered meaningless the Purchase Agreement's Liability Bar. It also slighted the requirement in the text of the Purchase Agreement that Westinghouse indemnify Chicago Bridge for a broad set of claims related to Stone ...By so interpreting the contract, the Court of Chancery failed to give adequate weight to the structure of the Purchase Agreement and the subordinate and confined purpose of the True Up.

*Id*. at 916-17.

Similarly, but conversely, reading limitations into the broad reference to specialty conferences and webinars based on a single reference in the preamble to the CLM as a trade association of claims and litigation management professionals is inconsistent with the structure of the APA in which the Sellers' Businesses is defined in Schedule A.  The reference to The CLM as a trade association states what it is.  Schedule A states what it does.  Defendants may not compete with what the CLM does.

Sellers' Businesses as defined in the APA include any specialty conferences, so BIH should be prohibited from offering any conferences of that nature.  Beyond that, as noted previously, the APA does not merely bar Defendants from engaging in the exact same business.  Rather, Section 6.12(a) prohibits any "activities that are ***otherwise competitive*** with the Sellers' Businesses."  Thus, even if the Sellers' Businesses are limited to claims and litigation management, Defendants have still engaged in otherwise competitive activities.

For instance, claims and litigation management professionals attend specialty conferences or webinars on other insurance related topics.  That is particularly true for senior executives with claims and litigation management responsibilities.  Conversely, professionals in other aspects of the insurance business attend CLM events.  Further, some CLM advertisers and sponsors market their products and services beyond claims and litigation management personnel.

The CLM competes with BIH's audience for the limited time and financial resources attendees and limited budgets sponsors have to devote to specialty conferences and webinars. *See, e.g.,* Tr. at 171:25-172:13; 176:16-19.  As Mr. Acunto succinctly testified: "They are in the business of offering conferences. We're in the business of offering conferences[.]" Tr. at 292:5-15.

Potter and BIH all but admitted that BIH now competes with CLM when they attempted to argue that Jeremy Campbell, the former director of sponsorships for BIH, was in violation of a non-existent non-compete when he was hired by CLM in September of 2019.  *See* Tr. at 368:10-369:2. Mr. Kenner confirmed that one of the reasons they wanted to enforce the alleged non-compete was their concern that Mr. Campbell would be in a position to compete with BIH when he moved to CLM. *See* Tr. at 356:6-9; 357:2-4.  But if Potter and BIH did not believe Mr. Campbell was going to a competing entity, the non-compete would be meaningless.  This demonstrates Defendants' understanding that BIH and CLM were competing.

## IV.    THE INSTITUTES ARE ENTITLED TO MONETARY DAMAGES AND INJUNCTIVE RELIEF

### A.    The Institutes Did Not Receive the Benefit of the Bargain.

To recover damages, a plaintiff must prove the injury and a reasonable basis to measure the losses resulting from the injury. *Siga Technologies, Inc. v. PharmAthene, Inc.,* 132 A.3d 1108, 1130 (Del. 2015).  Once a plaintiff establishes injury in fact, it need not prove the amount of damages with precise certainty.  *Siga*

*Technologies, Inc. v. PharmAthene, Inc., supra.*  In fact, "doubts about the extent of damages are generally resolved against the breach[ing] party."  *Id.*

A breach causes injury where it deprives the nonbreaching party of the benefit of its bargain.  *Greenstar, LLC v. Heller*, 934 F. Supp.2d 672, 693-4 (D. Del. 2013).  The Delaware Supreme Court explained that the benefit of the bargain is measured:

> [B]y the amount of money that would put the promisee in the same position as if the promisor had performed the contract. Expectation damages thus require the breaching promisor to compensate the promisee for the promisee's reasonable expectation of the value of the breached contract, and, hence, what the promisee lost.

*Siga Technologies, Inc. v. PharmAthene, Inc.,* 132 A.3d at 1130 (Del. 2015).

