## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

THE AMERICAN INSTITUTE FOR
CHARTERED PROPERTY CASUALTY
UNDERWRITERS and THE
INSTITUTES, LLC,

        Plaintiffs,

    v.

ADAM POTTER, PBIH, LLC and
BUSINESS INSURANCE HOLDINGS,
INC.,

        Defendants.

C.A. No. 1:19-cv-01600- RGA-JLH

## ANSWERING POST-TRIAL BRIEF OF
## DEFENDANT BUSINESS INSURANCE HOLDINGS, INC.

Dated: July 29, 2022

**OF COUNSEL:**
Christopher Oprison (admitted *pro hac vice*)
DLA PIPER LLP (US)
200 South Biscayne Boulevard, Suite 2500
Miami, Florida 33131
Telephone: 305.423.8522
Facsimile: 305.675.6366
chris.oprison@dlapiper.com

**DLA PIPER LLP (US)**
Matthew P. Denn (DE Bar No. 2985)
1201 North Market Street, Suite 2100
Wilmington, DE 19801-1147
Telephone: 302.468.5700
Facsimile: 302.394.2341
matthew.denn@dlapiper.com

*Attorneys for Defendant Business
Insurance Holdings, Inc.*

# TABLE OF CONTENTS

SUMMARY OF ARGUMENT ...................................................................................1

STATEMENT OF FACTS ......................................................................................2

ARGUMENT ......................................................................................................14

I.  THE PLAINTIFFS HAVE NOT ESTABLISHED A BREACH OF
    CONTRACT BY BIH ...................................................................................14

    A.  The Plaintiffs Have Not Proven That They Incurred Any
        Damages, A Necessary Element of a Breach of Contract Claim........14

        i.  The Plaintiffs' Witnesses Were Unable to Demonstrate
            that Any Customer, Sponsor, or Advertiser Was Lost As a
            Result of Any Alleged Breach by BIH ....................................16

        ii.  The Plaintiffs Have Not Provided the Court With a
             Reasonable Basis to Measure Damages....................................18

             (a)  Dr. Meyer's Testimony Was Not the Product of
                  Reliable Principles and Methods ...................................19

             (b)  Dr. Meyer Did Not Reliably Apply Her Model to
                  the Facts Of the Case ....................................................20

             (c)  Dr. Meyer's Testimony Does Not Fit the Issues in
                  the Case........................................................................23

        iii.  The Case Law Cited by the Plaintiffs Suggesting That
              They Need Not Prove Damages Is Inapposite ..........................23

    B.  The Plaintiffs Have Not Proven That BIH Provided Content
        Related to Claims and Litigation Management..................................25

    C.  The Plaintiffs Have Not Proven That BIH Targeted Its Events at
        Claims and Litigation Management Professionals..............................26

D.    The Plaintiffs Have Not Proven that ClaimsX Provided Content Related to Claims and Litigation Management at Any Events Where BIH Was Involved ................................................................27

E.    BIH Did Not Violate the Non-Solicitation Provision of the APA......28

II.   THE COURT SHOULD REJECT THE PLAINTIFFS' REQUEST TO REARGUE THE MEANING OF THE CONTRACT BASED ON THE EXACT SAME ARGUMENTS THE PLAINTIFFS MADE PRIOR TO THE COURT'S PRIOR DECISION .......................................................29

III.  THE DEFENDANTS ARE ENTITLED TO NO RELIEF ...........................30

A.    The Plaintiffs Are Not Entitled to an Injunction .................................31

B.    The Plaintiffs Should Not Receive an Award of Attorney's Fees from BIH ...........................................................................................32

CONCLUSION .........................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allied Capital Corp. v. GC-Sun Holdings*,
  LP, 910 A.2d 1020 (Del. Ch. 2006)...............................................................26

*Concord Steel Inc. v. Wilmington Processing Co., Inc.*,
  C.A. No. 3369-VCP, 2008 WL 902406 (Del. Ch., April 3, 2008).............*passim*

*Deere & Co. v. Exelon Generation Acquisitions, LLC*,
  C.A. No. N13C-07-330-MMJ-CCLD, 2016 WL 6879525 (Del.
  Super., Nov. 22, 2016) .......................................................................32

*Duncan v. STTCPL, LLC*,
  C.A. No. K16C-12-020-JJC, 2020 WL 829374 (Del. Super., Feb.
  9, 2020) ............................................................................................15

*eBay, Inc v. MercExchange, LLC*,
  547 U.S. 388 (2006)............................................................................31

*Schneider ex. rel. Estate of Schneider v. Fried*,
  320 F.3d 396 (3d. Cir. 2003) ..............................................................19

*Hydrogen Master Rights, Ltd. v. Weston*,
  228 F. Supp. 3d. 320 (D. Del. 2017).....................................................14

*Johnson v. Gov't Employees Ins. Co.*,
  C.A. No. 06-408-RGA, 2014 WL 2708300 (D. Del., June 16,
  2014) .................................................................................................15

*Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc.*,
  C.A. No 2019-0002-SG, 2021 WL 1592473 (Del. Ch., April 23,
  2021) .................................................................................................24

*SARN Energy LLC v. Tatra Defence Vehicle A.S.*,
  C.A. No. N17C-06-355-EMD-CCLD, 2019 WL 6525256 (Del.
  Super., Oct. 21, 2019) .........................................................................32

*Siga Techs., Inc. v. PharmAthene, Inc.*,
  132 A.3d 1108 (Del. 2015) ..................................................................24

**<u>Other Authorities</u>**

Federal Rule of Evidence 702......................................................................19

## SUMMARY OF ARGUMENT

Prior to trial, the Court clearly established what the Plaintiffs would need to prove in order to show that any conference or event offered by Business Insurance Holdings (BIH) violated the parties' Asset Purchase Agreement (APA): the Plaintiffs could only show a breach of contract by proving that BIH had offered "a specialty conference that provides content related to claims and litigation management or that targets claims and litigation management professionals," (D.I. 304 at p. 5).

In spite of knowing of this standard, the Plaintiffs introduced no evidence at trial of the actual content offered at any conference that they alleged to have violated the APA, and no evidence that BIH had targeted claims and litigation management professionals with respect to any of its events or conferences. The Plaintiffs did not just fail to introduce evidence of content that met the standard required by the Court; they introduced no evidence of any actual content from any conference, with the exception of some slides from a single conference that on their face have nothing to do with managing claims or litigation.

