IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

The American Institute for Chartered )
Property Casualty Underwriters and )    Civil Action No. 1:19-cv-01600-RGA
The Institutes, LLC, )
)
Plaintiffs, )
)
v. )
)
Adam Potter, PBIH, LLC and )
Business Insurance Holdings, Inc., )
)
Defendants. )

---

## DEFENDANT ADAM POTTER'S BRIEF IN
## SUPPORT OF THE ENTRY OF JUDGMENT IN HIS FAVOR
## AND IN OPPOSITION TO PLAINTIFFS' POST-TRIAL BRIEF

---

Seth Niederman (#4588)
**FOX ROTHSCHILD LLP**
Citizens Bank Center
919 North Market Street, Suite 300
Wilmington, DE 19899-2323
T: (302) 622-4238
SNiederman@foxrothschild.com

**OF COUNSEL:**
Robert S. Tintner (*Admitted Pro Hac Vice*)
Nathan M. Buchter (*Admitted Pro Hac Vice*)
**FOX ROTHSCHILD LLP**
2000 Market Street, 20th Floor
Philadelphia, PA, 19103-3222
rtintner@foxrothschild.com
nbuchter@foxrothschild.com

Dated: July 29, 2022             *Attorneys for Defendant Adam Potter*

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...........................................................................1

STATEMENT OF FACTS ................................................................................5

   I.    THE APA, VRC'S VALUATION OF THE SELLERS' BUSINESSES, AND THE PARTIES' AGREED UPON DEAL POINTS. ....................................................5

   II.   THE "CLM BUSINESS." .......................................................................7

   III.  THE APA'S RESTRICTIVE COVENANTS AT ISSUE. .......................................8

   IV.  THE C&H AND INTELLECTUAL PROPERTY CONFERENCES. .........................9

   V.   WILSON ELSER. ...............................................................................12

   VI.  POTTER SELLS BUSINESS INSURANCE. ...................................................12

   VII.  SYDNEY POSNER, JEREMY CAMPBELL, AND CLAIMSXCHANGE. ................13

   VIII. COVID-19'S IMPACT ON THE CLM BUSINESSES. ...................................13

   IX.  WAGGY GROUP. ..............................................................................14

ARGUMENT ..............................................................................................15

   I.    THERE WAS NO BREACH OF THE RESTRICTIVE COVENANT. .....................15

       A.   The Non-Compete's Three-Step Framework. .....................................15

          1.  Step Two of the Non-Compete's Analytical Framework Requires that the C&H Conference be a Product or Service Conducted by the CLM Business as of the Closing Date, and it was Not. .................................16

          2.  The C&H Conference was a Permitted Activity even if Found to be Competitive with the CLM Business. .................................................18

       B.   No Basis Exists to Interpret "Content Related to Claims and Litigation Management" as Including Risk Management and other Pre-Loss Content. ..............................................................................20

       C.   CLM's "Specialty Conferences" and "Webinars" are Limited to the Events it Provided as of the Closing Date. ..........................................23

D.      Potter Did Not Violate the Non-Solicit. .............................................26

E.      Arguments As to ClaimsXchange Should Be Disregarded. ..............27

II.     PLAINTIFFS ARE NOT ENTITLED TO MONEY DAMAGES OR INJUNCTIVE
        RELIEF. .......................................................................................................28

A.      Plaintiffs Received the Benefit of Their Bargain. ..............................28

B.      Plaintiffs Did Not Establish Any Damages Caused By Potter's Alleged
        Breach of the APA. ............................................................................30

   1.   Plaintiffs Did Not Offer Any Evidence of An Injury.........................30

   2.   No Evidence Exists in the Record Showing that Plaintiffs Suffered
        Damages as a Result of Potter's Alleged Breaches. ...........................31

C.      Plaintiffs are Not Entitled to Injunctive Relief Prohibiting Defendants
        from Engaging in Competitive Activities for Five Years. .................33

D.      Plaintiffs are Not Entitled to Attorneys' Fees and Expert Witness Fees.
        ............................................................................................................34

CONCLUSION ...................................................................................................35

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Allied Capital Corp. v. GC–Sun Holdings, L.P.*, 910 A.2d 1020 (Del.Ch. 2006) ...............................................................................................24

*Beacon Theatres, Inc. v. Westover*, 359 U.S. 500 (1959)...................................33

*Beard Rsch., Inc. v. Kates*, 8 A.3d 573 (Del. Ch.), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010) ...................................................32

*ConAgra Foods Inc. v. Lexington Ins. Co.*, 21 A.3d 62 (Del. 2011)..................23

*Concord Steel, Inc. v. Wilmington Steel Processing Co.*, 2008 WL 902406 (Del. Ch. Apr. 3, 2008) ........................................................................................24

*Genencor Int'l, Inc. v. Novo Nordisk A/S*, 766 A.2d 8 (Del. 2000)............. 28, 34

*Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2020 WL 7861336 (Del. Ch. Dec. 31, 2020)..................................................................35

*Greenstar LLC v. Heller*, 934 F. Supp. 2d 672 (D. Del. 2013) ................... 28, 29

*Mahani v. Edix Media Grp., Inc.*, 935 A.2d 242 (Del. 2007) ...........................34

*Manti Holdings, LLC v. Authentix Acquisition Co.*, 261 A.3d 1199 (Del. 2021) ......................................................................................... 15, 16, 24

*Maverick Therapeutics, Inc. v. Harpoon Therapeutics*, 2021 WL 1592473 (Del. Ch.) ...........................................................................................................29

*Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153 (Del. 2010)............... 21, 22, 24

*Rhone-Poulenc Basic Chem. Co. v. American Motorists Inc. Co.*, 616 A.2d 1192 (Del. 1992)........................................................................................23

*Shawe v. Elting*, 157 A.3d 142 (Del. 2017)........................................................34

*Siga Technologies, Inc. v. PharmAthene, Inc.*, 132 A.3d 1108 (Del. 2015) ......30

Defendant, Adam Potter ("Potter"), through counsel, submits this Brief in Support of the Entry of Judgment in his Favor and in Opposition to the Opening Post-Trial Brief ("Opening Brief") filed by Plaintiffs The American Institute for Chartered Property Casualty Underwriters ("AICPCU") and The Institutes, LLC ("The Institutes," together with AICPCU, Plaintiffs").

## **PRELIMINARY STATEMENT**

Down to a single claim for breach of contract which the parties tried before this Court on June 27-29, 2022, Plaintiffs failed to meet their burden of proof with respect to establishing: (1) any alleged breach by Potter of the restrictive covenants; (2) causation; or (3) actual damages. Much like the other filings made by Plaintiffs in this case, Plaintiffs resort to argument, speculation and innuendo to bolster their bare allegations rather than providing the Court with citations to relevant testimony or supporting evidence. Indeed, in the Preliminary Statement of their Opening Brief, Plaintiffs surprisingly refer to the evidence in their favor as "overwhelming" and showing "multiple breaches" of the at-issue non-compete and non-solicit. Nothing could be further from the truth.

Indeed, Plaintiffs improperly seek through this case to have the Court impose broader restrictions into the at-issue asset purchase agreement (the "APA") and to create a monopoly for "specialty conferences" that are inconsistent with the express language of the APA and that have twice been rejected by this Court.