The Institutes offered compelling evidence of injury.  Pete Miller testified that The Institutes would not have proceeded with the transaction if it were contemplated that defendants would compete.  Tr. 64:21-65:2.   In an email to The Institutes' Board Chair seeking authority to make the $20 million offer, he identified a noncompete as a key term.  Tr. 35:14-38:21.  Miller's email was written reacquisition and in the ordinary course of business.  Jeffrey Scheidt, who prepared The Institutes' initial valuation, testified that it was based on the understanding that defendants would not compete post-acquisition beyond the permitted activities.  *Id*., 126:5-24.

The Institutes' insistence upon a broad non-compete in response to Potter's attempt to narrow the draft language shows the importance it ascribed to preventing BIH and Potter from competing.  Beyond measuring the loss, Dr. Meyer's analysis demonstrated that a company facing competition will ultimately lose market share.  *See id.* at 461:4-466:14.  Defendants did not controvert this testimony.  Further, the assistance BIH provided ClaimsX facilitated competition by another entity with the exact business model.

Moreover, The Institutes acted immediately upon learning of the C&H Conference because of concern about BIH entering this market.  As Ms. Horowitz said, The Institutes acted "to protect what we purchased." Tr. at 697:9; *see also* Tr. at 52:4-10 (Miller testifying as to "great concern" about BIH's "very formidable presence," as "[t]hey have great reach into the industry" and "they're going to get more into events," which would "certainly diminish the value of the investment we made.").

Neither Potter nor Acunto claimed that defendants' competition did not affect the value of The CLM.  BIH presented no expert damages testimony.  Potter offered the testimony of Harris Devor, but he opined only that CLM suffered no harm from the initial C&H conference.  *See* Tr. at 739:10-20.  He grudgingly conceded on cross-examination that a prospective buyer of CLM would at least

assess whether BIH's move into the specialty conference space impacted its value. *See id.* at 740:3-741:9.

In *Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc.,* 2021 WL 1592473 (Del. Ch. Ct. 2021), the purchaser of an entity developing T-cell therapies to treat cancer treatment the defendants spun-off sought to recover for the diminished value of the entity as a result of defendants' competing against in violation of noncompetition agreements.  After holding that the defendant misrepresented the extent to which it would refrain from competing against the spin-off, the Court of Chancery had no difficulty concluding that these actions caused injury by diminishing the value of the acquired entity.  *Id.* , at *2 ("Resolution of the damages question is, in theory, simple.  What is the difference between what Millennium thought it had purchased , and what it actually got as a result of Harpoon's fraud?")[4]  Courts in other jurisdictions have repeatedly articulated this same view.  *See, e.g., D.L. Anderson's Lakeside Leisure Co., Inc. v. Anderson*, 757 N.W.2d 803, 811 (Wis. 2008) (affirming award to plaintiffs for

---

[4] The defendant in *Maverick* technically complied with the acquisition agreement's noncompetition provisions, but the Court still found liability on the grounds that it had misrepresented their scope.  That is an immaterial distinction because in either event the plaintiff did not receive the protection from subsequent competition it was promised.  Further the measure of damages for fraud and breach of contract are similar.  The difference between the value of the entity as represented (in fraud) or if the defendant had performed as promised (contract) and the value of what was received.

violation of restrictive covenants in sale of business likening relief to "that of a buyer of a defective car, who had, this court recognized, ordinary loss of bargain damages: the difference between the actual value of the goods accepted and the value that they would have had if they had been as warranted."); *Spicer, Trustee for Estate of Brady v. Maxus Healthcare Partners, LLC*, 616 S.W.3d 59, 111 (Tex. App. Ct. 2020) (affirming award of damages for breach of APA where "the jury was asked to determine by how much [buyer] had overpaid for the assets on the day of the sale and whether [buyer] was entitled to recover the difference when the overvaluation was revealed).[5]