The Plaintiffs also failed to show that any of BIH's alleged violations of the APA – either the conferences referenced above, or Mr. Acunto's fleeting involvement with the board of ClaimsXchange ("ClaimsX") – damaged the Plaintiffs in any way. Damages are a required element of a claim for breach of

contract in Delaware, and the damages must be shown specifically for each alleged breach in order for a cause of action to be sustained. The Plaintiffs could not demonstrate damages by any means other than through their expert Christine Meyer, and Dr. Meyer's testimony was shown at trial to be based on incorrect factual assumptions, the misapplication of the model she professed to use, and the misapplication of state law regarding "benefit of the bargain" damages. Dr. Meyer's "model" resulted in absurd outcomes, and fell far short of the standard that is required for the Court to use it as a basis to find that damages occurred.

The Plaintiffs, recognizing that they did not introduce evidence sufficient to meet the requirements established by the Court, also attempt to (1) suggest definitions of the terms used by the Court that would eviscerate the Court's earlier rulings (Opening Brief (D.I. 325) at pp. 16-19), and (2) persuade the Court that its earlier rulings were in error (*id*. at 19-23). The Court should reject both of these efforts.

## STATEMENT OF FACTS

The Plaintiffs had the burden of proof in this case, and they failed to introduce any evidence necessary to satisfy the legal elements of their claims. The material facts with respect to BIH are familiar to the Court. The case primarily involves five

events that the Plaintiffs allege to have violated the APA.[1]  Mr. Acunto, the indirect

owner of BIH through Beacon Intercontinental during each of the five events,

testified at trial that BIH did not target claims and litigation professionals for its

events or have events focused on claims and litigation management.  Tr. at 778-780.

The Plaintiffs also allege that Mr. Acunto's brief personal involvement with a new

company known as ClaimsX violated the APA.   Mr. Acunto testified that his

personal involvement with ClaimsX was brief and sharply limited, and did not

involve any planning of events.  BIH's only involvement with ClaimsX was a

business arrangement whereby Business Insurance would attempt to enhance its

subscriptions by initially offering them for free to ClaimsX members.  Mr. Potter

acknowledges that he told Mr. Acunto that the APA's non-compete provisions did

not apply to BIH once Mr. Potter sold the company, Tr. at 253, and the Plaintiffs

acknowledge that Mr. Potter made this assurance to Mr. Acunto.  Opening Brief at

pp. 6-7.

**No Evidence of Conference Content Related to Claims and Litigation Management**

As noted above, the Court expressly rejected the interpretation of the APA

urged before trial by the Plaintiffs – that any event organized by BIH other than an

event expressly listed in the APA's "Schedule of Permitted Activites" was a

---

[1] It is undisputed that the planning for the first event, the cannabis and hemp conference, was done while Mr. Potter still owned BIH.

violation of the non-compete clause. Instead, the Court stated that there were two ways that the Plaintiffs could demonstrate that a conference violated the APA, one of which was to show that the conference provided "content related to claims and litigation management." The Plaintiffs do not attempt to argue that BIH's conferences met this standard. The most they argue is that the disputed conferences "involved claims content." Opening Brief at pp. 9-10. But that is not the requirement established by the Court.

Tellingly, the Plaintiffs did not introduce evidence of any actual content at any of the conferences in dispute. In spite of having a list of every attendee at the cannabis and hemp conference, any one of whom Plaintiffs' counsel could have contacted to ask about the actual content that was offered; in spite of having discussed internally the possibility of sending someone to the cannabis and hemp conference to determine its content; in spite of apparently having the ability at one point to access actual recordings of at least one of the on-line events in question (PX26), the Plaintiffs offered absolutely no evidence of any content offered at any conference, other than a set of slides from the cannabis and hemp conference that not even the Plaintiffs argue discuss claims and litigation management. (PX23)

**No Evidence of Targeting of Claims and Litigation Professionals**

The Plaintiffs also offered no evidence that any BIH conference "targets claims and litigation professionals." The Plaintiffs presented evidence that

particular conferences might be "of interest" to claims and litigation professionals, and also presented evidence that BIH made no affirmative effort to purge its subscriber lists of any person who might be a claims and litigation professional. But the fact that a panel at a particular conference might be of interest to a claims or litigation professional, or the fact that BIH did not attempt to cleanse its lists of claims and litigation professionals, does not constitute "targeting" of those persons under any rational definition of the term.

The purported examples of "targeting" offered by the Plaintiffs are not only not "targeting," but they are not described accurately in the Plaintiffs' brief. The entirety of the "targeting" alleged by the Plaintiffs, after three days of trial testimony, consists of four pieces of evidence. Opening Brief at pp. 11-13.

1.  The Plaintiffs, quoting former BIH employee Katie Kett, allege that "Potter contemplated a special, discounted pricing structure for risk managers and 'insurance company folks (underwriters/claims).'" D.I. 325 at p. 11. First, of course, contemplating something is not the same thing as doing it, so even if the Plaintiffs' statement accurately recited the evidence, the mere fact that Mr. Potter thought about offering a discounted pricing structure for claims and litigation professionals would not be evidence of "targeting." But the evidence does not even suggest that Mr. Potter thought about targeting them. The email referred to in the testimony cited the Plaintiffs is to Katie Kett, and it says:

> I think we should do something a bit different and more like the WCF conference, where we have different tiers. What does everyone think about $99/$199 for Risk Managers, $499 (early)/$599 regular) for insurance company folks (underwriters/claims), $899/$999 for brokers $1499/$1599 for all others"

(PX 51). When Ms. Kett was asked to explain the email, she indicated that she thought Mr. Potter was simply trying to describe the types of people who worked for insurers, and distinguish them from risk managers to whom he wanted to offer a much lower price in order to encourage risk managers to attend. Tr. at 439-441. In other words, to the extent the testimony cited by the Plaintiffs demonstrates anything, it is that Mr. Potter wanted to encourage people who were not claims and litigation managers to attend.