Moreover, after almost three (3) years of litigation, and despite their attempts to broaden the restrictions in the APA, Plaintiffs have still only *alleged* three (3) acts of competition/solicitation as to Potter, none of which Plaintiffs established as a breach of the APA at trial.

  ***First***, Plaintiffs claimed that Potter planned and organized the Cannabis and Hemp Conference (the "C&H Conference") in 2019.  Not only did the undisputed evidence and testimony establish that:  (1) Plaintiffs did not have any cannabis or hemp product at the time of the closing on the APA (June 2018) but also, (2) Plaintiffs, by their own admission, did not offer any "specialty conference" on cannabis or hemp at that time or now (consistent with Schedule A to the APA); and (3) the C&H Conference put on by defendant, Business Insurance Holdings, Inc. ("BIH"), in October 2019 was not targeted to claims and litigation management professionals.  The marketing materials for the C&H Conference expressly state so. Most importantly, despite a clear and affirmative obligation on Plaintiffs' part to demonstrate at trial that CLM had a cannabis or hemp product as of the June 2018 closing date, they failed to address the issue entirely at the trial.  As a result, the C&H Conference and Potter's limited involvement in it did not in any way breach the non-competition provision of the APA.  The fact that there was some discrete but arguably limited "claims content" at the C&H Conference related entirely to risk

management and business insurance issues simply did not establish any violation of the APA.

***Second***, Potter did not improperly solicit the Wilson Elser law firm to participate in the C&H Conference or not to engage in business activities with CLM. If the Court concludes that the C&H Conference did not violate the non-competition provision of the APA, then certainly the involvement of Wilson Elser also could not constitute a violation of the non-solicit.  Separately, however, the restriction contained in the non-solicit merely restricted Potter from calling-on, soliciting or inducing, or attempting to induce, any "customer or other business relation of ***Buyer***," which as defined in the APA was "***The Institutes***."  Thus, because Wilson Elser was a customer of BIH, as well as CLM, at the time of the APA – and not of The Institutes – Plaintiffs should be precluded from making any type of claim under the non-solicit as there was no violation under the express language of the APA.

***Third***, Plaintiffs state: "Potter conceded that he set up a meeting between BIH and his sister, Ms. Posner to form a venture that competed with CLM.  Though he did not participate in the subsequent meeting, Potter was well aware of what was happening."  Op. Br. at 13.  Not surprisingly, those statements are unsupported by record citations because they are patently false and were contradicted by the testimony and evidence presented at trial, which showed that Potter introduced Posner to Steve Acunto, Sr. ("Acunto") for one reason only: to hire Posner at BIH to replace Jeremy

Campbell who had recently given notice.  Based upon that uncontroverted evidence –
and the fact that Plaintiffs offered no other evidence to the contrary – there is simply
no merit to Plaintiffs' bare and unsupported assertion that Potter assisted in the
formation of Claims Xchange or otherwise violated the APA in that regard.  The Court
should disregard any allegations or resulting arguments by Plaintiffs that takes such
improper liberties with the testimony and record evidence.

      With respect to causation and damages, Plaintiffs failed to establish any causal
connection between the aforementioned allegations of breach and any harm suffered
by Plaintiffs.  To cover up such deficiencies in the evidence presented, and their own
admissions that they suffered no lost customers, business or sponsors as a result of
any conduct on the part of Potter, Plaintiffs claim some limited loss of revenues from
CoventBridge, SEA and Winget Spadafora.  Aside from the fact that Plaintiffs wholly
failed to connect the loss of those revenues to any conduct on the part of Potter (or
BIH), they failed to present any testimony or evidence explaining why such loss of
revenues has anything to do with this case.  The entirety of Plaintiffs' damages theory
is based not just on some hypothetical analysis but pure and unadulterated speculation.
Plaintiffs failed to offset any losses due to COVID-19 on their purported damages
(despite all of their witnesses testifying to the contrary) or the impact of what amounts
to an isolated allegation of competition (indeed, as to Potter, one single event in the
last four years) had on their theoretical assessment.  Plaintiffs' damages expert clearly

could have done that analysis. Instead, in the absence of such evidence, Plaintiffs failed to show any actual damages or advance a cognizable damages theory that could be supported in any way by the "benefit of the bargain" they claim to have lost.

Finally, in one last-gasp effort to salvage some form of recovery, Plaintiffs claim that they are entitled to attorneys' fees and injunctive relief. The attorneys' fees provision contained in the indemnification provision of the APA is inapplicable to this dispute. The fact that Plaintiffs waited four (4) years into a five (5) year restrictive covenant to move for such purported injunctive relief belies the absence of any immediate or irreparable harm. Such a claim is also undercut by their purported and speculative damages analysis. The absence of any damages – much like the failure to establish any breach of the APA – independently and collectively warrants the entry of judgment in Potter's favor and against Plaintiffs entirely on the breach of contract claim and all accompanying requests for relief.

## STATEMENT OF FACTS

### I.  THE APA, VRC'S VALUATION OF THE SELLERS' BUSINESSES, AND THE PARTIES' AGREED UPON DEAL POINTS.

On June 1, 2018, Plaintiffs closed on their largest ever purchase acquiring substantially all assets of The CLM Group, Inc. ("CLM"), Claims Pages, LLC ("CP"), and C&E MGMT and Planning, Inc. ("C&E") through the APA. P-13; Tr. at 32:5. The "Buyer" was The Institutes. P-13; at Preamble and Appendix A. The

"Sellers" or "Selling Parties" were CLM, CP, C&E, Potter, and Moxie HC, LLC.[1] *Id.*  The target in The Institutes' acquisition ("Sellers' Businesses") were the "CLM Business," "CP Business," and "C&E Business."  *Id.*

Early on in due diligence, The Institutes engaged Valuation Research Corporation ("VRC") to provide a valuation of the Sellers' Businesses' assets.  Tr. at 31:20-32:10.  On March 8, 2018, VRC provided The Institutes with a valuation opinion report, which is "a report in which [The Institutes] relied in determine what purchase price to pay." *Id.* at 32:18-20; P-11.  This "Pre-Valuation" report does not reference any restrictive covenants, non-compete, or non-solicit.  *See* P-11.

Katherine Horowitz, then a Senior Vice President, negotiated for The Institutes.  Tr. at 675:17-676:17.  Horowitz also led The Institutes' due diligence team under the direction of its Chief Executive Officer, Peter Miller.[2]  *Id.*  Horowitz never exceeded Miller's directives when negotiating with Potter; she communicated the terms exactly as Miller provided them to her.  *Id.* at 70:18-24, 676:18-24.

On March 13, 2018, Horowitz sent Miller a draft email congratulating Potter and memorializing the points "agreed to" in a recent conversation.  Potter-09.  The email contained purchase price terms and identified other (mutual) consideration for the "CLM Offer."  *Id.*  It also noted the deal was contingent on final board approval

---

[1] Potter owned CLM, CP, and C&E as of the Closing Date.  P-13; at Preamble and Appendix A; Tr. at 675:7-14.

[2] Miller executed the APA on behalf of The Institutes.  P-13, Potter-DE-000040.

and "the remainder of the due diligence requested." *Id.* Horowitz's email did not mention a restrictive covenant or non-compete. *Id.*; Tr. at 681:3-8.