While Potter delivered the assets promised, their value was diminished by defendants' subsequent competition. *Leaf Invenergy Co. v. Invenergy Renewables LLC*, 210 A.3d 688, 695 (Del. 2019) (damages include "the loss in value caused by the deficient performance compared to what had been expected.") (internal quotations omitted); *See McLachlan v. Wilmington Dry Goods Co.*, 22 A.2d 851, 853 (Del. Super. 1941) ("The usual damages recoverable for the breach of warranty ...is the difference between the actual value of the goods bought and their value if they had been as warranted."). Unlike, for example, artwork, businesses have no intrinsic value. Regardless of valuation methodology, the measure of a

---

[5] *See also*, *WSP, Inc. v. Wyo. Steel Fabricators & Erectors, Inc.*, 158 P.3d 651, 656 (Wyo. 2007) (affirming award for violation of non-compete in sale of business in amount of value of the performance of the non-compete itself).

business' worth is its projected profits.  Here, a prospective purchaser simply could not project the same profitability level if The CLM faces competition from defendants.

As recognized in the VRC Asset Valuation Report, the acquired assets were virtually all intangible, consisting of trademarks, customer relationships and goodwill. *See* P-12.  The value of those assets reflects a business' ability to generate revenues based on its brand reputation, customer relationships and competitive position. Competition from a former founding owner who was viewed synonymously with The CLM and an entity previously associated with it and with a strong brand recognition in the insurance business invariably will affect The CLM's brand and customer relationships and alter its competitive position.[6]

Having established injury, The Institutes provided a reasonable measurement of the amount of the resulting loss through Dr. Meyer's testimony.  Dr. Meyer calculated The CLM's diminished value by applying the Cournot model to assess the impact of defendants' competition on The CLM's future profitability.  That model was developed over one hundred years ago, has been repeatedly validated and

---

[6] That is why The Institutes insisted upon broad restrictive covenants.  Conversely, a purchaser of a company with tangible strategic advantages may not be concerned about competition from the former owner.  For example, the purchaser of an airport parking lot immediately next to the airport may not be concerned about competition from the seller because it could not, at least not without significant investment, challenge that locational advantage.

is used, *e.g.*, by the Federal Trade Commission and Department of Justice in applying the Horizontal Merger Guidelines. Further, there were numerous factors supporting Meyer's conclusions, including additional competition from ClaimsX.

Defendants insist that The Institutes' only measure of damages is any profits lost. That is simply not the law. Defendants also claim that The CLM's failure to prove any losses attributable to their competition shows it will sustain no competitive harm. But, COVID masked any such losses. In any event, Ms. Pernie confirmed that certain sponsors reduced their spend with CLM, which she specifically attributed to the presence of ClaimsX in the market. Specifically, she cited to CoventBridge, SEA, and Winget Spadafora as entities that "have decided to move over to ClaimsXchange." Tr. at 331:17-332:3. Mr. Miller similarly testified that CoventBridge and SEA both significantly reduced their spend with CLM from 2018 to 2021. *See* Tr. at 51:8-14.

This case has never just been about a few conferences; it is about The Institutes' well-founded concerns for the future. The Institutes were promised five years of lead time to grow CLM without competition from BIH. Instead, BIH laid the groundwork to emerge from COVID as a formidable competitor, with the infrastructure in place to run conferences, a well-planned slate of conferences, and sponsors and panelists to present content to the public. Not even injunctive relief can compensate for this harm.

Meyer's damages analysis quantifies this harm.  This type of exercise is never "straightforward" and "inevitably involves some speculation", but that is not a valid reason for rejecting the results generated by its application.  *In re Southern Peru Copper Corp. Shareholder Deriv. Litig.*, 52 A.3d 761, 816 (Del. Ch. 2011).  Courts regularly permit damage experts to use the same economic models and statistical analyses employed to quantify damages that are utilized in business valuations, provided the assumptions underlying the expert testimony are not indefensible.  *See In re Live Concert Antitrust Litig.*, 863 F. Supp.2d 966, 981-82 (C.D. Cal. 2012).  That is exactly what Dr. Meyer did here.  Moreover, the *Maverick* court held that the defendants' competition reduced the value of the acquired entity by fifty percent even though there was a significant risk the technology would ever be marketed.