2.      The Plaintiffs argue that Ms. Kett said that that "no effort was made to exclude claims professionals and that the claims session would certainly interest claims professionals." Opening Brief at p. 11. She did not say either of these things. With respect to interest by claims professionals, Ms. Kett said the following:

> Q: So, is it your understanding that Ian Stewart is suggesting here that the cannabis claims session may be – may have broader appeal?
>
> A: I don't know. I think the only – I think his thinking was that the brokers and insurers would like to understand how claims are handled as well, and not – and not specifically claims professionals necessarily.
>
> Q: So, by including – you think that by including cannabis in a specific track, they would be more narrowly tailored towards claims professionals?

THE WITNESS:   I mean, not necessarily.  I think – I was – we were just trying to collaborate to find – to come up with a topic that would be of interest to – to everyone attending the conference, not – not just claims professionals.

Q:  In your estimation, would a topic on cannabis claims be – would appeal to claims professionals?

THE WITNESS:   Yes, among – among other insurance professionals.

Tr. at 408-409.  Ms. Kett's actual testimony not only does not say what the Plaintiffs recite, but actually suggests the opposite – that the panel in question was designed to appeal to a broad audience in the insurance industry, and was not targeted at claims or litigation professionals.  And leaving aside the fact that there is a difference between targeting claims and litigation professionals and affirmatively seeking to bar their attendance, Ms. Kett confirmed that Mr. Potter did discourage attendance by claims and litigation professionals, specifically by changing the web site for the conference to indicate that it was not developed and was not intended for claims and litigation management professionals.  (PX 70 & Tr. at 416).  Ms. Kett identified this request as something designed to make sure that no claims or litigation management professionals attended the cannabis conference.  Tr. at 419.

3.     The Plaintiffs argue that the Defendants' use of a marketing list from a law firm (Wilson Elser) constituted targeting of claims and litigation management professionals.  But there is no evidence whatsoever of who was on the Wilson Elser

list.  Tr. at 364-365.  The use of the Wilson Elser list was at the law firm's request, Tr. at 400, not at Mr. Potter or BIH's request.

4.     Finally, the Plaintiffs argue that the fact that some claims and litigation professionals attended the cannabis conference constitutes evidence that the conference was targeted at claims and litigation professionals.  Opening Brief at 12. The fact that claims and litigation professionals were there, of course, does not mean that they were targeted.  As Mr. Acunto explained, there were a number of ways that claims and litigation professionals could have learned of the conference other than being targeted.  Tr. at 781-782.  Mr. Potter explicitly testified that Business Insurance did not target claims professionals.  Tr. at 615.  Mr. Potter confirmed that Business Insurance's subscription list was open to anyone who wanted to purchase a subscription, and included not only people from all parts of the insurance industry but also people who were not part of the insurance industry at all.  Tr. at 641.  Mr. Acunto also denied that the cannabis conference, or any BIH conference, was targeted at claim or litigation management professionals.  Tr. at 778.

In addition to the four supposed examples of "targeting" described above, the Plaintiffs also claim that Mr. Acunto inadvertently acknowledged that one of the conferences – the cannabis and hemp conference – was targeted at claims and litigation professionals.  This would make no sense, of course, as Mr. Acunto testified that all of the marketing for the cannabis and hemp conference was done

before he even owned BIH.  Tr. at 284.  But beyond that, a full reading of both statements cited by the Plaintiffs reveals that Mr. Acunto was not admitting anything of the type.

In the first instance cited by the Plaintiffs, a full reading of Mr. Acunto's testimony makes clear that he is referring to insurance brokers in making his statement:

> Q:  So what, if any, panels at the 2019, October 2019 cannabis and hemp conference were targeted to claims and litigation management professionals?
>
> A:  Did you say "what if"?
>
> Q:  What, if any, panels at that conference were targeted to claims and litigation management professionals?
>
> A:  None of them and all of them.
>
> Q:  What do you mean by that?
>
> A:  Well anyone who's in the business, I'm sure they would want to understand – look, if I were a claims professional, let's just say I would want to understand what a hemp producer did if I were going to be faced with defending a policy in three years, let's just say.  It's a subject matter that's a broad interest, a new one.  This was not – you know, Cannabis and Hemp have not been legal.  In fact, they're still not legal anywhere.  It was a new emerging field in insurance.  The insurable interests in that process, in other words, the portion of the process that could be subject to insurance was emerging, being found out, purity, potency, et cetera.
>
> So I would be surprised – I'm not surprised if anyone in the business would not want to learn it, especially brokers, because they're going to be the ones called upon to write the business later on.  And they do participate in the claims process as brokers.  They – for example when

you have a car collision, you call your broker. Broker participates in the claim, right? They would be a party to that.

So I'm surprised there weren't more people there and then – in fact, there weren't – that there weren't – there weren't more people on the legal side.

Tr. at 788-789.

The second example cited by the Plaintiffs also does not stand for the proposition they claim when read in context. Mr. Acunto, in explaining why people serving as general counsel at insurance companies who might have claims management as part of their broader portfolios would be interested in BIH conferences, said:

"A general counselor of an insurance company will have multiple hats, and that individual would be responsible for claims management, hiring lawyers, alternative dispute resolution. I was very active with an association that we worked with, we did their printing and stuff, called the American Reinsurance and Insurance Arbitration Society. I think it still exists in Washington. We were part of helping general counsel, in many cases, move their disputes to arbitration, rather than to – to come to court.

Those individuals would have an interest, for example, in how a cannabis business plays out, what the risks are, what the exposures are. I mean, it's common sense that anybody in the business who wants to stay with it would try to – right now, there are other things trending, and they will want to do that too, cyber risk, the wildfires in New Mexico.

I actually got a call, would we consider doing a seminar on the implications of the wildfires on the insurance market in New Mexico. So these are trends, and people do want to follow them.

Q:  Simply because you have claims management professionals or litigation management professionals as subscribers or advertisers, interested parties, does that – to what extent does that affect or drive the content at any of your risk management conferences that you offer?

A:  A hundred percent.  I mean, why would we offer anything that they wouldn't be interested in?

Q:  Right.  But I'm asking specifically: Do you – do you have conferences that are focused on claims and litigation management, or are they continued to be focused on risk management?

A:  We do not have – to answer the first part, no, we do not have conferences or events that focus on claims or claims management or litigation.  Our focus is risk management.

Tr. at 779-780.  Contrary to the implication in the Plaintiffs' brief, Mr. Acunto was discussing the content of BIH conferences, not the target audience, and when he said "why would we offer anything that they wouldn't be interested in?", he was referring to the general counsel of insurance companies that he had just finished describing at length.  Tr. at 780.