Miller responded later that day, approving Horowitz's draft email without any edits. Potter-21. Horowitz then sent the email to Potter. Potter-22.

After closing on the APA, The Institutes engaged VRC to issue another report "to value identifiable assets [from the transaction] and report them . . . for financial statement purposes." Tr. at 128:5-8. Jeffrey Scheidt, The Institutes' Chief Financial Officer, doesn't typically value non-compete provisions because "even if there is one . . . the value is in customer relationships and then trademark." *Id.* at 130:19-131:2. But VRC did, stating in that "Post-Acquisition" report that "the value of the non-compete is believed to be immaterial." P-12, Institutes0015099.

## II.   THE "CLM BUSINESS."[3]

The APA defines the "CLM Business" as "the business of operating as a national trade association for the claims and litigation management industries, as more specifically set forth in <u>Schedule A</u>" (emphasis in original). Schedule A identifies 11 products and services offered by the CLM Business as of the Closing Date – all of which concern claims handling, dispute resolution, and litigation management for "professionals in the claims resolution and litigation management

---

[3] "There were multiple businesses sold to Plaintiffs in the APA, but in this litigation, Plaintiffs are only concerned with CLM's business." D.I. 304 at 4.

industries." P-14, Sched. A. "Specialty Conferences" are one of those products. *Id.*
Schedule A identifies 10 specialty conferences – none among them dedicated to
cannabis and hemp or intellectual property. *Id.*; Tr. at 206:21-25. In fact, cannabis,
hemp, or intellectual property is not mentioned anywhere in Schedule A. *Id.*; Tr. at
193:14-19. Also absent from Schedule A's definition of the CLM Business is any
reference to "risk managers" or the "risk management" industry. P-14, Sched. A.
Business Insurance's Permitted Activities in Schedule 6.12 is the ***only*** place in the
APA and its schedules where "risk managers" and "risk management" is mentioned.
Tr. at 63:14-64:3, 65:15-66:3.

## III.   <u>THE APA'S RESTRICTIVE COVENANTS AT ISSUE.</u>

The APA contains non-compete and a non-solicit provisions. P-13, § 6.12(a).
The non-compete prohibits the Selling Parties from competing with, or causing their
Affiliates[4] to compete with, "Sellers' Businesses ***as conducted as of the Closing***
***Date***" for five years, except that during th[at] timeframe "any Selling Party, or any
other party listed on Schedule 6.12, may undertake the activities set forth on
Schedule 6.12 attached hereto (collectively, the 'Permitted Activities')." *Id.*
(emphasis added); *see* P-14, Schedule 6.12. Business Insurance Holdings, LLC,
which Potter owned at the time, is one of the parties identified in Schedule 6.12's
Permitted Activities. *Id.* at Schedule 6.12(a).

---

[4] *See* P-13, Appendix A (defining "Affiliates").

The non-solicit prohibits the Selling Parties from, or causing their Affiliates to, "directly or indirectly, call-on, solicit or induce, or attempt to solicit or induce, any customer or other ***business relation of Buyer*** for the provision of products or services related to any of Sellers' Businesses or in any other manner that would otherwise interfere with the business relationship between Buyer and its customers and other business relations." P-13, § 6.12(b) (emphasis added).

## IV.   THE C&H AND INTELLECTUAL PROPERTY CONFERENCES.

Plaintiffs first learned BIH was offering the "C&H Conference" in July 2019. Tr. at 212:10-13. Cannabis and hemp is an emerging area. *Id.* at 245:1-5, 789:5-6. CLM did not have any cannabis-related product on the Closing Date, including a cannabis and hemp conference or cannabis advisory committee. Potter-1; Tr. at 191:21-192:3, 197:20-198:8, 205:17-19, 328:8-16.

The C&H Conference did not target claims and litigation management professionals. *Id.* at 362:14-23, 594:11-21. It did not contain claims and litigation management content either. *Id.* at 595:14-20, 596:18-597:2. The C&H Conference's content was focused entirely on an emerging risk and risk management. *See* P-23. The so-called "claims sessions" as initially marketed stated:

> **Business Track Session: Cannabis Claims: A Peek Down the Rabbit Hole**
>
> The cannabis claims experience ***is often difficult to evaluate due to rapidly emerging risks in a highly regulated industry and lack of significant claims data***.

> This panel of experienced cannabis claims professionals will attempt to shed light on the type, frequency and severity of cannabis claims to date, and what these claims will look like in the future.

P-70 (emphasis added).

After learning about the C&H Conference, Plaintiffs sent Potter a cease and desist letter demanding that BIH cancel the C&H Conference as well as an intellectual property conference that BIH was also planning.  Tr. at 632:20-633:4.  Like cannabis and hemp, CLM did not have an intellectual property conference on the Closing Date.  *Id.* at 207:1-4, 319:5-8.  BIH's intellectual property conference also never occurred.  *Id.* at 81:1-8, 300:3-5, 340:8-14.

At no point did Potter ever believe the C&H Conference (or the intellectual property conference) violated the non-compete.  Tr. at 572:1-7, 634:13-19, 636:2-5.  Potter left the claims and litigation management industry after selling the Sellers' Businesses in June 2018.  *Id.* at 569:15-23.  Since then, Potter has not (i) competed with CLM; (ii) solicited any of CLM's customers, members, or business associates; (iii) owned an interest in any business or enterprise that competes with CLM; (iv) or operated, managed, or otherwise engaged in activities that compete with CLM.  *Id.* at 571:8-25; *see id.* at 198:22-25.

Nonetheless, Potter wanted to "do as much as I can to show [CLM] that this [C&H Conference] is not for their audience."  *Id.* at 597:3-11.  Outside lawyers were already precluded from attending the C&H Conference.  *Id.* at 400:22-401:3, 404:9-

12, 596:2-5.  In addition to that pre-existing limitation, Potter created and placed the following disclaimer (in bold text) on the C&H Conference webpage: "**This conference was not developed and is not intended for claims and litigation management professionals**."  *Id.* at 597:11-12 (emphasis in original); P-23; P-70. Potter changed the session "to show that its exposure related . . . not claims related":

### Business Track Session: Cannabis *Exposure*: A Peek Down the Rabbit Hole

The cannabis exposure is often difficult to evaluate due to rapidly emerging risks in a highly regulated industry and lack of access to significant data. This panel of experienced cannabis professionals will attempt to shed light on the various cannabis *exposures* to date, and how these will involve in the future.

P-70; Tr. at 597:12-14 (emphasis added).

The C&H Conference occurred in October 2019.  Tr. at 425:10-12.  Plaintiffs did not attend it; nor did they speak with anyone who attended the C&H Conference. *Id.* at 102:15-104:6, 196:2-10, 203:23-204:1, 689:6-24.  Plaintiffs have not identified any members, customers, or sponsors lost because of Potter, the C&H Conference, or the cancelled intellectual property conference.  *Id.* at 83:18-84:23, 98:5-11, 106:6-12, 207:5-20, 218:14-18, 330:7-331:7, 691:3-6.  Plaintiffs have identified three customers (CoventBridge, SEA, and Winget Spadafora) that reduced the amount spent with CLM between 2018 and 2021, *id.* at 51:8-14, 331:25-332:2, but never spoke to anyone from those companies to determine why their spending decreased

11

for those years.  *Id.* at 87:5-14.  CoventBridge, SEA, and Winget Spadafora were not and have never been BIH sponsors.  *Id.* at 602:22-603:5.