Meyer's testimony demonstrates that The Institutes lost between $6.7 to $8.0 million as a result of the Defendants' violations of the non-compete.  Tr. 471:18-473:13.  Damages should be awarded within that range.

**B.    In Addition to Money Damages, The Institutes are Entitled to Injunctive Relief Prohibiting Defendants from Engaging in Competitive Activities for Five Years.**

The Institutes are entitled to enforce the restrictive covenants for five years from the entry of the injunction.  Section 6.12(f) expressly provides that the term of the restrictive covenant shall be extended by the period of the duration of any breach

of Section 6.12.  Defendants have ignored Section 6.12 virtually since the closing, so The Institutes should be afforded the full five year term specified in the APA.

In the APA, Defendants conceded that The Institutes' remedies at law would be inadequate, so that they are entitled to injunctive relief.  Even without this concession, "harms resulting from competition by someone bound by a non-competition agreement are frequently found to be irreparable." *Tristate Courier and Carriage, Inc.*, 2004 WL 835886, at *13 (Del. Ch. April 15, 2004).

Here, it is impossible to determine the full extent of the CLM's damages and BIH has reaped long-term and building business benefits from each of its violations. Its specialty conferences, webinars, and strategic partnership with ClaimsX operated to expand its reach to more claims and litigation management professionals, who are then incorporated into BIH's mailing list.  Those individuals – whose names were acquired only through BIH's various competitive breaches – are then targeted for even more of BIH's expanding offerings.  Thus, a single BIH violation cannot be viewed in isolation, as each one yields ill-gotten gains that BIH then builds upon with each subsequent event.  Moreover, ClaimsX will continue as a competitor regardless of any injunctive relief the Court may enter.

The Institutes are entitled to enforce the restrictive covenants for five years from the entry of the injunction.  Defendants have ignored the covenant-not-compete virtually since the closing and BIH has no intention of cutting back its offerings, or

removing any of the claims content from future events.  *See* Tr. at 357:23-358:9, 358:10-10.   Indeed, Mr. Potter's original intention was for the C&H and IP conferences to be annual events.  *Id.* at 242:11-14.  Mr. Kenner would like to see BIH focus on IP in the future, as he considers it to be a growing part of the business, and said BIH intends to continue growing in the LTC space and already has another event scheduled for 2022.  *See id.* at 342:12-15; 348:21-349:5.  Such a conference would draw sponsors that might otherwise sponsor a CLM event.  *See id.* at 185:2-8.  BIH also seeks to expand its offerings in the cyber security space and already has another webinar scheduled for September 2022.  *See id.* at 350:21-351:4.

Defendants also publicly announced their intention to expand BIH's conference offerings.  *See* Tr. 287:7-11; P-74.  The press release following the sale of BIH announced new potential offerings such as cybersecurity, wildfires, and AI.  Mr. Acunto confirmed that BIH continued to advertise and market its growing conference schedule, which included cyber security, the new addition or iteration of the C&H conference, and the LTC conferences.  *See* Tr. at 288:10-289:5. And lest there be any doubt that such future offerings will violate the non-compete, when Mr. Acunto was asked whether future specialty conferences will contain claims content, he responded: "How could it not?" Tr. at 295:17-21.

The Institutes should thus be afforded the full five-year term specified in the APA.  Such a decision is both consistent with Delaware law and necessary as a

matter of equity.  Indeed, allowing BIH to compete at the end of the originally-contemplated five years would allow it to seize on the business momentum it achieved through its repeated violations.  Imposing a full-five year non-compete, in contrast, would at the very least stall BIH from capitalizing on its misconduct.

### C.   The Institutes are Entitled to Attorneys' Fees and Expert Witness Fees Pursuant to the Specific Language in Article IX of the APA.