**Mr. Acunto's Individual Involvement With ClaimsX Was Fleeting And Caused No Damage to the Plaintiffs**

Mr. Acunto testified at length at trial regarding his fleeting involvement with ClaimsX, which he undertook only after Mr. Potter assured him that he was permitted by the APA to do.  As described by Mr. Acunto, and uncontradicted by the Plaintiffs, Mr. Acunto met with Ms. Posner shortly after purchasing BIH; agreed to serve as a board member for ClaimsX; briefly provided some administrative help to Ms. Posner in setting up ClaimsX; and attended half of a single board meeting

before leaving the board. Tr. at 807-812. Mr. Acunto specifically testified that he did not assist ClaimsX in organizing any events. Tr. at 812-813. He also testified that the only involvement BIH had with ClaimsX was offering free subscriptions to ClaimsX members, which BIH would later attempt to convert to paid subscriptions. Tr. at 811.[2]

No Plaintiffs' witness was able to articulate any damage that the Plaintiffs incurred as a result of the existence of ClaimsX – either during Mr. Acunto's brief tenure on the board, or in the years following. Mr. Miller said that he was not aware of any customers or sponsors that CLM had lost as a result of ClaimsX. Tr. at 100. Ms. Horowitz testified that CLM had lost some board members as a result of the creation of ClaimsX, Tr. at 698, but the parties have stipulated that lost board members do not constitute damages for purposes of this case. (D.I. 196) Ms. Horowitz admitted that she could only think of a single CLM member who may have failed to attend a CLM event as a result of the creation of ClaimsX, but that she didn't know why that person had failed to attend a ClaimsX event and that everything she knew was from Anne Blume. Tr. at 699-700. Ms. Blume, in turn, testified that as recently as August of 2021with respect to ClaimsX, "I don't think they were doing much," Tr. at 216, and that she was not aware of a single customer

---

[2] The Plaintiffs continue to state that BIH had a "strategic partnership" with ClaimsX, based on a statement on ClaimsX's web site, even though the unrefuted trial testimony is that there was no such strategic partnership. Tr. at 363.

or sponsor that had failed to attend or sponsor a CLM event because of any action by BIH.  Tr. at 217-218.  Finally, Tina Pernie speculated "anecdotally, through conversations I have had with the sales team," that two companies – CoventBridge and SEA – had "decided to move over to ClaimsXchange," and that she would "wager to guess" that a third would.  Tr. at 331-332.  The Plaintiffs provided no direct evidence that any of these three companies were or had ever been sponsors of ClaimsXchange, much less that any such sponsorship had been the cause of any reduction in support to the Plaintiffs.

**Non-Solicitation Clause**

The uncontradicted testimony at trial was that Wilson, Elser approached Mr. Potter about sponsoring the cannabis conference after Mr. Potter had previously spoken to a friend at the firm more generally about the viability of such a conference. Tr. at 637.  The Plaintiffs do not allege any violation of the non-solicitation clause by BIH other than a single sentence that says "BIH's continued association with Wilson Elser as a sponsor and/or presenter at the various events cited above constitutes further breaches of Section 6.12(b)."  Opening Brief at p. 15

**No Evidence of Damages**

As discussed *infra* at 16-17, the Plaintiffs introduced no evidence of any damages arising from any actions by BIH, other than to offer the testimony of an expert.   To the extent that there was any fact testimony regarding CLM's

performance following the Defendants' alleged violations of the APA, the testimony from the Plaintiffs' own witnesses was that CLM had continued to perform well.  Tr. at 691.  To the extent that CLM failed to meet any revenue targets after the alleged violations, the Plaintiffs' own fact witnesses attributed this shortfall directly to the Covid-19 pandemic.  Tr. at 212, 696.

## ARGUMENT

The Plaintiffs did not carry their burden to show a breach of contract, did not prove damages of any kind, and are not entitled to any relief.  In spite of being assured by Mr. Potter that it was not subject to the non-compete provisions of the APA, BIH has adhered to the non-compete clause as it is interpreted by the Court.

## I.     THE PLAINTIFFS HAVE NOT ESTABLISHED A BREACH OF CONTRACT BY BIH.

In order to prevail in a claim for breach of contract, the Plaintiffs must demonstrate (1) a contractual obligation, (2) a breach of that obligation by BIH, and (3) a resulting damage to the Plaintiff.  *Hydrogen Master Rights, Ltd. v. Weston*, 228 F. Supp. 3d. 320, 333 (D. Del. 2017).  The Plaintiffs failed to prove either a breach by BIH of the APA, or any resulting damages.

### A.     The Plaintiffs Have Not Proven That They Incurred Any Damages, A Necessary Element of a Breach of Contract Claim.

Damages resulting from a breach of contract are not just a remedy, they are a required element of the cause of action.  *Hydrogen Master Rights*, 228 F. Supp. 3d.

at 333.  Moreover, the damages demonstrated must arise from the breach in question; they cannot be alleged generally.  *Johnson v. Gov't Employees Ins. Co*., C.A. No. 06-408-RGA, 2014 WL 2708300, at *1 (D. Del., June 16, 2014); *Duncan v. STTCPL, LLC*, C.A. No. K16C-12-020-JJC, 2020 WL 829374, at *10 (Del. Super., Feb. 9, 2020).

The Plaintiffs' expert witness argued at trial that any factual evidence regarding individual lost customers, advertisers, or sponsors was irrelevant to the question of damages because of the intervening event of the Covid-19 epidemic:

> Q:     Okay.  Now, I think you sat in the courtroom this week during the trial and you heard some testimony about whether or not the CLM after the acquisition lost any customers and what the impact was.
>
> Does any of that information impact your conclusions?
>
> A:     Well, in this particular case the general nature of the competition was certainly something that I looked at and was aware of and, as I said before, the example, for example, Wilson Elser.  But of course, we had COVID which came in between.
>
> So, it's not possible in this situation to look at actual – the actual performance and gain any – any real insights in terms of, you know, what the thinking would have been about the effect on value of competition because, you know, we didn't see sort of a – the kind of marketplace or conferences that everyone thought we were going to see. We – you know, obviously no one was going to conferences for some period of time.