## V.  WILSON ELSER.

Wilson Elser sponsored the C&H Conference.  *Id.* at 249:14-16.  Potter did not ask Wilson Elser to sponsor the C&H Conference – Wilson Elser suggested it. *Id.* at 248:15-16, 249:19-21, 600:21-601:3.  Potter wrote to Ian Stewart of Wilson Elser to invite him to an awards presentation and to gauge interest overall in the creation of a cannabis conference.  *Id.*  At the time, Wilson Elser was a business relation of CLM, *id.* at 250:4-9, but not The Institutes.  *Id.* at 250:25-251:23.  Wilson Elser remains a sponsor of CLM today – recently sponsoring CLM's 2021 and 2022 annual conference. *Id.*  at 99:9-20, 200:16-18, 717:22-23.  A Wilson Elser attorney even told Blume his firm's involvement in a BIH event does not preclude us (Wilson Elser) from working with you (CLM).  *Id.*  at 182:12-20, 207:21-24.  Wilson Elser and its attorneys are still CLM-members.  *Id.*  at 191:13-14, 200:16-18.

## VI.  POTTER SELLS BUSINESS INSURANCE.

Potter sold BIH to Beacon Intercontinental Group, Inc. 55 days before the C&H Conference.  *Id.* at 570:3-6; P-18; *see* P-23.  Acunto signed that sale agreement on behalf of Beacon.  P-23.  Potter exited the risk management and business insurance industry after that sale and has no plans to return.  Tr. at 569:24-570:19.

## VII.   SYDNEY POSNER, JEREMY CAMPBELL, AND CLAIMSXCHANGE.

Sydney Posner is Potter's sister.  *Id.* at 618:1-2.  Posner worked at CLM as its lead salesperson prior to The Institutes, and then as CLM's Chief Relationship Officer after the sale until The Institutes discharged her.  *Id.* at 301:6-8, 618:3-16.

In September 2019, Business Insurance's lead salesperson (Jeremy Campbell) gave notice that he was leaving.  *Id.* at 366:25-367:2.  Potter learned about Campbell's departure and introduced Posner to Acunto so that they could discuss Posner replacing Campbell given her sales experience.  *Id.* at 619:12-24, 645:13-19 (A: "The whole inten[t] on introducing her [to Acunto] was to replace Jeremy Campbell for his job that he left."), 807:15-17, 869:7-13, 871:23-872:2.  Potter never participated in any discussions between Posner and Acunto.  *Id.* at 620:13-15.  In fact, Potter affirmatively communicated to Acunto that he would only make an introduction, and that he would not participate in any discussions. P-86.

Posner later formed ClaimsXchange.  *Id.* at 645:23-24.  Potter has no involvement with ClaimXchange.  *Id.* at 621:14-17.  He does not have any ownership interest in ClaimsXchange nor is he a member.  *Id.* at 621:2-10.

## VIII.   COVID-19'S IMPACT ON THE CLM BUSINESSES.

Prior to COVID-19, CLM annually held 10-12 in-person events.  *Id.* at 686-18-20.  CLM would collect registration/attendance fees for those in-person events,

as well as sponsorship revenue. *Id.* at 687:1-10. Registration/attendance fees and sponsorship revenue were the <u>majority</u> of CLM's 2019 revenue.[5] *Id.* at 692:15-21.

From March 2020 – August 2021, CLM transitioned all in-person events to online events because of COVID-19. *Id.* at 687:11-17. CLM made the majority of its post-COVID-19 online events free for attendees. *Id.* at 687:25-688:5. CLM did not accept sponsorship revenue from March 2020 – August 2021. *Id.* at 89:22-25. CLM also refunded sponsors for in-person events that CLM converted online events after March 2020 because of COVID-19. *Id.* at 688:13-19. CLM did not to meet its 2020 target revenues because of COVID-19. *Id.* at 696:9-11.

## IX.   WAGGY GROUP.

With Plaintiffs' permission and consent, Potter formed Waggy Group, Inc. ("Waggy") after closing on the APA to handle "all the run-off hotel commissions that were permitted in the agreement for CLM and also . . . receive the commissions for Business Insurance as well." *Id.* at 246:6-18. The APA states Potter "shall have the absolute right to use the IATA Number with any other Person and other business relationships other than with Buyer," but that the Selling Parties keep ten (10%) of the commissions earned in connection with that IATA number and certain events contracts with hotels that are annexed to the agreement. P-13, §§ 2.1(a)(xii), 6.1(a).

---

[5] Horowitz also identified membership revenue, but that testimony is contrary to Miller's prior testimony stating that CLM membership is free. *Id.* at 94:5-8, 97:7-12.

# ARGUMENT

## I.   THERE WAS NO BREACH OF THE RESTRICTIVE COVENANT.

### A. The Non-Compete's Three-Step Framework.

The non-compete's plain text provides a three-step framework for analysis.

*First*, the Court must determine if a "Selling Party" or an "Affiliate" (if caused by a Selling Party) undertook the alleged activities within five years from the Closing Date.  P-13, § 6.12(a).  If yes, then proceed to Step Two.  If no, the inquiry is over; the alleged activities are not prohibited conduct.  *Manti Holdings, LLC v. Authentix Acquisition Co.*, 261 A.3d 1199, 1208 (Del. 2021) ("When a contract is clear and unambiguous, the court will give effect to the plain meaning of the contract's terms and provisions." (citation and internal quotation marks omitted)).

*Second*, the Court must determine if the alleged "activities . . . are otherwise competitive with any of the Sellers' Businesses as conducted as of the Closing Date." P-13, § 6.12(a).  If yes, then one must proceed to Step Three.  If not, the inquiry is over; the alleged activities are not prohibited conduct.

*Third*, the Court must determine if the alleged activities are excepted Permitted Activities.  Only this third step requires an analysis into the content and target audience of the alleged activities to determine if they comply with Schedule 6.12's express limitation on "educational content related to claims and litigation management" or "live delivery, such as events . . . and conferences targeted to claims and litigation management professionals."  P-14, Sched. 6.12.

15

    *1. Step Two of the Non-Compete's Analytical Framework Requires that the C&H Conference be a Product or Service Conducted by the CLM Business as of the Closing Date, and it was Not.*

While not decided on summary judgment, the Court must now consider the non-compete's plain language to determine whether the C&H Conference was a product or service offered by the CLM Business as conducted as of the Closing Date. Step Two of the non-compete asks whether the alleged "activities . . . are otherwise competitive with any of the Sellers' Businesses as conducted as of the Closing Date." P-13, § 6.12(a). Here, the Sellers' Businesses at issue – the CLM Business – is defined as "offer[ing] specific 'products and services,' including an annual conference and specialty conferences," to the claims and litigation management industries. D.I. 320 at 2; D.I. 304 at 4-5; P-14, Sched. A. The undisputed trial evidence established the C&H Conference was ***not*** a product or service conducted by the CLM Business as of the Closing Date. Therefore, it did not violate the non-compete. *Manti Holdings*, 261 A.3d at 1208.