The APA provides for the award of attorneys' fees in the indemnity provisions of Article IX.  Specifically, Section 9.2 provides:

> <u>Indemnification of Buyer</u>.   The Selling Parties shall ... defend, indemnify and hold harmless Buyer ...from, against, for and in respect of and pay any and all **<u>Losses</u>** [emphasis added] suffered, sustained, incurred or required to be paid by any such party arising out of or resulting from:
>
>> (a) any breach of any representation, warranty, covenant or agreement of any Selling Party contained in this Agreement or in any Ancillary Agreement ...
>>
>>       *     *     *
>>
>> (f) the enforcement by any Buyer Indemnified Party of any of its rights under this <u>Section 9.2</u> or any other indemnification covenant contained in this Agreement.

In Section 9.7, "Losses" are defined to include "all reasonable attorneys', . . . and expert witness' fees incurred in connection therewith[.]"

Read together, Sections 9.2 and 9.7 create a broad right to indemnity for "all" Losses, including attorneys' and expert witness' fees, resulting from "any" breach of any "covenant" or enforcement of the indemnity rights set forth therein.  The Institutes claims in this case fall within the broad scope of these provision as they

claim  a breach of the restrictive covenants specified in Sections 6.12.  And, the attorneys' and expert fees and litigation costs generated in this matter were "incurred in connection" with those claims.

Moreover, Section 9.5 provides that the basket and cap specified therein do not apply to any "breaches of covenants in Article VI."  Expressly providing that breaches of Article VI are exempt from the basket and cap definitively evidences that intention that claim for breach of the various covenants specified therein are included within the indemnity provisions.  The parties would not have exempted those claims from the cap and basket if they were not encompassed within the indemnity obligations.  Moreover, the noncompetition and other provisions of Article VI impose obligations upon the Selling Parties personal to The Institutes, so a breach thereof would not result in third party claims against the plaintiffs.

The Institutes are entitled to an award of such fees under the express terms of the APA, in an amount to be determined in a separate fee petition following trial. *See, e.g., Greenstar, LLC v. Heller,* 934 F. Supp. 2d 672 (D. Del. 2013).

### D.      The Institutes Are Entitled to Pre- and Post-Judgment Interest.

An award of pre-judgment interest generally relates back to the date of the loss or injury.  *Stonewall Ins. Co. v. E.I. du Pont de Nemours & Co.,* 996 A.2d 1254, 1262 (Del. 2010).  In a breach of contract action, interest accrues from the date of the breach.  *Mobile Diagnostics, Inc. v. Lindell Radiology, P.A., C.A.,* 1985 WL

189241 (Del. Super. Aug. 9, 1985).  A court in its discretion may determine when prejudgment interest began to accrue if there is any uncertainty as to when interest began to run. *Raymond v. Board of Public Works, C.A.,* 1990 WL 63829 (Del. Super. May 8, 1990).  The rate of interest allowed in actions at law generally is equated to the "legal rate" of interest described in 6 Del. C. § 2301(a). In equity, setting the rate of interest is a matter of discretion. *Montg. Cellular Holding Co., Inc. v. Dobler*, 880 A.2d 206, 226 (Del. 2005).

<div style="margin-left:40%">

Respectfully submitted,

/s/  Barry Klayman
Barry M. Klayman, Esq. (#3676)
**COZEN O'CONNOR**
1201 North Market Street, Suite 1001
Wilmington, DE 19801
Tel: (302) 295-2035
Fax: (215) 701-2209
Email: bklayman@cozen.com
***Attorneys for Plaintiffs, The American***
***Institute for Chartered Property Casualty***
***Underwriters and The Institutes, LLC***

</div>

OF COUNSEL:
Robert W. Hayes (Admitted
*Pro Hac Vice*)
Matthew J. Siegel (Admitted
*Pro Hac Vice*)
COZEN O'CONNOR
1650 Market Street
Suite 2800
Philadelphia, PA  19103

July 15, 2022