Tr. at 475-476.  The only way that the Plaintiffs could establish any damages at all, or any measure of damages, was through their expert's "benefit of the bargain" analysis.  As explained below, that analysis should be rejected in its entirety.

### i. The Plaintiffs' Witnesses Were Unable to Demonstrate that Any Customer, Sponsor, or Advertiser Was Lost As a Result of Any Alleged Breach by BIH.

The Plaintiffs, having conceded that they could not prove damages through any actual evidence of lost customers, sponsors, or advertisers, sought to make their case for damages solely through expert testimony. But before being permitted to offer a damages estimate, the Plaintiffs must prove that some actual damage occurred. As the Court has previously held in this case, the Plaintiffs were required to show the fact of damages with reasonable certainty. D.I. 304 at p. 7 (citing *Siga Techs., Inc. v. PharmAthene, Inc*., 132 A.3d 1108, 1111 (Del. 2015). The Plaintiffs did not do so. In fact, to the limited degree that evidence was introduced at trial regarding the financial health of CLM, the evidence was that CLM was meeting the Plaintiffs' expectations, even in the face of the Covid-19 pandemic. *Supra* at 14.

Of the few sponsors or advertisers who the Plaintiffs even suggested had ended or reduced their support of CLM, the Plaintiffs offered no evidence that any of that change in support was related in any way to any actions by BIH. With one exception, the Plaintiffs' witnesses all squarely stated that they had no idea why any company reduced its support, and the one witness (Tina Pernie) who suggested otherwise said "anecdotally, through conversations I have had with the sales team," that two companies – CoventBridge and SEA – had "decided to move over to ClaimsXchange." This statement was not only speculative on its face, but directly

contrary to the testimony of Mr. Miller – who, unlike Ms. Pernie, still works for The Institutes. Mr. Miller testified that CoventBridge and SEA continued to be sponsors of the CLM, albeit at lower levels for which he had no explanation. There was no direct evidence introduced that CoventBridge or SEA were financial supporters of ClaimsX. In short, there was no evidence of an injury in fact resulting from any alleged contract breach, and certainly not evidence meeting the "reasonable certainty" standard.

Recognizing that they cannot prove injury in fact, the Plaintiffs seek to simply bypass the requirement. First, they argue that "A breach causes injury where it deprives the nonbreaching party of the benefit of its bargain." Opening Brief at 24. But that is simply an effort to skip the first step of the analysis. Second, the Plaintiffs argue that the non-compete agreement was important to them in agreeing to buy CLM, and that they would not have purchased CLM if they had known that the Defendants would compete with them. *Id*.[3] The mere fact that a Plaintiff alleges

---

[3] The Plaintiffs also incorrectly argue that "Jeffrey Scheidt, who prepared the Institutes' initial valuation, testified that it was based on the understanding that Defendants would not compete post-acquisition beyond the permitted activities." Opening Brief at p. 24. That is not what Mr. Scheidt said. In fact, Mr. Scheidt candidly admitted that his valuation was based on a much more narrow assumption about competition – simply that the sellers would not duplicate the specific programs that were already being offered by the CLM after selling the company. Tr. at 146-147. His testimony is important not only for legal reasons, as it completely undermines the factual assumption underpinning the testimony of the Plaintiffs' expert, but is also important in assessing the equities of the case. Not even the Plaintiffs have argued that the Defendants did what Mr. Scheidt assumed they would

that a contractual term was important does not, as a matter of law, mean that the Plaintiff was injured by non-compliance with that term. The Plaintiffs cite no authority for this proposition, and it would effectively eliminate the "resulting damage to Plaintiff" element of the legal definition of a contract breach.

The Plaintiffs argue that "neither Potter nor Acunto claimed that the Defendants' competition did not affect the value of The CLM." Opening Brief at p. 25. Leaving aside that it was not their burden to do so, Mr. Potter and Mr. Acunto did not have to make that argument. The Plaintiffs' own witnesses introduced evidence that the CLM had thrived during the period of the supposed contract violation. Ms. Blume, for example, testified that CLM's financial trends were all positive in 2019 and even into 2020 right up until the point of the pandemic. Tr. at 212.

### ii. The Plaintiffs Have Not Provided the Court With a Reasonable Basis to Measure Damages.

The testimony of the Plaintiffs' expert, Dr. Christine Meyer, failed almost every standard required of expert testimony by the Federal Rules of Civil Procedure. Her testimony should be stricken, and given that it was the sole basis upon which the Plaintiffs claimed quantifiable damages, the Court should find that the Plaintiffs have proven no damages and cannot sustain a breach of contract claim.

---

not do – mimicking existing CLM events. The Plaintiffs have received exactly what Mr. Scheidt thought they had bargained for.

Although the Court usually hears pre-trial *Daubert* motions to exclude expert testimony (and did so in this case), *Daubert* is an explanation of Federal Rule of Evidence 702, and if expert testimony offered at trial does not satisfy the standard of Rule 702, it should not be considered by the Court following a bench trial, both because it fails the requirements of Rule 702 and because it does not provide a reasonable basis to measure damages.

Rule 702 requires that an expert's testimony be the product of reliable principles and methods, that the expert reliably apply those principles and methods to the facts of the case, and that the testimony fit the issues in the case. *Schneider ex. rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404-406 (3d. Cir. 2003). Dr. Meyer's testimony failed on all three fronts, and should be given no weight by the Court.

> **(a) Dr. Meyer's Testimony Was Not the Product of Reliable Principles and Methods**.

Dr. Meyer testified that she used the "Cournot Model" as described in "Industrial Organization" by Jeffrey Church and Roger Ware as the basis for her expert analysis, Tr. at 512, that she used the "simple model" described in the treatise to do her analysis, Tr. at 516, and that the simple model required that products be homogeneous, two firms choose output, two firms compete with each other just once and make their production decisions simultaneously, and that there is no entry by other producers. *Id*. Yet she agreed that the products in this case are not

homogeneous, Tr. at 517, and that the companies did not compete with each other just once, Tr. at 519. Jeremy Campbell, the Plaintiffs' own witness, testified that CLM had multiple competitors, not just one. Tr. at 370-371. In short, virtually none of the required assumptions for the simple Cournot model that Dr. Meyer applied were present in this case. Dr. Meyer insisted that there were other versions of the Cournot model that allowed for some of these assumptions to be relaxed, Tr. at 461-465, but she admitted that she had not applied other versions of the Cournot model – she applied the simple one, which was unsupported by any of the actual facts of the case. Tr. at 518. Dr. Meyer also admitted that her model would result in exactly the same measure of damages no many how many times the non-compete clause was assumed to be violated, and no matter how seriously the non-compete was assumed to be violated. Tr. at 535. She admitted that even if she learned that, rather than losing business as a result of the Defendants' actions, CLM had actually tripled its business since 2018, tripled its profits, and tripled its revenues, that this would not affect her model. Tr. at 505. A model that, by the expert's own admission, does not adhere to the basic requirements of the treatise upon which it is based, and results in facially absurd results, is not the product of reliable principles and methods.