Schedule A conclusively defines the CLM Business and contains no reference to cannabis and hemp, let alone a dedicated cannabis and hemp conference. Potter, who owned the CLM Business as of the Closing Date, confirmed that it had no cannabis or hemp product. Tr. at 594:6-10. So too did Blume and Horowitz for Plaintiffs. *Id.* at 193:14-16, 688:23-25. Notably, Blume also stated in a July 19, 2019 email that "CLM did not have any Cannabis-related product on the Closing

Date."   Potter-1.   That declaration is particularly compelling because it was unsolicited, made internally at The Institutes by CLM's then-chief executive officer, and extends more broadly than just events, to include ***any cannabis-related product***.

At trial, Plaintiffs made this issue rather simple for the Court to decide, failing to present any affirmative evidence, which it was their burden to do, that the CLM Business offered any cannabis or hemp product – let alone a conference similar to the C&H Conference – as of the closing date.   Instead, Plaintiffs fall back on the argument that they have some type of monopoly on all "specialty conferences" related to the insurance industry.   The Court has already rejected that argument. Thus, in the absence of affirmative evidence to the contrary, it is undisputed that the CLM Business had no cannabis or hemp product as of the closing date, and it offered no such conference.   Indeed, Blume stated at trial and in her e-mail: there was no cannabis or hemp product.   Schedule A also lists no cannabis or hemp product.

Thus, the indisputable facts recited above conclusively establish that the C&H Conference was not a product or service conducted by the CLM Business as of the Closing Date and, as a result, does not violate the non-compete.   Per the non-compete's plain text, the Court need not entertain a Permitted Activities analysis or go any further into content and target audience if the C&H Conference was not one of the CLM Businesses' products or services conducted as of the Closing Date.

17

    *2. The C&H Conference was a Permitted Activity even if Found to be Competitive with the CLM Business.*

There was ample evidence introduced at trial showing that the C&H Conference was a Permitted Activity, even if the Court determines the C&H Conference competed with the CLM Business. The Permitted Activities expressly include the "business operations" of Business Insurance:

> a news and information source for executives concerned about risk and the impact on their business, including risk managers, insurers, brokers and other providers of insurance products and services. Business Insurance delivers in-depth analysis on new and emerging risks, case studies of successful programs, market intelligence on trends, and guidance on how to capitalize on opportunities and overcome challenges.

P-14, Sched. 6.12. The Permitted Activities also list products and services that Business Insurance provided as of the Closing Date, including events. *Id.* Thus, the Permitted Activities authorized Business Insurance to develop events based on an "in-depth analysis on new and emerging risks" and "enterprise risk management." *See id.* Cannabis and hemp falls under that definition. *Id.* at 245:1-5 (stating that cannabis and hemp "was a new and emerging area which . . . was specifically called out for new and emerging areas within the permitted activities"), 789:5-6.

The C&H Conference also did not violate the Permitted Activities' claims and litigation management exceptions. P-14, Sched. 6.12. Plaintiffs presented no evidence at trial showing the C&H Conference targeted claims and litigation

management professionals.  The C&H Conference's marketing materials expressly stated the opposite, Tr. at 597:11-12, and Plaintiffs  have proffered no evidence that any, but a few (7 out of 200), *potential* claims professionals even attended the C&H Conference.[6]  Indeed, the undisputed evidence was that the C&H Conference was designed for business insurance and risk managers who were interested in the cannabis space – a new and emerging risk.  *Id.* at 245:1-5, 339:21-340:3, 352:8-14, 789:5-6.  Because Wilson Elser was a C&H Conference sponsor, attendees were limited to non-lawyer professionals, precluding the majority of CLM's members from attending.  *Id.* at 318:12-16, 400:22-401:3, 404:9-12, 596:2-5.

Second, the C&H Conference's content was not on claims and litigation management.  *Id.* at 595:14-20, 596:18-597:2.    The content was on business insurance and risk management; specifically, how to evaluate the exposure of the rapidly emerging cannabis risks.  *See* P-23.  Even the one so-called "claims session" (out of several) upon which Plaintiffs center the entirety of their content argument, which based on a full reading of the session description demonstrates that it was focused on evaluating the rapidly emerging risks associated with cannabis, not how cannabis claims are resolved or managed.  P-70; *see id.* at 339:21-340:3, 352:8-14.

---

[6] The trial testimony was unclear whether these attendees were "claims" professionals or merely risk managers, but the burden to establish that was clearly on Plaintiffs (who failed).

Finally, Schedule 6.12 is by no means an exclusive list of Business Insurance events; nor was it ever intended to be one. *See* Tr. at 245:1-18, 610:16-613:8. Schedule 6.12 contains ***no*** language limiting BIH's business operations to certain products and services. *See* P-14, Sched. 6.12. While Plaintiffs would like to expand the non-compete's scope beyond its clear text to include all "specialty conferences" related to the insurance industry (despite no such description in Schedule A), and limit the Permitted Activities to only those products and services enumerated there, they cannot do so. The non-compete's language, coupled with the Permitted Activities in Schedule 6.12, demonstrates clearly: the C&H Conference did not compete and was not in violation of the non-compete. As such, Plaintiffs have failed to establish that Potter breached the non-compete.

### B. No Basis Exists to Interpret "Content Related to Claims and Litigation Management" as Including Risk Management and other Pre-Loss Content.

Plaintiffs argue the phrase "content related to claims and litigation management" should be interpreted broadly to include "risk management" and other "pre-loss" content. Op. Br. at 20-22. Plaintiffs are asking this Court to suspend logic and ignore the APA's plain language, basic contract interpretation principles, and the weight of the trial evidence. Plaintiffs' argument should be rejected.

Schedule A conclusively defines the CLM Business as limited to the claims resolution and litigation management industries. D.I. 320 at 2; D.I. 304 at 5; *see* P-

14, Sched. A.  "Risk management" is **not** directly part of that definition.  In fact, the **only** place where "risk management" is even mentioned in the APA's 50 pages of single-spaced text, and 104 pages of schedules, is Schedule 6.12's Permitted Activities.  There, the parties expressly state the operations of Business Insurance "covers core risk management," and that several of Business Insurance's products and services include "risk management" content.  *See* P-13; P-14, Sched. 6.12 ("Businessinsurance.com website . . . **content focuses on . . . risk management** . . . ."; [B]i-weekly newsletters **including     . . . Risk Management**"; and the "Risk Management Roundtable" event (emphasis added)).

Business Insurance's Permitted Activities are, of course, excluded from the competitive activities prohibited by the  non-compete. *see* P-13, § 6.12, provided that they are not to include "content related to claims and litigation management" or target claims and litigation management professionals.  P-14, Sched. 6.12.