### (b) Dr. Meyer Did Not Reliably Apply Her Model to the Facts Of the Case

To the degree that Dr. Meyer made particular factual assumptions in applying her model, those factual assumptions were revealed at trial to be incorrect. In other

areas, Dr. Meyer purposefully did not check her model against available facts at all, even though she agreed that care should be taken to ensure that her model was consistent with the facts of the case. Tr. at 498.

Dr. Meyer testified that the VRC analysis that formed the basis for the Plaintiffs' purchase price of CLM and the other businesses they bought was "based on assurances that Defendants would not engage in any behavior other than those enumerated in Section 6.12 of the APA". Tr. at 494. Dr. Meyer testified that this assumption found its way into the VRC analysis because Institutes CFO Jeffrey Scheidt provided VRC with financial projections that "were based on the assumption that [the Defendants] would not be competing." Tr. at 453-454. But as it turns out, that was not the assumption that Mr. Scheidt made in preparing his revenue estimates for VRC. Mr. Scheidt testified that in generating his revenue projections for VRC, he simply assumed that the Defendants would not duplicate the events that CLM was already putting on. Tr. at 146-147. Dr. Meyer's core factual assumption, that Mr. Scheidt had "embedded" in his revenue projections a far more sweeping non-compete assumption, is completely contradicted by Mr. Scheidt's own trial testimony. Indeed, the Plaintiffs have not alleged that the Defendants have done anything that Mr. Scheidt assumed they would refrain from doing in generating his revenue projections; if Dr. Meyer were truly measuring the difference between the assumptions built into the VRC analysis through Mr. Scheidt's revenue projections

and the Defendants' actions, she would have come up with a damages estimate of zero.

Dr. Meyer also purposefully declined to make basic factual inquiries that would have tested her model. For example, Dr. Meyer agreed that her model assumed that CLM would lose 50% of its market share by December 31, 2022. Tr. at 499. But she admitted that she had made no effort to try to determine CLM's actual market share. Tr. at 504. She also confirmed that her model was attempting to readjust the VRC model assuming a 50 percent reduction in market share, Tr. at 532, but that she did not take the simple step of contacting VRC and asking VRC how it would have adjusted its model if it had been told to assume a 50% reduction in market share. Tr. at 533-534. When the Court asked Dr. Meyer to confirm that under her model, "what actually happened after the deal went through, other than there was some competition, didn't matter," Dr. Meyer agreed that in her view, because of Covid-19, "I don't think we can look at what actually happened." Tr. at 548.

Dr. Meyer did not reliably apply her model to the facts of the case, and in multiple instances went out of her way to avoid learning easily discoverable facts that would have tested her model.

        **(c)**      **Dr. Meyer's Testimony Does Not Fit the Issues in the Case.**

As the Plaintiffs themselves point out, "benefit of the bargain" or "expectation" damages are calculated by a sum that would "put the promisee in the same position as if the promisor had performed the contract." Opening Brief at p. 24, citing *Siga Techs., Inc.*, 132 A.3d at 1130. But by her own admission, Dr. Meyer did not attempt to make this calculation – by purposefully ignoring any facts about how the Defendants' alleged breach actually impacted the Plaintiffs, she had no baseline against which to measure the difference between the value of the contract as promised[4] and its value following the alleged breach. Benefit of the bargain damages are not measured by trying to hypothesize how the Plaintiffs would have reassessed the value of the contract if non-compliance was assumed. Not only does Dr. Meyer's testimony fail to meet basic standards of reliability and factual accuracy, it also does not reflect the legal test for damages upon which the Plaintiffs rely.

        **iii.**      **The Case Law Cited by the Plaintiffs Suggesting That They Need Not Prove Damages Is Inapposite.**

Recognizing that they have not provided the Court with a reasonable basis for calculating damages, the Plaintiffs also argue that they do not really need to do so.

---

[4] Dr. Meyer's decision to use the VRC analysis as the basis for determining the actual value of CLM at the time of purchase was also undermined by Mr. Scheidt's admission at trial that his revenue estimates relied upon by VRC were simply CLM's prior revenues increased by 3% every year. Tr. at 135.

They claim that "doubts about the extent of damages are generally resolved against the breaching party," Opening Brief at p. 24, and argue that the mere finding of a misrepresentation of a non-competition agreement can be the basis for monetary damages. Opening Brief at p. 26. That is not the law in simple breach of contract cases. The Plaintiffs' arguments are based upon two cases where the courts found that the Defendants had engaged in willful misconduct. See *Siga Techs.*, 132 A.3d at 1131; *Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc*., C.A. No 2019-0002-SG, 2021 WL 1592473, at *10 (Del. Ch., April 23, 2021) (damages award based on Court's finding that "the perpetrator of an intentional tort should not get the benefit of uncertainty in the quantum of harm he has caused"). [5] This is a simple breach of contract case, where the Plaintiffs have not even alleged, much less proven, willful conduct by the Defendants. Moreover, the Delaware Supreme Court in *Siga Techs* did not suggest that a plaintiff could recover damages with no calculation of damages whatsoever, merely that the plaintiff "need not establish the amount of damages with precise certainty" once the fact of damages had been proven. Siga Techs., 132 A.3d at 1131.

---

[5] Additionally, in *Maverick Therapeutics,* the Defendant actually agreed with the Court that simply discounting the purchase price by a particular percentage representing competition was an appropriate measure of damages, and disagreed only over the percentage (suggesting 25% rather than 50%). *Id.* at, *12 & n.160. It was based in part upon this concession from the Defendant that the Court in *Maverick* determined that it could make a "responsible estimate" of the amount of damages. *Id*. at 11.