Here, Plaintiffs' interpretation of "content related to claims and litigation management" is implausible, writing much of Business Insurance's contractually agreed upon Permitted Activities out of Schedule 6.12 entirely.  Delaware courts "read a contract as a whole and . . . give each provision and term effect, so as not to render any part of the contract mere surplusage." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (citations and internal quotation marks omitted)).  According to Plaintiffs, the parties expressly agreed that Business Insurance did and

was permitted to continue to provide risk management-related content in its various products and services, but then several lines later stated that Business Insurance was also precluded from those risk management-related activities because it is "content related to claims and litigation management."  If true, why even identify in Schedule 6.12 the Businessinsurance.com website, with its "content focuse[d] on . . . risk management," the biweekly newsletter, which "include[s] . . . Risk Management," or Business Insurance's "Risk Management Roundtable," as Permitted Activities in the first place?  Plaintiffs' interpretation of "content related to claims and litigation management" is not objectively reasonable.  *Osborn*, 991 A.2d at 1159.

That interpretation is also unsupported by the weight of trial evidence.  Potter[7] testified at trial about the "two main aspects" of the insurance industry – "pre-loss" and "post-loss" – and how Business Insurance was on one side (pre-loss), and CLM was on the other (post-loss).  *Id.* at 577:1-18, 585:24-586:23, 588:1-589:21.  Potter explained that "pre-loss is a risk manager . . . an insurance company underwriter" and is about assessing and analyzing risk.  *Id.* at 577:4-10.  Potter then explained "post-loss," which "is after a claim occurs" and deals with notice of and response to a claim.  *Id.* at 577:11-16.  And while there is some overlap, there is a line between the two where "the people are on one side or the other."  *Id.* at 578:7-11.  Notably,

---

[7] Potter was a risk manager at three different companies before starting CLM.  Tr. at 576:22.  He also handled claims in another profession.  *Id.* at 225:9-10.  Perhaps most important, Potter founded CLM and was its sole owner through the Closing Date.  *See id.* at 225:2-3.

Tina Pernie, whose testimony Plaintiffs primarily rely upon here, corroborated Potter, testifying that risk management, claims management, and even litigation management *are all different roles*. *Id.* at 321:21-322:12. So did Blume. *Id.* at 211:15-16 ("Claims can be part of risk management. It's not always. It depends.").

Plaintiffs have offered no competent trial evidence to support their tortured interpretation of "content related to claims and litigation management," show that it is ambiguous, or that it was intended by the parties to include anything other than its ordinary meaning – claims management and litigation management content. *Rhone-Poulenc Basic Chem. Co. v. Am. Motorists Inc. Co.*, 616 A.2d 1192, 1196 (Del. 1992) ("Courts will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty."); *ConAgra Foods Inc. v. Lexington Ins. Co.*, 21 A.3d 62, 68-69 (Del. 2011) (stating that Delaware courts interpret writings by "giv[ing] effect to the plain meaning of a contract's terms and provisions when the contract is clear and unambiguous").

### C. CLM's "Specialty Conferences" and "Webinars" are Limited to the Events it Provided as of the Closing Date.

Plaintiffs next argue the non-compete does not limit the products and services of the CLM Business to the "claims and litigation management industries" unless that phrase is expressly stated in connection with the product or service in Schedule A. Op. Br. at 22-27. Schedule A identifies 11 products and services for the CLM Business, but Plaintiffs only reference two in their post-trial brief: specialty

conferences and webinars.  This argument is (again) contrary to the APA's plain language and contract interpretation principles and, therefore, should be rejected.

Plaintiffs continue to ignore the non-compete's express limitation to "the Sellers' Businesses *as conducted as of the Closing Date*." P-13, § 6.12(a) (emphasis added).  The phrase "as conducted as of the closing date" is not superfluous; it must have meaning under Delaware contract interpretation principles (and does).  *Osborn*, 991 A.2d at 1159.  It must also be observed that "Delaware courts construe restrictive covenants narrowly as written." *Concord Steel, Inc. v. Wilmington Steel Processing Co.*, 2008 WL 902406, at *6 (Del. Ch. Apr. 3, 2008); *Allied Capital Corp. v. GC–Sun Holdings, L.P.*, 910 A.2d 1020, 1024 (Del. Ch. 2006) ("Restrictive covenants in contracts . . . limit[ing] the commercial freedom otherwise available to the parties cannot reasonably be read in [a] squishy and uncertain manner . . . .").

When read in that (proper) context, the phrase "as conducted as of the closing date" plainly limits the non-compete's scope to the CLM Business as of June 1, 2018. *Manti Holdings*, 261 A.3d at 1208.  If it was not part of the CLM Business on June 1, 2018, the non-compete does not prohibit it.  The uncontroverted trial record shows that the CLM did not have any cannabis product or intellectual property conference as of the Closing Date.  Potter-1; P-14, Sched. A; Tr. at 191:21-192:3, 193:14-19, 197:20-198:8, 205:17-19, 206:21-25, 207:1-4, 319:5-8, 328:8-16.

Notably, the parties identified specific "Specialty Conferences" and "Webinars" in the APA, *see* P-14, Sched. A, some of which Blume testified about at trial. *Compare id.* (listing "Restaurant and Hospitality," "Workers Compensation," and "Midwest"), *to* Tr. at 162:9-22 (discussing same). Why identify any "Specialty Conferences" and "Webinars" at all if the identification of those products in Schedule A was intended to preclude Potter and Business Insurance from presenting ***any*** specialty conferences or webinars other than those specifically identified in the Permitted Activities? Simply listing "Specialty Conferences" and "Webinars" would have accomplished what Plaintiffs argue. But that is not what the parties agreed to in Schedule A. They agreed to language in Schedule A, which provides a complete list of all "Specialty Conferences" and "Webinars," held by CLM held as of the Closing Date. *See* Tr. at 592:3-593:7. The ***only*** way that makes sense is if those "Specialty Conferences" and "Webinars" were intended to be limited. To that end, Schedule A and the non-compete's express limitation of "the Sellers' Businesses" to "as of the Closing Date" are entirely consistent in that regard.[8]

---

[8] For example, CLM held a Medical-Legal Summit from 2014 or 2015 through 2016. Tr. at 592:15-20. It is not listed in Schedule A because CLM did not produce a Medical-Legal Summit as of June 1, 2018 – the Closing Date. *Id.* at 194:24-195:13, 592:21-593:4.

### D. Potter Did Not Violate the Non-Solicit.

That same reasoning provided above is fatal to Plaintiffs' breach of contract claim alleging Potter violated the non-solicit.  There was no evidence presented that Potter solicited or induced, or attempted to solicit or induce, "any customer or other business relation of Buyer for the provision of products or services related to any of Sellers' Businesses."  *See* 6.12 of the APA.  CLM did not have any cannabis-related product as of the Closing, nor a stand-alone conference on cannabis as of April 2021 when Blume left CLM.  Tr. at 319:1-4.  The non-solicit is also expressly inapplicable to Permitted Activities, such as the C&H Conference.  *See* P-13, § 6.12(b).

Potter testified at trial – and the documentary evidence confirms – that Potter reached out to Ian Stewart at Wilson Elser not to sponsor the C&H Conference, but to inquire about the new and emerging industry in general.  *Id.*at 248:15-16, 249:19-21, 600:21-601:3.  It was Mr. Stewart who offered and suggested that Wilson Elser sponsor the C&H Conference and serve on its planning committee.  *See id.*  It was not a solicitation or inducement.