**B.     The Plaintiffs Have Not Proven That BIH Provided Content Related to Claims and Litigation Management.**

The Plaintiffs did not introduce any evidence of any content at any conference, other than a set of slides from the cannabis and hemp conference that do not mention claims or litigation management.  The Plaintiffs attempt to wordsmith this deficiency by saying that the conferences "of necessity involved claims content," or had materials that referred to claims, or discussed claims trends, or were enjoyed by people involved in claims underwriting, or discussed claims, or had speakers who handled claims.  Opening Brief at pp. 9-10.  But saying the word "claims" over and over again does not constitute evidence of claims and litigation management content.  The Plaintiffs ultimately do not even argue that they have introduced actual evidence of claims and litigation management content.

The only way that the Plaintiffs can address their failure to introduce evidence of any actual content at any conference is simply to argue that any content involving insurance in any way constitutes "claims and litigation management" content.  And indeed, they make that argument.  Opening Brief at pp. 15-18.  The Plaintiffs' argument that the term should be interpreted "broadly," *id.* at 15, is directly contradictory to Delaware law interpreting non-compete agreements.  In fact, Delaware law requires that restrictive covenants be interpreted narrowly.  *Concord Steel Inc. v. Wilmington Processing Co., Inc*., C.A. No. 3369-VCP, 2008 WL 902406, at *6 (Del. Ch., April 3, 2008) (interpreting restrictive covenant in asset

purchase agreement). But even the most broad interpretation of "claims and litigation management content" would not encompass the Plaintiffs' definition, which would render any conference involving insurance a conference with claim and litigation content. The Plaintiffs' own witness Anne Blume admitted at trial that "claims management" refers to activity that takes place after a claim has occurred. Tr. at 212.

### C. The Plaintiffs Have Not Proven That BIH Targeted Its Events at Claims and Litigation Management Professionals.

In applying its interpretation of the APA, the Court should do so consistent with Delaware law that requires that non-compete provisions be construed narrowly. See, e.g., *Concord Steel Inc.*, 2008 WL 902406, at \*6; *Allied Capital Corp. v. GC-Sun Holdings*, LP, 910 A.2d 1020, 1024 (Del. Ch. 2006). With respect to applying the phrase "targets claims and litigation management professionals," BIH proposes that the Court use the common-sense definitions of "target" used in standard dictionaries. Whether it is "to direct advertising, criticism, or a product at someone,"[6] or "to direct an action, message, etc. at someone or something,"[7] the central meaning of the verb "target" requires some affirmative effort on the part of

---

[6] Cambridge Dictionary
(https://dictionary.cambridge.org/us/dictionary/english/target)
[7] Britannica Dictionary (https://www.britannica.com/dictionary/target)

the Defendant to direct its advertising to a particular person or persons. This is even more true given the narrow definition required by Delaware case law.

The Plaintiffs' allegations all involve BIH's alleged failure to take actions, rather than any affirmative effort by BIH. Whether it is the allegation that BIH did not affirmatively seek to purge its subscriber rolls or its conference rolls of claims and litigation management professionals, or the allegation that BIH conceded that some of its conference content might be of interest to claims and litigation management professionals (among many others), or the allegation that BIH agreed to a law firm's request that BIH invite people from the law firm's mailing list (which may or may not have included claims and litigation management professionals), these allegations all involve supposed failures by BIH to take action. The very nature of targeting requires action by the Defendant, and the Plaintiffs have provided no evidence whatsoever of that.

### D. The Plaintiffs Have Not Proven that ClaimsX Provided Content Related to Claims and Litigation Management at Any Events Where BIH Was Involved.

Mr. Acunto testified, and the Plaintiffs do not appear to dispute, that his involvement with ClaimsXchange was brief and did not involve the active planning of any events. There was no evidence introduced at trial that ClaimsXchange, during Mr. Acunto's involvement with the organization, targeted claims or litigation management professionals for its events. (There was testimony that board members

left CLM for ClaimsXchange's board, but the parties have stipulated that the Plaintiffs were not seeking damages for the loss of board members. D.I. 196) The Plaintiffs did not introduce evidence at trial sufficient to show that BIH or its affiliates violated the APA through Mr. Acunto's brief involvement with ClaimsXchange.

### E. BIH Did Not Violate the Non-Solicitation Provision of the APA.

In an apparent afterthought, the Plaintiffs allege that BIH also violated the non-solicitation provision of the APA (Section 6.12(b)) because it continued to associate with the Wilson Elser law firm after Mr. Potter had allegedly solicited the firm to sponsor the cannabis and hemp conference. Opening Brief at pp. 14-15. Mr. Potter explained at trial, in uncontradicted testimony, that Wilson Elser first raised with him the possibility of sponsoring the cannabis and hemp conference. Tr. at 599-600. Beyond that, Mr. Potter explained at trial that Section 6.12(b) was meant only to apply to customers of The Institutes at the time of purchase, which is why the reference in the non-solicitation paragraph is to "Buyer's Customers" rather than "Sellers' Businesses." Tr. at 250-251. This interpretation of the contract not only comports with its plain language, but makes far more sense than the Plaintiffs' interpretation which would cause an APA violation literally any time any Defendant had any communication, even inadvertently, with any customer of CLM -- even if the same customers were also an existing customer of BIH. If Section 6.12(b) were

interpreted as the Plaintiffs argue, it would be unenforceable for being inequitable and not enforcing the Plaintiffs' legitimate economic interests. *Concord Steel Inc.* 2008 WL 902406, at *4. Finally, the plain language of Section 6.12(b) demonstrates that its scope is intended to be limited to customers related to the Sellers' Businesses, effectively restricting Section 6.12(b) in the same manner that Section 6.12(a) is restricted.

## II. THE COURT SHOULD REJECT THE PLAINTIFFS' REQUEST TO REARGUE THE MEANING OF THE CONTRACT BASED ON THE EXACT SAME ARGUMENTS THE PLAINTIFFS MADE PRIOR TO THE COURT'S PRIOR DECISION.