Moreover, there is no evidence in the record that Potter engaged in conduct that "would otherwise interfere with the business relationship between Buyer and its customers or other business relations."  Again, Wilson Elser, the only identified "customer" or "sponsor" was not a customer of sponsor of the "Buyer" – The Institutes.  P-13; at Preamble and Appendix A.  Indeed, the only "business

26

relationship" that Plaintiffs referenced at trial, Wilson Elser, is both a sponsor of CLM and BIH. Tr. at 191:8-15. Plaintiffs presented no evidence of interference with any relationship with Wilson Elser, which is still a CLM-member (along with its attorneys); still sponsors CLM events; and sits on CLM's cannabis advisory board. *Id.* at 99:9-20, 183:6-18, 191:13-14, 200:16-18, 717:22-23. Notably, Blume testified that a Wilson Elser partner expressly advised that Wilson Elser's involvement in a BIH event would <u>not</u> preclude the firm from working sponsoring CLM events and participating in CLM. *Id.* at 182:12-20, 207:21-24.

Thus, Plaintiffs presented no evidence demonstrating that Potter violated the non-solicit because of any contact or involvement by Wilson Elser in the C&H Conference or otherwise.

### E. Arguments As to ClaimsXchange Should Be Disregarded.

For all of the reasons previously articulated, any issue as to Potter with respect to ClaimsXchange are a red herring that should be disregarded. Potter did not introduce Posner to Acunto for the purpose of setting up a joint venture. Instead, the introduction was made to find Ms. Posner a job. Because Posner was a fired/former employee of CLM, there was no prohibition against that introduction in the restrictive covenant of the APA. Plaintiffs should have conceded this issue in the absence of any supporting evidence. Nevertheless, there is no basis for any argument

that Potter's introduction of Posner to Acunto is in violation of the APA, and accordingly, such an argument fails to support Plaintiffs' breach of contract claim.

## II. PLAINTIFFS ARE NOT ENTITLED TO MONEY DAMAGES OR INJUNCTIVE RELIEF.

### A. Plaintiffs Received the Benefit of Their Bargain.

Plaintiffs confuse receipt of the benefit of the bargain that they negotiated – an APA with restrictive covenants – with an alleged breach of those provisions. It is undisputed that The Institutes obtained the Sellers' Businesses and received a negotiated non-compete and non-solicit. As such, Plaintiffs received the benefit of their bargain in the underlying transaction and Dr. Meyer's damages analysis is not applicable to the purported future breach of the APA alleged by Plaintiffs here.

Although Delaware Courts recognize benefit of the bargain as a damages theory for breach of contract claims, Dr. Meyer's damages analysis does not fit into any type of benefit of the bargain theory. *See Genencor Int'l, Inc. v. Novo Nordisk A/S*, 766 A.2d 8, 11 (Del. 2000) ("It is a basic principle of contract law that [the] remedy for a breach should seek to give the nonbreaching [] party the benefit of its bargain by putting that party in the position it would have been but for the breach."). Plaintiffs cite to *Greenstar LLC v. Heller*, 934 F. Supp. 2d 672 (D. Del. 2013), to support application of Dr. Meyer's benefit of the bargain damages analysis.

*Greenstar* involved, *inter alia*, an award of damages for breaches of representations and warranties in an asset purchase agreement related to certain

environmental liabilities. *Id.* at 693-96. The Court awarded damages for the breach of the representations and warranties equal to the cost associated with specific breach – *i.e.*, the cost to remove the environmental liability. *Id. at* 694. Similarly, the proper measure for calculating damages related to Plaintiffs' alleged breach of the APA's restrictive covenants should be the damages caused by the specific breach (if proven) – *i.e.*, the lost profits related to any lost customers, sponsors, or potential competition but clearly limited to what the actual competition was.

Plaintiffs also cite to *Maverick Therapeutics, Inc. v. Harpoon Therapeutics*, 2021 WL 1592473 (Del. Ch. April 23, 2021) to support Dr. Meyer's benefit of the bargain damages analysis. However, *Maverick* involved an award of expectation damages ***for fraudulent representations*** made concerning the sale of a business – not a breach of the related purchase agreement. *Id.* at *1. This is not a distinction without a difference as Plaintiffs contend. *See Greenstar*, 934 F. Supp. 2d at 696 ("[W]here an action is based entirely on a breach of the terms of a contract between the parties, and not on a violation of an independent duty imposed by law, a plaintiff must sue in contract and not in tort."). Fraudulent inducement and breach of contract are distinct claims with separate elements. *See id.* Here, Plaintiffs are not claiming they were fraudulently induced into entering into the APA or any of its provisions. Rather, Plaintiffs claim that Potter (and BIH) breached the APA's restrictive covenants. The proper measure of damages related to a breach of a restrictive

29

covenant should be the damages associated with the specific breach – *i.e.*, the lost profits related to any lost customers, sponsors or potential competition but, again, limited to the actual competition.

### B. Plaintiffs Did Not Establish Any Damages Caused By Potter's Alleged Breach of the APA.

For the reasons set forth above, Plaintiffs have not established a breach of the APA and therefore cannot recover damages. Additionally, Plaintiffs cannot recover damages because they have not offered evidence of an injury or any reasonable basis to measure losses resulting from any alleged injury. *See Siga Technologies, Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1130 (Del. 2015).

#### 1. *Plaintiffs Did Not Offer Any Evidence of An Injury.*

Plaintiffs' contend that they offered evidence of injury through testimony concerning the value Plaintiffs attributed to the non-compete. Op. Br. at *28*. However, Plaintiffs could not identify any members, customers, or sponsors lost because of Potter, the C&H Conference, or the cancelled intellectual property conference. Tr. at 83:18-84:23, 98:5-11, 106:6-12, 207:5-20, 218:14-18, 330:7-331:7, 691:3-6. Plaintiffs' argument that "COVID-19 masked any such losses" does not obviate their affirmative burden of proof or otherwise justify their inability to prove resulting damages from Potter's alleged conduct. Equally plausible here is that CLM cannot show damages because there was no injury caused by Potter in the first place (which is what Potter argues). *See id.* at 696:9-11 (testifying CLM did not

meet 2020 target revenue because of COVID-19).  Either way, Plaintiffs did not establish an injury caused by Potter's purported competition.

Faced with no other injury to support their purported damages, Plaintiffs attempt to claim some limited loss of revenues from CoventBridge, SEA, and Winget Spadafora between 2018-2021.  Op. Br. at 28.  Again,  Plaintiffs failed to offer any competent evidence at trial to establish a nexus between this alleged reduction of sponsorship revenues and Potter's alleged conduct.  Plaintiffs conceded at trial that they never spoke to anyone from those companies about why they decreased their spending.  *Id.* at 87:5-14.  The trial evidence established that CLM transitioned all conferences from in-person to virtual because of COVID-19 during that same timeframe; made most of those virtual conferences free; did not collect sponsorship revenue, and even refunded sponsorship revenue paid for in-person conferences.  *Id.* at 89:22-25, 687:11-17, 687:25-688:5, 688:13-19.  Moreover, the sponsors were not and have never been sponsors of BIH.  *Id.* at 602:22-603:5.

Thus, Plaintiffs failed to connect their alleged loss of sponsorship revenues to Potter's alleged conduct (or BIH).  Discussed more below, Plaintiffs' entire damages theory is based on speculation, which cannot establish a compensable injury.