The Plaintiffs also attempt to persuade the Court to reverse its previous interpretation of the APA by repeating exactly the same argument that the Court already considered and rejected at the summary judgment stage. In their summary judgment brief, the Plaintiffs argued that the "Sellers Business" with which the Defendants were forbidden from competing included all "specialty conferences" of any kind. D.I. 269 at p. 8. The Plaintiffs argued that because some of the examples listed in "Schedule A" of the contract referred to claims or litigation management professionals, that the Court should infer that "specialty conferences" applied to any specialty conference of any kind, because the term did not have the same qualification. *Id.* at p 9. The Court rejected this argument in its opinion on the parties' summary judgment motion.

Undeterred, the Plaintiffs have resurrected exactly the same argument in their post-trial brief. Opening Brief at pp. 18-23. The result of this argument, according to the Plaintiffs, is that the Defendants are forbidden from holding specialty conferences -- which the Plaintiffs effectively define to mean any conference about anything [8] -- unless the conferences are enumerated in the list of "permitted activities" in Schedule 6.12. The Court has already found that this interpretation is "inconsistent with the plain language of the APA." D.I. 302 at p. 5.

The language of the APA says the same thing now that it did when the parties sought summary judgment, and the Plaintiffs' interpretation is still contrary to the plain language.

## III.  THE DEFENDANTS ARE ENTITLED TO NO RELIEF.

For the reasons described above, the Plaintiffs are not entitled to an award of monetary damages. The Plaintiffs have also requested a permanent injunction, effectively doubling the length of the non-compete clause, and an award of attorney's fees and costs. Even if the Court were to find a violation of the APA, these requests are not permitted by law.

---

[8] "That reference [to Specialty Conferences] is to a broad category of services, and is not limited by content or to whom they are targeted." Opening Brief at p. 19

## A.    The Plaintiffs Are Not Entitled to an Injunction.

The Plaintiffs have asked for a permanent injunction extending the non-compete provisions of the APA for another five years.  Aside from the fact that the Plaintiffs have not established a breach of the APA, the Plaintiffs' request fails virtually every prong of the test applied by the courts in assessing permanent injunction requests.  To grant a permanent injunction, the Court must find that the Plaintiff has suffered an irreparable injury, the remedies such as monetary damages are inadequate to compensate for that injury, that a remedy in equity is justified by the balance of the hardships between the Plaintiff and Defendant, and that the public interest would not be disserved.  *eBay, Inc v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  In this case, the Plaintiffs have vigorously insisted that monetary damages are not only adequate but capable of estimation.  Although the Plaintiffs have failed to establish their right to such damages, they cannot make that claim and ask for an injunction at the same time.  Additionally, the only two events about which the Plaintiffs even attempted to introduce any evidence at trial – the cannabis and hemp conference and Mr. Acunto's brief personal involvement with ClaimsX – occurred within the first year and a half of the non-compete clause.  Imposition of a five-year injunction based on two events that occurred soon after the APA was signed would violate basic principles of equity and fairness.

## B. The Plaintiffs Should Not Receive an Award of Attorney's Fees from BIH.

The Plaintiffs claim that if they can establish a breach of the APA, they are entitled to an award of attorney's fees from BIH under Section 9.2 of the APA. First, as a contractual matter, a long line of Delaware cases establishes that indemnification language of the type in the APA does not allow for attorney's fees claims arising from first-party actions between parties to the contract. "Standard indemnity clauses are not presumed to apply to first party claims. Otherwise a typical indemnification provision would swallow the American Rule. In order for an indemnification provision to cover fee-shifting among parties, the contract must specifically state that requirement." *Deere & Co. v. Exelon Generation Acquisitions, LLC*, C.A. No. N13C-07-330-MMJ-CCLD, 2016 WL 6879525 at *1 (Del. Super., Nov. 22, 2016). The language that the Court cited in *Deere & Co.* as being insufficient to justify an attorney's fee award is similar to the language relied upon by the Plaintiffs in this case:

> "From and after the Closing, [Exelon] shall indemnify, defend and hold harmless [Deere]…from and against any and all Losses incurred by [Deere] by reason of, arising out of, resulting from or related to…(ii) any breach or nonperformance of any of the covenants or agreements of [Exelon] contained in this Agreement."

*Id. See also SARN Energy LLC v. Tatra Defence Vehicle A.S.*, C.A. No. N17C-06-355-EMD-CCLD, 2019 WL 6525256, at *1 (Del. Super., Oct. 21, 2019) (denying attorney fees based upon similar indemnification language). Because the APA does

not contain the "clear and unequivocal agreement to shift fees…in connection with a dispute between parties to the contract, *Deere*, 2016 WL 6879525, at *1, and in fact employs indemnification language similar to that which other Delaware courts have found insufficient to create a right to attorney's fees in a dispute between the parties, the Plaintiffs' request should be denied even if the Court were to find that a breach of contract had occurred.

In addition, given that any finding of a breach by the Court is likely to have resulted in either no damage or trivial damages, the attorney's fees incurred by the Plaintiffs after years of pre-trial proceedings and a full trial would be vastly disproportionate to the magnitude of the litigation. To award the Plaintiffs attorney's fees would be unreasonable (the contract recognizes only "reasonable" attorney's fees as Losses), and would also render the contractual language itself inequitable. A covenant not to compete must survive a balancing of the equities in order to be enforceable by the Court, *Concord Steel*, 2008 WL 902406, at *4, and because the Plaintiffs are (improperly) seeking to invoke the indemnification provision with respect to enforcement of the restrictive covenant, the indemnification provision is also subject to a balance of the equities analysis as applied to the restrictive covenant. It would be facially inequitable (and, again, unreasonable) to require the Defendants to pay attorney's fees for years-worth of litigation over acts that have had no provable impact on the Plaintiffs.

## CONCLUSION

For the reasons stated above, Defendant BIH asks that the Court enter

judgment in its favor.

Dated: July 29, 2022

**OF COUNSEL:**
Christopher Oprison (admitted *pro hac vice*)
DLA PIPER LLP (US)
200 South Biscayne Boulevard, Suite 2500
Miami, Florida 33131
Telephone: 305.423.8522
Facsimile: 305.675.6366
chris.oprison@dlapiper.com

**DLA PIPER LLP (US)**

*/s/ Matthew P. Denn*
Matthew P. Denn (DE Bar No. 2985)
1201 North Market Street, Suite 2100
Wilmington, DE 19801-1147
Telephone: 302.468.5700
Facsimile: 302.394.2341
matthew.denn@dlapiper.com

*Attorneys for Defendant Business
Insurance Holdings, Inc.*