### 2. No Evidence Exists in the Record Showing that Plaintiffs Suffered Damages as a Result of Potter's Alleged Breaches.

In order to be recoverable, damages must be quantified based on a "responsible" calculation.  *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch.),

*aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010). "When acting as the fact finder, the Court may not set damages based on mere 'speculation or conjecture'" where a plaintiff fails to adequately prove damages. *Id.* (brackets omitted). Plaintiffs failed to establish that any alleged violation of the restrictive covenants caused actual damages, or that an amount of resulting damage can be calculated with any modicum of reliability. Indeed, Plaintiffs offered no competent evidence of actual loss from Potter's alleged acts.

Dr. Meyer's testimony revealed that the underlying assumptions on which her opinions are based are unsupported by any record facts and are otherwise unreliable. Dr. Meyer's assumptions related to competition in the VRC Report were incorrect and unconfirmed. Tr. at 523:7-528:4, 533:12-534:14. Dr. Meyer's damages theory also incorrectly assumed Potter's continued involvement with BIH, *id.* at 542:11-543:6, which ceased in September 2019. *Id.* at 569:15-23. Dr. Meyer's testimony also revealed that she did not strictly apply the Cournot model that her theoretical adjustment relies on and therefore the damages are not reliable. *Id.* at 515:25-522:7.

Lastly, Dr. Meyer's damages theory also fails to offset or account for:

- Any losses CLM suffered because of COVID-19. *Id.* at 510:10-17. Plaintiffs' witnesses testified that COVID significantly impacted the CLM Business. *See id.* at 48:3-5, 86:4-8, 132:8-16, 181:1-8, 686:14-688:19, 696:9-11.

- The number and scope of the allegedly competitive events. *Id.* at 508:15-510:9. The evidence presented at trial relates to isolated allegations of competition as to Potter – *e.g.*, a single event in the last four years.

- The lack of any evidence or claim that Potter (or BIH) were allegedly competing between June 1, 2018 (the Closing Date) and July 2019, when Plaintiffs first learned about the C&H Conference. *Id.* at 534:25–535:18. Dr. Meyer assumes competition throughout the five-year Non-Compete Period, despite The Institutes (at a minimum) receiving 13 months where Potter was not purportedly competing.

- CLM facing "[h]uge competition" – other than BIH, allegedly – for events and sponsorship revenue, which was the majority of CLM's revenue for 2019. *Id.* at 173:5-17, 583:22-585:18, 692:15-693:1.

- Potter leaving the insurance industry for good in September 2019. *Id.* 569:24-570:19

All of the above impact Dr. Meyer's damages theory, should have been considered, but ultimately were not. Plaintiffs decided instead to rely solely on the Theoretical Adjustment contained in Meyer's Report. As such, Plaintiffs failed to offer any actual damages or a cognizable theoretical theory that could be supported in any way by the "benefit of the bargain" damages that they purport to claim.

### C. Plaintiffs are Not Entitled to Injunctive Relief Prohibiting Defendants from Engaging in Competitive Activities for Five Years.

The party seeking the extraordinary and drastic remedy of injunctive relief must prove their entitlement to one through record evidence supporting all *prima facie* elements, including proof of irreparable harm. *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500 (1959) ("The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies."). Plaintiffs did not offer any evidence of irreparable harm at trial. Moreover, any claim of irreparable harm is principally contradicted by Plaintiffs' simultaneous pursuit of

33

millions of contractual/expectation damages – the very purpose of which is to place the non-breaching party in the position it would have been but for the breach.  *See Genencor Int'l, Inc.*, 766 A.2d at 11.

Plaintiffs' failure to seek injunctive relief – which could have been filed in the form of a motion for preliminary injunction at the time that they commenced this action in August 2019 – should be seen as an admission that Plaintiffs did not believe the C&H Conference violated the restrictive covenant, and that it did not warrant any form of injunctive relief.  The fact that The Institutes waited four (4) years into a five (5) year restrictive covenant to move for such purported injunctive relief belies the absence of any immediate or irreparable harm.  Accordingly, Plaintiffs are not entitled to injunctive relief.

### D. Plaintiffs are Not Entitled to Attorneys' Fees and Expert Witness Fees.

"Delaware follows the 'American Rule,' which provides that each party is generally expected to pay its own attorneys' fees regardless of the outcome of the litigation." *Shawe v. Elting*, 157 A.3d 142, 149 (Del. 2017).  "An exception to this rule is found in contract litigation that involves a fee shifting provision."  *Mahani v. Edix Media Grp., Inc.*, 935 A.2d 242, 245 (Del. 2007).

Plaintiffs' argue they are entitled to attorneys' fees and expert witness fees pursuant to the APA's indemnity provisions.  In Delaware, "indemnity agreements are presumed not to require reimbursement for attorneys' fees incurred as a result of

34

substantive litigation between the parties to the agreement absent a clear and unequivocal articulation of that intent." *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2020 WL 7861336, at *5 (Del. Ch. Dec. 31, 2020) (citing cases) (internal quotation marks omitted); *Deere & Co. v. Exelon Generation Acquisitions, LLC*, 2016 WL 6879525, at *1 (Del. Super. Nov. 22, 2016); *TranSched Systems Ltd. v. Versyss Transit Solutions, LLC*, 2012 WL 1415466, at *2 (Del. Super. Mar. 29, 2012). Here, the APA's plain text does not contain the "clear and unequivocal" language necessary to overcome the presumption in Delaware that the APA's indemnification provisions are limited to third-party claims.

In sum, Plaintiffs failed to establish any causal connection between their allegations of breach by Defendants and any harm allegedly suffered by Plaintiffs. Indeed, the entirety of Plaintiffs' damages theory is based on a hypothetical analysis and pure speculation. The absence of any damages–much like the failure to establish any breach of the APA–warrants the entry of judgment in Potter's favor on the breach of contract claim and all accompanying requests for relief.

## CONCLUSION

For all of the foregoing reasons, Defendant Adam Potter respectfully requests that the Court enter judgment in his favor and against Plaintiffs on their breach of contract claim (Count I) and all other claims and requests for relief.

[*Signature of Counsel on Next Page*]

Respectfully Submitted,

**FOX ROTHSCHILD LLP**

*/s/  Seth Niederman*
Seth Niederman (#4588)
Citizens Bank Center
919 North Market Street, Suite 300
Wilmington, DE 19899-2323
(302) 622-4238
SNiederman@foxrothschild.com

**OF COUNSEL:**
Robert S. Tintner (*Admitted Pro Hac Vice*)
Nathan M. Buchter (*Admitted Pro Hac Vice*)
**FOX ROTHSCHILD LLP**
2000 Market St., 20th Floor
Philadelphia, PA, 19103-3222
rtintner@foxrothschild.com
nbuchter@foxrothschild.com

Dated: July 29, 2022                    *Attorneys for Defendant Adam Potter*

36

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of Defendant Adam Potter's Brief in Support of the Entry of Judgment in his Favor and in Opposition to Plaintiffs' Post-Trial Brief was caused to be served on this date on all counsel of record for the parties *via the Court's CM/ECF*:

<u>/s/  Seth Niederman</u>
SETH NIEDERMAN

Dated: July 29, 2022