1                    IN THE UNITED STATES DISTRICT COURT

2                       FOR THE DISTRICT OF DELAWARE

3

4    THE AMERICAN INSTITUTE FOR        )
     CHARTERED PROPERTY CASUALTY       )
5    UNDERWRITERS and THE              )
     INSTITUTES, LLC,                  )
6                                      )
                      Plaintiffs,      )
7                                      ) C.A. No. 19-1600-RGA
     v.                                )
8                                      ) Volume II
     ADAM POTTER and BUSINESS          )
9    INSURANCE HOLDINGS, INC.,         )
                                       )
10                                     )
                      Defendants.      )
11

12                                          J. Caleb Boggs Courthouse
                                            844 North King Street
13                                          Wilmington, Delaware

14                                          Tuesday, June 28, 2022
                                            8:30 a.m.
15                                          Bench Trial

16

     BEFORE:   THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.
17

18   APPEARANCES:

19              COZEN O'CONNOR
                BY:  BARRY M. KLAYMAN, ESQUIRE
20              BY:  ROBERT W. HAYES, ESQUIRE
                BY:  MATTHEW J. SIEGEL, ESQUIRE
21
                              For the Plaintiffs
22

23              FOX ROTHSCHILD LLP
                BY:  SETH NIEDERMAN, ESQUIRE
24              BY:  ROBERT S. TINTNER, ESQUIRE

25                            For the Defendant
                              Adam Potter

```
 1   APPEARANCES CONTINUED:

 2              DLA PIPER LLP
              BY:  MATTHEW P. DENN, ESQUIRE
 3              BY:  CHRISTOPHER G. OPRISON, ESQUIRE
              BY:  AMY EVANS, ESQUIRE
 4              BY:  CHRIS ALIZIAN, ESQUIRE

 5                        For the Defendant
                        Business Insurance Holding, Inc.
 6
```

08:05:43  7              ***  PROCEEDINGS  ***

08:05:43  8

08:24:40  9              DEPUTY CLERK:  All rise.  Court is now in

08:30:43 10   session.  The Honorable Richard G. Andrews presiding.

08:30:43 11              THE COURT:  All right.  Please be seated.

08:30:46 12         I guess, plaintiff, you're ready to go?

08:30:48 13              MR. OPRISON:  Your Honor, one housekeeping

08:30:49 14   matter, if I may.

08:30:50 15              THE COURT:  Okay.

08:30:50 16              MR. OPRISON:  On the record just real quick.

08:30:52 17   Yesterday at the end of Mr. Acunto's cross-examination by

08:30:56 18   Mr. Hayes, there was an en- -- Mr. Hayes was entering in a

08:30:59 19   series of documents.

08:31:00 20              THE COURT:  Yes.

08:31:01 21              MR. OPRISON:  I think there was some confusion

08:31:02 22   about one document that came in, which was Plaintiffs'

08:31:05 23   Exhibit 32.  That was mentioned on the record.  That was not

08:31:09 24   one that was offered in.  It relates to a conference that's

08:31:12 25   coming up or scheduled to come up.

08:31:14 1                    THE COURT:  I thought --

08:31:15 2                    MR. OPRISON:  It's in the transcript.  I just

08:31:17 3      wanted to make sure that had not come into evidence.

08:31:19 4      Plaintiffs' Exhibit 32.

08:31:20 5                    THE COURT:  I didn't mark it down as coming in.

08:31:22 6      What about my deputy clerk?

08:31:24 7                    DEPUTY CLERK:  I have that in.

08:31:27 8                    THE COURT:  You have that in?

08:31:28 9                    DEPUTY CLERK:  I have that in.

08:31:29 10                   THE COURT:  Oh.  Well, what is it?  I mean --

08:31:32 11                   MR. OPRISON:  It -- actually, we can -- I can

08:31:34 12     put it up.  It's a Cannabis and Hemp Conference

08:31:38 13     advertisement for October 2022.  It's as to a conference

08:31:43 14     that's upcoming that's not part of the conferences that were

08:31:46 15     approved by the Court for them to discuss.

08:31:47 16                   And, Your Honor, I don't think this document was

08:31:49 17     actually even put up during the course of Mr. Acunto's

08:31:52 18     cross-examination.  But it was mentioned at the end.  And I

08:31:55 19     think there was just a flurry of activity and I think that

08:31:58 20     number just got put out there.

08:32:00 21                   THE COURT:  All right.  Well, I -- I guess my

08:32:03 22     notes -- I didn't write the exhibit number down, so I

08:32:09 23     probably didn't write that down either.  What do you think

08:32:11 24     has happened, Mr. Hayes, on this?

08:32:13 25                   MR. HAYES:  So I don't -- we didn't -- first, I

08:32:15 1  disagree that this would not be a proper exhibit since it is

08:32:19 2  the Cannabis and Hemp Conference. But beyond that, I didn't

08:32:22 3  reference that document. I mean, I didn't use it during

08:32:25 4  direct examination.

08:32:26 5          THE COURT: Okay. Well, so then it's a moot

08:32:27 6  point because if it's in the record, it's in the record by

08:32:30 7  mistake. Or it's not an exhibit based on the fact that he

08:32:34 8  didn't use it. All right.

08:32:36 9          MR. OPRISON: Okay. Thank you, Your Honor.

08:32:40 10         MR. SIEGEL: Your Honor, we call Keith Kenner of

08:32:43 11 Business Insurance.

08:32:44 12         THE COURT: Okay.

08:33:01 13         DEPUTY CLERK: Please state and spell your full

08:33:04 14 name for the record.

08:33:04 15         THE WITNESS: Keith Harrison Kenner, K-E-I-T-H

08:33:04 16 H-A-R-R-I-S-O-N K-E-N-N-E-R.

08:33:11 17         KEITH KENNER, the witness herein, after having

08:33:11 18 been duly affirmed under oath, was examined and testified as

08:33:19 19 follows:

08:33:19 20         DEPUTY CLERK: Thank you.

08:33:20 21         THE COURT: You can sit down right here.

08:33:23 22         MR. SIEGEL: Your Honor, I have witness binders,

08:33:26 23 if I may? May I proceed, Your Honor?

08:33:44 24         THE COURT: Yes.

08:33:45 25         MR. SIEGEL: Thank you.

DIRECT EXAMINATION

BY MR. SIEGEL:

Q.     Good morning, Mr. Kenner.

A.     Good morning.

Q.     Would you tell us where you're employed?

A.     I'm with Business Insurance Holdings.

Q.     And how long have you been employed at Business Insurance Holdings?

A.     Almost seven years.

          DEPUTY CLERK:  Mr. Kenner, can you speak up a little bit?

          THE WITNESS:  Sure.

          DEPUTY CLERK:  The microphone is just right there.

          THE WITNESS:  Sure.

          DEPUTY CLERK:  Thank you.

BY MR. SIEGEL:

Q.     What is your position at Business Insurance?

A.     I'm publisher at Business Insurance.

Q.     What are your job responsibilities as publisher at Business Insurance?

A.     I'm responsible for all the commercial aspects of Business Insurance.

Q.     Okay.  And are you generally familiar with the types of conferences and webinars that Business Insurance holds?

08:34:24 1  A.      I am, but we have an accounts director.  Excuse me,

08:34:28 2  an events director, that is more day-to-day on that.  And a

08:34:32 3  head of sales specifically for conferences.

08:34:34 4  Q.      And you have general understanding of the nature of

08:34:37 5  the conferences and the audience that Business Insurance

08:34:39 6  intends to reach through its conferences; correct?

08:34:41 7  A.      Correct.

08:34:43 8  Q.      I want to turn back to the Cannabis and Hemp and the

08:34:49 9  IP conferences that were planned for 2019.

08:34:53 10            Do you recall discussions about the planning for

08:34:55 11 those conferences, generally?

08:34:56 12 A.      I don't mostly because I wasn't directly involved in

08:35:00 13 the planning of them.

08:35:02 14 Q.      Okay.  Well, speaking specifically about the cannabis

08:35:06 15 conference, did you tell me that you -- at your deposition,

08:35:10 16 you don't recall that there were any discussions in the

08:35:12 17 planning for the cannabis conference to restrict the -- the

08:35:17 18 audience to prevent claims professionals from attending;

08:35:21 19 correct?

08:35:21 20 A.      That's correct.

08:35:26 21 Q.      And didn't you also tell me that if you had held a

08:35:31 22 session at the cannabis conference and the IP Conference

08:35:35 23 that discussed claims, that would be attractive to somebody

08:35:38 24 who practices in the claims and litigation management space?

08:35:41 25 A.      Yes, it might be.  But you have to understand the

08:35:44 1    context is also through the filter of being a risk manager.

08:35:48 2    Risk mitigation is part of it.  It's not specifically about

08:35:51 3    the claims.

08:35:51 4    Q.    But to answer my question specifically, you did say

08:35:55 5    that such a session would be attractive to folks who

08:35:57 6    practice in claims and litigation management; right?

08:36:01 7    A.    It could be, yes.

08:36:02 8    Q.    Now, talking specifically about the planned IP

08:36:05 9    Conference, it was originally scheduled for October of 2019;

08:36:08 10   right?

08:36:08 11   A.    Mm-hmm.

08:36:10 12   Q.    And that was rescheduled to October of 2020 but then

08:36:13 13   it was never held; right?

08:36:15 14   A.    That's correct.

08:36:18 15   Q.    Can we pull up Exhibit 24, please?  Plaintiffs' 24?

08:36:29 16   Would you agree with me that the scheduled -- excuse me.

08:36:35 17   You should see on your screen the web -- you agree with me

08:36:41 18   this is the web page that advertises the intellectual

08:36:46 19   property conference that BI had scheduled for 2019?

08:36:50 20   A.    Yes, this is our promotional pages on our website.

08:36:53 21   Q.    And would you agree with me that this conference as

08:36:57 22   planned had a session on IP claims?

08:37:00 23   A.    I would have to look at the topics and the synopsis

08:37:08 24   of the agenda.

08:37:09 25   Q.    Okay.  Can we go to Page 6 of the PDF, please?

08:37:12 1    And for your reference, Mr. Kenner, if you want

08:37:17 2 to look at it in your binder, it should say Page 406 at the

08:37:21 3 bottom.

08:37:29 4 A.    All these are tabbed exhibits.  Is there --

08:37:31 5 Q.    Yes, I'm sorry, if you turn to tabbed Exhibit

08:37:35 6 Number 24.  You can also see it on the screen.

08:38:09 7    And are you on Page 406?  Do you see the 2:15

08:38:13 8 session was titled Taking the Mystery Out of IP Insurance

08:38:16 9 Claims?

08:38:16 10 A.    Yes.

08:38:18 11 Q.    Okay.  And then if you go to the bottom of the

08:38:19 12 page -- at the bottom of that page continuing onto the next,

08:38:23 13 would you read into the record the description of the claim

08:38:28 14 sessions that was scheduled for the IP Conference?

08:38:31 15 A.    It's "Taking The Mystery Out of IP Insurance Claims."

08:38:37 16 Q.    Okay.  And would you read into the record the

08:38:42 17 description of the conference -- the description of the

08:38:44 18 session?

08:38:44 19 A.    "As the old adage goes, claims sell insurance.  Types

08:38:53 20 of claim on standalone IP policies vary widely due to

08:38:57 21 different categories of IP, different motivations of IP

08:39:00 22 holders enforcing IP in different jurisdictions."

08:39:04 23    "There are misconceptions about information

08:39:06 24 required to accept claims, counsel selection, and control of

08:39:08 25 litigation strategy.  Most of the IP insurance claims

08:39:11 1  experience has been on the IP infringement liability

08:39:14 2  policies.  Therefore, this panel will focus on these types

08:39:17 3  of claims."

08:39:18 4  Q.    We can pause there.

08:39:19 5  A.    Thank you.

08:39:20 6  Q.    Yeah, I didn't need to mean to make this, you know, a

08:39:23 7  reading comprehension lesson for you.

08:39:26 8        But you agree with me, clearly, that as

08:39:30 9  advertised, this conference did have a session that was

08:39:33 10 focused on discussing IP claims; right?

08:39:36 11 A.    This -- this agenda topic was, yes.

08:39:39 12 Q.    And you did tell me that IP is an area that you like

08:39:43 13 to see Business Insurance focus on in the future; right?

08:39:46 14 A.    Yeah, intellectual property is an -- actually a

08:39:49 15 growing part of the business.

08:39:49 16 Q.    And wasn't the IP Conference intended to be an than

08:39:52 17 annual conference, similar to the Cannabis and Hemp

08:39:55 18 Conference?

08:39:55 19 A.    I don't think I could say that.  It was we wanted to

08:39:58 20 see how it would go.

08:39:59 21 Q.    Okay.  And do you personally intend to suggest that

08:40:05 22 Business Insurance put on an IP Conference in the future?

08:40:08 23 A.    We do not have one planned for this year.

08:40:11 24 Q.    Do you intend on planning one for the future?

08:40:13 25 A.    Potentially.

08:40:14 1    Q.    Okay.  Generally speaking, you agree with me that

08:40:21 2    some BI conferences and webinars contain content relating to

08:40:26 3    claims and litigation management; right?

08:40:28 4    A.    Yes.  But under the -- when you -- when you say that,

08:40:33 5    you have to understand that the context is through a risk

08:40:37 6    mitigate or risk manager's perspective.

08:40:40 7    Q.    Yes.  We can -- you can elaborate further when your

08:40:43 8    counsel asks questions.

08:40:45 9    A.    Sure.

08:40:45 10   Q.    I just want to get confirmation from you that you

08:40:48 11   agree with me that you do provide claims and litigation

08:40:51 12   management content at some of your conferences; correct?

08:40:55 13   A.    Yes, as it pertains to risk management strategies.

08:41:00 14   Q.    And you specifically said at your deposition that

08:41:03 15   cannabis conference would touch on claims and the Long-Term

08:41:08 16   Care Conference recently touched on claims; right?

08:41:09 17   A.    Yes.

08:41:10 18   Q.    We'll get into more of those specifics in a few

08:41:13 19   minutes.

08:41:14 20         And speaking specifically about cannabis and IP,

08:41:17 21   you told me at your deposition that the conferences would

08:41:21 22   also discuss litigation strategies as part of the insurance

08:41:25 23   discussion; right?

08:41:26 24   A.    Yes.  They might.

08:41:32 25   Q.    All right.  I want to move on to some events that BI

08:41:35 1    has held since -- since 2019.  On --

08:41:40 2                Can we bring up Exhibit 32, please?

08:41:43 3                We can turn to 32 in the binder, Mr. Kenner.

08:41:56 4    Turning to Page 9 of 17.

08:42:34 5                Okay.  On May 25th, 2021, BI had a webinar

08:42:39 6    titled Crisis in Senior Care:  Risk Management Concerns in

08:42:43 7    Long-Term Care Facilities.

08:42:46 8                Do you recall that webinar?

08:42:46 9    A.    Mm-hmm.  Yes.

08:42:48 10   Q.    And you agreed with me at your deposition that this

08:42:53 11   would be -- that this webinar discussed claims arising in

08:42:57 12   the long-term care setting; correct?

08:43:00 13   A.    Correct.

08:43:03 14   Q.    Specifically, what sort of -- what types of high

08:43:05 15   incidents of claims would happen at such facilities, like

08:43:10 16   slips and falls?

08:43:10 17   A.    Mm-hmm.  And how to eliminate them.

08:43:13 18   Q.    How to eliminate them.  Okay.

08:43:15 19                THE COURT:  Mr. Kenner, when you're meaning to

08:43:18 20   say yes, please say yes.  Okay?  Don't say mm-hmm.  Say yes.

08:43:20 21   Okay.  Mm-hmm doesn't come through in the transcript.

08:43:26 22                MR. SIEGEL:  Thank you, Your Honor.  Used to

08:43:28 23   doing that at depositions.  I'm not used to doing it so much

08:43:31 24   in court.

08:43:32 25   BY MR. SIEGEL:

08:43:32 1  Q.    And you agree with me that -- if you turn to the next

08:43:36 2  page -- among the panelists for the webinar was an attorney,

08:43:40 3  Wilson Elser; right?

08:43:42 4  A.    Yes.

08:43:43 5  Q.    And Wilson Elser was the sponsor, the lead sponsor,

08:43:46 6  for the Cannabis and Hemp Conference back in 2019; correct?

08:43:49 7  A.    Yes.

08:43:52 8  Q.    And are you familiar with this Ms. Semlies who

08:43:57 9  practices of Wilson Elser?

08:43:59 10  A.    Could you restate the question, please?

08:44:01 11  Q.    Are you familiar with Lori Semlies, the attorney who

08:44:05 12  practices at Wilson Elser?

08:44:07 13  A.    Yes.

08:44:08 14  Q.    Okay.  Do you know what -- what she does?

08:44:09 15  A.    Yes, I do.

08:44:13 16  Q.    And what is her -- what is her role?

08:44:14 17  A.    She's an attorney for Wilson Elser.

08:44:17 18  Q.    Okay.  What type of law does she practice?

08:44:19 19  A.    That, I don't know off the top of my head.

08:44:25 20  Q.    If we can look quickly at the P-23.  I have to get

08:44:49 21  the page number.  I apologize for that.

08:45:26 22         You should see on your screen Lori Semlies,

08:45:31 23  chair of Wilson Elser, medical professional liability

08:45:36 24  practice?

08:45:36 25  A.    Yes.

08:45:36 1  Q.     Does that sound familiar to you?  Does that refresh

08:45:38 2  your recollection of what her position is at Wilson Elser?

08:45:42 3  A.     Yes.

08:45:42 4  Q.     Then you agree with me that Ms. Semlies, who spoke at

08:45:45 5  the webinar on long-term care, is a claims and litigation

08:45:48 6  management professional?

08:45:49 7  A.     Yes.

08:45:53 8  Q.     All right.  We can we take that down.

08:45:56 9         And then in July of 2021, BI held a long-term

08:46:03 10 care virtual conference.  Do you recall that?

08:46:05 11 A.     Mm-hmm.  Yes.

08:46:07 12 Q.     Can we bring up Exhibit 28?

08:46:10 13        Okay.  Do you agree with me this is the web page

08:46:27 14 advertising the Long-Term Care Conference that was held

08:46:30 15 July 15 to 16, 2021?

08:46:33 16 A.     Yes.

08:46:35 17 Q.     Okay.  Looking at the landing page, this conference

08:46:40 18 was marketed to address slips and falls, which are the

08:46:42 19 number one injury claim, abuse and neglect, labor and

08:46:46 20 employment issues insurance, and litigation trends and trial

08:46:50 21 experiences.

08:46:52 22        Do you see that?

08:46:52 23 A.     Mm-hmm.  Yes.

08:46:55 24 Q.     And when I asked you about these, you agreed with me

08:46:57 25 these topics would specifically discuss claims arising out

Kenner - Direct

08:47:00 1   of long-term care facility abuse and neglect; right?

08:47:03 2   A.      Yes.  But, again, through the prism of risk

08:47:08 3   management strategies.

08:47:10 4   Q.      But they would still discuss claims and litigation

08:47:13 5   and, specifically including litigation trends; right?

08:47:16 6   A.      Yes.  To risk managers who are trying to prevent

08:47:20 7   them.

08:47:32 8   Q.      But you also agreed with me at your deposition that

08:47:34 9   such topics would also appeal to people who practice in

08:47:36 10  claims and litigation management; right?

08:47:39 11  A.      They might.

08:47:42 12  Q.      And in addition to the attendees at the conference,

08:47:46 13  weren't many of the speakers that BI gathered for this

08:47:49 14  virtual conference professionals in the claims and

08:47:51 15  litigation management space?

08:47:53 16  A.      Some of them were.

08:48:02 17  Q.      At your deposition, you told me that a large

08:48:06 18  percentage of the topics had somebody on the litigation side

08:48:08 19  as presenters, do you remember that?

08:48:11 20  A.      Can you repeat that, please.

08:48:12 21  Q.      At your deposition, you told me that a large

08:48:14 22  percentage of the topics for the web -- for the conference

08:48:18 23  would have been presented by somebody on the litigation

08:48:21 24  side.

08:48:21 25          Do you recall that?

08:48:21 1   A.      No, I don't.

08:48:25 2   Q.      Can we pull up Page 144 of Mr. Kenner's deposition?

08:48:31 3           Looking at lines 3 through 10.

08:48:48 4   A.      Mm-hmm.

08:48:49 5   Q.      Specifically your answer to my question.  "I think we

08:48:54 6   had almost -- a large percentage of the topics had somebody

08:48:56 7   on the litigation side."

08:48:58 8   A.      I see that.  Yes.

08:49:00 9   Q.      So, does that refresh your recollection that a large

08:49:02 10  percentage of the presenters at the Long-Term Care

08:49:07 11  Conference are folks that practice in litigation?

08:49:09 12  A.      You know, I wouldn't characterize it that way.  I

08:49:11 13  think we had a balance of people.  A small percentage of

08:49:16 14  people that would be interested in litigation.  But we also

08:49:19 15  had owners and operators of long-term care facilities, we

08:49:23 16  had brokers, and we had risk managers of long-term care

08:49:25 17  facilities as well.  So there was a balance.

08:49:29 18  Q.      You didn't say balance at your deposition, though.

08:49:32 19  At your deposition, you said it was a large percent.

08:49:36 20  A.      I did.

08:49:37 21  Q.      And sticking with long-term care, does BI intend to

08:49:41 22  make long-term care a recurring conference?

08:49:43 23  A.      That's unknown at this point.

08:49:46 24  Q.      Well, aren't there events planned for 2022 on

08:49:50 25  long-term care?

08:49:50  1    A.    There is an event planned for 2022.

08:49:53  2    Q.    Okay.  So you had one in -- you had a webinar and a

08:49:57  3    virtual conference in 2021, and now you have a conference

08:50:00  4    planned for 2022; correct?

08:50:02  5    A.    Correct.

08:50:08  6    Q.    Let's turn to a cyber webinar that was held in 2021.

08:50:14  7    Can you bring up Exhibit 26, please?

08:50:16  8          Do you have the exhibit in front of you,

08:50:28  9    Mr. Kenner?

08:50:29 10    A.    Mm-hmm.

08:50:30 11    Q.    And this is the web page advertising the July 29,

08:50:39 12    2021, Specialty Insurance Webinar on cyber security?

08:50:42 13    A.    Yes.

08:50:45 14    Q.    And among the topics that were addressed at this

08:50:48 15    webinar included how companies should respond if they are

08:50:56 16    hit with a cyber attack or their system is compromised;

08:51:00 17    right?

08:51:00 18    A.    Yes.

08:51:01 19    Q.    You agreed with me that responding to a cyber

08:51:04 20    security event would be a post-loss -- would be a post-loss

08:51:09 21    activity; right?

08:51:10 22    A.    Yes.

08:51:13 23    Q.    And sticking with the webinar, just taking a look at

08:51:17 24    the panel lists, first we have Scott Godes, partner and

08:51:23 25    co-chair of his firm's insurance recovery and counseling

08:51:27 1    practice.

08:51:28 2                        Do you see that?

08:51:28 3    A.    Mm-hmm.

08:51:29 4    Q.    Are you familiar with Mr. Godes?

08:51:31 5    A.    I'm not personally, no.

08:51:34 6    Q.    You agree with me that he's a lawyer practicing in

08:51:36 7    litigation?

08:51:37 8    A.    Yes.

08:51:38 9    Q.    Okay.  And Michael Phillips is the chief claims

08:51:42 10   officer at Resilience Cyber Insurance Solutions?

08:51:45 11   A.    Yes.

08:51:48 12   Q.    You agree with me that he's a claims professional?

08:51:51 13   A.    Yes.

08:51:52 14   Q.    And in addition to that, Mr. Reagan at Marsh.

08:51:58 15                       Between these three presenters, all three of

08:52:00 16   them are professionals in the insurance industry; correct?

08:52:03 17   A.    Correct.

08:52:04 18   Q.    And two of them specifically are in claims and

08:52:06 19   litigation management; right?

08:52:08 20   A.    Correct.

08:52:09 21   Q.    And does BI intend to continue offering content on

08:52:15 22   cyber security in the future?

08:52:16 23   A.    Potentially.

08:52:17 24   Q.    Well, but isn't there a webinar already scheduled for

08:52:20 25   September?

08:52:21  1    A.      It's scheduled but I don't know whether it's going to

08:52:25  2    happen.

08:52:27  3    Q.      It's on the web page, isn't it?

08:52:28  4    A.      It is on the web page.

08:52:33  5    Q.      If he we can just go back to Exhibit 32.

08:52:36  6            Flip to Page 8017.  And at the bottom, that

08:52:48  7    webinar is currently scheduled for September 28th, 2022;

08:52:52  8    correct?

08:52:52  9    A.      Mm-hmm.  I would say our -- our events calendar for

08:52:59 10    2022 is fluid.

08:53:01 11    Q.      Understood.

08:53:03 12            MR. DENN:  Your Honor, once again, having events

08:53:06 13    put up that are outside the scope of what is permissible.  I

08:53:08 14    understand that plaintiffs are allowed to generally ask

08:53:11 15    about what future events are planned, but the specific

08:53:14 16    details should not be --

08:53:16 17            THE COURT:  Well, there's been no question about

08:53:17 18    specific details at this point.

08:53:20 19            MR. DENN:  I just --

08:53:20 20            THE COURT:  But, I mean, things that are on the

08:53:22 21    screen, I'm not even seeing them, so...

08:53:24 22            MR. DENN:  Okay.

08:53:25 23            THE COURT:  When they're not in the record --

08:53:27 24    you know, they could be putting up pictures of sitting on

08:53:30 25    the beach in Hawaii out there.  You know, what difference.

08:53:37 1          MR. SIEGEL:  I don't intend to do that,

08:53:38 2     Your Honor.

08:53:39 3     BY MR. SIEGEL:

08:53:42 4     Q.    Speaking of future conferences that BI is planning,

08:53:45 5     you're also intending to continue to have Cannabis and Hemp

08:53:49 6     Conference; correct?

08:53:49 7     A.    Correct.

08:53:53 8     Q.    So all these conferences that we talked about and

08:53:57 9     webinars that we talked about, you agree with me they all do

08:53:59 10    have content, claims content, presented by insurance and

08:54:04 11    claims professionals; right?

08:54:05 12    A.    Yes.  Again, under the context of the risk management

08:54:11 13    and risk mitigation.  These people need to understand how to

08:54:14 14    avoid claims and litigation.

08:54:21 15    Q.    I want to draw your attention to the attendee list

08:54:26 16    for the cannabis conference.

08:54:28 17          Can we pull up Exhibit 109, please?

08:54:31 18          And there's a Excel spreadsheet that's -- that's

08:54:40 19    also part of Exhibit 109.

08:54:45 20          Have you ever seen this attendee list before,

08:54:50 21    Mr. Kenner?

08:54:51 22    A.    Yes.

08:54:52 23    Q.    Is this -- you agree with me this is an attendee list

08:54:56 24    for the Cannabis and Hemp Conference that was held in

08:55:00 25    October of 2019?

08:55:01 1    A.    It appears so, yes.

08:55:05 2    Q.    I want to first draw your attention to Row 8.  You

08:55:11 3    see Theresa Bartlett?

08:55:13 4    A.    Mm-hmm.

08:55:13 5    Q.    You see that --

08:55:14 6    A.    Yes.

08:55:14 7    Q.    -- she's -- excuse me?

08:55:16 8    A.    Yes, I see.

08:55:18 9    Q.    Okay.

08:55:18 10   A.    Row 8.

08:55:19 11   Q.    And that's her business industry, she's listed as

08:55:22 12   claims third-party administrator adjuster?

08:55:25 13   A.    Yes.

08:55:26 14   Q.    Can we go to Row 34?

08:55:36 15         Mike Coduto, he's listed as claims professional

08:55:40 16   also, claims third-party administrator adjuster?

08:55:43 17   A.    Yes.

08:55:45 18   Q.    You agree with me?  Okay.

08:55:47 19         Line -- Row 60.  Kerry Foris is a claims

08:55:55 20   attorney, do you agree with me on that?

08:55:57 21   A.    Yes.

08:55:59 22   Q.    Line 125.  Sherry Merber is the vice president of

08:56:11 23   claims at Ascot Group?

08:56:13 24   A.    Yes.

08:56:14 25   Q.    Line 137.  Beth Ossino, is a claims manager at Golden

08:56:25 1    Bear Insurance Company; correct?

08:56:26 2    A.      Correct.

08:56:26 3    Q.      All right.  212.  Ryan Welch is a claims professional

08:56:36 4    with Beasley, correct?

08:56:38 5    A.      Correct.

08:56:39 6    Q.      And finally 217.  We see -- don't know the first

08:56:48 7    name -- Ms. Wood -- Mr. or Mrs. Woodfield is a claim

08:56:52 8    professional; correct?

08:56:53 9    A.      That, I can't tell.

08:56:56 10   Q.      Well, just the -- three columns, in claims

08:56:59 11   professional?

08:57:00 12   A.      That's what it says.

08:57:02 13   Q.      And that's the characterization of these folks'

08:57:08 14   profession by Business Insurance; right?  Is the Business

08:57:11 15   Insurance record?

08:57:11 16   A.      As an attendee, this is what their title is and

08:57:15 17   their -- obviously their experience.

08:57:16 18   Q.      So you agree with me, just looking at these few that

08:57:19 19   we looked at, there were several claims professionals who

08:57:21 20   were in attendance, or at least on the attendee list for the

08:57:25 21   cannabis conference; right?

08:57:26 22   A.      Yes, but I certainly wouldn't characterize it as a

08:57:28 23   majority.

08:57:30 24   Q.      I didn't ask you if it was a majority.

08:57:32 25           You agree with me that there were folks that BI

08:57:35 1  identifies as claims professionals at the cannabis

08:57:38 2  conference; right?

08:57:39 3  A.    Yes.

08:57:41 4  Q.    And you told me that if somebody comes to a BI event,

08:57:43 5  you keep them on the list for future events; right?

08:57:46 6  A.    Yes.

08:57:46 7  Q.    There's no attempt to cull the list to make sure that

08:57:49 8  you're not reaching out to claims professionals for future

08:57:52 9  conferences; right?

08:57:53 10  A.    Correct.

08:57:55 11  Q.    So, if these folks came to the cannabis conference,

08:57:58 12  they would be on the list to receive marketing for future

08:58:00 13  events; correct?

08:58:01 14  A.    Yes.

08:58:12 15  Q.    Okay.  I want to just ask you a couple of quick

08:58:14 16  questions about Jeremy Campbell.  Do you recall when Jeremy

08:58:19 17  Campbell left the employee -- the employment of BI?

08:58:21 18  A.    Yes.

08:58:24 19  Q.    Okay.  And what was Mr. Campbell's position with BI?

08:58:27 20  A.    He was head of event sales.

08:58:31 21  Q.    And when he left, do you recall having discussions

08:58:34 22  with him about whether he had a non-compete?

08:58:37 23  A.    Yes.

08:58:38 24  Q.    And I think you told me at your deposition that

08:58:44 25  Mr. Potter thought that BI should aggressively attempt to

08:58:49  1   keep Mr. Campbell at Business Insurance; right?

08:58:52  2   A.    Yes.

08:58:55  3   Q.    You made an aggressive counteroffer to try to get him

08:58:57  4   to stay; right?

08:58:58  5   A.    That's correct.

08:58:59  6   Q.    And one of the reasons that Mr. Potter wanted him to

08:59:03  7   stay or thought that he should stay was that he thought that

08:59:07  8   Mr. Campbell might be in a position to compete with BI if he

08:59:10  9   went to CLM?

08:59:11  10  A.    I don't think it was that as much as Jeremy was a

08:59:15  11  valued employee and a good salesperson.

08:59:17  12  Q.    But the competition was a factor, wasn't it?

08:59:19  13  A.    I didn't see it that way, but I don't know what

08:59:23  14  Adam -- how Adam saw it.

08:59:25  15  Q.    But do you recall telling me that at your deposition?

08:59:27  16  A.    I beg your pardon.

08:59:28  17  Q.    You recall telling me that at your deposition?

08:59:31  18  A.    Do I recall telling you that at my deposition, no, I

08:59:34  19  don't.

08:59:34  20  Q.    Can we pull up Page 86 of Mr. Kenner's transcript?

08:59:47  21        And if you look at the bottom of Page 86, I

08:59:51  22  asked you:  "Was he concerned that if Jeremy left, that he

08:59:56  23  would be in a position to potentially compete with BI?"

08:59:59  24        And your answer was:  "I think that was part of

09:00:02  25  it."

09:00:04 1   A.      Okay.

09:00:06 2   Q.      So you agree with me that was a consideration and a

09:00:08 3   concern; correct?

09:00:09 4   A.      If could be, yes.

09:00:18 5   Q.      At your deposition, I asked you some questions about

09:00:24 6   the relationship between Business Insurance and a company

09:00:27 7   known as ClaimsXchange; right?  Do you recall that?

09:00:30 8   A.      Vaguely, yes.

09:00:34 9   Q.      And at your deposition --

09:00:35 10             If we could pull up P-27.

09:00:38 11             Do you recall when I showed you this website at

09:00:47 12  your deposition?

09:00:47 13  A.      Vaguely, yes.

09:00:52 14  Q.      And your deposition was on August 4th, 2021; right?

09:00:56 15  A.      Correct.

09:00:57 16  Q.      Do you remember that date?

09:00:57 17             And I pulled this up live at your deposition;

09:01:02 18  right?  Do you remember that?

09:01:03 19  A.      I don't, actually, but I'm looking at it now.

09:01:07 20  Q.      Okay.  And it says there that Business Insurance is

09:01:11 21  listed as a strategic partner of ClaimsXchange; correct?

09:01:15 22  A.      That's what it appears.

09:01:51 23  Q.      And, Mr. Kenner, speaking more generally about

09:01:54 24  potential future events, you intend to continue putting on

09:01:58 25  events that contain content related to claims; correct?

09:02:01  1   A.     I don't think we're -- we put on events that are

09:02:07  2   dedicated to claims.  Claims --

09:02:08  3   Q.     I didn't ask if they were dedicated to claims.  You

09:02:11  4   intend to put on conferences that will include claims as

09:02:14  5   topics for discussion; correct?

09:02:16  6   A.     Yes, they could potentially include topics that would

09:02:19  7   involve claims.

09:02:22  8   Q.     And litigation strategies as well?

09:02:25  9   A.     Goes it with it, yes.

09:02:26 10   Q.     And you intend to continue to use claims and

09:02:28 11   litigation management professionals to lead these

09:02:31 12   conferences?

09:02:31 13   A.     Sometimes.  Yes.

09:02:36 14          MR. SIEGEL:  Okay, Your Honor, I have no further

09:02:38 15   questions but I would like to move into evidence Exhibit 24,

09:02:48 16   30 --

09:02:50 17          THE COURT:  So, 24 is admitted without

09:02:52 18   objection.

09:02:53 19          (Plaintiffs' Exhibit No. 24 was admitted into

09:02:53 20   evidence.)

09:02:53 21          MR. SIEGEL:  32.

09:02:57 22          MR. DENN:  32, we do object to, Your Honor, for

09:02:59 23   the reasons that we were discussing earlier that's --

09:03:01 24          THE COURT:  Well, so 32 appears to be lots of

09:03:04 25   different things put together.

09:03:05  1          MR. SIEGEL:  It's a compendium of the Business

09:03:09  2     Insurance website, I think, as it -- as it appeared a couple

09:03:13  3     of weeks before the pretrial, Your Honor.

09:03:15  4          THE COURT:  Well, why don't we just admit the

09:03:17  5     two things.  I think it was -- you were using Page 9 of 17,

09:03:25  6     possibly you were using Page 10 of 17.  Why don't we just

09:03:29  7     admit those two pages.

09:03:43  8          MR. DENN:  We don't object to that, Your Honor.

09:03:51  9          MR. SIEGEL:  One other issue, Your Honor.  At

09:03:54 10     least the Cannabis Conference that's on the first page,

09:03:58 11     although it's in 2022, I thought your ruling from last week

09:04:03 12     clarified that while we couldn't get into new topics, that

09:04:07 13     if there were a topic that was previously covered, we could

09:04:11 14     present evidence that they intend to continue putting them

09:04:14 15     on in the future.

09:04:16 16          THE COURT:  Well, certainly I don't think

09:04:19 17     there's any particular harm to admitting the first page of

09:04:23 18     this exhibit, either.  And I do think that what I said -- or

09:04:31 19     what I have right in front of me was basically they intend

09:04:35 20     to keep on putting conferences of the nature.

09:04:39 21          In the end, it has nothing to do with why.  It

09:04:42 22     clearly only has something to do with possibly whether

09:04:44 23     there's an injunction later on.  So, I'm going to admit that

09:04:47 24     over -- Page 1 of 1 over Defendants' objection, and Pages 9

09:04:56 25     and 10 without objection.

09:05:02 1          MR. SIEGEL:  Thank you, Your Honor.

09:05:03 2          MR. DENN:  Your Honor, I'm sorry.  Page 10 -- I

09:05:06 3   apologize for not keeping up with the numbers.  Page 10, we

09:05:08 4   did object to because that contains a description of an

09:05:11 5   event that the Court specifically prohibited the plaintiff

09:05:15 6   from discussing.

09:05:16 7          THE COURT:  Yeah, well, so I'm admitting it for

09:05:18 8   the part that's been discussed, which did include the fact

09:05:21 9   that Lori Semlies was on Page 10 at the top.  So that's the

09:05:25 10  reason I'm admitting that.

09:05:31 11         MR. DENN:  Okay.  Thank you.

09:05:32 12         THE COURT:  All right.  Anything else there?

09:05:39 13         (Discussion held off the record:)

09:05:43 14         MR. SIEGEL:  Exhibit 28, Your Honor.

09:05:48 15         THE COURT:  All right.  I think that should be

09:05:50 16  admitted without objection, and it is.

09:05:54 17         (Plaintiffs' Exhibit No. 28 was admitted into

09:05:56 18  evidence.)

09:05:56 19         MR. SIEGEL:  Exhibit 26.

09:05:59 20         THE COURT:  I think that would be admitted

09:06:01 21  without objection, and it is.

09:06:03 22         (Plaintiffs' Exhibit No. 26 was admitted into

09:06:04 23  evidence.)

09:06:04 24         MR. SIEGEL:  We already talked about Exhibit 32.

09:06:13 25         Exhibit 109.

09:06:17 1       THE COURT:  Do you really want to -- I don't

09:06:21 2  know how much information it has in there.  You know, if we

09:06:27 3  admit these things, it is a public proceeding, I think you

09:06:29 4  got your point across for the examination.  So, I'm not

09:06:31 5  really sure that there's any particular need to admit the

09:06:34 6  exhibit.

09:06:46 7       MR. SIEGEL:  We just as soon have it in the

09:06:48 8  record, Your Honor, unless there's an objection to it.

09:06:49 9       MR. DENN:  Our objection is to the precise

09:06:51 10  reason that Your Honor just stated.

09:06:53 11       THE COURT:  Yeah, you know -- so I'm -- I mean,

09:06:58 12  it has no additional evidentiary value beyond what the

09:07:03 13  witness said about it.  So -- and I think the record is

09:07:09 14  clear that it was a cannabis conference, 2019, you were that

09:07:15 15  you were asking about.

09:07:16 16       So I'm -- I'm not going to admit it because I

09:07:23 17  think you've already gotten what you need out of it.  And

09:07:30 18  this concern about personal information of the 225 or so

09:07:35 19  people who are listed on it.  All right.

09:07:38 20       MR. SIEGEL:  Thank you very much.

09:07:39 21       THE COURT:  So I'm not going to admit that.

09:07:42 22       MR. SIEGEL:  And then, finally, Exhibit P-27.

09:07:50 23       (Discussion held off the record:)

09:07:57 24       THE COURT:  All right.  So that's admitted

09:07:59 25  without objection.

09:08:00 1          (Plaintiff's Exhibit No. P-27 was admitted into

09:08:01 2   evidence.)

09:08:05 3          THE COURT:  All right.  Thank you, Mr. Siegel.

09:08:06 4          MR. SIEGEL:  Thank you, Your Honor.

09:08:11 5                  CROSS-EXAMINATION

09:08:11 6   BY MR. DENN:

09:08:24 7   Q.    Mr. Kenner, you -- you saw a list up on the screen

09:08:28 8   of -- an attendee list of about 218 people who had attended

09:08:32 9   the June 2019 Cannabis and Hemp Conference; right?

09:08:36 10  A.    Yes.

09:08:36 11  Q.    And Mr. Siegel asked you about, I think, seven

09:08:42 12  specific people who were on that list?

09:08:43 13  A.    Yes.

09:08:44 14  Q.    Do you know how any of those people learned about the

09:08:47 15  conference?

09:08:48 16  A.    Not specifically, no.

09:08:52 17  Q.    Could they have learned about it just through general

09:08:54 18  advertising?

09:08:55 19  A.    Yes.

09:08:58 20  Q.    To your knowledge, was there any specifying effort

09:09:02 21  made to target claims or litigation professionals to attend

09:09:05 22  that conference?

09:09:05 23  A.    No.

09:09:06 24  Q.    Or -- or any Business Insurance conference?

09:09:08 25  A.    No.  Correct.

09:09:14 1   Q.    You were asked some questions about Mr. Campbell and

09:09:16 2   about his departure from Business Insurance?

09:09:20 3   A.    Yes.

09:09:22 4   Q.    In his job at Business Insurance, did Mr. Campbell

09:09:24 5   have access to -- to lists of sponsors and potentially

09:09:30 6   customers?

09:09:30 7   A.    Yes.

09:09:35 8   Q.    Was his access to those lists a concern of Business

09:09:38 9   Insurance when he was leaving the company?

09:09:39 10   A.    Yes.

09:09:43 11   Q.    Finally, the last exhibit that you saw on the screen,

09:09:47 12   the live shot of the website, the ClaimsX website that

09:09:53 13   listed Business Insurance as a strategic partner, do you

09:09:56 14   recall that?

09:09:56 15   A.    Yes.

09:09:57 16   Q.    To your knowledge, was Business Insurance a strategic

09:10:00 17   partner of ClaimsX at the time that you were shown that

09:10:02 18   advertisement?

09:10:03 19   A.    No.  As a matter of fact, I didn't know about that.

09:10:07 20             MR. DENN:  No other questions, Your Honor.

09:10:08 21             THE COURT:  All right.  All right.

09:10:11 22             Anything further from anyone?

09:10:12 23             MR. SIEGEL:  Just really quick.

09:10:18 24                  REDIRECT EXAMINATION

09:10:18 25   BY MR. SIEGEL:

09:10:22 1    Q.    Mr. Kenner, I asked you at your deposition if you

09:10:25 2    were aware that when Wilson Elser sponsored the Cannabis and

09:10:30 3    Hemp Conference, that Wilson Elser asked Business Insurance

09:10:32 4    to use its marketing list to solicit attendees for the

09:10:37 5    conference.

09:10:38 6              Do you recall that?

09:10:39 7              MR. DENN:  Your Honor, I just object.  This is

09:10:41 8    outside the scope.

09:10:42 9              THE COURT:  Well, I think it has to do with your

09:10:44 10   questions about targeting.

09:10:49 11              So go ahead if you know the answer.

09:10:51 12              THE WITNESS:  Could you repeat the question,

09:10:52 13   please?

09:10:52 14   BY MR. SIEGEL:

09:10:53 15   Q.    Were you aware that Wilson Elser asked Business

09:10:56 16   Insurance to use its marketing list to solicit attendees for

09:11:00 17   the Cannabis and Hemp Conference?

09:11:01 18   A.    I think they asked us, yes.

09:11:03 19   Q.    And do you know whether that happened?

09:11:05 20   A.    I think it did, yes.

09:11:09 21   Q.    So, just to be clear, when Business Insurance

09:11:12 22   marketed the Cannabis and Hemp Conference, it used the BI

09:11:17 23   list and the Wilson Elser law firm's marketing list;

09:11:22 24   correct?

09:11:22 25   A.    Yes.  It was a separate mailing, but yes.

09:11:26 1        MR. SIEGEL:  Thank you.  No further questions,

09:11:27 2   Your Honor.

09:11:28 3        MR. DENN:  Your Honor.

09:11:30 4        THE COURT:  All right.

09:11:31 5        MR. DENN:  I just have one question.

09:11:32 6             RECROSS-EXAMINATION

09:11:32 7   BY MR. DENN:

09:11:34 8   Q.    Mr. Kenner, do you know who was on the Wilson Elser

09:11:36 9   list.

09:11:36 10  A.    I do not.

09:11:38 11       MR. DENN:  Nothing further.

09:11:39 12       THE COURT:  All right.  Mr. Kenner, thank you,

09:11:41 13  you may step down.  Watch your step.  You're -- may he be

09:11:45 14  excused?

09:11:48 15       MR. SIEGEL:  Yes.

09:11:49 16       THE COURT:  You're excused.

09:11:50 17       THE WITNESS:  Thank you.

09:12:00 18       MR. SIEGEL:  Your Honor, our witness is in the

09:12:02 19  hallway.

09:12:02 20       THE COURT:  All right.

09:12:27 21       MR. SIEGEL:  Your Honor, we call Jeremy

09:12:29 22  Campbell.

09:12:39 23       DEPUTY CLERK:  Please state and spell your full

09:12:44 24  name for the record.

09:12:44 25       THE WITNESS:  Jeremy Campbell, J-E-R-E-M-Y,

09:12:44 1    Campbell, C-A-M-P-B-E-L-L.

09:12:51 2            JEREMY CAMPBELL, the witness herein, after

09:12:51 3    having been duly sworn under oath, was examined and

09:13:00 4    testified as follows:

09:13:00 5            DEPUTY CLERK:  Thank you.

09:13:03 6                    DIRECT EXAMINATION

09:13:03 7    BY MR. SIEGEL:

09:13:03 8    Q.    Good morning, Mr. Campbell.

09:13:04 9    A.    Good morning.

09:13:06 10   Q.    Mr. Campbell, where are you employed?

09:13:07 11   A.    At CLM.

09:13:10 12   Q.    Okay.  How long have you been with CLM?

09:13:11 13   A.    Since 2019.

09:13:16 14   Q.    What is your current position at CLM?

09:13:18 15   A.    VP of partnerships.

09:13:21 16   Q.    Can you describe for the Court what VP of

09:13:23 17   partnerships is?

09:13:24 18   A.    I run our sales team, so I sell our sponsorships for

09:13:32 19   all of our events, non-event marketing, like advertising,

09:13:37 20   things like that.  And then I have a couple reps, sales reps

09:13:42 21   that work for me that do the same thing.

09:13:45 22   Q.    Where were you employed immediately before being with

09:13:49 23   CLM?

09:13:49 24   A.    Business Insurance.

09:13:51 25   Q.    What was your position with BI?

09:13:53 1   A.    I was head of sales for their events, D&I Institute,

09:14:00 2   and workers' comp magazine.

09:14:01 3   Q.    And in that capacity, were you generally familiar

09:14:04 4   with BI's subscriber list and conference attendees and that

09:14:11 5   nature?

09:14:11 6   A.    Yes.

09:14:13 7   Q.    Generally speaking, what would you describe the

09:14:15 8   makeup of BI's audience?

09:14:17 9   A.    They are written for the risk managers, but with that

09:14:27 10  is the brokers and underwriters and insurance professionals

09:14:33 11  that work with the broke -- with the risk managers.  So, at

09:14:37 12  our events, a lot of the attendees were brokers and

09:14:44 13  underwriters.

09:14:44 14  Q.    All right.  And how about third-party administrators?

09:14:47 15  A.    TPAs as well, yeah.

09:14:49 16  Q.    And what portion, would you say, of BI's audience

09:14:53 17  would be classified as risk managers?

09:14:54 18  A.    I wouldn't know that offhand.

09:14:59 19  Q.    Was it a large percentage?

09:15:01 20  A.    No, I don't think so.

09:15:06 21  Q.    When did you -- when did you decide to leave BI?

09:15:10 22  A.    September of 2019.

09:15:15 23  Q.    And do you remember who you gave notice to at BI?

09:15:19 24  A.    Keith Kenner.

09:15:22 25  Q.    Did you tell him where you intended to go?

09:15:24 1    A.    Yes, to CLM.

09:15:26 2    Q.    Excuse me?

09:15:26 3    A.    Yes, to CLM.

09:15:27 4    Q.    To CLM?  Okay.

09:15:29 5          What was his reaction to that?

09:15:30 6    A.    Well-wishes at first.  And later on, you know, there

09:15:41 7    was an attempt to try to keep me at Business Insurance.

09:15:46 8    Q.    What did -- what, if anything, did they say to try to

09:15:48 9    keep you at BI?

09:15:49 10   A.    They -- they mentioned that there was an intention to

09:15:56 11   grow their conference base which would result in me having

09:16:00 12   more opportunity to sell, which would result in more revenue

09:16:06 13   for myself, more commissions.

09:16:10 14   Q.    Do you recall any specifics about the expanding

09:16:14 15   conference list?

09:16:15 16   A.    No, we didn't -- we didn't go into the type of

09:16:17 17   conferences that we were going to expand to.  It was just

09:16:20 18   that there was going to be -- they were planning to expand.

09:16:24 19   And there was going to be more opportunity and more events.

09:16:31 20   Q.    Do you recall anyone at BI advising you that you were

09:16:36 21   subject to a non-compete?

09:16:37 22   A.    Yes.

09:16:39 23   Q.    And what, if anything, did they tell you?

09:16:41 24   A.    Keith had -- had emailed me that -- that he was

09:16:47 25   advised by Steve Acunto that I did have a non-compete and

09:16:52 1    that they planned to enforce the non-compete when I go to

09:16:56 2    CLM.

09:16:56 3    Q.     And did they specifically tell you that if you went

09:16:59 4    to CLM that would be a violation of your non-compete?

09:17:02 5    A.     I don't know if they said it in direct terms, just

09:17:09 6    said that they planned to enforce the -- the non-compete

09:17:13 7    when you go to CLM.

09:17:14 8    Q.     And did you, in fact, have a non-compete?

09:17:16 9    A.     No.

09:17:18 10   Q.     Did anyone ever show you a copy of such a document?

09:17:21 11   A.     No, I requested it on multiple occasions and was

09:17:24 12   never given a copy.

09:17:29 13   Q.     Are you generally familiar with a company known as

09:17:32 14   the ClaimsXchange?

09:17:33 15   A.     Yes.

09:17:34 16   Q.     What do you know about ClaimsXchange?

09:17:36 17   A.     It's run by Sydney Posner and they are basically a

09:17:44 18   direct competitor of CLM.

09:17:47 19   Q.     What makes you say that they're a direct competitor

09:17:49 20   of CLM?

09:17:50 21   A.     She's got people on her advisory board that are

09:17:55 22   heavily involved with CLM.  They go after the same type of

09:17:59 23   attendees that we do, which are, you know, claims

09:18:03 24   professionals, defense attorneys, things like that.

09:18:06 25          And then the same type of sponsors that we

09:18:10 1    target for our events with Rimkus, CoventBridge, law firms,

09:18:18 2    things like that.

09:18:19 3    Q.    Okay.  And are there any other specific individuals

09:18:22 4    or entities you can think of that CLM competes with

09:18:27 5    ClaimsXchange for sponsorship dollars?

09:18:30 6    A.    Well, there's a lot of competitive organizations out

09:18:34 7    there.  A lot of them are more specific, like, for example,

09:18:40 8    the trucking industry has TIDA. Subrogration was NASP.

09:18:45 9    Q.    Yeah, I apologize.  I actually just meant any other

09:18:49 10   companies that you can think of that ClaimsX competes with

09:18:53 11   CLM for sponsorship dollars?

09:18:55 12   A.    Yeah.  Business Insurance, probably,

09:19:02 13   PropertyCasualty360.  And others.

09:19:09 14           MR. SIEGEL:  Okay.  I have no further questions,

09:19:11 15   Your Honor.

09:19:11 16           THE COURT:  All right.

09:19:18 17           Cross-examination, Mr. Oprison.

09:19:21 18           MR. OPRISON:  Thank you, sir.

09:19:24 19               CROSS-EXAMINATION

09:19:24 20   BY MR. OPRISON:

09:19:25 21   Q.    Good morning, Mr. Campbell.

09:19:25 22   A.    Hi.

09:19:26 23   Q.    My name is Chris Oprison.  I'm the counsel for

09:19:28 24   defendant, BIH, in this action.

09:19:33 25           Mr. Siegel was asking you a question about other

09:19:34 1    competitive organizations, and I think he cut you off in the

09:19:37 2    middle of your sentence.  Did you want to finish that

09:19:37 3    answer, sir?

09:19:40 4          What other competitive organizations are there

09:19:42 5    to CLM?

09:19:42 6    A.    There's a lot of topical specific organizations, like

09:19:47 7    in the transportation industry, subrogation industry.

09:19:52 8    There's -- I don't know if there's any one that competes

09:19:55 9    with CLM directly for everything that we do.

09:19:58 10   Q.    But many compete with it in terms of specific

09:20:01 11   content-based conferences and events; true?

09:20:05 12   A.    Yeah.

09:20:06 13   Q.    Okay.  And all competing for the same sponsorships

09:20:09 14   and same -- same registrants; correct?

09:20:11 15   A.    Yes.

09:20:21 16   Q.    You gave notice when you were leaving in 2019?

09:20:31 17   A.    Mm-hmm.

09:20:33 18   Q.    Is that yes?

09:20:33 19   A.    Yes.

09:20:34 20   Q.    Okay.  And that was about September 25th, 2019?  Do

09:20:41 21   you recall?

09:20:41 22   A.    Right.

09:20:42 23   Q.    Okay.  You had been at that time for months working

09:20:45 24   on planning and preparation for the Cannabis and Hemp

09:20:49 25   conference, were you not?

Campbell - Cross

09:20:50 1    A.    Correct.

09:20:51 2    Q.    Okay.  From -- from the inception.  From the spring

09:20:53 3    of 2019; right?

09:20:55 4    A.    Correct.

09:20:56 5    Q.    Okay.  You had helped secure sponsors for that

09:20:59 6    program?

09:20:59 7    A.    Correct.

09:21:00 8    Q.    You had helped with advertisements to subscribers to

09:21:06 9    get them to attend the program?

09:21:07 10   A.    That wasn't really my side of it.  It was more just

09:21:11 11   the sponsorships.

09:21:12 12   Q.    Okay.  You had secured Wilson Elser -- you were

09:21:15 13   instrumental in securing Wilson Elser as the sponsor in

09:21:18 14   that -- in that conference, weren't you?

09:21:20 15   A.    Not really.  That one came from Adam.

09:21:23 16   Q.    But you interfaced with Ian Stewart and others at

09:21:26 17   Wilson Elser to lock in the sponsorship, did you not?

09:21:29 18   A.    We had planning calls.  And I may have put the

09:21:35 19   agreement together, but the agreement was really all put

09:21:38 20   together with Adam and Ian.

09:21:42 21           MR. OPRISON:  Your Honor, and I apologize, I had

09:21:43 22   binders.  If -- I'm going to go through a couple of

09:21:45 23   documents.  May I pass those out?

09:21:47 24           THE COURT:  Sure.

09:21:48 25           MR. OPRISON:  I forgot to do that at the

09:21:49 1    beginning.

09:22:15 2              May I approach?

09:22:16 3              THE COURT:  Sure.

09:22:25 4    BY MR. OPRISON:

09:22:31 5    Q.     So I want to go back to the question that I was just

09:22:33 6    asking you about -- about the sponsorships.

09:22:36 7    A.     Mm-hmm.

09:22:37 8    Q.     You had a sponsorship break out of the different

09:22:40 9    levels of sponsorship for that conference; right?

09:22:42 10   A.     Mm-hmm.

09:22:43 11   Q.     And you were principally responsible for working from

09:22:46 12   spring of 2019 until you left to secure sponsors for the

09:22:50 13   Cannabis and Hemp conference?

09:22:52 14   A.     Correct.

09:23:02 15   Q.     And you did that as head of sales for events at

09:23:05 16   workers' compensation magazine, was that your title?

09:23:08 17   A.     Yeah.  Correct.

09:23:10 18   Q.     So, in addition to Cannabis and Hemp conference, you

09:23:14 19   also secured sponsorships and advertisements for the

09:23:17 20   publications that BI had?

09:23:19 21   A.     Mainly just the workers' comp magazine.  And then

09:23:24 22   also we had a Diversity Included Institute that I secured

09:23:29 23   memberships for.

09:23:30 24   Q.     And you had full access, did you not, to the full

09:23:34 25   subscriber list for Business Insurance Holdings, did you

09:23:37 1  not?

09:23:37 2  A.    I don't believe so.  No.

09:23:42 3  Q.    You did not have access to their subscriber list?

09:23:44 4  A.    I -- I would have -- there was no need for me to have

09:23:51 5  access to a subscriber list.  There's demographics that I --

09:23:55 6  I've seen.  But the actual subscriber list, I wouldn't have

09:23:59 7  seen.

09:23:59 8  Q.    Were there any restrictions whatsoever, sir, on your

09:24:02 9  accessing the subscriber list for Business Insurance

09:24:05 10 Holdings?

09:24:05 11 A.    I don't think there was restrictions, it's just

09:24:08 12 something that I never needed to see.

09:24:10 13 Q.    And you also had historical sponsorship lists from

09:24:15 14 other conferences that had been hosted by BIH and CLM in the

09:24:19 15 past; correct?

09:24:20 16 A.    Sponsor -- not much really.  When I -- when I got

09:24:29 17 there in 2019, there was not a lot of historical

09:24:33 18 information.

09:24:34 19 Q.    I'm sorry.  I misspoke by not confining the time.

09:24:38 20 When -- I'm talking about CLM before it became -- before it

09:24:41 21 was sold to The Institutes.  You had the list of

09:24:44 22 sponsorships for events that were hosted prior to that;

09:24:47 23 correct?

09:24:47 24 A.    Well, I worked for CLM before I came to Business

09:24:54 25 Insurance, so -- but I was primarily on the advertising

09:24:58 1   side.  So, I -- other than going on their -- the public

09:25:05 2   website, I probably wouldn't have seen.

09:25:06 3   Q.   So, let -- let me just fast-forward, then, to when

09:25:10 4   BIH, and you came over from CLM to BIH, when BIH was formed

09:25:14 5   in June of 2018?

09:25:16 6   A.   Mm-hmm.

09:25:17 7   Q.   Yes?

09:25:17 8   A.   Correct.

09:25:19 9   Q.   And during that time, from June 2018 to

09:25:22 10   September 2019, you had access to, and were principally

09:25:26 11   responsible, for securing sponsorships for all of the BIH

09:25:31 12   activities; right?

09:25:32 13   A.   Correct.

09:25:42 14   Q.   Now, at the time you gave notice in September of

09:25:46 15   2019, that you were leaving BIH to go to CLM, you knew that

09:25:51 16   CLM had sued BIH; right?

09:25:55 17   A.   I did not know that at the time.

09:25:57 18   Q.   I'm sorry.  I misspoke.  You knew that CLM had sued

09:26:00 19   Adam Potter, did you not?

09:26:02 20   A.   I did not.

09:26:26 21   Q.   I'm going to put up on the screen, but you have it in

09:26:28 22   front of you, sir.  If you could turn to Tab 3 in your

09:26:31 23   binder.  This is Plaintiffs' Exhibit 77.

09:26:35 24           And if you could scroll down to the second page.

09:26:51 25   Actually -- I'm sorry.  Second page.  Yeah.

09:26:55 1          I'm going to let you take a look at -- have you

09:26:58 2    had a chance to take a look at the entire document,

09:27:01 3    Mr. Kenner?

09:27:02 4    A.    Not yet, no.

09:27:03 5    Q.    It's -- the first email that I draw your attention is

09:27:05 6    the bottom of Page 1 that spills over onto Page 2, from

09:27:09 7    Bennett Heller to Katie Kett, copying Ian Stewart from

09:27:15 8    September 11, 2019.  It's at the bottom of Page 1, spills

09:27:18 9    over onto Page 2.

09:27:27 10          Do you see that?

09:27:29 11   A.    Yeah.

09:27:30 12   Q.    Okay.  And this is an email from Mr. Heller to

09:27:35 13   Ms. Kett at Business Insurance, Mr. Heller being at Wilson

09:27:39 14   Elser, requesting for an indemnification provision in light

09:27:41 15   of the lawsuit that had been brought by The Institutes and

09:27:46 16   CLM.

09:27:49 17          Do you see that?

09:27:49 18   A.    Yeah.

09:27:52 19   Q.    Okay.  Now, further up, you get added to the email

09:27:56 20   directly above it on September 11th, from Ms. Kett to Marcia

09:28:01 21   Erker to you and Keith Kenner, where it says:  "Hi all,

09:28:05 22   Wilson Elser has requested these edits to the contract in

09:28:09 23   light of the suit from The Institutes and CLM."

09:28:11 24          Do you see that?

09:28:12 25   A.    I do.

Campbell - Cross

09:28:13 1    Q.    Does that refresh your recollection that as of

09:28:17 2    September 11th, before you gave notice that you were leaving

09:28:21 3    BIH to go to CLM, that CLM -- CLM had actually sued Adam

09:28:28 4    Potter in relation to the Cannabis and Hemp Conference?

09:28:31 5    A.    Yeah, I mean, there was a lot going on at that time.

09:28:36 6    Obviously, I was probably in the midst of interviewing with

09:28:41 7    CLM.  So it looks like, yes, I was -- would have been aware,

09:28:50 8    but I don't recall the exact date of when I would have.

09:28:56 9    Q.    Well, you don't recall, but does this refresh your

09:28:59 10   recollection that, in fact, prior to giving notice to BIH,

09:29:02 11   that -- that you knew or learned of the lawsuit by CLM

09:29:06 12   against Adam Potter for the C and H conference?

09:29:10 13   A.    Yeah, according to this, I -- I was.

09:29:11 14   Q.    Now, you raised actually a good point.  I'm glad

09:29:14 15   you -- I'm glad you did that.  I want to ask you about when

09:29:16 16   you were first contacted by CLM.  You said this might have

09:29:18 17   been about the time that you were interviewing with CLM.

09:29:22 18         When did they first contact you to recruit you

09:29:26 19   from BIH to CLM?  Do you recall?

09:29:31 20   A.    I actually had an interview with The Institutes in

09:29:34 21   June of 2019.  And that was the first time that I met Anne

09:29:41 22   Blume, and we had a conversation about potentially coming

09:29:48 23   back to CLM as well.

09:29:51 24   Q.    So did Ms. Blume in June of 2019 discuss with you

09:29:56 25   going to work for The Institutes or for CLM?

09:29:57 1    A.    I had conversations with two different people on that

09:30:02 2    date.    One was with The Institutes and one was with Anne

09:30:06 3    Blume about CLM.    So they were separate conversations.

09:30:08 4    Q.    Who at The Institutes did you speak with?

09:30:10 5    A.    Jason Terrell.

09:30:14 6    Q.    And then after June of 2019 -- was that a meeting,

09:30:17 7    in-person meeting?

09:30:18 8    A.    It was.

09:30:19 9    Q.    Did you tell anybody at BIH at the time you were

09:30:22 10   speaking with Ms. Blume at CLM?

09:30:24 11   A.    No.

09:30:25 12   Q.    You didn't -- you didn't tell them that you had met

09:30:28 13   with them?

09:30:28 14   A.    No.

09:30:30 15   Q.    What about any other calls or meetings after

09:30:33 16   June 2019, with CLM or Institutes about you going over --

09:30:39 17   leaving BIH and going over to The Institutes?

09:30:42 18   A.    Yeah, I had a conversation with Ben -- or, I'm sorry,

09:30:47 19   with Jason, probably in July, just letting him know that the

09:30:53 20   opportunity at The Institutes wouldn't work.    But it was

09:30:58 21   probably August time frame that Anne had reached back out.

09:31:05 22   Q.    And in -- in August of 2019, do you recall when?

09:31:08 23   A.    Not the exact date, no.

09:31:12 24   Q.    But Ms. Blume reached back out to you in August --

09:31:15 25   some time in August of 2019 to determine whether or not

09:31:19 1   you're still interested in a job move from BIH to CLM?

09:31:24 2   A.    Correct.

09:31:27 3   Q.    And at that same time, you were still planning the C

09:31:30 4   and H, or the Cannabis and Hemp Conference for BIH and

09:31:34 5   securing sponsorships; right?

09:31:35 6   A.    Correct.

09:31:37 7   Q.    Were you aware at the time you talked with Ms. Blume

09:31:40 8   in August of 2019 that there had been a demand or a cease

09:31:45 9   and desist letter from Ms. Blume or from Cozen O'Connor

09:31:50 10  about the Cannabis and Hemp Conference?

09:31:52 11  A.    Not that I recall.

09:31:55 12  Q.    Your testimony is that that never came up during your

09:31:58 13  conversation with Ms. Blume, about your move from BIH to

09:32:00 14  CLM, that was driven by the fact -- I'm sorry.  Strike that.

09:32:05 15          During your conversation with Ms. Blume, it

09:32:07 16  never came up, the fact that CLM was demanding that the

09:32:13 17  Cannabis and Hemp Conference that you were working on be

09:32:15 18  cancelled because it violated the non-compete?

09:32:18 19  A.    That was not part of the conversations, no.

09:32:21 20  Q.    How many conversations in August of 2019 did you have

09:32:24 21  with Ms. Blume?

09:32:25 22  A.    In all before -- in August and September, before I

09:32:34 23  gave my notice, it was probably four or five conversations.

09:32:42 24  Q.    Anybody else at CLM that you spoke with other than

09:32:45 25  Ms. Blume?

09:32:45  1    A.    No, it was just Anne.

09:32:54  2    Q.    When did they -- when did CLM actually offer you the

09:32:56  3    job?

09:33:01  4    A.    I don't know the exact dates, but it would have been

09:33:03  5    late September, right before I gave notice.

09:33:05  6    Q.    So, between August and September -- on or about

09:33:10  7    September 25th, late September, were you negotiating over

09:33:16  8    times?

09:33:17  9    A.    Yeah.  At the time I had actually told them that I

09:33:20 10    planned to stay with Business Insurance until the end of the

09:33:24 11    year because of the way our commissions were structured, but

09:33:32 12    they kind of were putting together an offer that would kind

09:33:40 13    of bring me over immediately.

09:33:45 14    Q.    And you were negotiating over the terms of your

09:33:47 15    compensation, principally?

09:33:49 16    A.    Yes.

09:33:50 17    Q.    And the compensation ultimately included both salary

09:33:54 18    and commissions; right?

09:33:55 19    A.    Correct.

09:33:56 20    Q.    And those commissions --

09:33:57 21          MR. SIEGEL:  Your Honor, I just want to object.

09:33:58 22    I believe, first of all, this strays well beyond direct

09:34:01 23    examination and also as to relevance.

09:34:04 24          THE COURT:  Well, I'm not sure what the exact

09:34:07 25    details of his salary situation are.  But, you know, there's

09:34:16  1    no reason to be having him called back.  So, it's beyond the

09:34:21  2    scope, but I'm going to allow it.

09:34:23  3             MR. OPRISON:  Thank you, Your Honor.  It does go

09:34:25  4    to part impeachment and part laying the groundwork for

09:34:28  5    actions by The Institutes, Your Honor, that -- also

09:34:33  6    impeaching -- even this witness will be impeaching The

09:34:36  7    Institutes.  But appreciate that, Your Honor.

09:34:38  8    BY MR. OPRISON:

09:34:38  9    Q.    Going back to the -- the issue of your compensation,

09:34:40 10    the commissions were based on the level of sponsorships and

09:34:47 11    advertisements --

09:34:48 12    A.    Correct.

09:34:48 13    Q.    -- that you would be able to bring in to CLM once you

09:34:51 14    went over?

09:34:51 15    A.    Correct.

09:34:52 16    Q.    There was an expectation that you would be productive

09:34:55 17    and profitable by bringing in sponsorships and

09:34:59 18    advertisements to CLM; correct?

09:35:01 19    A.    Correct.

09:35:24 20    Q.    For the -- for this Cannabis and Hemp Conference, as

09:35:30 21    you were securing sponsors, you secured one platinum sponsor

09:35:34 22    for the cannabis -- Cannabis and Hemp?

09:35:38 23    A.    It was a long time ago but I believe so, yeah.

09:35:41 24    Q.    And then there was different levels below that, gold

09:35:43 25    sponsor and silver sponsor?

09:35:45 1    A.    Yeah.  There were different levels of sponsorship,

09:35:48 2    correct.

09:35:48 3    Q.    And you were principally responsible for securing

09:35:50 4    those different levels of sponsorship; correct?

09:35:52 5    A.    Correct.

09:35:58 6    Q.    Prior to moving over from -- well, strike that.

09:36:05 7          When you first joined CLM, when it was still

09:36:08 8    owned by Mr. Potter, you signed a non-compete with CLM;

09:36:13 9    correct?

09:36:13 10   A.    Back in 2013 --

09:36:21 11   Q.    Yes.

09:36:22 12   A.    -- you mean?

09:36:23 13         It's likely, yeah.

09:36:27 14   Q.    You thought -- when you were giving your notice and

09:36:29 15   you were asked about the non-compete, you thought you -- you

09:36:32 16   did have a non-compete with BIH, didn't you?

09:36:34 17   A.    No.

09:36:51 18         MR. OPRISON:  Plaintiffs' 87.

09:36:56 19   BY MR. OPRISON:

09:36:56 20   Q.    This is Tab 1 in your binder, Mr. Campbell.  And I'll

09:37:01 21   direct your attention to the email at the bottom of the page

09:37:04 22   from you, September 30th, to Keith Kenner copying Steve

09:37:10 23   Acunto, subject is Transition of Employment, spills over

09:37:16 24   onto Page 2.

09:37:19 25         And I'll just read this into the -- into the

09:37:22 1  record and see if this refreshes your recollection.

09:37:25 2  "Can you please share a signed copy of this

09:37:27 3  document" -- meaning your non-compete -- "as I don't recall

09:37:32 4  signing it? I do remember being presented with one when I

09:37:34 5  joined BI, but not signing it. I do need the signed

09:37:38 6  agreement so that I can share with CLM accordingly."

09:37:41 7  Do you see that?

09:37:42 8  A.   Yeah.

09:37:42 9  Q.   Does that refresh your recollection that at the time

09:37:45 10  you were discussing your transition over from BIH to CLM

09:37:48 11  that you believed you had a non-compete?

09:37:50 12  A.   That I believed I did not have a non-compete.

09:37:56 13  Q.   I'm sorry, I'm going to read it again. Was there

09:37:59 14  something -- was there something that you misunderstood

09:38:01 15  about the language in your email that you send to

09:38:03 16  Mr. Kenner?

09:38:04 17  THE COURT: He said -- he says, "I don't recall

09:38:05 18  signing it." That's him not having a non-compete.

09:38:09 19  MR. OPRISON: Fair enough, Your Honor.

09:38:10 20  BY MR. OPRISON:

09:38:10 21  Q.   You were presented with -- with a non-compete when

09:38:13 22  you came over to Business Insurance; right?

09:38:15 23  A.   Correct, I did not sign it.

09:38:17 24  Q.   You were asked to sign it at the time, were you not?

09:38:21 25  A.   It was part of my comp plan and we were negotiating

09:38:25 1    on the comp plan, which I actually did not sign until

09:38:29 2    August.  And when I signed it, the comp plan, in August,

09:38:34 3    there was not a non-compete on it.

09:38:36 4    Q.    August of what year?

09:38:38 5    A.    2017.

09:38:40 6    Q.    The expect -- well, okay.  Business Insurance -- are

09:38:44 7    you referring to Business Insurance?

09:38:46 8    A.    Yes.

09:38:46 9    Q.    Okay.  But your understanding was that you were

09:38:48 10   presented with one, and the expectation was that you would

09:38:52 11   have signed it at the time you came to employment at BI;

09:38:55 12   right?

09:38:55 13   A.    I was presented with it but I did not sign it; I did

09:38:57 14   not agree to it.

09:39:17 15   Q.    Your -- strike that.

09:39:19 16          Your job responsibilities when you left BIH to

09:39:24 17   go over to CLM were pretty much the same, securing

09:39:27 18   sponsorships?

09:39:30 19   A.    It was a little bit expanded on that.  I also had

09:39:33 20   somebody that worked for me, so there was management duties

09:39:36 21   with that, but also advertising.  But yeah, sponsorship and

09:39:41 22   advertising were the main two.

09:39:42 23   Q.    And securing advertising specifically for CLM-owned

09:39:46 24   or sponsored publications; right?

09:39:47 25   A.    Correct.

09:39:49 1    Q.    And that would have included publications on topics

09:39:52 2    such as claims and litigation management?

09:39:54 3    A.    Yes.

09:39:55 4    Q.    That would have included topics on risk management?

09:39:58 5    A.    Sure.

09:39:58 6    Q.    It would have been included topics on -- that are

09:40:02 7    relevant to brokers and adjusters?

09:40:04 8    A.    To -- yeah, adjusters for sure.

09:40:08 9    Q.    And other insurance professionals?

09:40:10 10    A.    Correct.

09:40:24 11    Q.    You mentioned -- I want to talk about ClaimsXchange

09:40:27 12    that Mr. Siegel had asked you about.  You indicated that

09:40:35 13    they -- that the advisory board was heavily involved in CLM.

09:40:40 14          Do you recall that testimony?

09:40:41 15    A.    Mm-hmm.

09:40:43 16    Q.    Yes?

09:40:43 17    A.    Yes.

09:40:46 18    Q.    You knew that Ms. Blume had said that any ClaimsX --

09:40:51 19    any individuals that were involved in CLM that wanted to

09:40:54 20    serve on the board for ClaimsX had to pick one or the other,

09:40:57 21    couldn't do both; right?

09:40:58 22    A.    Yes.

09:41:02 23    Q.    You also indicated that there's -- there's "a lot of

09:41:05 24    competitive organizations out there like CLM and ClaimsX";

09:41:09 25    right?

09:41:09 1    A.    Correct.

09:41:10 2    Q.    And, again, competing for the same sponsorships?

09:41:13 3    A.    Yeah.

09:41:19 4    Q.    How much were you making in both compensation and

09:41:21 5    commission when you left BIH in September 2019?

09:41:24 6              MR. SIEGEL:  Your Honor, I object to the

09:41:25 7    relevance of this.

09:41:27 8              THE COURT:  What's the relevance?  He got a

09:41:31 9    better deal at the new place.

09:41:33 10             MR. OPRISON:  Well, that's what I wanted to

09:41:35 11   know, how much they were paying him and what the expectation

09:41:37 12   was in terms of commissions, Your Honor.

09:41:39 13             MR. SIEGEL:  Again --

09:41:39 14             THE COURT:  I don't think the details are

09:41:42 15   relevant.  I mean, I'm pretty sure, and my understanding of

09:41:47 16   his testimony is it was a better -- it was like a promotion;

09:41:51 17   right?

09:41:51 18             THE WITNESS:  Yeah.

09:41:59 19             MR. OPRISON:  That's all I have, Your Honor.

09:42:03 20   Thank you.

09:42:04 21             THE COURT:  All right.

09:42:05 22             MR. OPRISON:  Oh, you know, Your Honor, I

09:42:06 23   apologize.  There's one document that I wanted to move into

09:42:08 24   evidence.  I apologize.  It's Exhibit 77, Plaintiffs'

09:42:21 25   Exhibit 77.

09:42:24 1      MR. SIEGEL:  No objection, Your Honor.

09:42:25 2      THE COURT:  All right.  It's admitted without

09:42:27 3 objection.

09:42:28 4      (Plaintiffs' Exhibit No. 77 was admitted into

09:42:28 5 evidence.)

09:42:28 6      THE COURT:  Okay.  Thank you.

09:42:30 7      Mr. Siegel.

09:42:31 8      MR. SIEGEL:  No redirect.

09:42:33 9      THE COURT:  All right.  Sorry, I forgot --

09:42:37 10 Mr. Spencer is it?

09:42:38 11      THE WITNESS:  Campbell.

09:42:40 12      THE COURT:  Campbell.  Yeah, okay, Jeremy

09:42:42 13 Spencer is somebody else.  Mr. Campbell, thank you.  You're

09:42:45 14 excused.

09:42:45 15      THE WITNESS:  Okay.  Thank you.

09:42:54 16      MR. SIEGEL:  Your Honor, we have another

09:42:55 17 deposition to play for the Court.

09:42:56 18      THE COURT:  All right.  Who is it?

09:43:01 19      MR. HAYES:  Your Honor, it's going to be about

09:43:03 20 an hour and a half video.  Could we just have a five-minute

09:43:06 21 break.

09:43:06 22      THE COURT:  Okay.  You can have a five-minute

09:43:08 23 break.  I mean, though, who -- who is the hour-and-a-half

09:43:12 24 witness we're going to have?

09:43:13 25      MR. SIEGEL:  It's Katie Kett, former employee at

09:43:16 1  Business Insurance.

09:43:17 2          THE COURT:  Okay.

09:43:19 3          MR. SIEGEL:  And the video, Your Honor, is also

09:43:21 4  broken up.  It's plaintiff designations and counter

09:43:24 5  designations by both defendants.

09:43:28 6          THE COURT:  What do you mean broken up?

09:43:30 7          MR. SIEGEL:  I'm sorry, I didn't mean to say

09:43:32 8  broken up.  It's -- it's a compilation of --

09:43:34 9          THE COURT:  Right, right.  Got it.

09:43:35 10         Okay.  We'll take --

09:43:36 11         MR. SIEGEL:  We'll give you the time breakdown

09:43:38 12 is what I meant.

09:43:39 13         THE COURT:  Yeah.  Okay.  We'll take a

09:43:41 14 five-minute recess.

09:43:42 15         MR. SIEGEL:  Thank you, Your Honor.

09:43:43 16         DEPUTY CLERK:  All rise.

09:48:22 17         (Recess was taken.)

09:49:46 18         DEPUTY CLERK:  All rise.

09:49:59 19         THE COURT:  You all can be seated.  And I guess

09:50:07 20 you can start playing the deposition.  I take it everybody

09:50:13 21 in here other than me has already seen it.

09:50:20 22         MR. SIEGEL:  Your Honor, we intend to -- I can

09:50:22 23 give you the time breakdowns now or --

09:50:24 24         THE COURT:  Why don't you do it afterwards.

09:50:27 25         (Video deposition of Katie Kett.)

Q.    Okay.  When were you first hired to work at Business Insurance?

A.    I was hired in 2015, in January, when -- when the company was still owned by Craig Communications.

Q.    And eventually Adam Potter purchased Business Insurance, right?

A.    Yes, the -- August 26th or September 2016, I think.

Q.    Did you know him at the time?

A.    Pardon me, did I know him?

Q.    Yeah, did you -- yeah, did you know Adam at the time?

A.    I did not know him prior to him purchasing Business Insurance.

Q.    Okay.  And you met him -- the first time you met him was when he purchased Business Insurance?

A.    I forget when I met him in person, but, yes, that's when I met him was when he bought it.

Q.    Okay.  What was your initial position at Business Insurance?

A.    My initial position, my title was sales and marketing specialist.  And I -- so I supported the ad sales team and also did some work on marketing projects.

Q.    And what was your next position after that?

A.    When Adam purchased the company and I was rehired, I was -- Crane shut us down and then we were -- everyone was let go for a brief period of time and about half of the

09:52:14 1  staff was hired back.  I was hired back as marketing

09:52:17 2  manager.

09:52:18 3  Q.    Okay.  And to the best of your recollection, just

09:52:22 4  describe your roles and responsibilities as the marketing

09:52:25 5  manager.

09:52:27 6  A.    As the marketing manager, I primarily focused on

09:52:31 7  developing collateral and putting the media kit and sales

09:52:35 8  sheets for the ad sales team as well as sales sheets for

09:52:43 9  sponsorship sales for the events.  And working on all the

09:52:47 10 marketing campaigns that supported those efforts.

09:52:54 11 Q.    Did you work directly with -- with sponsors, so with

09:53:01 12 selected sponsorships?

09:53:02 13 A.    I -- I did not.  I did not work in a sales capacity.

09:53:05 14 I was -- I typically was in contact with sponsors, after

09:53:11 15 their sponsorship was sold.

09:53:13 16 Q.    Okay.  And who, at the time, was responsible for

09:53:16 17 selling sponsorships?

09:53:18 18 A.    At what time?

09:53:20 19 Q.    At the time that you were the marketing manager in

09:53:24 20 September of 2016?

09:53:25 21 A.    I believe that was Jeremy Campbell was selling

09:53:30 22 sponsorships.

09:53:36 23 Q.    And you were marketing manager for a period of time,

09:53:38 24 and then am I correct that in October of 2018 you became the

09:53:46 25 director of marketing events?

09:53:48 1    A.     Correct.

09:53:48 2    Q.     Okay.  And how did your job responsibilities shift,

09:53:52 3    if at all, when you became the director of marketing and

09:53:55 4    events?

09:53:55 5    A.     The primary -- the primary shift was I became --

09:54:00 6    managing the events and the programming around the events,

09:54:04 7    and then I -- I brought on a market -- another -- a new

09:54:10 8    marketing manager who -- who handled a vendor relation or

09:54:17 9    the venue relationships for the events and handled some of

09:54:23 10   the marketing support for the campaigns.

09:54:27 11   Q.     Who was that?

09:54:28 12   A.     Brittany Collins.

09:54:29 13   Q.     Okay.  When you said that you handled the

09:54:35 14   programming, what does that mean?

09:54:37 15   A.     I handled -- if an event had educational sessions, I

09:54:48 16   -- I worked with the advisory boards to -- to develop the

09:54:51 17   content and -- and to find speakers to speak on the panels.

09:54:58 18   Not all the events were content focused, some of them were

09:55:05 19   award focused.  So I would also -- I supported the awards

09:55:09 20   programs as well.  Once -- once we announced winners, I

09:55:12 21   would work with the winners and -- to support them in

09:55:16 22   promoting their -- their accolades.

09:55:20 23   Q.     Okay.  And you held that position through March of

09:55:29 24   2021; is that right?

09:55:30 25   A.     Correct.  Mm-hmm.

1  Q.      And then is that the -- is that -- is March 2021 when

2  you left Business Insurance?

3  A.      Yes, March 5th, 2021.

4  Q.      What was the reason that you left BI?

5  A.      They eliminated my position.  They were restructuring

6  the marketing and events team.

7  Q.      And when I'm asking you questions about Business

8  Insurance, obviously I'm not asking you anything from -- you

9  know, that -- that Business Insurance may have done prior to

10 you being hired or anything that it's currently doing.  So,

11 everything what I'm asking about BI's business is the period

12 of time that you were employed there.

13          So, how would you describe BI's audience?

14 A.      I would say the primary target is risk managers and

15 enterprise risk managers, also the greater commercial

16 insurance industry, including insurance carriers, agents,

17 brokers and other service providers, like legal, like

18 attorneys or third-party administrators.  Yeah, that's --

19 that's the audience.

20 Q.      And what is a third-party administrator in your

21 understanding?

22 A.      To the best of my knowledge, a third-party

23 administrator is a company that primarily focuses on

24 administering claims either for in-house for a company or --

25 or in conjunction with another insurance company.

09:57:22 1    Q.      During your time at BI between 2015 and 2021, do you

09:57:30 2    -- to your knowledge, did that audience change at all?  Was

09:57:35 3    there ever a shift in focus or a -- a -- a growth in any one

09:57:40 4    particular area?

09:57:41 5              THE WITNESS:  Not to my knowledge.  I -- I don't

09:57:45 6    recall there being a shift that I -- that I noticed.

09:57:49 7    Q.      So, prior to 2019, you mentioned World Captive Forum,

09:57:56 8    insurance awards, there was the breakout awards, innovation

09:58:00 9    awards, women to watch, did BI ever put on any

09:58:08 10   topic-specific conferences or events?

09:58:11 11             THE WITNESS:  I mean I think you named them all,

09:58:14 12   except the one you didn't mention was diversity inclusion.

09:58:19 13   We had -- Business Insurance had or has -- they called it

09:58:25 14   diversity inclusion institute which they -- I believe

09:58:30 15   there's only been two conferences in person.

09:58:35 16   Q.      But how about on specific areas of the law, for

09:58:41 17   instance, something like cyber security, prior to 2019, did

09:58:48 18   Business Insurance ever put on a -- you know, a

09:58:56 19   topic-specific event that focused on a particular area of

09:58:59 20   law?

09:58:59 21   A.      To my knowledge, the -- the events were topic

09:59:05 22   specific, but I don't -- I don't recall an event that was

09:59:08 23   specifically focused on a legal topic.

09:59:12 24   Q.      Okay.  There were topics -- there were conferences

09:59:18 25   though that BI held with the CLM; is that correct?

A.    Correct.  For a brief period Business Insurance and CLM were kind of partnered up, had some co-branded events, and those would be like the restaurant, retail and hospitality, I think was one.  And there was a workers' comp conference.  The -- the audience at those was generally almost entirely CLM attendees.  I think we had -- we had a hard time mixing the brands on those events.

Q.    Why is that?

A.    There wasn't -- I -- so, I think those events, you would draw a lot of legal attendees and that's really not the core audience of Business Insurance.

Q.    When there was a co-sponsored event with CLM, were you involved in helping to develop content, working with the advisory boards, et cetera?

A.    No, I was not.

Q.    Do you know who was?

A.    I believe it was their program manager or program director.  I -- I don't recall her name, but they did have a -- they did have -- CLM had someone dedicated to managing programming.

Q.    So, when there was a co-branded event, focused on a particular legal area, that tended to draw more CLM audience members than B -- than Business Insurance?

A.    Yeah, to the best of my knowledge, yes.  Mm-hmm.

Q.    And when -- if you remember, when email blasts went

10:01:24 1    out advertising those co-branded events, did they go to both

10:01:31 2    Business Insurance and CLM membership lists?

10:01:35 3    A.    Yes, they did.

10:01:38 4    Q.    So, prior to 2019, BI had never put on an event that

10:01:46 5    focused on the Cannabis and Hemp industry, right?

10:01:51 6    A.    Correct.

10:01:52 7    Q.    Okay.  And how about intellectual property, long-term

10:01:56 8    care, cyber security, had it ever put on an event

10:01:59 9    specifically related to those topics?

10:02:02 10          THE WITNESS:  Business Insurance did used to do

10:02:05 11   a cyber -- it was a cyber event called -- I don't think it

10:02:09 12   was cyber security, it was called the cyber summit, I

10:02:15 13   believe.

10:02:16 14   Q.    You said --

10:02:16 15   A.    Business.

10:02:17 16   Q.    Yeah, I'm sorry go ahead.

10:02:18 17   A.    Yeah, Business Insurance did, I'm not sure how many

10:02:21 18   years they did, but they did do a cyber summit.  They did

10:02:26 19   not do cannabis event.  And I -- I do not know of an

10:02:34 20   intellectual property event or a long-term care event that

10:02:37 21   happened before 2019.

10:02:41 22   Q.    Was the -- the cyber summit that you mentioned, was

10:02:46 23   that also done in conjunction with CLM?

10:02:49 24   A.    No, it was -- there was a -- the last in-person one

10:02:59 25   that I recall that I went to was under the Crane ownership,

10:03:04 1  I believe, so, that would have been 2016.  And there may

10:03:10 2  have been -- there was -- what year was it?  It was 20 --

10:03:16 3  either 2016 or 2017 when there was -- they -- they did three

10:03:23 4  events together.  It was -- I think it was -- I'm -- I'm not

10:03:30 5  recalling properly.  I'm sorry.

10:03:33 6  Q.    No, that's okay.

10:03:34 7  A.    That was -- it was a little convoluted because...

10:03:37 8  Q.    What were your thoughts about BI putting on a

10:03:41 9  Cannabis and Hemp and an IP Conference?

10:03:44 10      THE WITNESS:  Well, I -- I knew it would be a

10:03:46 11 lot more work for me, so I -- no, I -- I just -- I guess I

10:03:54 12 considered it part of the job.  I -- Adam was often coming

10:03:58 13 up with ideas for things, like he came up with the U.S.

10:04:02 14 insurance awards event, and I think he did try to keep

10:04:06 15 content fresh, so it didn't really surprise me.  I thought

10:04:16 16 -- you know, I thought it was a little more exciting than

10:04:18 17 some of our other topics.  Yeah, it sounded like an -- an

10:04:23 18 interesting idea.

10:04:24 19 Q.    Did you think it was delving into a -- a new -- a new

10:04:29 20 area of business for BI?

10:04:31 21      THE WITNESS:  Yeah, I knew -- I knew that it

10:04:33 22 would probably draw a -- a slightly newer audience because

10:04:38 23 of the new -- the new topic.

10:04:41 24 Q.    And, I mean, I apologize, because it's my fault that

10:04:46 25 we're sort of talking about both of them together, so let me

10:04:50 1  break it down.

10:04:52 2         Did you think that the Cannabis and Hemp

10:04:54 3  Conference was developing into a new area of business for

10:04:56 4  BI?

10:04:56 5         THE WITNESS:  Yes.

10:04:58 6  Q.    And how about for the IP Conference, same answer?

10:05:02 7         THE WITNESS:  Yes.

10:05:05 8  Q.    At the time, what did you think that new audience,

10:05:08 9  you know -- did you think at the time that it was developing

10:05:10 10 into a new audience and, if so, what audience did you think

10:05:14 11 it would be expanding into?

10:05:16 12        THE WITNESS:  I think, I guess for cannabis, if

10:05:22 13 it was -- we really -- I expected to see more carriers and

10:05:29 14 brokers for cannabis and any carriers that were considering

10:05:35 15 that line of coverage, not as much the cannabis producers,

10:05:44 16 but -- you know, there was some overlap with the existing

10:05:51 17 audience, too, but I think I didn't know what -- exactly

10:05:55 18 what audience it would draw, but it -- because of the new

10:05:58 19 topic, I -- I knew it would generate some new interest.

10:06:02 20 Q.    And it was your understanding from the beginning that

10:06:05 21 Wilson Elser was going to be the lead sponsor for that

10:06:08 22 event?

10:06:09 23 A.    Yes, I knew that.

10:06:12 24 Q.    And did you think that with a law firm like Wilson

10:06:19 25 Elser as the lead sponsor, that you might generate, a -- you

1  know, an audience that would be interested in cannabis

2  litigation issues?

3  A.      Possibly, yes.

4  Q.      Turning back to the Cannabis and Hemp Conference now,

5  after that initial call with the folks at Wilson Elser, did

6  you have internal discussions about the topics to focus on

7  during the conference, and I'm talking now just in the very

8  early planning stages?

9          THE WITNESS:  I -- I can't definitively say what

10 the conversations -- conversations were about, but I'm sure

11 there were some discussions with there being a new event and

12 kind of a newer role for me as far as planning content.

13 Q.      And do you remember any conversations with Adam about

14 planning for that conference?

15 A.      I remember having conversations.  I don't -- I don't

16 recall exactly -- I don't recall specifically what we

17 discussed about content.

18 Q.      Okay.  What about the audience that Adam was hoping

19 to attract, did you have any conversations with Adam about

20 the audience?

21         THE WITNESS:  I think the goal was really more

22 driving the bot -- the overall number, it wasn't necessarily

23 driving a specific type of entity.

24 Q.      Do you remember Adam saying anything about wanting to

25 expand into, you know, an -- an -- wanting to expand into a

10:08:28 1  new area of business?

10:08:29 2        THE WITNESS:  I'm not quite sure how to answer

10:08:32 3  that, but I -- I mean, obviously getting -- having new

10:08:38 4  conferences under new topics, I think he was hoping to -- to

10:08:45 5  draw some -- maybe some new subscribers and new attendees

10:08:49 6  that had not necessarily gone to Business Insurance events

10:08:53 7  before.

10:08:53 8  Q.    To your knowledge, did you want to -- did you want to

10:08:58 9  expand the conference schedule as an ongoing thing?

10:09:03 10        In other words, Business Insurance had those

10:09:08 11  events that you told me about before.  Did you think or --

10:09:14 12  you know, was it your understanding that Adam wanted to add

10:09:17 13  to those conferences by creating these -- these additional

10:09:22 14  conferences, cannabis and IP, as an -- as an ongoing

10:09:25 15  operation?

10:09:26 16        THE WITNESS:  I -- I believe that he would have

10:09:29 17  wanted those, the cannabis and IP conferences, to become the

10:09:36 18  annual conferences.

10:09:37 19  Q.    Do you know what marketing list you would have used

10:09:40 20  to -- you know, to send out to announce the cannabis

10:09:46 21  conference?

10:09:47 22  A.    Primarily lists generated by the Business Insurance

10:09:53 23  database, but I believe Wilson Elser gave, you know, us a

10:09:59 24  smaller list as well.  And we gave those sponsors the option

10:10:03 25  to do that.

10:10:05 1   Q.    As a general rule, you gave sponsors the option to

10:10:08 2   use their marketing list?

10:10:09 3   A.    Correct.

10:10:11 4   Q.    I'm just trying to clarify what you said.

10:10:13 5   A.    Yes.  Yes.

10:10:14 6   Q.    And you specifically remember Wilson Elser asked you

10:10:17 7   to use their marketing list for purposes of the cannabis

10:10:21 8   conference?

10:10:21 9   A.    Yes.

10:10:25 10  Q.    Was there any internal discussion -- were you

10:10:27 11  involved in any internal discussions at BI about using

10:10:31 12  Wilson Elser's marketing list?

10:10:35 13          THE WITNESS:  I don't recall any conversation

10:10:37 14  specifically about it.  I just know that -- I believe it was

10:10:43 15  written into their -- their -- their contract that it was an

10:10:48 16  option.

10:10:49 17  Q.    Was there any discussion about going through the list

10:10:53 18  and removing anybody from it?

10:10:57 19          THE WITNESS:  Not from that list specifically,

10:11:00 20  no.

10:11:01 21  Q.    What about from any list?

10:11:02 22  A.    For the Cannabis and Hemp Conference, we did -- we

10:11:09 23  did block all outside counsel from our database.

10:11:15 24  Q.    Why is that?

10:11:16 25  A.    It was more of an exclusivity as part of the

10:11:22 1   membership or the sponsorship for Wilson Elser, that they

10:11:26 2   would be the only law firm represented at -- at the

10:11:33 3   conference.

10:11:34 4   Q.    Okay.  So, the only limitation that was placed on

10:11:38 5   either the BI marketing list or the Wilson Elser marketing

10:11:43 6   list was just that outside counsel wouldn't be invited --

10:11:49 7   A.    Correct.

10:11:49 8   Q.    Do you remember any discussions suggesting that folks

10:11:53 9   involved in handling claims should be included on the

10:11:58 10  advisory board?

10:11:59 11         THE WITNESS:  I was not part of that discussion

10:12:01 12  if it happened.

10:12:03 13  Q.    Welcome back.  I'm going to pull up on my screen,

10:12:08 14  Ms. Kett, a -- another document.  For the record, it is an

10:12:20 15  April 30, 2019, email from Adam Potter, initial Bates stamp

10:12:25 16  is Potter-DE-000639.  I will turn control over to you, and

10:12:38 17  feel free to read through from the bottom, if you'd like.

10:12:44 18         Okay.  I'm going to take control back.  And I

10:12:47 19  really just want to ask some questions about your initial

10:12:52 20  email dated April 23, 2019, to Adam Potter, copy to Ian

10:13:01 21  Stewart and Gavin Souter with an update about the confirmed

10:13:06 22  cannabis advisory board as of that date.

10:13:10 23         Do you recognize the names on this list?

10:13:14 24  A.    Yes.

10:13:17 25  Q.    Who is Theresa Bartlett?

10:13:23 1  A.    She is the senior medical officer of Sedgwick.

10:13:30 2  Q.    What is Sedgwick?

10:13:31 3  A.    A TPA.

10:13:33 4  Q.    Do you know Ms. Bartlett personally?

10:13:36 5  A.    Only through working with her at Business Insurance.

10:13:41 6  Q.    Okay.  And do you know generally what -- what the

10:13:48 7  senior medical officer of a TPA generally does for a living?

10:13:54 8          MR. BUCHTER:  Object to form.

10:13:59 9          THE WITNESS:  I honestly cannot tell you what

10:14:01 10 she does day-to-day.  I know that Theresa, her background is

10:14:05 11 that she is a medical doctor, but in terms of what her

10:14:08 12 direct responsibilities -- can you guys still hear -- hear

10:14:15 13 me?  Sorry, I got a phone call.

10:14:24 14          I -- no, I -- I can't go into detail about what

10:14:28 15 she specifically is responsible for but she -- she -- I know

10:14:33 16 that she's a medical doctor.

10:14:35 17 Q.    And your understanding of a TPA like Sedgwick,

10:14:40 18 Sedgwick Claims Management Services, is that they're

10:14:43 19 involved in handling -- in handling insurance claims, right?

10:14:48 20 A.    Correct.

10:14:50 21 Q.    Do you recall how the pricing was set for attendees

10:14:54 22 at the conference?

10:14:55 23 A.    I think that we based it off previous conferences and

10:15:09 24 may have compared it to other competitive events.

10:15:16 25 Q.    Yeah, I'm not trying to play gotcha or anything --

10:15:19 1    A.    Yeah, no, I don't recall specifically.

10:15:23 2    Q.    All right.  I'm going to pull up an email that will

10:15:25 3    jog your memory on that.  I guess I forgot to mention that

10:15:34 4    the last exhibit would have been marked Exhibit 3.

10:15:37 5          I'm going to pull up and I'm going to mark

10:15:40 6    Exhibit 4.  So, I should have on your screen now an

10:15:47 7    April 17, 2019, email from Adam Potter, Bates-stamped Potter

10:15:53 8    DE-000682.  I will -- let me just see if I can shortcut it

10:16:06 9    so you don't have to see the whole thing, but you can

10:16:08 10   certainly scroll all through it all if you'd like.

10:16:13 11         Really starting from here, Ms. Kett, when the

10:16:20 12   discussion turned to cannabis registration?

10:16:21 13   A.    Mm-hmm.

10:16:22 14   Q.    And I'll turn control over to you if you'd like.  And

10:16:27 15   then you can scroll up.  Taking a look at Adam's email to

10:16:36 16   you dated April 17th, he says he found a few cannabis

10:16:47 17   conference registration fees online.  And suggests a

10:16:51 18   breakdown to you.  And you see that second one down there's

10:16:55 19   a 499 for early registration, 599 for regular registrations

10:17:01 20   for insurance company folks, which includes underwriters and

10:17:05 21   claims.

10:17:07 22         Do you see that?

10:17:07 23   A.    Yes.

10:17:07 24   Q.    Okay.  Do you recall any discussions with Adam about

10:17:15 25   opening up registration to folks involved in the claims

10:17:19 1    industry?

10:17:19 2    A.    I -- not specifically.  I mean, claims is -- claims

10:17:25 3    professionals were -- are a part of the Business Insurance

10:17:28 4    audience, so they are typically included.

10:17:33 5    Q.    And there was no discussion saying that claims people

10:17:37 6    who might have been part of your audience should be excluded

10:17:42 7    from registering for this event, right?

10:17:45 8    A.    Correct, not -- not excluded from registration.

10:17:50 9    Q.    Then the only -- I know we're repeating ourselves,

10:17:54 10   the only people that would be excluded were outside counsel,

10:17:58 11   right, based on your agreement with Wilson Elser?

10:18:01 12   A.    Correct.

10:18:03 13   Q.    Okay.  And that's memorialized at the bottom of that

10:18:06 14   email.  Okay.  Going back to planning for the conference and

10:18:23 15   now talking about the content.  To the best of your memory,

10:18:31 16   when was the first time that somebody suggested including a

10:18:34 17   topic on claims at the cannabis conference?

10:18:36 18   A.    I think it was kind of in the early planning stages

10:18:46 19   of the advisory board, probably in like June or July.

10:18:53 20   Q.    Were you involved in -- in those discussions?

10:18:55 21   A.    In leading the advisory board calls, I think it -- it

10:19:04 22   came up on the calls, yes.

10:19:07 23   Q.    And when you say it, you mean the topic of -- of

10:19:11 24   including claims as a topic of the conference?

10:19:14 25   A.    Yes, a claims -- a claims-related topic.

10:19:19  1    Q.    Do you recall who brought that up?

10:19:20  2    A.    I -- I -- I do not.

10:19:31  3    Q.    And do you ever remember anyone saying that you

10:19:34  4    should exclude claims as a topic of the conference?

10:19:37  5    A.    Not on advisory board calls.

10:19:44  6    Q.    How about not on the advisory board calls, were there

10:19:48  7    -- in the -- in the early planning stages, were there other

10:19:50  8    conversations about not including claims as a topic of the

10:19:53  9    conference?

10:19:53 10    A.    Not that I remember, no.

10:19:57 11    Q.    It's a Tuesday May 21st, email from Gavin Souter to

10:20:02 12    you, Bates-stamped BIH-002-002489.

10:20:09 13            I'll turn control over to you.  So this email

10:20:17 14    from Gavin to you says:  "Attached is a draft consolidating

10:20:20 15    and elaborating a little on the topics that came up during

10:20:23 16    the call."

10:20:25 17            So, do you -- do you remember being part of this

10:20:29 18    advisory board call where topics for the cannabis conference

10:20:34 19    were discussed?

10:20:35 20    A.    Yes.

10:20:39 21    Q.    Does this jog your memory that it was -- I think you

10:20:42 22    said before it might have been June that you -- you know,

10:20:45 23    that claims became a topic of conversation but it was maybe

10:20:50 24    earlier back in May?

10:20:51 25    A.    Right.  Yeah.

10:20:56 1  Q.    The topic at issue there is claims experience, review

10:21:00 2  of real-world claims in the cannabis sector.  Do you recall

10:21:04 3  any specific discussions about what that -- what that topic

10:21:09 4  would actually entail?

10:21:10 5  A.    I -- I don't recall what was discussed specifically

10:21:16 6  on the advisory board call about that.

10:21:22 7  Q.    Do you have any idea who raised it as a topic?

10:21:24 8  A.    No, I can't recall.

10:21:35 9  Q.    Okay.  But no one -- no one suggested deleting it,

10:21:44 10 right?

10:21:44 11 A.    No, I don't --

10:21:47 12        UNIDENTIFIED SPEAKER:  Objection to form.

10:21:49 13 Q.    Do you ever remember somebody saying that this -- a

10:21:52 14 topic on claims should be deleted from the conference?

10:21:58 15        THE WITNESS:  I do recall, I think it was maybe

10:22:05 16 early October, I did -- Adam reached out to me and had me

10:22:10 17 change some of the names of the sessions that were claims

10:22:14 18 related.

10:22:16 19 Q.    We are definitely going to get there, I promise.  So,

10:22:20 20 maybe we can short-circuit a little bit and say between this

10:22:25 21 email that we're looking at with this list of topics, and

10:22:28 22 that email that you just referenced from Adam asking you to

10:22:32 23 change the name of one of the conference sessions, do you

10:22:40 24 recall any discussions suggesting that claims topic be

10:22:43 25 deleted from the conference?

10:22:47 1    A.    I -- I don't recall it being suggested that we remove

10:22:50 2    it or delete it from the agenda, no.

10:22:55 3    Q.    Okay.  I'm pulling up an email.  It's dated June 20,

10:23:01 4    2019, from Ian Stewart, Bates-stamped BIH-002-000 -- I'm

10:23:08 5    sorry -- -002105.  I will give you control.  I really just

10:23:19 6    want to ask a question about the top email, but I want to

10:23:23 7    give you a chance to scroll through it if you'd like.

10:24:36 8    A.    Okay.

10:24:38 9    Q.    Okay.  So, just to confirm, you know, what you had

10:24:46 10   said before, and scrolling down here, an email from -- was

10:24:55 11   -- was Mark Pugh at Preferred Medical a member of the

10:24:59 12   advisory board?

10:25:01 13   A.    Yes.

10:25:01 14   Q.    Okay.  So, his email to you suggests including

10:25:07 15   cannabis claims as a business breakout; do you see that?

10:25:11 16   A.    Mm-hmm.

10:25:12 17   Q.    Okay.  And then there was also a suggestion for a

10:25:19 18   legal breakout discussing case law; do you recall that?

10:25:21 19   A.    I don't recall it, but I see it.

10:25:25 20   Q.    Fair enough.  You see cannabis claims as a proposed,

10:25:34 21   you know, proposed slot from 9:30 to 10:15.  But then I just

10:25:40 22   want to go up to the top where Ian Stewart, in his email to

10:25:48 23   you of June 20th of 2019, says, "The only other alternative

10:25:54 24   topic that I would recommend for a general session would be

10:25:57 25   cannabis claims."

10:25:58 1        Do you see that?

10:25:59 2    A.    Mm-hmm.

10:25:59 3    Q.    Okay.  Do you recall discussing that issue with Ian

10:26:07 4    Stewart?

10:26:07 5        THE WITNESS:  Not specifically.  I mean I forget

10:26:09 6    where we landed on the final agenda in the general session.

10:26:12 7    Q.    Well, let me ask you this, generally at conferences,

10:26:17 8    you would have some general sessions and some track

10:26:20 9    sessions, correct?

10:26:23 10       THE WITNESS:  That's -- that's the format that

10:26:25 11   we laid out and, yes, typically -- well, I think only World

10:26:35 12   Captive Forum and cannabis are the only ones that have

10:26:38 13   tracks.

10:26:39 14   Q.    How do you decide what topics would be included at

10:26:44 15   general sessions versus those that would be included on

10:26:48 16   specific tracks?

10:26:48 17       THE WITNESS:  I think we -- generally, we just

10:26:54 18   -- the -- the general topics are more -- that would be of

10:26:58 19   more interest to the entire audience versus just the smaller

10:27:02 20   sector.  So, I think we like to keep those a little more

10:27:05 21   broad rather than specialized topics.

10:27:09 22   Q.    So, is it your understanding that Ian Stewart is

10:27:12 23   suggesting here that the cannabis claims session may be --

10:27:16 24   may have broader appeal?

10:27:17 25       THE WITNESS:  I don't know.  I think the only --

10:27:22  1    I think his thinking was that the brokers and insurers would

10:27:28  2    like to understand how claims are handled as well, and not

10:27:32  3    -- and not specifically claims professionals necessarily.

10:27:38  4    Q.    So, by including -- you think that by including

10:27:42  5    cannabis in a specific track, they would be more narrowly

10:27:50  6    tailored towards claims professionals?

10:27:52  7              THE WITNESS:  I mean, not necessarily.  I think

10:28:00  8    -- I was -- we were just trying to collaborate to find -- to

10:28:03  9    come up with a topic that would be of interest to -- to

10:28:06 10    everyone attending the conference, not -- not just claims

10:28:10 11    professionals.

10:28:13 12    Q.    In your estimation, would a topic on cannabis claims

10:28:18 13    be -- would appeal to claims professionals?

10:28:27 14              THE WITNESS:  Yes, among -- among other

10:28:31 15    insurance professionals.

10:28:33 16    Q.    I'm bringing up what I'll mark as Exhibit 7,

10:28:43 17    June 26th, 2019, email from Ian Stewart to you,

10:28:48 18    Bates-stamped BIH-002-001928.  No need to give you control,

10:28:59 19    because it's really just this one page.  So I'll give you

10:29:02 20    time to read through it.

10:29:12 21    A.    Okay.

10:29:13 22    Q.    To your knowledge, did Ian Stewart draft this -- this

10:29:18 23    conference -- I mean, this -- this topic -- what's the word

10:29:23 24    I'm looking for -- summary?

10:29:25 25    A.    I believe so, yes.

Q.     Who are Stacey Jackson and Morgan Moore, are they

also advisory board members?

A.     They are.  Morgan dropped out of the board, I forget

at what point, but -- but he wasn't very involved.

Q.     Okay.  And to your knowledge, was -- was this the

agenda description that would have been sent out to BI's

marketing list?

THE WITNESS:  I believe we did have it on the

website at one point.  We didn't always include the full

description in the marketing materials, aside from the

website.

Q.     Okay.  Let me -- let me break that down.  So you

would have had email blasts that would have gone out.  Those

email blasts may not have given the full description,

correct?

A.     Correct, but they would have linked -- been linked to

the event site.

Q.     So, anybody that received the marketing blast who was

linked back to the website, would see this full description

on the website?

THE WITNESS:  They -- they would have if it was

still live on the site, yes.

Q.     And just so -- so I'm clear, that email marketing

blast would have gone out to both the BI list and to Elser's

list, correct?

10:31:01 1    A.    Correct.

10:31:03 2    Q.    All right.  Now, a couple of months before the

10:31:05 3    conference, do you remember getting an email from Adam

10:31:08 4    asking you how many claims professionals and underwriters

10:31:12 5    and various people were included -- who had signed up for

10:31:16 6    the conference?

10:31:17 7    A.    I don't recall specifically.

10:31:20 8    Q.    Okay.  Well, as I'm sure you've guessed, I have an

10:31:26 9    email to show you that will help jog your memory.  We'll

10:31:41 10   mark it as Exhibit 8.

10:31:43 11          An email dated August 12, 2019, from Adam Potter

10:31:48 12   to you, Bates-stamped BIH-002-001080, and start from the

10:32:01 13   bottom and turn control over to you.

10:32:06 14          Do you remember getting this email from Adam?

10:32:08 15   A.    I -- I don't recall specifically.

10:32:16 16   Q.    Okay.  So, do you remember discussing with him why he

10:32:25 17   wanted to get a list of -- with a breakdown of the various

10:32:33 18   registrations for the conference?

10:32:34 19   A.    I don't -- I don't recall that he gave me a reason.

10:32:44 20   I think, I mean generally we like to have a nice mix of

10:32:49 21   different people from -- from the insurance industry of the

10:32:54 22   different areas of business.

10:32:56 23   Q.    Okay.  Did you discuss this with him?

10:33:00 24          THE WITNESS:  I don't -- I don't recall

10:33:03 25   discussing -- having a conversation with him outside of this

10:33:06 1 email about it.

10:33:08 2 Q.    So, I was going to ask you how you -- you

10:33:11 3 specifically referenced there are three claims

10:33:14 4 professionals.  And then seen here there's a rate category

10:33:18 5 for claims professionals.

10:33:19 6            Is this, for lack of a better word, a screenshot

10:33:27 7 or a grab of a -- of a database?

10:33:34 8 A.    Yeah, that's -- that's like a section of the

10:33:40 9 registration list.

10:33:43 10 Q.    And is claims professionals a drop-down selection for

10:33:49 11 that rate category?

10:33:50 12 A.    Yes, it must have been if it's generated in that rate

10:33:55 13 category column.

10:33:59 14 Q.    And do you know how BI defines somebody as a claims

10:34:09 15 professional?

10:34:09 16            THE WITNESS:  That's really -- that's something

10:34:14 17 more the audience development team handles, and typically

10:34:19 18 subscribers are -- are vetted a little more than non

10:34:28 19 members, but I believe they either have to work for like a

10:34:34 20 TPA type of company or have claims as their primary

10:34:41 21 responsibility or maybe in their title, like VP of claims.

10:34:46 22 Q.    Do you know who makes the decision or at the time who

10:34:49 23 made the decision to categorize somebody as a claims

10:34:53 24 professional versus some other category?

10:34:56 25 A.    I guess it depends on when they became a subscriber,

but our -- the VP of marketing would have -- would have made

that determination, who is Brian McGann.

Q.     Okay.  I see in this email, August 12th, Adam

responds to you and says -- and I think he means, can you

let me know -- "the three claims professionals, their titles

and companies."

Did you have any -- any understanding at the

time of why Adam wanted to know the titles of companies of

the three claims professionals?

A.     No, I did not.

Q.     Did you think that was an odd request?

THE WITNESS:  I don't recall thinking it was

strange.

Q.     Did he ever ask you to follow-up with these -- with

any of these three claims professionals and, you know, tell

them not to come to the conference?

A.     No.

Q.     Did he ever ask you to take any further action with

respect to these three claims professionals after you

identified them for him?

A.     No, he didn't.

Q.     Okay.  Did you have any idea at the time why he was

focused on the claims professionals?

THE WITNESS:  I -- I did not know at the time.

Q.     And I think you said before you never -- you never

10:36:32 1    talked to him about this.  You emailed back and forth, but

10:36:35 2    you never talked to him about this email?

10:36:38 3    A.     Not that I can recall, no.  I think -- I think I

10:36:42 4    probably just thought he was wondering if a specific person

10:36:46 5    was attending or someone from a company was coming related

10:36:51 6    to claims.

10:36:54 7    Q.     You said email -- email blasts would go out to the BI

10:36:57 8    marketing list.

10:36:58 9           Do you know if at the time -- you know, when BI

10:37:02 10   and CLM were putting on joint conferences, if the marketing

10:37:07 11   lists were ever merged, if the BI list was ever merged with

10:37:11 12   the CLM list?

10:37:12 13          THE WITNESS:  I think there was a small section

10:37:15 14   of the CLM list that was added, but I do remember having

10:37:18 15   strict instructions to -- I think CLM's email was down for a

10:37:25 16   bit and -- and BI was sending emails on their behalf for a

10:37:30 17   very short time, but we were instructed to -- to block them

10:37:34 18   from all future emails.

10:37:37 19   Q.     When -- when was that instruction made?

10:37:39 20   A.     I -- I believe it was when we were first acquired by

10:37:46 21   Adam and were -- we -- CLM and BI were sharing a lot of

10:37:50 22   services to get by for events.

10:37:56 23   Q.     Okay.  So, some time in 2016, you think there was a

10:38:02 24   directive to -- to separate the lists?

10:38:11 25   A.     I think there was always a separation.  It was like a

10:38:14 1    one-time kind of special use of the list.

10:38:17 2    Q.    So, I will share my screen, Exhibit 9, the Monday,

10:38:26 3    August 19, 2019, email from Adam, Gavin Souter and you.

10:38:32 4    That's Bates-stamped BIH-002-000904.

10:38:38 5          You should be able to see the whole thing on

10:38:40 6    your screen without having to scroll, so you can just leaf

10:38:42 7    through it.

10:38:42 8    A.    Yes, I can see it.  Okay.

10:38:58 9    Q.    Okay.  So, this -- this is the email you referred to

10:39:01 10   earlier where Adam said that the description for the

10:39:04 11   cannabis claim session should be revised, correct?

10:39:08 12   A.    Correct.

10:39:09 13   Q.    Okay.  And so, this is dated August 19, 2019.  Was

10:39:16 14   this the first time you heard a suggestion that the cannabis

10:39:20 15   claims session should be revised?

10:39:23 16          THE WITNESS:  Yes, to my best of my knowledge.

10:39:29 17   Q.    And did you know why these changes were being made?

10:39:31 18   A.    I did not, no.

10:39:34 19   Q.    Okay.  So, Adam never -- never discussed it with you?

10:39:38 20   A.    No.

10:39:41 21   Q.    Okay.  Did you talk to Gavin Souter about it?

10:39:45 22   A.    No, I didn't.

10:39:47 23   Q.    Okay.  Did you talk to anybody else about why this

10:39:51 24   change was being made?

10:39:51 25   A.    No.

| | |
|---|---|
| 10:40:00 | 1 |
| 10:40:04 | 2 |
| 10:40:06 | 3 |
| 10:40:10 | 4 |
| 10:40:12 | 5 |

Q.     Okay.  And you see this line that was being added, in bold, that the conference wasn't developed and is not intended for claims and litigation management professionals.

Did you have any thought about that change at the time?

THE WITNESS:  I -- well, I assumed it had something to do with -- with Adam's sale of CLM.

Q.     Well, I was going to talk about that in a minute, but maybe -- maybe we can just switch gears and talk about that now.

What did you understand about Adam's sale of CLM?

A.     I -- I knew that The Institutes bought it and that they were also doing a cannabis conference.

Q.     Okay.  When did you first learn that The Institutes purchased CLM?

A.     I think shortly after it was announced, which was -- was that like the summer of 2018.

Q.     Was -- so, June of 2018; does that sound right?

A.     Yeah.

Q.     Were you aware also at the time that Adam sold not just CLM but two of his other entities?

THE WITNESS:  Yes.

Q.     And what was your understanding of what those two other companies were?

10:41:22 1   A.    I -- I think it was the -- the one for jobs, the

10:41:29 2   insurance jobs.  And then I'm not sure I know the name of

10:41:34 3   the other company.  I -- I know that Adam owns multiple

10:41:37 4   companies.

10:41:40 5   Q.    Okay.  We don't need to get into any of the details,

10:41:44 6   but if I told you it was Claims Pages and C & E Management

10:41:48 7   and planning, does that sound familiar?

10:41:52 8   A.    Okay.  I think so, yes.

10:41:57 9   Q.    So, in connection with that sale, did -- did you ever

10:42:06 10  discuss the sale of CLM with Adam?

10:42:10 11         Let me back up.  Prior to selling CLM, did you

10:42:13 12  know that Adam was looking to sell it?

10:42:17 13  A.    No, I didn't.

10:42:19 14  Q.    After the sale, did you have discussions with Adam

10:42:22 15  about it?

10:42:22 16  A.    I don't recall discussing that with him, no.

10:42:28 17  Q.    And do you -- did you know at the time that there

10:42:32 18  were any restrictions placed on Adam following the sale?

10:42:39 19         THE WITNESS:  I do not know about restrictions,

10:42:43 20  no.

10:42:45 21  Q.    Had you heard anything about a covenant or an

10:42:47 22  agreement not to compete with CLM?

10:42:50 23         THE WITNESS:  No, I don't recall hearing about

10:42:52 24  that.

10:42:53 25  Q.    Okay.  How about up until the time I just -- I just

10:42:56 1   mentioned it, were you aware that there was a -- a

10:42:59 2   non-compete agreement in -- in the sale, in connection with

10:43:02 3   the sale of CLM?

10:43:03 4   A.     I believe I -- I found out about it -- I'm trying to

10:43:10 5   remember -- I -- I think it was shortly after it was sold to

10:43:21 6   be -- after Adam sold Business Insurance.

10:43:24 7   Q.     And there are some emails that get into some of those

10:43:28 8   issues and we can talk about that in a little bit.

10:43:31 9          But fair to say that -- up until the time that

10:43:38 10  Business Insurance was sold to the Acuntos, you weren't

10:43:44 11  aware of the existence of a covenant not to compete, right?

10:43:48 12  A.     Right.

10:43:49 13  Q.     So, when you saw that there was going to be a line

10:43:52 14  added saying that this conference wasn't developed for

10:43:55 15  claims and litigation management professionals -- well, let

10:44:04 16  me ask you this, did you agree with that statement?

10:44:06 17         THE WITNESS:   Yeah, I mean there was a little

10:44:09 18  bit of a -- a conflict with having a claims-related session

10:44:17 19  and saying that the conference was not meant for claims

10:44:21 20  professionals.

10:44:21 21         I -- obviously, litigation, we -- from the start

10:44:26 22  we were not allowing outside counsel to attend, but it -- it

10:44:35 23  didn't make total sense to me, no.

10:44:37 24  Q.     And so, there were -- you know, because you said

10:44:40 25  before, there were claims professionals on the advisory

10:44:42 1    board, right?

10:44:43 2    A.    Right.

10:44:46 3    Q.    And would you say that Wilson Elser, as outside

10:44:50 4    counsel, is a law firm that's involved in claims and

10:44:55 5    litigation management?

10:44:58 6          THE WITNESS:  Definitely.

10:45:01 7    Q.    And there's -- there was a session devoted to claims

10:45:04 8    at the conference --

10:45:07 9          UNIDENTIFIED SPEAKER:  Objection.

10:45:07 10   A.    Initially, reworded, yes.

10:45:12 11   Q.    So you had -- and you have -- you know that there are

10:45:15 12   already claims people that had signed up for the conference?

10:45:20 13   A.    Yes.

10:45:21 14   Q.    So, following this email, did anybody ever suggest to

10:45:24 15   you that -- that you should do anything to make sure that no

10:45:30 16   claims or litigation management professionals attended the

10:45:33 17   conference?

10:45:33 18         THE WITNESS:  Aside from this language change, I

10:45:39 19   don't recall having to change registration or notify anyone

10:45:43 20   that they could no longer attend or anything like that.

10:45:51 21   Q.    If anybody suggested to you that claims litigation

10:45:53 22   management professionals should be removed from the

10:45:55 23   registration list, would that have been something you would

10:45:57 24   have been involved in?

10:46:00 25         THE WITNESS:  Possibly, it's never something

10:46:04 1 that I had -- had to deal with before.  So, I think we would

10:46:10 2 have treated it very delicately if that would have been the

10:46:14 3 case.

10:46:16 4 Q.    And -- but to your knowledge, nothing like that had

10:46:19 5 ever occurred?

10:46:19 6               UNIDENTIFIED SPEAKER:  Objection.

10:46:19 7               THE WITNESS:  Not that I know of, no.

10:46:22 8 Q.    Now, you were still involved at this time, this is in

10:46:27 9 August of 2019, the conference is about two months away.

10:46:33 10 Were you still involved, at this time, in assisting and

10:46:37 11 developing the content for the conference, still working

10:46:40 12 with the advisory board?

10:46:42 13 A.    Yes, I -- I believe the agenda was firm at that

10:46:49 14 point, but -- yes, I was in touch with the advisory boards

10:46:52 15 and all the speakers through -- through the conference.

10:46:57 16 Q.    Do you remember this email -- let's first focus on

10:47:01 17 this email.

10:47:02 18               Do you remember if this email was ever sent to

10:47:05 19 any of the -- any of the advisory board members?

10:47:07 20 A.    I do not recall spelling it out specifically to the

10:47:16 21 advisory board that these changes were made.

10:47:19 22 Q.    Okay.  Do you remember anybody discussing with the

10:47:25 23 advisory board that these changes were being made?

10:47:28 24 A.    No.

10:47:32 25 Q.    Okay.  And how about with the -- with the proposed

10:47:38 1 speakers for the conference, do you remember if the speakers

10:47:41 2 were ever advised of this change to the conference title and

10:47:46 3 description?

10:47:47 4 A.    I -- I can't recall.  They -- they must have seen it

10:47:59 5 on the web sites and the program, but I don't recall

10:48:02 6 notifying them specifically about the change.

10:48:05 7 Q.    It only would have been if they had gone onto the

10:48:08 8 website to look at it, but they weren't -- to your

10:48:12 9 knowledge, they weren't affirmatively told about these

10:48:14 10 changes, right?

10:48:15 11 A.    Not that I recall, no.

10:48:19 12 Q.    You should see an August 23rd, 2019, email,

10:48:24 13 Bates-stamped Potter-DE-000388.  And I just want to scroll

10:48:35 14 down to an August 22, 2019, email on Page 2 of the PDF

10:48:44 15 starting with Bates number 389 going -- going into 390.

10:48:55 16        It's an email from Ian Stewart to you, and what

10:48:59 17 I can only assume is the advisory board; does that look

10:49:03 18 right?

10:49:03 19 A.    Correct.

10:49:06 20 Q.    And this is August 22nd, this is -- what is it, three

10:49:14 21 days after Adam told you he was changing the -- the

10:49:22 22 conference, the session description -- title and

10:49:26 23 description, right?

10:49:27 24 A.    Mm-hmm.

10:49:30 25 Q.    But he references here that there's a session on

10:49:33 1    cannabis claims, right?

10:49:34 2    A.    Mm-hmm.

10:49:36 3    Q.    Do you know who Beth Ossino is?

10:49:39 4    A.    I -- only through planning the event, yeah.

10:49:46 5    Q.    What does Beth Ossino do?

10:49:50 6    A.    Claims manager at Golden Bear.

10:49:55 7    Q.    And is Golden Bear an insurance company that

10:49:57 8    specializes in cannabis insurance?

10:49:59 9    A.    Yes, they do.  They -- I believe they have cannabis

10:50:07 10   coverage, yes.

10:50:09 11   Q.    And your understanding of Beth Ossino's role is

10:50:16 12   managing claims for Golden Bear, right?

10:50:20 13   A.    Correct.

10:50:21 14   Q.    And how about -- boy, I don't want to butcher this,

10:50:26 15   Gerrit Nagarwalla, claims supervisor at Canopius.

10:50:33 16   A.    Yes.

10:50:33 17   Q.    Did you know Gerrit just from this -- being involved

10:50:39 18   in the advisory board?

10:50:40 19   A.    Yeah, same, met him through the event.  And he -- he

10:50:45 20   is on the advisory board or -- yeah.

10:50:50 21   Q.    He's an advisory board member?

10:50:52 22   A.    I'm not sure.  He might have joined the next year,

10:50:57 23   actually.  I -- I can't recall if he was -- yeah, I think he

10:51:05 24   joined later as an advisory board member, actually.

10:51:09 25   Q.    What's your understanding of what Canopius is?

10:51:12 1 A.    They are also an insurer that -- I think a broker.

10:51:23 2 They're an insurer.  They handle claims.  They specialize in

10:51:27 3 handling insurance for cannabis-related companies.

10:51:34 4 Q.    Okay.  And his position is claims supervisor, who

10:51:39 5 also is involved in handling claims arising out of cannabis

10:51:44 6 exposure, correct?

10:51:46 7             THE WITNESS:  Correct.

10:51:47 8 Q.    Nobody ever -- you don't recall anyone suggesting,

10:51:50 9 after this email, that we're no longer having a cannabis

10:51:54 10 claim session, right, that we're now having a cannabis

10:51:58 11 exposure session?

10:51:59 12             THE WITNESS:  I don't recall those words

10:52:01 13 specifically, but there was no discussion of cancelling the

10:52:05 14 session that I remember, regardless of what we called it or

10:52:11 15 described it.

10:52:12 16 Q.    It was going to go forward as planned, correct?

10:52:18 17             THE WITNESS:  Correct.  Yeah, I think Ian was

10:52:21 18 using kind of the initial topic terms and not the updated

10:52:27 19 session titles that we came up with here.

10:52:31 20 Q.    And nobody suggested at this point, you know, taking

10:52:38 21 the panel lists off the mix and bringing new people in,

10:52:43 22 right?

10:52:43 23             THE WITNESS:  No, I don't recall that.

10:52:46 24 Q.    To your knowledge, was -- was Ian told about the

10:52:51 25 change to the -- to the session?

10:52:54 1       THE WITNESS:  Not -- I -- I do not know how he

10:52:57 2  came to know about the change to the session name.  If -- I

10:53:04 3  assume he did, but I don't think -- it was not me.  It may

10:53:12 4  have been Adam.  I -- I don't know.

10:53:15 5  Q.      And why do you assume that he ultimately did find

10:53:18 6  out?  Are you -- are you referring to the email prior to the

10:53:24 7  conference that Ian Stewart sent suggesting some changes to

10:53:28 8  the -- to the contract?

10:53:30 9       THE WITNESS:  No, I mean, I assume he noticed it

10:53:33 10 because he was very involved and he was at the conference,

10:53:37 11 and he was a speaker.  Yeah, I -- I know he found out

10:53:44 12 eventually.  At what point, I'm not sure.  I don't recall.

10:53:47 13 Q.      But, to your knowledge, those planning the

10:53:52 14 conference, the agenda, the topics that would be discussed,

10:53:57 15 they essentially continued to plan as they had from the

10:54:01 16 beginning?

10:54:01 17      THE WITNESS:  Correct, yes.

10:54:05 18 Q.      So, this is a -- what I put up is a Friday,

10:54:09 19 September 13th email.  It's part of the email chain that we

10:54:14 20 just looked at, but this is Bates-stamped BIH-002-005794.

10:54:24 21      And, Nate, per your suggestion, I will just go

10:54:34 22 through it from the bottom.

10:54:36 23      Most of the -- the emails are those that we just

10:54:42 24 looked at in Exhibit Number 11.  So, I just want to focus,

10:54:52 25 really, on the first two pages here, Ms. Kett.

10:54:55 1  So, at this point, of course, understanding that

10:54:59 2  the IP Conference did not go forward, the proposed session

10:55:08 3  for the IP Conference, that you're referring to in your

10:55:13 4  email to Steven Acunto is called Taking the Mystery Out of

10:55:16 5  IP Insurance Claims.  And -- I mean you can take a look at

10:55:23 6  the -- at the description here, but it seems pretty clear,

10:55:28 7  I'd think you'd agree, that the IP Conference did plan on

10:55:33 8  having a session devoted specifically to IP claims, right?

10:55:38 9  THE WITNESS:  Yes.

10:55:40 10  Q.    So, this was September of 2019.  The conference --

10:55:45 11  the cannabis conference took place October of '19, correct?

10:55:48 12  A.    Correct.

10:55:50 13  Q.    All right.  Were you there?

10:55:50 14  A.    The cannabis conference?

10:55:53 15  Q.    Yes.

10:55:53 16  A.    Yes.

10:56:01 17  Q.    How many people were in attendance?

10:56:03 18  A.    I don't recall exactly, but I believe there was about

10:56:09 19  150 attendees.

10:56:12 20  Q.    And I know we talked about the initial change to the

10:56:17 21  -- to the landing page for the website, but up until the day

10:56:24 22  that the doors opened up in October of 2019, was there any

10:56:29 23  attempt ever made to ensure that no claims or litigation

10:56:34 24  management professionals attended the conference?

10:56:36 25  THE WITNESS:  Not to my knowledge.  It was not

10:56:38 1   something I was tasked with aside from changing the language

10:56:41 2   in the agenda.

10:56:45 3   Q.     And you don't remember anyone else being tasked with

10:56:47 4   that, correct?

10:56:48 5   A.     I don't.

10:56:49 6   Q.     I'm going to pull up the conference final agenda from

10:56:57 7   the web page, from the BI web page, and we can mark this as

10:57:07 8   Exhibit 14.  For the record, this is a screen capture PDF

10:57:12 9   created on -- on June 10, 2021, from the Business Insurance

10:57:19 10  website, and it's kind of a long document.  It's 35 pages.

10:57:28 11  I don't need you to read the whole thing.

10:57:31 12         So, I'm just going to go through it kind of

10:57:35 13  slowly and then quickly when I need to, but if anybody wants

10:57:39 14  to see it in more depth, we can do that.  But I don't -- I

10:57:45 15  just don't think you want to sit and watch somebody scroll

10:57:48 16  through 35 pages.

10:57:49 17         So this is the landing page to the event, and we

10:57:52 18  see here that this is the bolded language, this conference

10:57:57 19  was not developed and not intended for claims and litigation

10:58:00 20  management professionals, right, that was the language that

10:58:02 21  you put onto the website at Adam's request?

10:58:04 22  A.     Yes.

10:58:06 23  Q.     All right.  So Exhibit 14 is everything I -- I just

10:58:10 24  described up above.  Here is the bolded language that Adam

10:58:17 25  had added to the -- the landing page, right?

A.     Yes.

Q.     Okay.  And then scrolling through the agenda, on Page 6 of the PDF, we see the session at issue, Business Track Sessions, Cannabis Exposure, a Peak Down the Rabbit Hole.

In an earlier email we had seen that Beth Ossino and Gerrit Nagarwalla were included in the -- on the panel.

Do you know who Lisa Simon is?

A.     Yeah, just from the event.

Q.     Who -- I mean, I see that she's a VP at Swiss Re, but do you know what her -- what her general job description is at Swiss Re?

A.     I actually don't.  You probably have it, her speaker bio, in your screen grab, though.

Q.     Yeah, I -- I think it is there.  We can get there if I need to.  And then scrolling down, how are the -- how did the panelists put together slide presentations for -- for their session, do you know?

THE WITNESS:  We are -- our team provided each panel will with a PowerPoint template and kind of left it up to them.  We honestly didn't have a lot of time or resources to really strictly proof their slides, so there -- there wasn't a lot -- there wasn't really restrictions there on the slides.

Q.     Speaking specifically about the cannabis -- what was

1 originally described as the cannabis claim session, do you

2 know who put together the -- the slide presentation or the

3 handouts for that session?

4 A.    Yeah, Brittany Collins did the program and the -- I

5 mean we -- so, the speakers put their own slides together

6 but we had what looks like a placeholder slide that we would

7 create for each event to kind of show when people came into

8 the room.  Or that might have been -- I don't know if that

9 was a social asset or where that came from.

10 Q.    I'm sorry, a social asset?

11 A.    Yeah, like a graphic that we may have posted on

12 social media.

13 Q.    Okay.  And then would the panelists themselves have

14 been tasked with putting together the substantive slides?

15 A.    Yes.

16 Q.    Do you know who put together the substantive slides

17 for this session?

18 A.    I don't know.  And I -- I don't recall necessarily

19 that they had slides, not every session had slides.  So,

20 they -- they might not have, unless you're going to show

21 them to me right now.

22 Q.    Well, right.  This is pulled off --

23 A.    Oh, yeah that one, we did have a video.

24 Q.    Okay.  That was -- I was curious because this looked

25 -- this looked like it's stretched out and not very clear.

1  So, I was curious, is that what that is, this is a video?

2  A.    Yeah, that's a video of, like, a nursery.

3  Q.    So, did you actually view these slides before the

4  presentation?

5  A.    Yes.  I would proof them briefly, and, you know, fix

6  the front.  Yeah, I guess --

7  Q.    Did you -- did you attend this session?

8  A.    Yes.

9  Q.    Okay.  So -- so I wanted to just make sure that -- I

10 mean, I know I pulled these directly off the website, but to

11 your recollection, is this how -- is what I'm showing you on

12 the screen here representative of what these slides or

13 handouts looked like at the conference?

14 A.    Yes.

15 Q.    Okay.  So, the first one is a video on fire claims.

16 The second slide is a continuation of fire claims.  And then

17 there's a slide for theft claims, product liability,

18 packaging and warnings.  And then just pulling pictures of

19 people buying pot.

20          So -- so then we get down to CBD claims.

21          Do you know if there were any other materials

22 that were handed out during this session?

23          THE WITNESS:  No, not aside from -- well, so, we

24 had a program and then there was also like -- like an Expo

25 Hall, but that was nothing specific to the session that was

11:03:43 1  handed out that I recall.

11:03:44 2  Q.     Do you recall sending out the attendee survey after

11:03:48 3  the conference?

11:03:48 4  A.     Yeah.

11:03:53 5              MR. SIEGEL:  It should be up on the screen now,

11:03:55 6  Exhibit -- 14 -- 15.

11:03:58 7              November 7, 2019, email, initial Bates stamp is

11:04:02 8  BIH-002-003818.  Again, this is another long one.  It's nine

11:04:11 9  pages.  I just want to ask a few questions about the survey.

11:04:18 10 So, this is an email from you, I'm assuming, to the advisory

11:04:23 11 board, correct?

11:04:25 12             THE WITNESS:  Yes, and then I cc'd -- it looks

11:04:28 13 like I cc'd all -- all of the other speakers, too.

11:04:33 14 Q.     These were all of the speakers from the entire

11:04:36 15 Cannabis and Hemp Conference, right?

11:04:37 16 A.     Yeah.

11:04:38 17 Q.     Okay.

11:04:46 18 A.     I was -- oh, it's -- it's 234, not 150.

11:04:50 19 Q.     Oh, total people?

11:04:51 20 A.     Yeah.

11:04:52 21 Q.     Yeah.  Again, I -- you know, this was not meant to be

11:04:54 22 a guessing game, but that's a good point, thank you.

11:04:58 23             Does this refresh your recollection of the total

11:05:00 24 number of people who attended the conference?

11:05:02 25 A.     Yes.

11:05:03 1  Q.     The total number is 234?

11:05:05 2  A.     It appears so, yes.

11:05:07 3  Q.     Okay.  Great.  Thanks.  I'm just scrolling down to

11:05:16 4  question one.  The survey asks people what persuaded them to

11:05:27 5  register, see here answer Number seven, and part of the

11:05:33 6  claims underwriting team that handles these products, these

11:05:36 7  seminars are few and far between.  I really don't have a

11:05:41 8  question for you on that, just confirming that your

11:05:46 9  understanding is right, that there were -- there were people

11:05:48 10 that were involved in handling claims that attended the

11:05:51 11 conference, correct?

11:05:53 12        THE WITNESS:  According to the response, yeah.

11:05:56 13 Yeah, this was an open-ended question, but at least a

11:06:00 14 fill-in.

11:06:02 15 Q.     Okay.  And there's a couple down in question Number

11:06:04 16 seven, speakers that people found most valuable.  Let's see.

11:06:13 17 Answer number 12, "I enjoy the forms panel and the claims

11:06:21 18 trends panel as that pertains to what I do."

11:06:24 19        Obviously, you don't know who this person is,

11:06:28 20 'cause it's a blind survey.

11:06:29 21        Were there any other panels at the cannabis

11:06:33 22 conference that addressed claims arising in the cannabis

11:06:37 23 space?

11:06:38 24 A.     I don't recall specifically.  I mean, it was

11:06:49 25 definitely kind of a topic of interest because I think

1    insurance companies that don't have those lines of coverage,

2    just don't -- don't know how to cover the claim.  So,

3    anyway, that's not answering the question.  I -- no, I don't

4    recall specifically other sessions that talked about claims.

5    Q.    Okay.  Well, you say that insurance companies, when

6    you're -- don't know how to cover the claims, you're talking

7    about insurance companies that are in the cannabis and hemp

8    space?

9    A.    No, I'm talking about the bigger insurance carriers,

10   they think they -- they -- they're avoiding starting that

11   line of coverage because of the federal legality of it.  So,

12   like most of them do not have that line of coverage, so

13   they're just trying to understand what claims are involved

14   in the industry, if they were to get involved is what my

15   understanding of the audience was.

16          MR. SIEGEL:  I'll just pull it up real quick,

17   Exhibit 16, November 7, 2019, email.  It is Bates-stamped

18   BIH-002-003827.

19          So, I just wanted to talk about this -- this

20   conference call that you had with the advisory board members

21   following the -- following the conference and following

22   sending out the survey.

23          This discussion item is to talk about the next

24   conference in 2020, correct?

25          THE WITNESS:  Correct.

11:08:45 1    Q.    Was there any discussion that you recall on this

11:08:50 2    conference call about including a topic on claims in a

11:08:54 3    future cannabis session -- and I'm sorry, a future cannabis

11:08:59 4    conference?

11:09:03 5    A.    I don't believe we got into those specifics of topics

11:09:08 6    yet on this -- on this call.

11:09:13 7    Q.    Okay.  And you say here that it was a very engaged

11:09:15 8    audience, a new audience for BI.  Those may not have been

11:09:23 9    your words, but what's your understanding of what the new

11:09:26 10   audience for BI referred to there?

11:09:28 11             THE WITNESS:  I mean, I don't recall who brought

11:09:32 12   that up specifically, but I -- like, as someone who's run

11:09:36 13   Business Insurance events and attended them, I can -- I

11:09:40 14   noticed that it was -- it was -- I saw a lot of new faces.

11:09:43 15   It was just -- it was a lot of new people that hadn't been

11:09:46 16   to other events before.

11:09:48 17             Certainly, we hadn't specifically drawn

11:09:53 18   cannabis-related businesses necessarily, but I -- I think it

11:10:04 19   might have been like some of the cannabis insurers and some

11:10:08 20   broke -- brokers as well.  Yeah, I mean I think the audience

11:10:17 21   ultimately was still largely insurers and brokers.

11:10:20 22   Q.    So, after the cannabis conference was held, am I

11:10:29 23   right that BI only held one more in-person event before

11:10:37 24   March of 2020, when the world shut down?

11:10:40 25   A.    No, we've had a lot of events.

11:10:44 1    Q.    Oh, what did you have?

11:10:45 2    A.    We had -- we had, let's see; so cannabis was in

11:10:53 3    October.  We would have had women to watch.

11:10:57 4    Q.    Oh, yeah.

11:10:58 5    A.    In November, women to watch, in December.  And then

11:11:02 6    World Captive Forum in end of January.  And we -- yeah, we

11:11:10 7    were -- we were in planning for the cannabis conference in

11:11:15 8    April 2020 and that was supposed to be in San Francisco.

11:11:19 9    And then the U.S. Insurance Awards was cancelled kind of

11:11:25 10   last minute in March, like mid-March.  That was in New York.

11:11:29 11   Q.    So, when the April cannabis conference was cancelled,

11:11:32 12   was that converted to an online event?

11:11:36 13   A.    Yeah, we converted it to a web series which started

11:11:41 14   at the beginning of May and ran through June.  We had -- I

11:11:47 15   think we had six -- six webinars.

11:11:51 16   Q.    Were you involved in putting together the content for

11:11:54 17   those webinars?

11:11:55 18   A.    Yes.

11:11:56 19   Q.    Okay.  Do you recall if those webinars involved

11:12:01 20   topics related to cannabis claims?

11:12:04 21   A.    I do not believe any of them were specifically

11:12:13 22   focused on claims.

11:12:14 23   Q.    What do you recall the -- the focus being for -- for

11:12:19 24   that -- for that webinar series?

11:12:21 25   A.    I think it was more focused on risk management and,

11:12:27 1    you know, interests of the insurers and brokers.

11:12:35 2    Q.    Do you recall anyone discussing after that webinar

11:12:39 3    series took place that you should bring claims back into the

11:12:43 4    mix --

11:12:44 5          THE WITNESS:  No, I don't recall that.

11:12:47 6    Q.    How about for the -- for future -- the future

11:12:51 7    Cannabis and Hemp Conference, did you stay active with the

11:12:56 8    advisory board up until the time that you left in March of

11:13:00 9    2021 about -- I'm sorry.  Were there discussions before you

11:13:06 10   left in March of 2021 about what was going to be included in

11:13:11 11   the virtual Cannabis and Hemp Conferences taking place in

11:13:15 12   October?

11:13:16 13   A.    We discussed it, but -- I don't -- it was very top

11:13:27 14   level.  We didn't -- I think we were focused more on getting

11:13:30 15   a web series together for the spring, but that -- again I

11:13:38 16   was -- I was coming off of the World Captive Forum and it

11:13:42 17   was -- it was kind of lower on my radar.  I mean, it hadn't

11:13:46 18   been flushed out by the time I left.  Yeah.

11:13:48 19   Q.    Now, speaking more generally, did anyone ever suggest

11:13:55 20   that future Conferences, webinars, and events should avoid

11:14:04 21   any discussion of -- of claims or litigation management?

11:14:11 22          THE WITNESS:  I -- you know, after what happened

11:14:21 23   with the -- the live event and having to change language, I

11:14:24 24   was careful about showing or running session topics and

11:14:28 25   titles by ownership, so their legal team can look at it.

11:14:35 1    But I don't -- I don't recall claims necessarily being a big

11:14:43 2    push for any events.

11:14:48 3    Q.    When you say "by ownership," you mean you ran it by

11:14:52 4    Steve Acunto?

11:14:54 5    A.    Yeah, Steve or Steve, Junior.  Steven.

11:15:00 6    Q.    And in the course of running proposed, you know,

11:15:12 7    session agendas or -- or titles by them, do you remember any

11:15:18 8    discussions with them about having to avoid certain --

11:15:24 9    certain areas, for instance, having to avoid discussing

11:15:29 10   claims and litigation management?

11:15:32 11        THE WITNESS:  Not specifically, no.

11:15:35 12   Q.    And in reverse, did they ever say anything to you

11:15:38 13   suggesting that there should be some limitation in the type

11:15:43 14   of programming that BI would put on going forward?

11:15:46 15   A.    I think they -- they did when we were putting the

11:15:52 16   cannabis web series together for 2020.  I think I do recall

11:15:57 17   them being -- wanting to be cautious about titles and topics

11:16:03 18   for that series.

11:16:05 19   Q.    And -- okay, specifically what do you mean, they

11:16:09 20   wanted to be cautious?

11:16:10 21   A.    Just -- I -- I think probably keeping claims, claims

11:16:16 22   language out of it, but I -- I just -- I let them review it

11:16:21 23   and come back to me if there was anything that needed to be

11:16:23 24   changed.

11:16:25 25   Q.    Okay.  So, for the 2020 conference, your

1  understanding is they did want to remove claims language

2  from that series, correct?

3          THE WITNESS:  To the best of my memory, yes.

4  Q.    Ms. Kett, my name is Matt Denn.  And as you know, I

5  represent Business Insurance Holdings.

6          I just wanted to return, very briefly, to some

7  of your testimony at the very beginning of your deposition.

8          You testified, if I wrote it down correctly,

9  that Business Insurance's primary audience was risk managers

10 and the greater commercial insurance industry; is that

11 accurate?

12 A.    Correct.  Mm-hmm.

13 Q.    And was that true throughout the time that you --

14 that you worked there up until earlier this year?

15 A.    Yes.  Mm-hmm.

16 Q.    Okay.  And when -- and when you say greater

17 commercial insurance industry, are you referring primarily

18 to insurers and -- and brokers?

19 A.    Yeah, if you look at the breakdown of the audience,

20 insurers and brokers do make up -- probably the largest

21 portion of the audience, but it also includes service

22 providers, like -- like attorneys and TPAs and other -- but

23 those are a smaller subset of the audience.

24 Q.    And I think you also testified when you were

25 discussing some of the co-branded events like workers'

11:17:44 1  compensation and restaurant hospitality, that those

11:17:47 2  conferences drew legal attendees who were not part of

11:17:53 3  Business Insurance's core audience; did I get that right?

11:17:56 4  A.    Yeah, if they -- from what I recall, those events,

11:18:03 5  even though they were co-branded, they were very much

11:18:05 6  largely CLM members that attended, and not so much people

11:18:09 7  that -- not BI subscribers.  There was -- there was probably

11:18:15 8  some overlap, but -- yeah, mostly CLM members.

11:18:19 9  Q.    Okay.  And when you said legal attendees, what did

11:18:22 10  you mean by that?

11:18:23 11  A.    Attorneys primarily or, I guess, claims

11:18:28 12  professionals, anyone who had qualified as a CLM member.

11:18:32 13  Q.    So, when you said that the legal attendees were not

11:18:36 14  part of Business Insurance's core audience -- you were

11:18:39 15  talking about attorneys and claims handlers?

11:18:44 16  A.    I mean they're part of the audience, but it's not --

11:18:48 17  it's not the biggest percentage of Business Insurance's

11:18:51 18  audience.  And I -- you know, without looking at the list, I

11:18:54 19  guess it's hard for me to say who -- who was only a Business

11:18:58 20  Insurance subscriber and not a CLM subscriber.  I suspect if

11:19:07 21  -- if they were an attorney and they were going to a CLM

11:19:10 22  event, they were probably already a CLM member.  But, yeah,

11:19:17 23  I don't know if I answered your question right.

11:19:19 24  Q.    And Ms. Kett, I'm going to give you remote access so

11:19:23 25  you can scroll through it really quick, just to

11:19:28 1  refamiliarize yourself with the document.

11:20:27 2  A.    Okay.

11:20:28 3  Q.    Okay.  I'm going to take back control, if you don't

11:20:32 4  mind.  All right.  And I'm going to bring you back to the

11:20:37 5  top of the email chain here in this April 17, 2019, email

11:20:44 6  from Mr. Potter to you, CCing several BI employees.

11:20:49 7            A few lines down, it mentions 499 (early)/599

11:20:57 8  regular for insurance company folks.  And then in

11:21:00 9  parentheses it says underwriter/claims.  Do you see that?

11:21:03 10  A.    Mm-hmm.

11:21:04 11  Q.    Do you -- do you know -- do you have any idea why

11:21:08 12  underwriters/claims is -- is included that way and they're

11:21:12 13  not separated out?

11:21:13 14  A.    I think -- well, generally like -- so, Adam's

11:21:28 15  alluding to we want to break it down, like the World Captive

11:21:32 16  conference.  Traditionally, Business Insurance events are

11:21:35 17  less expensive for risk managers, and that's kind of the

11:21:40 18  primary group that we want to pull out.  But, I mean, I

11:21:49 19  think he also intended that underwriters, claims, maybe

11:21:52 20  agents would be together.

11:21:55 21            I am -- I'm not totally sure why -- I think

11:22:03 22  maybe -- maybe he was just putting claims people in with

11:22:06 23  insurers.  I think he was just maybe clarifying titles.  I

11:22:18 24  -- I can't say exactly why he called out underwriters and

11:22:21 25  claims specifically.

11:22:22 1  Q.    Okay.  Any idea why he would treat them here

11:22:29 2  similarly as reflected by the, you know, the slash between

11:22:35 3  the two, underwriters and claims?

11:22:37 4  A.    I mean, probably because insurance companies are the

11:22:44 5  ones that handle the claims, or sometimes they do.  I -- I

11:22:51 6  think that for all others, that generally means, like,

11:22:55 7  service providers, which would normally include, like, TPAs.

11:23:00 8  And we price them higher because -- or we did price -- BI

11:23:04 9  prices them higher because they don't -- they don't want

11:23:09 10 salespeople, you know, dominating the audience.

11:23:14 11        So, I think -- yeah, this is all speculation, of

11:23:20 12 course, but by putting underwriters and claims, I think he

11:23:23 13 was referring to -- to insurers primarily, and people that

11:23:28 14 work for insurers.

11:23:32 15 Q.    So, I mean, as a recipient of this email, you -- you

11:23:34 16 don't understand, then, what he means when he is -- he's

11:23:38 17 including that in parentheses, underwriters/claims?

11:23:42 18 A.    I think he was trying to pull out titles of people.

11:23:47 19 So, sometimes it's not always obvious what bucket they fall

11:23:51 20 into, necessarily, from the name of their company.

11:24:04 21 Q.    Okay.  And -- and if I understand your testimony, the

11:24:09 22 -- the -- the pricing tiers reflects the -- the preferred

11:24:18 23 audience for -- for the cannabis event here, is that -- is

11:24:22 24 that -- my understanding correct?

11:24:23 25        THE WITNESS:  Yes, and no.

11:24:24 1    Q.    Let me --

11:24:24 2    A.    Yeah, go ahead.

11:24:25 3    Q.    Yeah, maybe I can -- I can rephrase.  You -- risk

11:24:31 4    managers are -- are priced the lowest at 99 to 199, correct?

11:24:35 5    A.    Correct.

11:24:36 6    Q.    And I believe you testified that's because that

11:24:38 7    Business Insurance would prefer risk managers to attend its

11:24:44 8    conferences over other industry professionals?

11:24:46 9    A.    I don't think I said that, but, yes, but I mean

11:24:51 10   that's their core audience, that's who they write for.  And

11:24:54 11   it was kind of an -- just kind of an understood sort of

11:24:59 12   favor that we -- that Business Insurance historically priced

11:25:04 13   registration lower for risk managers to lower the barrier of

11:25:09 14   entry to attract more risk managers.

11:25:13 15   Q.    To make it easier for risk managers to attend the BI

11:25:17 16   events and conferences?

11:25:18 17   A.    Right.

11:25:21 18   Q.    And then turning to the Wilson Elser contact list, I

11:25:24 19   just want to share my screen.

11:25:28 20         You should see a July 1st, 2019, email from Ian

11:25:43 21   Stewart to you, Bates-stamped BIH-002-001858.  And I guess

11:25:54 22   this will be Exhibit 18.

11:25:56 23         On June 28, 2019, you said to Mr. Stewart, you

11:26:01 24   ask him, "Do you have a contact/client list you would like

11:26:08 25   us to include in our promotions for the contract -- for the

11:26:11 1    conference?"

11:26:12 2            My question is -- well, actually, there's that.

11:26:20 3    And then he provides you the list on July 1st and says,

11:26:23 4    "Katie, here is the contact list.  This is highly valuable

11:26:27 5    IP for us.  Please keep it strictly confidential and please

11:26:31 6    do not distribute it outside BI."

11:26:38 7            You say here that you were going to include it

11:26:41 8    in your promotions for the conference.  Am I correct that

11:26:45 9    when Ian Stewart sent you the Wilson Elser contact list,

11:26:54 10   that the emails that went out promoting the conference went

11:27:00 11   out from Business Insurance?

11:27:01 12   A.       Correct.  Mm-hmm.

11:27:05 13   Q.       Okay.  So, everybody who was on the Wilson Elser

11:27:08 14   contact list would have gotten an email from Business

11:27:14 15   Insurance promoting the new Business Insurance Cannabis and

11:27:18 16   Hemp Conference?

11:27:18 17   A.       Correct.

11:27:21 18   Q.       Okay.  And he does say that it is highly valuable IP,

11:27:33 19   so, I don't want to -- well, it's marked as attorneys' eyes

11:27:41 20   only, so -- and a couple of things have been marked

11:27:46 21   attorneys' eyes only, so, let's talk about that issue after

11:27:50 22   we let Ms. Kett go.

11:27:53 23           But right now, I just want to pull up the list

11:27:57 24   that was attached to that last email that I showed you.  And

11:28:05 25   this is generally Bates -- this entire spreadsheet is

11:28:11 1   Bates-stamped BIH-002-001860.

11:28:17 2              And I would let you scroll through the document,

11:28:21 3   but for some reason, my Microsoft Excel decided it wanted to

11:28:25 4   pick right now to not respond.  But we don't need to go

11:28:29 5   through the whole thing.  Just looking at least what's on

11:28:32 6   the screen, does this look to you like the email list that

11:28:36 7   Wilson Elser sent to you?  I'm sorry, the contact list that

11:28:41 8   Wilson Elser sent to you?

11:28:42 9   A.      It -- it does look like that is -- that's what it is,

11:28:51 10  yes.

11:28:52 11  Q.      Okay.  Yeah, and it -- it is -- for the record, the

11:28:58 12  email that we just showed you that's marked Exhibit 18 is --

11:29:03 13  references that it has attached to it, Cannabis Contact

11:29:07 14  Review, Microsoft Excel.  But like I said, it's decided to

11:29:14 15  hang up on me right now.  But you can see at the bottom

11:29:17 16  left-hand corner of the screen, this spreadsheet is labeled

11:29:25 17  Cannabis Contact Review?

11:29:25 18  A.      Mm-hmm, yes.

11:29:27 19  Q.      Okay.

11:29:43 20              (Video paused.)

11:29:43 21              MR. SIEGEL:  Your Honor, there's a tiny little

11:29:46 22  bit that didn't -- that got cut off the video record, and

11:29:49 23  it's just my question.

11:29:50 24              "Okay.  So, your understanding is that this

11:29:52 25  spreadsheet is, in fact, the spreadsheet that Wilson Elser

| | |
|---|---|
| 11:29:55 1 | sent you to use for marketing purposes for the cannabis |
| 11:29:58 2 | conference; right?" |
| 11:29:59 3 | Response:  "To the best of my knowledge, yes." |
| 11:30:03 4 | THE COURT:  All right. |
| 11:30:04 5 | MR. SIEGEL:  And that concludes -- |
| 11:30:05 6 | THE COURT:  That ends that deposition? |
| 11:30:08 7 | MR. SIEGEL:  Yes, Your Honor. |
| 11:30:09 8 | THE COURT:  All right.  Do you want to just |
| 11:30:11 9 | state what the division of time is for that. |
| 11:30:13 10 | MR. SIEGEL:  So, for Plaintiffs, it's 58 minutes |
| 11:30:16 11 | and 17 seconds.  For Business Insurance, it's 24 minutes and |
| 11:30:23 12 | 34 seconds.  And Potter, it's 14 minutes and 18 seconds. |
| 11:30:29 13 | So, I guess, 28 minutes and roughly 29 minutes for the |
| 11:30:35 14 | Defendants' side. |
| 11:30:35 15 | THE COURT:  Well, we can do the math. |
| 11:30:38 16 | MR. SIEGEL:  Oh, 36, I apologize.  Yeah.  I, |
| 11:30:41 17 | obviously, didn't do the math well, so... |
| 11:30:44 18 | THE COURT:  So, why don't we take -- |
| 11:30:46 19 | MR. SIEGEL:  Well, actually, if I may, |
| 11:30:47 20 | Your Honor, there were exhibits that were marked at the |
| 11:30:50 21 | deposition and that were shown up on the screen, so I'd like |
| 11:30:53 22 | to move them into evidence. |
| 11:30:54 23 | THE COURT:  Yes. |
| 11:30:55 24 | MR. SIEGEL:  I'll read through them. |
| 11:30:58 25 | Exhibit 23. |

11:30:58 1    THE COURT:  Well, why don't you do this:  During

11:31:00 2   the break, talk to the other side, see if there's any

11:31:04 3   objection to any of these.  And if there's not, you can just

11:31:07 4   come back and slowly read the list to me.  And if there is

11:31:13 5   an objection, you can argue about it.  Let's find out.  I

11:31:18 6   think that would be quicker.

11:31:19 7    MR. SIEGEL:  Okay.

11:31:19 8    THE COURT:  So, you all talk to each other while

11:31:21 9   I'm gone.  All right.  We'll be in recess for 15 minutes.

11:31:25 10    DEPUTY CLERK:  All rise.

11:31:27 11    MR. SIEGEL:  Thank you, Your Honor.

11:43:54 12    (Recess was taken.)

11:46:56 13    DEPUTY CLERK:  All rise.

11:47:03 14    THE COURT:  All right.  Everyone can be seated.

11:47:07 15    MR. SIEGEL:  Your Honor, we conferred about the

11:47:11 16   documents.  I just wanted to move into evidence Plaintiffs'

11:47:16 17   Exhibits 23, 51, 52, 53, 57, 68, 66, 70, 71 -- oh, I

11:47:35 18   apologize, I think I said 68, I meant 58.  96, 97, 110, and

11:47:45 19   112.

11:47:46 20    THE COURT:  Okay.  So that's all without

11:47:48 21   objection?

11:47:50 22    MR. DENN:  Correct.

11:47:50 23    MR. NIEDERMAN:  Yes, Your Honor.

11:47:51 24    THE COURT:  All right.

11:47:54 25    (Plaintiffs' Exhibit Nos 23, 51, 52, 53, 57, 58,

11:47:54 1   66, 70, 71, 96, 97, 110 and 112 were admitted into

11:47:54 2   evidence.)

11:47:54 3               THE COURT:  What's next?

11:47:56 4               MR. HAYES:  We'll call Christine Meyer,

11:47:58 5   Your Honor.

11:47:58 6               THE COURT:  All right.

11:48:01 7               MR. HAYES:  I've given the exhibit to the

11:48:05 8   defense counsel.

11:48:06 9               THE COURT:  Okay.

11:48:06 10               MR. HAYES:  I'll hand them up to the Court.

11:48:14 11               DEPUTY CLERK:  Please state and spell your full

11:48:18 12   name for the record.

11:48:18 13               THE WITNESS:  Christine Siegwarth Meyer,

11:48:18 14   C-H-R-I-S-T-I-N-E S-I-E-G-W-A-R-T-H M-E-Y-E-R.

11:48:28 15               CHRISTINE MEYER, Ph.D., the witness herein,

11:48:28 16   after having been duly sworn under oath, was examined and

11:48:36 17   testified as follows:

11:48:36 18               DEPUTY CLERK:  Thank you.

11:48:36 19               MR. HAYES:  May I proceed, Your Honor?

11:48:36 20               THE COURT:  Yes.

11:48:41 21               MR. HAYES:  Thank you.

11:48:41 22             DIRECT EXAMINATION

11:48:48 23   BY MR. HAYES:

11:48:49 24   Q.    Would you state your name for the record, please?

11:48:51 25   A.    Christine Siegwarth Meyer.

Meyer - Direct

11:48:53 1    Q.    How are you employed, Mr. Meyer?

11:48:55 2    A.    I work for a company called NERA Economic Consulting.

11:48:59 3    Q.    And what is your position with NERA?

11:49:02 4    A.    I am a managing director and I am chair of the global

11:49:07 5    intellectual property practice at NERA.

11:49:09 6    Q.    And what is your specific field of expertise?

11:49:12 7    A.    My specific field of expertise is microeconomics.

11:49:18 8    Q.    Did you say microeconomics?

11:49:19 9    A.    Correct.

11:49:21 10   Q.    Were you asked to render a damage analysis in this

11:49:23 11   matter?

11:49:24 12   A.    I was.

11:49:25 13   Q.    Okay.  What specific -- what analysis, just as a

11:49:29 14   general matter to get started, did you undertake to perform?

11:49:31 15   A.    I undertook an analysis that I call benefit of the

11:49:37 16   bargain that's been referred to as benefit of the bargain

11:49:39 17   analysis.

11:49:40 18   Q.    Okay.  Now, just we -- we have previously provided to

11:49:45 19   the Court your CV.  But I just want to identify it for the

11:49:50 20   record.  And if you turn to Exhibit 8 A in your -- if you

11:50:03 21   could turn to Exhibit 8 A in your book of exhibits.  Just

11:50:07 22   confirm that that is your current Curriculum Vitae.

11:50:29 23   A.    That certainly was at the time that I -- I believe my

11:50:32 24   report was submitted.  Yes.

11:50:34 25   Q.    Okay.  And just to highlight, would you just briefly

11:50:36 1    state your educational background.  Please?

11:50:39 2    A.    Sure.  I received my bachelor's degree from the

11:50:42 3    United States Military Academy at West Point.  At that time

11:50:46 4    they weren't called majors, they were called concentrations.

11:50:48 5    I concentrated on economics; that's where my electives were.

11:50:53 6    And then I received my Ph.D. in economics from MIT.

11:50:57 7    Q.    Okay.  And have you worked in the field of economics

11:51:01 8    throughout your career?

11:51:01 9    A.    I have.

11:51:03 10   Q.    Okay.  You stated that you undertook a benefit of the

11:51:16 11   bargain analysis.  What specifically is that?

11:51:18 12   A.    So that is a, as I understand it, obviously as an

11:51:23 13   economist, is a measure of damages that says, you know, what

11:51:31 14   a -- how can we put the party back to where it would have

11:51:35 15   been had the alleged, in this case, violations of the

11:51:42 16   non-compete not occurred.

11:51:44 17          But by looking at what they expected to get at

11:51:47 18   the time that they signed the agreement and what -- and

11:51:50 19   compare that to what they actually got as a result of

11:51:53 20   signing the agreement.

11:51:53 21   Q.    Okay.  Now, I guess, do you assume liability for part

11:51:59 22   of your analysis?

11:51:59 23   A.    I always have to assume liability for damages

11:52:03 24   analysis.

11:52:03 25   Q.    Okay.

11:52:03 1    A.    That's correct.

11:52:04 2    Q.    Now, did you make any assumptions or was any part of

11:52:07 3    your analysis dependent on what the scope of the contractual

11:52:10 4    provisions are?

11:52:11 5    A.    I'm not a legal expert, so from a -- a legal scope

11:52:19 6    perspective, I would say, no.  But I certainly developed an

11:52:23 7    understanding as part of my analysis in terms of -- you

11:52:29 8    know, of the particular provision.  But it was from an

11:52:32 9    economic perspective not a legal perspective.  That's it.

11:52:37 10   Q.    Okay.  Now, what review did you undertake in order to

11:52:40 11   render your opinion here today?

11:52:41 12   A.    So, I did the kinds of things that I typically do in

11:52:46 13   these sorts of cases.  I certainly reviewed the complaint

11:52:52 14   and the answer, and sort of the Court records and some of

11:52:56 15   the back and forth in terms of -- of the Court documents.  I

11:53:00 16   reviewed a number of depositions.  I reviewed a number of

11:53:05 17   documents that were produced by both parties in this case.

11:53:08 18   I spoke with a number of individuals at CLM and at The

11:53:14 19   Institutes.  I also did some of my own research.

11:53:16 20   Q.    Okay.  And do you recall to whom you specifically

11:53:20 21   spoke or interviewed?

11:53:22 22   A.    I can just refer to my report just to make sure that

11:53:28 23   I -- I don't misspeak.

11:53:30 24   Q.    Okay.

11:53:31 25   A.    I spoke with Mr. Scheidt.  I spoke with -- my

11:53:43 1    recollection is I also spoke with -- with Ms. Blume.  I

11:53:52 2    think that might have been in my reply report.

11:53:55 3    Q.    Okay.

11:53:55 4    A.    Yeah.  So -- so to the best of my recollection, those

11:53:59 5    are the two individuals with whom I spoke.

11:54:00 6    Q.    Okay.  Now, direct your attention to what has been

11:54:04 7    marked as Exhibit 8 B.  Can you identify that document,

11:54:12 8    please?

11:54:12 9    A.    Yes, this is -- this is a list of materials upon

11:54:14 10   which I relied in the preparation of my initial report in

11:54:20 11   this matter.

11:54:21 12   Q.    Okay.  And specifically, did you make any review of

11:54:24 13   the market for the -- for the conferences at issue in that

11:54:27 14   -- in this case?

11:54:28 15   A.    I developed a general understanding of the -- of the

11:54:32 16   market for the conferences at issue, yes.

11:54:35 17   Q.    Okay.  So, how did you go about performing your

11:54:45 18   benefit of the bargain analysis?

11:54:46 19   A.    Well, what I did was I looked at the valuation, the

11:54:54 20   VRC valuation, we've heard about it here in the courtroom,

11:54:58 21   that was part of the due diligence process, and reflected

11:55:03 22   some valuation numbers upon which The Institutes relied in

11:55:12 23   coming up with its willingness to pay in this particular

11:55:16 24   case, and the amount that it actually offered and finally

11:55:21 25   agreed to, to pay for the CLM assets.

11:55:24 1        And then, I considered how I, as a person who

11:55:30 2    has done many valuations for another valuator would look at

11:55:35 3    the -- that particular valuation and make an adjustment with

11:55:40 4    an alternative set of assumptions, specifically assumptions

11:55:44 5    in which there was going to be competition from -- whether

11:55:50 6    it be Mr. Potter specifically or -- or BIH or -- or another

11:55:55 7    entity, exactly how that would happen legally was not my

11:56:00 8    focus.  But my focus was on an introduction of competition.

11:56:05 9    Q.    And I'll direct your attention to Plaintiffs'

11:56:07 10   Exhibit 11, which I believe is already in evidence.  Is that

11:56:10 11   the VRC report to which you're referring?

11:56:13 12   A.    Yes, that appears to be that report.  Mm-hmm.

11:56:20 13   Q.    Okay.  And if you want to point to a specific page,

11:56:25 14   but just generally what was significant in your VRC report

11:56:28 15   to you?

11:56:29 16   A.    Well, the VRC report included -- the first thing I

11:56:34 17   looked at was to see whether the VRC report comported with

11:56:41 18   what, in my experience, would be a standard valuation, and

11:56:46 19   it did.  It talked about the general categories of

11:56:52 20   valuation, the different approaches.

11:56:54 21        In the income approach specifically, it used a

11:56:58 22   DCF calculation, which is a very standard -- the standard

11:57:02 23   which I think of implementing, in my experience of

11:57:05 24   implementing an income approach.

11:57:07 25        So, that was the first thing that I looked at

11:57:09 1    just to see whether it comported with what I was used to

11:57:13 2    seeing in valuations, and it did.

11:57:16 3    Q.    Okay.  Was there any other further significance of

11:57:19 4    the VRC reports?

11:57:21 5    A.    Well, as I said, yes, there was a -- in particular,

11:57:26 6    the income approach which looked at the future expected --

11:57:32 7    valuation based on future expected earnings was the -- the

11:57:37 8    approach that -- that specifically spoke to, you know, what

11:57:42 9    the -- what The Institutes expected, because that's where a

11:57:46 10   lot of that data came from, and what VRC sort of endorsed,

11:57:51 11   if you will, as a valuation based on future expected

11:57:56 12   earnings projections.

11:57:58 13   Q.    Okay.  And I'll direct your attention to what I

11:58:03 14   believe is the sixth physical page of the document,

11:58:06 15   Bates-stamped 377.  Did you have an understanding of what

11:58:12 16   information is depicted there?

11:58:16 17   A.    I do.

11:58:16 18   Q.    Okay.  And what do you understand that to be?

11:58:19 19   A.    My understanding is that this is the -- these are the

11:58:24 20   projections, some of it is historical, some of them are

11:58:27 21   projected.  You can see based on the titles that the first

11:58:30 22   two columns are the historical -- based on the historical

11:58:35 23   data.  And the latter columns based on projections.  And

11:58:38 24   that is -- you can see from the notes that these were

11:58:41 25   provided to VRC from The Institutes management.

Meyer - Direct

11:58:45 1  Q.    Okay.  For what purpose -- what -- was your purpose

11:58:47 2  in your conversations with Mr. Scheidt?

11:58:51 3  A.    So, I spoke with Mr. Scheidt about a number of

11:58:55 4  things; one of which was the -- in particular, the

11:58:59 5  projections that Mr. Scheidt provided.  As I understand,

11:59:03 6  when it says provided by The Institutes management, that it

11:59:07 7  was Mr. Scheidt essentially who provided those projections

11:59:10 8  to VRC.

11:59:12 9  Q.    Okay.  Did you -- did you have an understanding of

11:59:14 10 what the assumption was in generating those projections as

11:59:19 11 to whether Mr. Potter and/or BIH would compete against the

11:59:25 12 CLM after the acquisition?

11:59:26 13 A.    Yes.  I have -- I did get gain an understanding of

11:59:30 14 that, that these projections were based on the assumption

11:59:35 15 that they would not be competing.

11:59:38 16 Q.    And did you have an understanding of what VRC's

11:59:41 17 understanding -- let me rephrase that, if I could.  I

11:59:45 18 started a poor question.

11:59:46 19       Did you have an understanding of what VRC's

11:59:48 20 assumption was and the valuation, as to whether there would

11:59:52 21 be competition?

11:59:53 22 A.    Well, I understand that in terms of the projections,

11:59:58 23 that VRC used The Institutes', Mr. Scheidt's in particular,

12:00:03 24 projections, and thus his assumptions as well, which

12:00:06 25 included an assumption of no competition by -- by BIH or

12:00:11 1    Mr. Potter.

12:00:11 2    Q.    And so -- and we've heard testimony earlier.  Can you

12:00:14 3    just summarize the income approach, what is the -- what is

12:00:18 4    that valuation specifically, what does it consider?

12:00:20 5    A.    So, on the income approach, it starts with these

12:00:26 6    kinds of projections that you see, not just projections on

12:00:30 7    revenue, but projections on costs.  It then also has to take

12:00:35 8    into account what's called a terminal value.  So here you

12:00:38 9    can see the projections go out for some period of time.

12:00:43 10          And then there are some -- a couple of different

12:00:45 11   ways, and VRC chose two different ways, to deal with the

12:00:48 12   question of how do I think about value after the actual

12:00:52 13   projection period.

12:00:53 14          And then the last step, if you will, in that is

12:00:59 15   to discount all that have, to bring it all back to the value

12:01:02 16   as of a particular date.  And I believe VRC used March of

12:01:08 17   2018, when it was creating the report.

12:01:11 18          So, those are in -- sort of big picture the

12:01:16 19   three steps in a DCF calculation such as this one.

12:01:20 20   Q.    Okay.  And what methodologies are utilized to bring

12:01:27 21   the total number, the terminal value back to present value?

12:01:31 22   A.    Well, to bring all the numbers back to present value,

12:01:35 23   that's called discounting.

12:01:36 24   Q.    Okay.  But I mean what -- is there a specific

12:01:39 25   methodology that's used to discount the cash flow?

Meyer - Direct

12:01:42  1    A.      It's called a net present value.

12:01:45  2    Q.      Okay.  All right.  Okay.  Now, did you make an

12:02:09  3    independent determination of the -- of the value of the CLM

12:02:12  4    as of the acquisition date?

12:02:14  5    A.      I would not consider -- to me independent means I

12:02:24  6    don't use anything from what someone else does, and I didn't

12:02:28  7    do that here.  I certainly started from the VRC report,

12:02:32  8    because that's, in fact, the way that The Institutes looked

12:02:35  9    at this.

12:02:36 10            So, I wouldn't consider it a completely

12:02:40 11    independent valuation.  But starting with that valuation, I

12:02:46 12    made adjustments to it.  And those were certainly my

12:02:49 13    decisions.  Those did not come from VRC.

12:02:53 14    Q.      Okay.  As a general matter, what adjustments did you

12:02:55 15    manage make to the VRC opinion or report?

12:02:57 16    A.      Well, one thing that I did was I -- instead of

12:03:02 17    bringing the present value back to March, I brought the

12:03:05 18    present value back to the actual acquisition date.

12:03:10 19            And the other thing that I did was looked at

12:03:13 20    the -- from a -- from a revenue perspective, looked at --

12:03:20 21    from a profits perspective, looked at how one would -- you

12:03:24 22    know, if I were sitting back at that time and considering

12:03:29 23    how to adjust for expected competition, looking forward, by

12:03:35 24    Mr. Potter and by BIH, how would I incorporate that into a

12:03:38 25    valuation.

Meyer - Direct

12:03:39  1    Q.     Okay.  So, you have to start with the assumption of

12:03:42  2    the value if there were no competition; correct?

12:03:45  3    A.     I mean, that's certainly how it happened here, yes.

12:03:48  4    Q.     Okay.

12:03:49  5    A.     Because that's what VRC had.  Mm-hmm.

12:03:51  6    Q.     So, I asked a poor question.  How did you determine

12:03:54  7    what the value was, assuming no competition, as of the -- as

12:04:00  8    of the Asset Purchase Agreement date?

12:04:03  9    A.     So, well, the value with no competition that VRC came

12:04:07 10    up with was -- was in the income approach just adjusting for

12:04:12 11    that date in shift that I was talking about.  But then we

12:04:16 12    can actually obviously also see exactly what was paid in

12:04:21 13    terms of there was -- we heard about this as well.  There

12:04:23 14    was a first tranche and then there was some earn-outs as

12:04:26 15    well.

12:04:28 16    Q.     So, then you said you had -- you started thinking

12:04:31 17    about what adjustments you'd make to revenue if they're

12:04:35 18    assuming competition, how did you go about that task?

12:04:38 19    A.     So, the -- the first thing I needed to understand was

12:04:43 20    sort of the -- the nature of that competition, understanding

12:04:51 21    that Mr. Potter had, you know, had owned CLM previous, was

12:04:57 22    in the best possible position to sort of know exactly what

12:05:01 23    was in that business, what worked, what didn't work, exactly

12:05:06 24    what CLM was doing.

12:05:08 25                 So, from the standpoint of economics, we call

12:05:12 1    that a next-best competitor.  I was aware of other firms

12:05:18 2    generally in the conference space, but Mr. Potter would

12:05:21 3    have, in my estimation, from an economic perspective,

12:05:25 4    provided sort of unique competition in being, you know, that

12:05:30 5    individual who sold those assets.

12:05:34 6    Q.    Did you make a valuation of the competitive, I'll

12:05:38 7    say, threat from BIH, the Business Insurance?

12:05:42 8    A.    Again, to the extent that it was Mr. Potter that was,

12:05:48 9    you know, also involved with BIH, and I understand that

12:05:50 10   there's plenty of dispute about that, and that's on the

12:05:55 11   legal side.  But to the extent that, you know, there was

12:05:59 12   involvement there, that -- again, that would be what

12:06:04 13   economists would call a next-best competitor or next-closest

12:06:09 14   competitor.

12:06:09 15   Q.    Okay.  Were you aware that at some point BIH was sold

12:06:15 16   to Beacon Intercontinental?

12:06:17 17   A.    I did under -- have that understanding, yes.

12:06:19 18   Q.    Okay.  Did you consider the competitive threat of BIH

12:06:23 19   after that transaction?

12:06:24 20   A.    Yes, I continued to -- I understand that that BIH,

12:06:28 21   even after that transaction, continued with the conferences,

12:06:32 22   and we've heard about those here as well.

12:06:35 23   Q.    Okay.  And did you -- how did you valuate that entity

12:06:38 24   as a competitor?  In other words, BIH without Mr. Potter?

12:06:42 25   Or after the transaction?

Meyer - Direct

12:06:43  1    A.      Again, I -- looking at the kinds of conferences that

12:06:50  2    were put on -- of course, we have COVID in between.  But the

12:06:56  3    conferences that were held, you know, before COVID or

12:07:01  4    planned before COVID, that then similar types of conferences

12:07:04  5    were held afterwards, and certainly at least advertised

12:07:10  6    afterwards, to me spoke to sort of continuity of that plan

12:07:16  7    that had been started by Mr. Potter and BIH when he was

12:07:21  8    still involved in BIH.

12:07:22  9    Q.      Okay.  Were you aware that BIH was previously owned

12:07:25 10    by Mr. Potter?

12:07:26 11    A.      Yes.

12:07:27 12    Q.      Okay.  Did you take into consideration the joint

12:07:32 13    operation of BIH and CLM when Mr. Potter owned them both?

12:07:37 14    A.      That -- I was certainly aware of that and that

12:07:43 15    factored in to a certain extent.  Yes.

12:07:46 16    Q.      Okay.  So, we're at the first step, you're trying to

12:07:50 17    make an analysis and the first thing is you look at the

12:07:52 18    nature of the competition.  What was the next step in your

12:07:55 19    analysis?

12:07:55 20    A.      Well, the next step was to decide what made -- what

12:08:01 21    was a reasonable way of adjusting the revenues in that cash

12:08:05 22    flow analysis -- and I'm sorry, in the projected income

12:08:10 23    analysis in order to come up with an alternative valuation.

12:08:15 24    Q.      Okay.  And what period of time are you looking for

12:08:22 25    purposes of this adjustment?

12:08:23 1    A.    Well, what I saw was that the -- the non-compete

12:08:29 2    agreement had a five-year time period, five-year time

12:08:33 3    horizon.  So I believe it's reasonable to think about the

12:08:36 4    competition happening over that five-year time horizon in

12:08:40 5    the first instance.

12:08:42 6            But the -- the entire DCF then, also,

12:08:46 7    incorporates terminal value which -- and we can talk about

12:08:49 8    there's some different ways of interpreting a terminal value

12:08:52 9    that VRC incorporated.  But essentially, then, looks out,

12:08:57 10   you know, even beyond that five-year time horizon.

12:09:00 11   Q.    Okay.  And so -- and then do you assume that the

12:09:05 12   adjustments were being made at any specific time?

12:09:08 13   A.    I'm not -- I'm not sure what you mean.

12:09:16 14   Q.    So are you looking at what would have been done as of

12:09:24 15   the time of the acquisition or at some other later time

12:09:27 16   period?

12:09:27 17   A.    Okay.  No, what I'm looking at would be how a

12:09:33 18   valuation would have been adjusted at the time of the

12:09:36 19   acquisition.  So, it's -- it's all what we call a

12:09:41 20   forward-looking exercise from the standpoint of the time of

12:09:44 21   the acquisition.

12:09:47 22   Q.    All right.  And so, what's the next step in the

12:09:49 23   analysis?

12:09:50 24   A.    So, then I considered, you know, how to think about

12:09:55 25   adjusting, as I said, those revenues.  And in my estimation,

12:10:01 1  based on the assessment of Mr. Potter, BIH, as the next

12:10:07 2  closest competitors to CLM within what I've heard described

12:10:10 3  as a niche marketplace; the particular concerns about sort

12:10:16 4  of sponsors and the early indications about, for example,

12:10:24 5  Wilson Elser, a key sponsor, sort of also being a sponsor of

12:10:30 6  the BIH Conferences, or at least Cannabis and Hemp

12:10:34 7  Conference, the first conference, my determination was to --

12:10:40 8  that the -- a reasonable approach would be to adjust the

12:10:46 9  revenues over a five-year time period such that by the end

12:10:51 10  of that five-year time period, essentially that niche would

12:10:57 11  be split between the two entities; between CLM and whether

12:11:02 12  it's BIH under its current ownership, or BIH under other

12:11:06 13  ownership or another entity -- you know, however the

12:11:11 14  corporate structure worked, essentially -- that that would

12:11:13 15  be a reasonable way of incorporating the competition into

12:11:16 16  the valuation.

12:11:18 17  Q.     What basis did you rely on determining that that

12:11:22 18  would be a reasonable way to adjust the revenues?

12:11:25 19  A.     So, of course, you know, there's no -- there's

12:11:31 20  nothing that you can look at in terms of, you know, the

12:11:35 21  actuals at the time of a -- of the acquisition, just like

12:11:40 22  VRC had to rely on projections, because it is a inherently a

12:11:45 23  forward-looking exercise.

12:11:47 24          So, what I did was consider, you know, in other

12:11:50 25  situations where I've looked at value, in other situations

12:11:54 1    where I've modeled out the effect of competition, you know,

12:11:58 2    variety of different contexts, how would I think about that

12:12:02 3    as an economist.

12:12:03 4           And there's a model called the Cournot model,

12:12:07 5    which is sort of a very, I'll say, sort of standard way of

12:12:12 6    just sort of thinking about this as a framework.  And so,

12:12:16 7    that tells us that when the two companies that are, you

12:12:21 8    know, sort of in close competition over a -- over a

12:12:24 9    particular space, that, you know, the best assumption that

12:12:30 10   we have is that they're they'll basically split that market.

12:12:33 11   Q.     Okay.

12:12:34 12   A.     And I -- but instead of doing that all at once, based

12:12:38 13   on my professional experience and -- and just judgment, that

12:12:45 14   it didn't make sense to think about that happening, you

12:12:48 15   know, in one particular year, but instead, to gradually get

12:12:54 16   to that point over a five-year time period, which matched up

12:12:57 17   with the non-compete time period.

12:13:01 18          MR. HAYES:  Could we put up the Cournot -- the

12:13:03 19   standard model of competition?  The other one, please.

12:13:16 20          This is titled "Cournot Model Standard for

12:13:19 21   Competition."

12:13:22 22          (Discussion held off the record:)

12:13:28 23   BY MR. HAYES:

12:13:32 24   Q.     Sorry.  So, what specifically is the Cournot model?

12:13:35 25   A.     So the Cournot model is a -- one of the workhorse

12:13:41 1    models, if you will, of economics.  It was developed, I

12:13:45 2    think, back in the 1800s by a French mathematician.

12:13:50 3            And it's one of the models, especially in a

12:13:54 4    situation of what we call an oligo point -- excuse me,

12:14:01 5    oligopoly.  So, this is not -- we're not talking about, you

12:14:03 6    know, many, many milk farmers or wheat farmers or something

12:14:07 7    else that -- that is more what we call perfect competition,

12:14:11 8    that's a -- sort of a different area.

12:14:13 9            But in oligopolist competition, when there are a

12:14:17 10   number of different firms -- and that number can vary --

12:14:20 11   give us generalized predictions about -- about how the

12:14:25 12   interaction between those firms will happen.

12:14:27 13   Q.      Okay.  And how is the Cournot model derived?  What

12:14:30 14   was the analytical or theoretical basis for it?

12:14:33 15   A.      The basis is basically profit maximization.  It's the

12:14:39 16   standard economic tool where we think about firms, each

12:14:45 17   trying to maximize their profit.  Whether they're a

12:14:49 18   non-profit or not, they still want to sort of, you know,

12:14:52 19   maximize their profit in the industry, or their return.

12:14:57 20           And if they're competitively interacting and

12:15:00 21   they're choosing -- and if the primary choice is, you know,

12:15:04 22   what we say quantity in these economic models, there's --

12:15:10 23   you know, there's price and quantity.  So when they're --

12:15:12 24   when the primary way of competing is deciding what to

12:15:17 25   produce, what to put out into the world, then a Cournot

12:15:21 1    model is the appropriate way to think about that.

12:15:24 2    Q.      Okay.  So, when was the Cournot model developed?

12:15:27 3    A.      As I said, I think back somewhere in the 1800s.

12:15:31 4    Q.      Okay.

12:15:31 5    A.      I don't have the exact date.

12:15:32 6    Q.      Sorry.  And then is it still continuously used in

12:15:37 7    today's world?

12:15:37 8    A.      I -- the Cournot model is, you know one, of the first

12:15:42 9    things that you're taught in -- in microeconomics, and in

12:15:46 10   particular on -- you know, in what we call industrial

12:15:50 11   organization which, is the area of microeconomics that deals

12:15:52 12   with firms.  It's used by the Federal Trade Commission and

12:15:57 13   the Department of Justice when they're evaluating mergers.

12:16:01 14          I've used it to model mergers, which is one of

12:16:05 15   the places where you model competition most directly, right.

12:16:09 16   So, if you have -- either you're going from certain number

12:16:13 17   of firms in a marketplace to, you know, that number minus

12:16:16 18   one, or others situations where you're talking about number

12:16:21 19   of competitors.

12:16:22 20          The Cournot model is -- and it's been,

12:16:26 21   obviously -- well, I mean, not obviously, but it's been

12:16:30 22   broadened past Cournot's original conception, and there have

12:16:35 23   been many, many papers written on the Cournot model.  It's

12:16:39 24   in most standard economic textbooks.

12:16:43 25   Q.      Okay.  What are the fundamental principles or

12:16:49 1    dictates of the Cournot model or -- yeah?

12:16:53 2    A.    So the fundamental dictates, as you said, are sort

12:16:58 3    of -- is that the products are largely similar to one

12:17:03 4    another, that it is -- it is choices of -- of what to put

12:17:11 5    out in the world.

12:17:11 6            So like I said, we talk about it in quantities

12:17:15 7    because in economic models there are prices and quantities.

12:17:18 8    But it really says, you know, what the firm is -- is

12:17:21 9    considering and how they're competing is -- is how much and

12:17:24 10   what they're putting out into the world.

12:17:27 11           So, in this case, the number of conferences --

12:17:30 12   yeah, the number -- the conferences would be the -- the

12:17:34 13   analytical, sort of, analogy to that.

12:17:38 14   Q.    You said you've used it in merger analysis under the

12:17:42 15   merger guidelines.  Can you explain what that is?

12:17:45 16   A.    Sure.  So, when the Federal Trade Commission or the

12:17:50 17   Department of Justice evaluates a merger, often times they

12:17:56 18   do that quantitatively.  They have a staff of economists,

12:18:02 19   the merging parties, often times higher the economists.  I

12:18:07 20   have often worked as part of a team that -- that does that

12:18:11 21   sort of work.

12:18:12 22           And in that case, the Cournot model, in a

12:18:17 23   situation like this where you have parties, you know,

12:18:24 24   oligopolist competition, which just means sort of, you know,

12:18:28 25   not an -- not a really, really large number of companies,

12:18:31 1    but sort of an identifiable number of companies that are

12:18:34 2    competing in the kind of way that these companies are

12:18:37 3    competing.

12:18:38 4           That's the first place that one would look for a

12:18:42 5    model.  And I've done that kind of work.

12:18:45 6    Q.    Okay.  Has the -- does -- is there any maximum number

12:18:55 7    of competitors involved in the market beyond which the

12:18:59 8    Cournot model cannot be utilized?

12:19:06 9    A.    Mathematically, no.  I don't think so.  I really --

12:19:14 10   yeah, I don't think mathematically.  No.

12:19:17 11   Q.    Okay.  All right.  So, how did you apply the Cournot

12:19:26 12   model to modify the revenue assumptions in the VRC report?

12:19:32 13   A.    So, again, what I had to understand was the specific

12:19:41 14   space in which these -- well, certainly which CLM was

12:19:46 15   operating, and the degree to which that was a unique space.

12:19:50 16          Certain -- I had -- I received an understanding

12:19:52 17   that, generally speaking, dollars, sponsorship dollars

12:19:57 18   are -- you know, for a particular law firm sponsorship,

12:20:02 19   those dollars can have many different outlets.  But

12:20:07 20   specifically with regards to the specific space that CLM was

12:20:12 21   in, that it was -- that it occupied a unique niche and that

12:20:18 22   -- yeah, so, I think that answers your question.

12:20:20 23   Q.    Okay.  And then, how specifically, I guess, then did

12:20:25 24   you adjust the revenues based on the Cournot model?  The

12:20:29 25   assumed revenues?

12:20:30 1    A.      Right.  So what I did was adjust the projections.

12:20:34 2    Q.      Okay.

12:20:35 3    A.      Right.  And so, what I looked at was, okay, the

12:20:39 4    Cournot model would tell us that a next-closest competitor

12:20:45 5    entering a niche space is expected to essentially take half

12:20:51 6    of -- well, take half of the -- of the rev -- of the unit,

12:20:58 7    what we would call the units, the quantity.  And, in fact,

12:21:01 8    take more than half of the revenue, because it's -- also

12:21:04 9    would be expected to start competing, again, with price.

12:21:08 10            I did not layer on a price aspect to this.  I

12:21:12 11   simply looked at taking 50 percent of the -- of the profits,

12:21:18 12   not more than that, even though the Cournot model would

12:21:21 13   project even a further decline in profits due to increased

12:21:26 14   price competition.

12:21:27 15   Q.      Can I direct your attention to Plaintiffs' Exhibit 8

12:21:31 16   C, please.  It's up there already.  Whichever you prefer to

12:21:37 17   look at.  Could you just tell the Court what this -- this

12:21:43 18   document depicts?

12:21:44 19   A.      So this is an exhibit from my initial report.  As you

12:21:50 20   can see on the top, discounted cash flow projections, we

12:21:53 21   talked about how the income approach is a DCF methodology.

12:22:00 22           Using a particular -- as you can see, 15 percent

12:22:03 23   weighted average cost of capital, that's the factor that is

12:22:07 24   used to discount back.  So to get to present value.

12:22:13 25           And so, what I did here was, looking at the --

Meyer - Direct

12:22:19 1    at the revenue, as you can see, based -- and then basically

12:22:25 2    on the -- on the operating expense and EBITDA, brought those

12:22:30 3    all down by this increasing amount over the years from --

12:22:38 4    from the baseline, which was the VRC projections.

12:22:41 5    Q.    Okay.  So, the -- and where -- and what line do you

12:22:48 6    show the adjustment to the revenues?

12:22:50 7    A.    You can see the adjustment by comparing the revenues

12:22:54 8    in line A to the revenues -- I have a similar table that has

12:23:00 9    the VRC projections in their sort of original format.  And I

12:23:08 10   think I also may have a graph of that as well.

12:23:11 11   Q.    Okay.  And then, so, the final conclusion is what is

12:23:15 12   the present -- what is the present value you reached

12:23:18 13   assuming competition?

12:23:19 14   A.    So, this doesn't quite have that yet.

12:23:23 15   Q.    All right.

12:23:24 16   A.    This -- this particular table looks at the present

12:23:28 17   value during the forecast period, so 2018 to 2023, which is

12:23:35 18   the 6.69 million which is at the bottom.  I followed the VRC

12:23:41 19   methodology, so they did this in two parts and I did it the

12:23:45 20   same way.  So, this, then, has to also be married up with

12:23:52 21   the terminal value piece.  And I do that in a separate -- in

12:23:57 22   a separate table.

12:24:00 23   Q.    I'll direct your attention to Plaintiffs' Exhibit 8d,

12:24:04 24   please.  Can you tell us what this schedule represents?

12:24:12 25   A.    Yes.  So, this is where I do what we were just

Meyer - Direct

12:24:16 1  talking about.  The VRC valuation has two methodologies for

12:24:24 2  a terminal value.

12:24:25 3          One is called an EBITDA exit multiple, which you

12:24:31 4  can think of as their estimate or what we call an estimate

12:24:36 5  of selling the business after the five-year time period.

12:24:41 6          And then an alternative methodology called the

12:24:45 7  Gordon Growth Model, which you can think of as the business

12:24:49 8  continuing on as a growing concern under the current

12:24:53 9  management or, of course -- yeah, under the current

12:24:56 10 management.  Those are just two ways of thinking about how

12:24:59 11 to -- how to value the terminal value.

12:25:02 12         So, what you can see here in Column 2(c)  is the

12:25:09 13 terminal value under the EBITDA exit multiple.  You can see

12:25:16 14 in Column 3(f), -- this is the two bolded numbers.  It's

12:25:21 15 called the residual value, but essentially it's the same

12:25:25 16 concept under the Gordon Growth Model.

12:25:28 17         And then those have to be discounted back to

12:25:31 18 present value because those are all amounts that are out in

12:25:36 19 subsequent years.

12:25:36 20         So, in line (h), you can see the present values

12:25:43 21 of those terminal values.  And then I add those together

12:25:49 22 with the number that we just saw on the previous table, the

12:25:53 23 6,690.

12:25:55 24         So, basically, the way VCR -- sorry, VRC, set

12:26:00 25 this up was -- and I followed their setup, which was -- you

Meyer - Direct

12:26:06 1    know, it was -- it was a fine setup to use was: What's the

12:26:10 2    present value during the forecast period, what's the present

12:26:13 3    value after the forecast period, and then you add them

12:26:16 4    together.

12:26:17 5            So, the total present value, yes, is right down

12:26:20 6    there. That's right. Depending on what terminal value

12:26:25 7    methodology you use that the value of the CLM assets under

12:26:31 8    competition, using the 15 percent WACC, would be somewhere

12:26:35 9    between 11.7 and $12.4 million.

12:26:41 10   Q.    Now, if I could direct your attention --

12:26:43 11           THE COURT: Actually, Mr. Hayes, sorry to

12:26:44 12   interrupt. This is certainly not important at all, but I'm

12:26:48 13   just curious. The terminal value is a number that applies

12:26:52 14   to five years out?

12:26:54 15           THE WITNESS: It's everything past five years

12:26:56 16   out. It's the value after the forecast period.

12:27:02 17           THE COURT: Okay. But it's a value actually

12:27:05 18   five years from now --

12:27:08 19           THE WITNESS: Yes, that -- and that's why it

12:27:10 20   then needs to be discounted back. It --

12:27:12 21           THE COURT: Right.

12:27:13 22           THE WITNESS: That is right.

12:27:13 23           THE COURT: So, 11,678 the residual value,

12:27:17 24   what's the date of that value?

12:27:20 25           THE WITNESS: So, one thing you might notice, if

12:27:22  1    the keen eye would -- I don't know if this is what -- this

12:27:25  2    is asking -- this is getting to your question, is that the

12:27:27  3    present value factor is slightly different.

12:27:29  4           So, the way that the Gordon Growth Model is

12:27:32  5    implemented is essentially right from these articles called

12:27:39  6    -- it's called a Midyear Convention.  So, essentially right

12:27:42  7    from the middle of that last year on out.  Whereas, the

12:27:49  8    EBITDA exit multiple thinks about that sort of one year

12:27:53  9    later because it's after the full forecast period.

12:27:56 10           So, that's why there's a little bit -- and this

12:27:59 11    also, like I said, mirrors what -- what VRC does.  So,

12:28:03 12    it's -- but, essentially, yes, they're both in the future.

12:28:06 13    But because of the difference in conceptually how we think

12:28:10 14    about them, there's a little bit of a difference in timing.

12:28:14 15    BY MR. HAYES:

12:28:14 16    Q.     Okay.  Why do you use two different standards for

12:28:20 17    reducing to present value?

12:28:21 18    A.     So, if -- are you talking about the WACC, the

12:28:28 19    15 percent?

12:28:28 20    Q.     Using that, yeah.

12:28:29 21    A.     Yeah.  So, in the first VRC valuation, they used a

12:28:35 22    15-percent weighted average cost to capital.  In the

12:28:39 23    post-acquisition valuation, they used a -- I believe it was

12:28:42 24    13-and-a-half-percent WACC.  And I didn't -- you know, I

12:28:47 25    think the 15 percent is probably more of what would have

12:28:51 1   been reflective of the time of the acquisition, right,

12:28:56 2   because that was done in March.  But I didn't want to make

12:29:01 3   determinations about that, so I just wanted to present both

12:29:03 4   the 15 and the 13-and-a-half-percent WACC.

12:29:06 5   Q.      Okay.  Thank you.

12:29:07 6           If I could direct your attention to Plaintiffs'

12:29:12 7   Exhibit 8e.  Now, we just -- we won't focus on the original

12:29:25 8   revenue adjustment, but can you just explain what the charts

12:29:28 9   are for the valuation and the theoretical adjustments?  So

12:29:32 10  maybe you could cut out that last column.

12:29:40 11  A.      Sure.  So, this just shows, under the VRC valuation

12:29:44 12  model, what the values were.  And I think we -- you know, we

12:29:51 13  heard earlier in the testimony that the income approach, you

12:29:56 14  know, resulted in about $20 million.  So, you can see

12:29:59 15  there's a little bit of variation, depending on the terminal

12:30:01 16  value approach.  And then what that adjustment would mean in

12:30:06 17  terms of the those values.

12:30:09 18  Q.      Okay.  Last, I'd like -- not last, but could I direct

12:30:20 19  your attention to Plaintiffs' Exhibit 8f.  And, again, we're

12:30:24 20  just going to focus on the theoretical adjustment.  Could

12:30:31 21  you explain to the Court, please, what this exhibit shows?

12:30:36 22  A.      Sure.  So, this shows, in a sort of summary form,

12:30:42 23  first of all, on the top, the actual amount of the purchase

12:30:49 24  price, again, from the standpoint -- from the point of view

12:30:53 25  of June 1st, 2018.

12:30:56  1    So, you can see on the top there was an initial

12:31:00  2    payment and then there were certain deferred payments.  And

12:31:04  3    because, as the saying goes, a dollar today is worth more

12:31:08  4    than a dollar tomorrow, I had to bring those back to net

12:31:12  5    present value, again, to everything as of June 1st, 2018.

12:31:17  6    So I'm trying to do a complete apples to apples.

12:31:20  7    So you can see the present value purchase price

12:31:23  8    on acquisition date reflects that discounting.  So it's 19.6

12:31:30  9    or 19.7, again, depending on which WACC you use.  You can

12:31:33 10    see it doesn't make a huge difference.

12:31:36 11    And then the bottom talks about, well, what was

12:31:40 12    the present value of the CLM assets in row (j) under the

12:31:49 13    adjustment that it made to the VRC report.  And so, there,

12:31:53 14    you can see -- I think you just talked about the numbers,

12:31:56 15    11.6 and 12.4, which are in row -- yeah, maybe -- yeah,

12:32:01 16    exactly.  And then under the 13-and-a-half-percent WACC, you

12:32:05 17    can see that the numbers change just slightly, 12.251,

12:32:13 18    13,019.  Exactly.

12:32:14 19    And then what I did -- so those are just numbers

12:32:18 20    coming from that model.  And then, in row (l), I simply

12:32:23 21    subtracted row (i).  Subtracted row (j) from row (i).  So

12:32:31 22    (i) minus (j).

12:32:32 23    And if you want to maybe highlight the whole row

12:32:35 24    (l), yeah.  You can highlight it all the way across if you

12:32:38 25    want.  Which gives you -- so, that's the difference between

12:32:41 1    what was paid in present value terms as of June 1st, 2018,

12:32:47 2    with what the -- my assessment of what a reasonable

12:32:53 3    adjustment to the income approach in the VRC model would

12:32:58 4    tell you that the CLM assets -- what the -- a reasonable

12:33:05 5    valuation of those under competition.  And the difference

12:33:09 6    between those would be the damages in this case.

12:33:14 7    Q.    That's 6.6 million -- well, 6. -- 691,000 to

12:33:21 8    8,600,000?

12:33:22 9    A.    That's right.  It's all in thousands of dollars, so

12:33:25 10   it's like 6.72 about to about $8 million.

12:33:29 11   Q.    Okay.  Now, is that your opinion within a reasonable

12:33:32 12   degree of economic certainty?

12:33:33 13   A.    Yes.

12:33:35 14   Q.    Now, are there any other -- beyond the Cournot model,

12:33:39 15   are there any other factors that support the adjustments

12:33:43 16   that you made?

12:33:43 17   A.    Yes.  As I said, I mean, there are a number of

12:33:48 18   reasons why this, in my estimation, is conservative.  Like I

12:33:55 19   said, I didn't explicitly factor in -- I didn't factor in

12:34:00 20   additional price competition.

12:34:02 21          So, you know, when I look at a 50 percent

12:34:06 22   reduction, the Cournot model projects a 50 percent reduction

12:34:11 23   in quantity, but also a reduction in price.  I didn't -- I

12:34:15 24   didn't factor in additional price competition.

12:34:18 25          I also didn't factor in any additional

12:34:25 1    reductions that would come about and profits that would come

12:34:28 2    about through competition based on anything outside of the

12:34:34 3    CLM assets.

12:34:35 4         So my understanding was that The Institutes was

12:34:40 5    particularly interested in the CLM assets because of the

12:34:43 6    interaction with the rest of its business and the ability to

12:34:47 7    drive more revenues and profits on other parts of the

12:34:51 8    business.  Any impairment or any reduction there was not

12:34:56 9    incorporated here at all.  I just focused on exactly what

12:34:59 10   the -- the VRC focused on, which was the CLM assets

12:35:03 11   specifically.

12:35:05 12   Q.    Okay.  Could you put up the remaining slide, the

12:35:15 13   factors?

12:35:16 14        Did you consider the competition from

12:35:21 15   ClaimsXchange in your damages analysis?

12:35:23 16   A.    I would say I considered competition broadly, whether

12:35:33 17   it would be specifically from BIH, specifically from BIH

12:35:38 18   under different ownership, or specifically from

12:35:42 19   ClaimsXchange, I did not -- I did not enumerate what that

12:35:49 20   would be because at the time of the acquisition, it wouldn't

12:35:53 21   have been -- I don't think it would have been reasonable to

12:35:58 22   know what that would have been.

12:35:59 23        In fact, you know, my understanding is The

12:36:02 24   Institutes thought that there would not be competition.  So,

12:36:06 25   what's sitting at the time of the acquisition or around that

12:36:09 1  time, to be doing a valuation and to think about how I would

12:36:13 2  adjust the valuation at that point in time, I didn't think

12:36:21 3  it was reasonable to put more specificity in there than

12:36:28 4  someone who was sitting at that point in time would have

12:36:30 5  been able to do.

12:36:32 6  Q.    Okay.  And on that point, they had been, at that

12:36:36 7  point in time, predicting the amount of the competition, how

12:36:39 8  many conferences, for example, or how frequently the

12:36:42 9  conferences would be held?

12:36:44 10 A.    No, I don't -- I don't think they would have.  I

12:36:47 11 mean, I think my understanding was based on, you know,

12:36:50 12 discussions that I had, based on looking at the documents

12:36:53 13 that were going to the board, looking at even VRC's

12:36:57 14 post-acquisition valuation, that the thought was there

12:37:02 15 wouldn't be competition.

12:37:04 16 Q.    Okay.  Now, I think you sat in the courtroom this

12:37:06 17 week during the trial and you heard some testimony about

12:37:09 18 whether or not the CLM after the acquisition lost any

12:37:14 19 customers and what the impact was.

12:37:16 20       Does any of that information impact your

12:37:19 21 conclusions?

12:37:19 22 A.    Well, in this particular case, the general nature of

12:37:25 23 the competition was certainly something that I looked at and

12:37:28 24 was aware of and, as I said before, the example, for

12:37:32 25 example, Wilson Elser.  But of course, we had COVID which

12:37:35 1    came in between.

12:37:37 2           So, it's not possible in this situation to look

12:37:41 3    at actual -- the actual performance and gain any -- any real

12:37:48 4    insights in terms of, you know, what the thinking would have

12:37:56 5    been about the effect on value of competition because, you

12:38:00 6    know, we didn't see sort of a -- the kind of marketplace or

12:38:06 7    conferences that everyone thought we were going to see.  We

12:38:09 8    -- you know, obviously no one was going to conferences for

12:38:11 9    some period of time.

12:38:12 10   Q.    Okay.

12:38:13 11          MR. HAYES:  Bear with me a second.  No other

12:38:33 12   questions on direct, Your Honor.

12:38:35 13          THE COURT:  All right.  Cross-examination.

12:38:39 14                 CROSS-EXAMINATION

12:38:40 15   BY MR. DENN:

12:38:54 16   Q.    Good afternoon, Dr. Meyer.

12:38:58 17   A.    Good afternoon.

12:38:59 18   Q.    I wanted to start with, I think, the second or third

12:39:02 19   question that Mr. Hayes asked you.  You told Mr. Hayes that

12:39:07 20   your analysis in this case was not dependent on the scope of

12:39:11 21   the non-compete agreement.

12:39:12 22          Did I hear you correctly?

12:39:13 23   A.    I think what I said was it wasn't -- I understand

12:39:18 24   that there are legal debates about exactly what the scope of

12:39:23 25   the non-compete is.  I certainly -- I took the allegations

12:39:27 1  as given and looked at competition as an economic matter,

12:39:33 2  and -- but I'm not -- I don't have an opinion as to the

12:39:36 3  legal side of -- of the case, that's what I was referring

12:39:40 4  to.

12:39:40 5  Q.    Okay.  But you didn't mean to suggest to Mr. Hayes

12:39:43 6  that the scope of the non-compete agreement wasn't an

12:39:49 7  important factor in rendering your opinion; correct?

12:39:51 8  A.    Like I said, I understand that there's disagreements

12:39:55 9  about that.  I certainly looked at the contract and looked

12:39:58 10 at the non-compete and had an understanding, for example, of

12:40:04 11 permitted activities and the five-year term.

12:40:08 12       So, I certainly had an understanding.  I -- I

12:40:11 13 was trying to get at the distinction between sort of the

12:40:15 14 legal reading of the non-compete versus the economic

12:40:21 15 consideration of not competing.

12:40:24 16 Q.    Well, the legal reading of the non-compete is the

12:40:26 17 scope of the non-compete; right?  I mean, that's what that

12:40:29 18 is?

12:40:29 19 A.    I understand.  And as I said, I've taken liability,

12:40:36 20 as -- as one has to do in a damages case, as -- as a

12:40:40 21 prerequisite for calculating damages.

12:40:42 22 Q.    Well, more than that, you in order to perform your

12:40:44 23 analysis in this case, you had to understand the scope of

12:40:48 24 the parties' non-compete agreement; correct?

12:40:50 25 A.    Again, as a matter of economics and as a matter of --

12:41:01 1  of the allegations, yes, absolutely.  As a matter of the

12:41:09 2  legal back and forth between the parties, I don't have a

12:41:16 3  legal opinion on the liability side.

12:41:19 4  Q.    But to properly do a valuation opinion, you needed to

12:41:24 5  understand the scope of the non-compete.  That's all I'm

12:41:27 6  trying to ask you.

12:41:28 7  A.    I've tried to answer your question as best I can.

12:41:33 8  I...

12:41:33 9  Q.    Okay.  Would it refresh your recollection -- do you

12:41:35 10  remember during your deposition being asked whether you

12:41:39 11  needed to understand the scope of the non-compete in order

12:41:41 12  to do your analysis and agreement, in fact, you did need to

12:41:45 13  understand it?

12:41:47 14  A.    I can't remember exactly what I said.

12:41:49 15  Q.    But would it refresh your recollection if I shared

12:41:52 16  with you that portion of your deposition?

12:41:54 17  A.    Sure.

12:41:55 18  Q.    Do you recall being asked a question:  "Does it

12:41:58 19  matter to you how broad or narrow or how narrow the

12:42:01 20  non-compete is for purposes of providing a valuation opinion

12:42:04 21  in this case?"

12:42:06 22         "Answer:  I'm not considering different

12:42:07 23  alternative non-compete agreements, some which are broad,

12:42:10 24  some which are narrow, or one which is broad and one which

12:42:13 25  is narrow.  I'm simply taking the non-compete and the

12:42:16 1    contract as it is in this case.

12:42:18 2         "Question:  Right.  And as part of that

12:42:19 3    consideration, you need to understand the scope of the

12:42:22 4    non-compete, then; right?

12:42:24 5         "Answer:  I certainly agree that I have to.  And

12:42:26 6    I did understand the scope of the non-compete as it relates

12:42:28 7    to the allegations in this case, and that I have -- I've

12:42:32 8    laid out in considerable detail in my report."

12:42:36 9         Do you recall that exchange?

12:42:36 10        MR. HAYES:  Your Honor, just I think since this

12:42:38 11   is a being particularly long answer, the witness should be

12:42:40 12   shown the deposition transcript.

12:42:41 13        MR. DENN:  I'm happy to share.

12:42:43 14        THE COURT:  Well, I think it's fine to do it

12:42:45 15   like this.  If she says she's confused or, you know, she

12:42:48 16   doesn't understand, you can show it to her in writing.  But

12:42:52 17   I think this is fine.

12:42:55 18   BY MR. DENN:

12:42:55 19   Q.    Do you -- do you recall that exchange?

12:42:56 20   A.    I don't recall it specifically but I think that's

12:42:59 21   completely consistent with what I testified to here today.

12:43:02 22   Q.    Okay.  So, you needed to understand what the

12:43:05 23   non-compete permitted and what the non-compete didn't permit

12:43:07 24   in order to do your analysis?

12:43:10 25   A.    Again, I certainly understood the allegations, yes.

12:43:14 1   Q.      And --

12:43:14 2   A.      In terms of --

12:43:15 3   Q.      You needed to understand the specifics of what it

12:43:18 4   permitted and it didn't permit in order to do your analysis

12:43:21 5   properly; correct?

12:43:22 6   A.      Again, I have to make a distinction.  I'm not a legal

12:43:25 7   expert, and I am not rendering any opinion on liability in

12:43:31 8   terms of -- what I'm doing is, as I always do in damages

12:43:34 9   cases, I look at the allegations as they pertain to the

12:43:40 10  actual non-compete agreement, whatever the dispute happens

12:43:45 11  to be, in this case about the non-compete agreement.

12:43:48 12          But if you're asking me about whether I have any

12:43:53 13  opinions on the -- on the liability side, and what the --

12:43:57 14  what the non-compete means from a legal perspective, I

12:44:01 15  don't -- that's not my area of expertise.

12:44:05 16  Q.      Let me try asking it this way:  In this instance, you

12:44:08 17  assumed the non-compete meant what The Institutes told you

12:44:11 18  the non-compete meant at the time that you did your

12:44:14 19  analysis; correct?

12:44:15 20  A.      I would agree.  As I -- as I always do with damages,

12:44:23 21  it's based on the -- it's based on the allegations, yes.

12:44:27 22  Q.      So, they told you this is what the non-compete

12:44:29 23  disallowed, and you took that as a given when you did your

12:44:34 24  analysis?

12:44:34 25  A.      I certainly did the analysis based on the

12:44:38 1    allegations.  Yes.

12:44:39 2    Q.    And if the non-compete agreement turned out to mean

12:44:42 3    something other than what The Institutes told you it meant,

12:44:44 4    that could potentially change your analysis; right?

12:44:46 5    A.    I can't rule that out.

12:44:55 6    Q.    So your principal conclusion, and I'll just read it

12:44:59 7    directly from your report is, "The valuation upon which

12:45:04 8    Plaintiffs relied, in order to determine the price they were

12:45:06 9    willing to pay for the CLM assets reflected, in assumption

12:45:10 10   that the Defendants would not be competing with CLM

12:45:12 11   post-transaction as per The Institutes' interpretation of

12:45:15 12   the APA."

12:45:17 13           Correct?

12:45:17 14   A.    I believe you read that correctly.  I mean, that

12:45:21 15   sounds like something I wrote.  Yes.  I can double-check if

12:45:24 16   you want me to check the language.

12:45:27 17   Q.    And, again, this is -- you're relying on The

12:45:30 18   Institutes' interpretation of the APA; correct?  Those are

12:45:33 19   your words?

12:45:33 20   A.    I agree.

12:45:34 21   Q.    Okay.  And in your report --

12:45:37 22           THE COURT:  And, I'm sorry, but, Doctor, the

12:45:40 23   interpretation you have is essentially all the income used

12:45:46 24   in activities of the CLM are that BIH is competing with

12:45:51 25   them; right?

12:45:52 1    THE WITNESS:  I'm not -- I'm sorry.  I'm not

12:46:00 2  quite sure what you are -- what you're getting at.

12:46:03 3    THE COURT:  Well, in other words, what Mr. Denn

12:46:06 4  is asking and what I'm curious about, too -- he may not be

12:46:11 5  curious -- is the scope of the non-compete that you're

12:46:19 6  assuming is -- and I think there's also a notice of the use

12:46:24 7  of the Cournot model -- is that essentially everything that

12:46:30 8  CLM does is now being competed with by BIH.

12:46:37 9    THE WITNESS:  I would say, yes, either directly

12:46:44 10  or indirectly, yes.

12:46:46 11    THE COURT:  All right.  Thank you.

12:46:48 12  BY MR. DENN:

12:46:50 13  Q.    Dr. Meyer, just picking up on what the judge has said

12:46:53 14  in terms of your understanding of what the non-compete

12:46:56 15  allowed, again, from your report, where you first offered

12:47:00 16  your opinion on October 21, you stated that the schedule of

12:47:05 17  permitted activities in the parties' contract limited the

12:47:08 18  events that BIH was permitted to hold to six specific

12:47:12 19  events.

12:47:13 20    Do you recall writing that?

12:47:15 21    THE COURT:  You know, Mr. Denn, I do think if

12:47:18 22  you're going to just -- you know, she's written probably

12:47:24 23  300 pages of this and given a deposition.  If you really

12:47:27 24  want to be asking her specific things, why don't you give

12:47:30 25  her --

12:47:31 1    MR. DENN:  Sure.

12:47:31 2    THE COURT:  -- the materials so she can look at

12:47:33 3 them.

12:47:34 4    MR. DENN:  Your Honor, I'm happy to give it to

12:47:36 5 her, or we can put it on the screen.  I thought that

12:47:40 6 Dr. Meyer actually had a copy of her report.

12:47:42 7    THE COURT:  Yeah, right.  But unless you tell

12:47:44 8 her exactly where you are...

12:47:47 9    MR. DENN:  Sure.

12:47:47 10 BY MR. DENN:

12:47:48 11 Q.    Dr. Meyer, I'm referring to Page 12 of your initial

12:47:50 12 report.  And you do have it up there with you?

12:48:00 13 A.    I do.

12:48:01 14 Q.    Okay.  And you have Page 12 in front of you?

12:48:06 15 A.    Yes.

12:48:27 16 Q.    So, do you recall writing in your report when you

12:48:30 17 first offered your opinion that the schedule of permitted

12:48:34 18 activities in the party's contract "limited the event that

12:48:37 19 BIH was permitted to hold to six specific events?"

12:48:40 20 A.    There's more to the paragraph before that talks about

12:48:45 21 delineated products and services, but that particular

12:48:48 22 sentence, yes, I believe you read that part correctly.

12:48:51 23 Q.    So, in preparing your opinion, you assumed that any

12:48:54 24 event that BIH had other than those that were listed in the

12:48:57 25 schedule explicitly would be violations of the non-compete

12:49:00 1  agreement?

12:49:01 2  A.    I would not -- I don't agree that I necessarily

12:49:39 3  assumed that any other event would necessarily violate the

12:49:49 4  non-compete agreement.

12:49:54 5  Q.    Okay.  Well, then what did you assume?  I mean,

12:49:57 6  you've just testified that you needed to -- to precisely

12:50:00 7  understand the scope of the non-compete in order to do your

12:50:02 8  analysis.  So, if that's -- that sounded like your

12:50:05 9  interpretation of it, but if not, what was it?

12:50:08 10  A.    Again, you know, so I go through a number of -- of

12:50:13 11  pages about the non-compete, but specifically talking about

12:50:17 12  that -- and here I'm reading, but, again, I don't have a

12:50:23 13  legal -- I'm not a legal expert, but talking about how the

12:50:28 14  selling parties are not going to conduct, manage, operate,

12:50:33 15  engage in or have any ownership interest in any business or

12:50:37 16  enterprise engaged in any activities that are otherwise

12:50:39 17  competitive with any of the seller's businesses.

12:50:42 18        So, it was the competition that I was focused

12:50:45 19  on.  I understand that there are certain events that are

12:50:48 20  permitted, regardless of whether or not they might be

12:50:52 21  considered competitive or not.

12:50:53 22  Q.    Okay.  So just in response to my question, again, we

12:50:57 23  have covered this, you needed to have for your purposes to

12:51:00 24  do your analysis, a definition of what was permitted and not

12:51:05 25  permitted in order to move forward.  So, if you could just

12:51:10 1    articulate for me exactly what that was, what was the --

12:51:13 2    what was your definition of the non-compete that you used to

12:51:16 3    do this analysis?

12:51:16 4    A.    Again, I just -- I want to be clear, you know, you

12:51:22 5    seem to be sort of wanting me to make legal determination,

12:51:27 6    and I'm not here to make a legal determination.  But in --

12:51:30 7    Q.    I'm not asking --

12:51:31 8    A.    -- terms of the non-compete and as it was -- as it

12:51:35 9    applied to my economic analysis, it involved that BIH was

12:51:45 10   not permitted to engage or -- and it's the sellers, not just

12:51:50 11   BIH, because there was -- it talks about the selling

12:51:52 12   parties -- any activities that are competitive but

12:51:59 13   specifically delineated certain events that were allowed,

12:52:04 14   regardless of whether or not they would be considered

12:52:06 15   competitive.  So, it was the engaging in the competitive

12:52:10 16   activities that would not be allowed.

12:52:13 17   Q.    So, your definition of the non-compete was that they

12:52:15 18   were not allowed to compete?

12:52:16 19   A.    I -- I read just a moment ago from the non-compete

12:52:25 20   specifically that each selling party agrees and shall cause

12:52:31 21   its affiliates not to engage directly or indirectly in

12:52:35 22   anywhere in the United States to conduct, manage, operate,

12:52:38 23   engage in or have an ownership interest in any business or

12:52:42 24   enterprise engaged in any activities that are otherwise

12:52:45 25   competitive with any of the seller's businesses as conducted

12:52:51 1   of this closing date.  I'm not reading every single word,

12:52:54 2   but that's the basic reading of the non-compete clause.

12:53:01 3          So, it's the focus on the competition, and then,

12:53:05 4   as I said, as I understand, that there are certain permitted

12:53:10 5   activities and certain permitted events regardless of

12:53:14 6   whether or not they would be considered necessarily

12:53:17 7   competitive or not.

12:53:20 8   Q.    And your definition of "otherwise competitive" is

12:53:23 9   just competitive?

12:53:25 10  A.    My understanding is -- and, again, I take the

12:53:30 11  allegations as -- as given in the case.  And so, it

12:53:38 12  specifically revolved around the putting on of conferences

12:53:45 13  that were specifically competitive.  I don't have a legal

12:53:48 14  opinion as to whether some other events or even other

12:53:57 15  activities that didn't occur would or would not be

12:54:01 16  competitive.

12:54:03 17  Q.    So, other than things that were specifically listed

12:54:06 18  as permitted on the schedule of permitted events, what other

12:54:10 19  types of competition would be allowed under the definition

12:54:14 20  of the non-compete that you use for your analysis?

12:54:16 21  A.    Again, I also understand there was a schedule of

12:54:24 22  permitted activities.

12:54:25 23  Q.    I'm saying aside from those.  Because you said that

12:54:28 24  that's not the whole thing.  My initial understanding was

12:54:31 25  that you thought that the non-compete limited BIH to those

12:54:36 1  enumerated activities, but you said that it would allow for

12:54:39 2  more than that.  So, I'm asking you to tell me what type of

12:54:43 3  competitive activity would be permitted under the definition

12:54:46 4  that you have adopted for your analysis?

12:54:49 5  A.     I don't -- I have not -- I don't have a -- that's a

12:54:52 6  legal question, and I don't have an answer to your legal

12:54:55 7  question.

12:54:55 8  Q.     So, you used some definition of the non-compete for

12:55:01 9  purposes of your analysis for which you cannot give me

12:55:04 10 examples of what falls within in it and what does not?

12:55:07 11 A.     Again, as I've said a number of times, I am -- I'm

12:55:10 12 not a legal expert.  I'm an economist coming to this from an

12:55:15 13 economic perspective.  I have an understanding of the types

12:55:19 14 of activities that are alleged to be competing in this

12:55:26 15 particular case, but I certainly don't have a legal opinion

12:55:31 16 as to any -- I haven't -- and I haven't given thought to any

12:55:35 17 other particular activity that could be, you know, an

12:55:40 18 infinite number of things.

12:55:42 19 Q.     Oh, I agree.  Even though you said that you needed to

12:55:46 20 have an understanding of what was permitted and not

12:55:48 21 permitted in order to embark on this process in the first

12:55:51 22 place; right?

12:55:51 23 A.     Again, as I said, here on the stand -- and I think is

12:55:58 24 completely consistent with my deposition testimony -- I

12:56:00 25 certainly have to have an understanding, and I do and did at

12:56:04 1    the time that I wrote my report, as to the non-compete, what

12:56:09 2    was alleged to be falling outside of the non-compete

12:56:12 3    agreement, what was specifically permitted as part of the

12:56:16 4    non-compete agreement.  And that was the basis on which I

12:56:23 5    conducted my analysis, but a further legal opinion of what

12:56:32 6    exactly falls inside and outside the non-compete is outside

12:56:36 7    of my area of my expertise.

12:56:38 8    Q.    Now, you said you took your interpretation of what

12:56:42 9    the non-compete permitted and didn't permit, whatever that

12:56:46 10   may be, from The Institutes; right?  You took what they told

12:56:49 11   you as -- as being what it meant; correct?

12:56:51 12   A.    Again, for a damages expert, the starting point,

12:56:56 13   unless there's some reason for it not to be the starting

12:56:59 14   point, is the allegations in this case.  And those come from

12:57:03 15   The Institutes, I agree.

12:57:05 16   Q.    And you're aware that in this case that The

12:57:08 17   Institutes argue that the non-compete provision of the APA

12:57:11 18   prohibits the defendant from offering any specialty

12:57:14 19   conference, any specialty conference relating to the

12:57:16 20   insurance industry unless it's listed as a permitted

12:57:19 21   activity?  You're aware that they took that position?

12:57:21 22   A.    That sounds generally -- generally consistent, but I

12:57:33 23   would have to look at the particular language if you want me

12:57:35 24   to verify something very specific.

12:57:37 25   Q.    Does that sound like what they told you when you were

12:57:40 1  doing your report?

12:57:41 2  A.    Can you repeat what you -- what you want me to agree

12:57:44 3  with --

12:57:44 4  Q.    Sure.

12:57:44 5  A.    -- that they told me?

12:57:45 6  Q.    Sure.  That the non-compete provision of the APA --

12:57:48 7  and my question was:  Are you aware that they had taken the

12:57:51 8  position in this case, was my first question, that the

12:57:53 9  non-compete provision of the APA prohibits defendants from

12:57:57 10 offering any specialty conference relating to the insurance

12:57:59 11 industry, unless it is listed as a permitted activity?

12:58:02 12       So my first question was:  Are you aware that

12:58:05 13 they had taken that position in this case?

12:58:07 14       MR. HAYES:  Just object.  That misstates our

12:58:10 15 position.

12:58:10 16       MR. DENN:  Your Honor, I'm literally reading

12:58:12 17 from your opinion summarizing the Plaintiffs' position.

12:58:15 18       THE COURT:  Well, what I say about their

12:58:17 19 position, that may not be what they say about what their

12:58:20 20 position is.  So, that's not a best source.

12:58:23 21 BY MR. DENN:

12:58:25 22 Q.    Well, let me ask it this way, Dr. Meyer.  Does what I

12:58:28 23 just read sound like what The Institutes told you the

12:58:31 24 non-compete meant?

12:58:33 25 A.    I don't recall them using that specific language with

12:58:38 1    me that -- that's that broad, no.

12:58:40 2    Q.    Okay.  Does it sound similar to what they told you?

12:58:43 3    A.    Again, that sounds -- I don't have it written in

12:58:50 4    front of me, so I'm trying to remember what you said.  But

12:58:53 5    that sounds considerably broader than what I remember having

12:58:59 6    explained to me or reading in various --

12:59:01 7    Q.    Okay.

12:59:02 8    A.    -- documents.

12:59:02 9    Q.    Okay.  Well, then what did they -- how did they

12:59:04 10   explain it to you?

12:59:05 11   A.    Again, that -- what was not permitted was activity,

12:59:15 12   in particular, that conferences would be the place where

12:59:18 13   they would see the competition most directly, where they

12:59:22 14   actually did see the competition directly and that it was --

12:59:26 15   it was conferences that specifically competed with the CLM,

12:59:33 16   again, with the exception of the specific permitted

12:59:37 17   activities.

12:59:39 18   Q.    Okay.  That sounds like what I just asked you, but

12:59:44 19   I'm not going to -- I think we've probably gone as far as we

12:59:48 20   can with that.

12:59:49 21              THE COURT:  All right.  So, Mr. Denn, why don't

12:59:51 22   we take a lunch break for an hour.  And we'll resume at

12:59:56 23   2 o'clock.  All right?

12:59:57 24              DEPUTY CLERK:  All rise.

01:56:25 25              (Lunch recess was taken.)

02:02:20 1          DEPUTY CLERK:  All rise.

02:02:24 2          THE COURT:  All right.  Dr. Meyer, come on back.

02:02:41 3          Mr. Denn?  And I am advised that you will be

02:02:43 4   leaving after your -- at least for a while after you finish

02:02:47 5   your --

02:02:47 6          MR. DENN:  Correct, Your Honor.

02:02:49 7          THE COURT:  No.  No.  It's fine.

02:02:51 8          MR. DENN:  I apologize.

02:02:53 9          THE COURT:  No.  No.  It's fine.

02:02:55 10  BY MR. DENN:

02:02:56 11  Q.    Dr. Meyer, I wanted to return briefly to the topic

02:02:59 12  that we had been discussing just before the lunch break.  Do

02:03:02 13  you remember that we were talking about what -- assumptions

02:03:04 14  about the non-compete you made for your analysis?

02:03:06 15  A.    Yes.

02:03:09 16  Q.    And would you agree that you tried to use the same

02:03:11 17  assumption about the non-compete that the VRC folks used so

02:03:15 18  that the analysis would match up?

02:03:18 19  A.    I would say I -- I used the same assumption about

02:03:25 20  competition about the marketplace as the VRC folks used,

02:03:29 21  yes.

02:03:29 22  Q.    And but -- since you were adjusting their model,

02:03:31 23  didn't you also need to use the same assumption about what

02:03:34 24  the non-compete permitted and didn't permit that they used?

02:03:38 25  A.    Their model doesn't include specific assumptions

02:03:45 1    about the non-compete per se.  It's about the market.

02:03:49 2    Right?  And the non-compete obviously can have an effect on

02:03:53 3    market but there's -- it's about the -- they have specific

02:03:57 4    assumptions about revenues and profits of a firm.

02:04:03 5    Q.    Well, isn't correct that your opinion assumes that

02:04:06 6    the VRC relied on certain assumptions regarding the

02:04:09 7    defendant's expected actions post-transaction with respect

02:04:13 8    to competition?

02:04:16 9    A.    Yes.  I agree with that.

02:04:18 10   Q.    So, they -- they team actually did make assumptions

02:04:21 11   about what was permitted and what wasn't permitted; correct?

02:04:24 12   Isn't that what you're saying?

02:04:25 13   A.    Again, I think this is a distinction similar to the

02:04:30 14   distinction I was making earlier.  The VRC received certain

02:04:38 15   projections from The Institutes, specifically from

02:04:43 16   Mr. Scheidt.  Those projections incorporated some

02:04:49 17   assumptions about competition.  I don't think that they did

02:04:56 18   nor would they needed to make any sort of legal distinctions

02:05:00 19   or any other distinctions about exactly metes and bounds of

02:05:04 20   a particular part of a contract.  It's a -- it's an economic

02:05:10 21   model.

02:05:12 22   Q.    Well, isn't it true that VRC's assumptions were based

02:05:15 23   on assurances that the defendants would not engage in any

02:05:18 24   behavior other than those enumerated in Section 6.12 of the

02:05:22 25   APA?

02:05:22  1   A.      I would agree that the basic assumptions were no

02:05:35  2   competition by Mr. Potter, BIH or any of the sellers in this

02:05:42  3   space which -- which lines up with the -- with the

02:05:45  4   particular provision that you're talking about, yes.

02:05:47  5   Q.      I'm asking very specifically.  Didn't VRC assume in

02:05:50  6   doing its analysis that the defendants would not engage in

02:05:55  7   any behavior other than those enumerated in Section 6.12 of

02:05:59  8   the APA?

02:05:59  9   A.      And, again, let me just be clear.  I don't have an

02:06:06 10   understanding that VRC had access to the specific language

02:06:13 11   of that -- of the contract --

02:06:17 12   Q.      Do you --

02:06:18 13   A.      -- but the assumption -- if I can finish, the

02:06:20 14   assumptions are economic assumptions.  And so, the question

02:06:24 15   is whether there's -- whether there's consistency between

02:06:27 16   those economics consumptions -- assumptions, sorry, and the

02:06:31 17   contract language, not whether they made specific

02:06:33 18   assumptions about the contract language.  Right?  Because

02:06:36 19   there's no -- the --it's an economic model.

02:06:40 20   Q.      You're -- you're entire analysis is trying to

02:06:43 21   recalculate what VRC would have come up with if they had

02:06:48 22   made a different assumption about the non-compete; right?

02:06:50 23   A.      I would -- almost, I mean, I would say what I as a

02:07:00 24   reasonable economist, how I would have changed that model

02:07:04 25   to -- I can't say -- I didn't talk to anyone from VRC.  So I

02:07:07 1    can't claim to be, you know, putting myself in the head of

02:07:14 2    VRC, but of a reasonable valuation specialist modifying that

02:07:20 3    model, yes.

02:07:21 4    Q.    I mean, that's literally everything that you were

02:07:23 5    just showing us up on the board before; right?  You were

02:07:26 6    rerunning their model but making a different assumption

02:07:29 7    about the economy?

02:07:30 8    A.    I would agree with that -- about the nature of

02:07:33 9    competition.

02:07:33 10   Q.    Sure.  Yes.  So you still have your report up there;

02:07:36 11   right?

02:07:36 12   A.    I do have my report up here, yeah.

02:07:38 13   Q.    Can you look at Page 17 of your report, Paragraph 35?

02:07:53 14   And would you agree with me that the first few sentences of

02:07:56 15   it read, "VRC relied on certain assumptions regarding the

02:07:59 16   defendants' expected actions post-transaction to inform the

02:08:02 17   judgement that were used in their valuation model.  These

02:08:05 18   assumptions were based on assurances that defendants would

02:08:07 19   not engage in any behavior other than those enumerated in

02:08:11 20   Section 6.12 of the APA?

02:08:16 21   A.    Yes, and it goes on further than that.  Yes.

02:08:20 22   Q.    And, I mean, if there's anything that you think you

02:08:22 23   need to add to -- that that will clarify what I just read,

02:08:27 24   feel free.

02:08:27 25   A.    The point is to really, as it continues and talks

02:08:37 1   about how the VRC prepared the report based on prior

02:08:43 2   performance and estimation provided by the staff of The

02:08:49 3   Institutes, based on the non-compete assumption to inform

02:08:51 4   the purchase price.  So, it's -- it's, yes, it's certainly

02:08:56 5   consistent with the non-compete in the APA, but it's about

02:09:01 6   the economic assumptions that are -- those are the ones that

02:09:04 7   are specifically used by VRC.

02:09:06 8   Q.     So, isn't -- isn't this the definition of the

02:09:09 9   non-compete that you must have used for your analysis if

02:09:12 10  it's what you assume that had VRC was relying on?

02:09:14 11  A.     I'm sorry.  Can you say that again?

02:09:18 12  Q.     In order for your analysis to be -- to match up to

02:09:22 13  what VRC was doing, you had to make the same assumption

02:09:25 14  about the non-compete; correct, about what it originally

02:09:29 15  meant?

02:09:30 16  A.     Again, I think we've been through this now, I don't

02:09:35 17  know how many times.  It's not about me making a legal

02:09:37 18  determination about the non-compete.  It's about how did

02:09:41 19  that show up and how was that reflected in the economic

02:09:45 20  assumptions that underlie an economic model.

02:09:51 21  Q.     You also recall that you -- that for purposes of you

02:09:54 22  doing your economic model that you've testified that you

02:09:57 23  relied upon what The Institutes had told you about what was

02:10:00 24  permitted and not permitted by the non-compete; correct?

02:10:03 25  A.     As I think I testified earlier, my job as a damages

02:10:08 1    expert is always to assume liability.  And in this case the

02:10:12 2    liability as alleged, and I'd agree, that that is as alleged

02:10:17 3    by The Institutes.  Yes.

02:10:19 4    Q.    But not just that there was liability.  You also

02:10:21 5    testified that you relied on The Institutes to tell you what

02:10:23 6    was permitted and what wasn't permitted by the non-compete

02:10:27 7    clause.

02:10:29 8    A.    And, again, as I said, we certainly had a discussion

02:10:33 9    about -- about, you know, what -- what it was about the

02:10:37 10   conferences and, for example, the Cannabis and Hemp

02:10:40 11   Conference and what those conferences would be that would

02:10:42 12   fall inside and outside.  Yes.  In general -- in general

02:10:47 13   terms, but not to a legal point of making a legal

02:10:50 14   interpretation about that particular part of the contract.

02:10:53 15   Q.    No, but at least in terms of saying what you can do

02:10:56 16   and you what you can't do?

02:10:57 17   A.    In -- in general terms, yes.

02:11:00 18   Q.    Okay.  I think you said you were in Court all day

02:11:03 19   yesterday; correct?

02:11:03 20   A.    Correct.

02:11:05 21   Q.    And you heard Anne Blume testify?

02:11:06 22   A.    I did.

02:11:08 23   Q.    And Anne Blume is the person who you talked to at The

02:11:11 24   Institutes about the non-compete; correct?

02:11:13 25   A.    I certainly did speak with Anne Blume and also spoke

02:11:21 1  with Mr. Scheidt.

02:11:22 2  Q.    Okay.  Well, we'll come back to him.

02:11:27 3          MR. DENN:  Can we put up Page 202 from

02:11:30 4  yesterday's transcript?

02:11:30 5  BY MR. DENN:

02:11:32 6  Q.    Do you recall Ms. Blume being asked yesterday when

02:11:36 7  she testified, "Is it your understanding that Business

02:11:39 8  Insurance can get into other events beyond those listed in

02:11:41 9  the permitted activities," and her answering, "My

02:11:44 10 understanding is Business Insurance is limited to the event

02:11:46 11 that are permitted activities in the purchase agreement?"

02:11:49 12         And then there was some objections and then at

02:11:52 13 the bottom of the page Mr. Tintner asks, "You would agree

02:11:57 14 that Business Insurance could put on other events than those

02:12:00 15 listed in the permitted activities, so long as they did not

02:12:03 16 target games and litigation management professionals?"

02:12:05 17         "Answer:  No.  That's not -- frankly, that's not

02:12:07 18 how I understand the purchase agreement."

02:12:10 19         Do you recall hearing that testimony yesterday?

02:12:12 20 A.    I can -- I can read that here.  I certainly don't,

02:12:16 21 you know, have it committed to memory, but I see that here.

02:12:20 22 Q.    So, does that refresh your recollection about what

02:12:25 23 Ms. Blume told you about the scope of the non-compete

02:12:29 24 agreement when she was speaking to you in preparation for

02:12:32 25 your report?

02:12:32 1    A.    Again, I don't think that I had a discussion with

02:12:38 2   Ms. Blume before the filing of my initial report. At least

02:12:44 3   not to the best of my recollection. I don't think the topic

02:12:47 4   of her opinion as to the scope of the non-compete came up or

02:12:57 5   was -- was even factored in to my initial report --

02:13:02 6    Q.    Okay.

02:13:02 7    A.    -- or my --

02:13:03 8    Q.    So you think it's more likely that you relied on

02:13:05 9   Mr. Scheidt's interpretation because you did talk to him?

02:13:08 10    A.    I certainly did speak with -- with Mr. Scheidt, yes.

02:13:12 11    Q.    Okay. Dr. Meyer, you'd agree that with all economic

02:13:20 12   models that care must be taken to ensure that the modeled

02:13:24 13   assumption are consistent with the facts of the case?

02:13:26 14    A.    I agree.

02:13:27 15    Q.    And that's true for your theoretical adjustment model

02:13:31 16   that you testified about today?

02:13:31 17    A.    Yes, I agree.

02:13:34 18    Q.    Care ought to be taken to assure that it's

02:13:36 19   assumptions are consistent with the facts of the case?

02:13:38 20    A.    I agree.

02:13:41 21    Q.    And I think I heard you testify that under the model

02:13:45 22   that you testified about today that CLM should lose

02:13:50 23   50 percent of its market share to BIH within five years of

02:13:52 24   the contract date?

02:13:55 25    A.    Again, as I testified earlier, the Cournot model

02:13:59 1    talks about the market share and doesn't have a specific

02:14:03 2    time period in mind based on -- that's where my judgment as

02:14:07 3    someone who does valuation exercises, looking at the

02:14:12 4    five-year non-compete time period, gradually got to a

02:14:20 5    50 percent over the course of five years.

02:14:25 6    Q.    So your model assumes that CLM is going to lose

02:14:30 7    50 percent of its market share by December 31, 2022;

02:14:33 8    correct?

02:14:33 9    A.    Yes.  I would say of its sales, not -- I wouldn't --

02:14:41 10   I haven't put that in terms of any particular market in

02:14:45 11   terms of its sales that it was projecting.

02:14:48 12   Q.    Do you recall being asked during your deposition,

02:14:50 13   "QUESTION:  I thought that you just said that the Cournot

02:14:53 14   model assumed that CLM would lose 50 percent of its market

02:14:56 15   share by December 31st, 2022" and answering, "Yes, that's

02:14:59 16   true"?

02:15:01 17          Do you recall that testimony?

02:15:02 18   A.    I agree.  I just in light of you haven't -- I can't

02:15:06 19   remember what came before the deposition, if there was

02:15:08 20   discussion of what market share meant there.  Here I just

02:15:11 21   wanted to be clear what I meant here because we haven't

02:15:14 22   spoken about that yet.

02:15:15 23   Q.    And at least as of January of this last year, you

02:15:20 24   hadn't made any effort to determine what CLM's actual market

02:15:23 25   share was; correct?

02:15:24 1   A.     I don't understand your question.  If there's a

02:15:31 2   particular -- I -- if there's a particular market that you

02:15:34 3   have in mind.

02:15:37 4   Q.     Have you -- under any definition of market, have you

02:15:39 5   made any effort to determine what CLM's share of the market

02:15:42 6   is currently?

02:15:42 7   A.     Again, I have an understanding of the broader market

02:15:49 8   in which it competes, but my understanding is that CLM

02:15:54 9   operates in a niche space.  As I said in my direct testimony

02:15:59 10  in which Mr. Potter through, you know, BIH and later, you

02:16:05 11  know, subsequent Beacon Intercontinental, is -- is the

02:16:12 12  closest competitor.  So, the right way to look at the

02:16:15 13  competition is not within some other larger market, but

02:16:18 14  rather as the niche space in which these two particular sets

02:16:24 15  of entities or entities would compete.

02:16:27 16  Q.     Pick whatever market you'd like.  Define it however

02:16:29 17  you like.  Have you made any effort to determine what CLM's

02:16:32 18  share of that market is?

02:16:33 19  A.     Again, within this niche, CLM has projected the

02:16:43 20  certain sales.  And the question is:  Within that niche,

02:16:47 21  what would be expected in terms of the effect of

02:16:52 22  competition?

02:16:52 23  Q.     Okay.  So, within that niche, what's their percentage

02:16:55 24  of the market share today?

02:16:56 25  A.     Within that -- the particular niche that we're

02:16:59 1    talking about, which is the CLM sales and projected sales,

02:17:04 2    they would -- they have that niche.  That's the fact of the

02:17:08 3    niche that I'm talking about.

02:17:09 4    Q.    Well, then they would have a hundred percent of it

02:17:11 5    today?

02:17:11 6    A.    Yes, exactly.

02:17:13 7    Q.    Okay.  So, I want to make sure that we're not

02:17:18 8    misunderstanding anything.  You just established that under

02:17:20 9    your model, that CLM by December of 2022 -- and it's June of

02:17:27 10   2022, that December of 2022, CLM should have lost 50 percent

02:17:32 11   of its market share to BIH.  That's -- I mean, that was

02:17:37 12   your -- that's what your model says; right?

02:17:39 13   A.    It's clear that what I was talking about -- and we

02:17:42 14   talked about this on direct.  I understand you're trying to

02:17:45 15   make this -- you know, forget that COVID happened in

02:17:48 16   between, right, that this was a projection based on the

02:17:52 17   projections that VRC used that Mr. Scheidt provided to them

02:17:58 18   were based on -- were not based on COVID.  No one could have

02:18:02 19   foreseen that at the time.  So, obviously, that has changed

02:18:05 20   what actually happened in the real world.

02:18:07 21   Q.    You did your analysis.  Your deposition that I was

02:18:11 22   just reading from is January of 2022, to -- I can't do the

02:18:15 23   math.  Is that two years into COVID, something like that?

02:18:18 24         So, two years into COVID, you still testified

02:18:22 25   that under your model, that by December of 2022, that CLM

02:18:28 1  should have lost 50 percent of its market share to BIH;

02:18:31 2  correct?

02:18:31 3  A.     What I explained, and I think this is very clear -- I

02:18:37 4  understand you're trying to make this more complicated -- is

02:18:40 5  what the -- how to adjust the valuation that was done in --

02:18:45 6  somewhere between March and June of 2018.  And, clearly, at

02:18:50 7  that point in time, COVID wasn't known.

02:18:59 8  Q.     Maybe I'm misunderstanding.  And perhaps I should

02:19:04 9  give you the date of your deposition so we can be clear.

02:19:07 10  January 19th, 2022.

02:19:09 11         "Question:  I thought you just said that the

02:19:12 12  Cournot model assumed that CLM would lose 50 percent of its

02:19:15 13  market share by December 31st, 2022.

02:19:18 14         "Answer:  Yes, that's true."

02:19:20 15         So, do you think that needs clarifying, or is

02:19:26 16  that -- those are your words.

02:19:30 17  A.     No, I agree.  That was -- using the assumptions in

02:19:34 18  the VRC model, it -- as of 2018, that's right.

02:19:39 19  Q.     This is your model that says that it's going to be

02:19:41 20  down by 50 percent by December of 2022; correct?  Not VRC's

02:19:44 21  model, this is your model.

02:19:46 22  A.     Well, starting from VRC at that time, yes.

02:19:48 23  Q.     And everything that we looked at this morning was

02:19:50 24  50 percent loss; correct?

02:19:51 25  A.     Correct.

02:19:52 1    Q.    I mean, that's -- again, that's the entire premise of

02:19:55 2    your analysis.  So, going back to where we started, my

02:19:58 3    question was:  Have you made any effort to find out whether

02:20:04 4    six months from when this was all supposed to be at

02:20:07 5    50 percent what CLM's share of the market is?

02:20:10 6    A.    And as I said, that is not a -- it's not a relevant

02:20:16 7    input because we all know that COVID happened in between,

02:20:19 8    and I explained that in my report.

02:20:21 9    Q.    Didn't you just tell me that -- that any economic

02:20:25 10   model, that care has to be taken to ensure that the

02:20:27 11   assumptions are consistent with the facts?

02:20:29 12   A.    Absolutely.  And the model is based on what was known

02:20:34 13   at 2018, not that COVID happened in between.

02:20:40 14   Q.    Well, your model is not 2018; right?  Your model is

02:20:44 15   2021, 2022.

02:20:45 16   A.    No, my model is looking back at how a 2018 model

02:20:50 17   would have been adjusted for competition.

02:20:53 18   Q.    There's nothing about 50 percent in the VRC report;

02:20:56 19   correct?

02:20:56 20   A.    I agree.

02:20:57 21   Q.    Fifty percent comes from you?

02:20:59 22   A.    I agree.

02:21:00 23   Q.    And it came from you for the first time in October of

02:21:03 24   2021 when you issued your report; correct?

02:21:04 25   A.    I agree.

02:21:06 1    Q.    With COVID -- everyone fully aware of COVID?

02:21:10 2    A.    I agree that at that time we were aware of COVID.

02:21:13 3    Yes.

02:21:14 4    Q.    Okay.  So --

02:21:14 5    A.    The analysis was what would a -- how would a

02:21:18 6    valuation done in 2018, how would that have changed in a

02:21:24 7    reasonable way --

02:21:25 8    Q.    Okay.

02:21:25 9    A.    -- without having known COVID.

02:21:27 10   Q.    Well, can we agree that you don't -- that you have

02:21:31 11   made no effort to try to determine what CLM's share of any

02:21:34 12   market actually is?

02:21:35 13   A.    Today?  Correct.

02:21:38 14   Q.    And -- and, therefore, of course, you don't know what

02:21:43 15   its share of any market is, and you're not able to match

02:21:46 16   that against your model; correct?

02:21:49 17   A.    That would be an irrelevant calculation to do and --

02:21:55 18   and to look at for the reasons that I've explained.

02:22:00 19   Q.    Would it -- would it be irrelevant if you found out

02:22:03 20   that CLM's doing terrific, better than it had ever projected

02:22:08 21   five years ago?  Wouldn't that be relevant?  Wouldn't that

02:22:10 22   call your model into question?

02:22:11 23   A.    Again, given what has happened with COVID, it is --

02:22:19 24   it's not possible to -- to use the -- and I explained this,

02:22:23 25   to use the actual real-world scenario to inform what would

02:22:27 1    have been expected back in 2018.

02:22:30 2    Q.    Well, that would be true maybe if they were doing

02:22:32 3    worse.  But what if they were actually, notwithstanding

02:22:35 4    COVID, were doing better than they had expected?  Wouldn't

02:22:38 5    you want to know that to determine if your model is right or

02:22:43 6    not?

02:22:43 7    A.    In my opinion, COVID was such a disruptive activity

02:22:46 8    that -- an event that it's not possible to -- to -- in this

02:22:50 9    -- this particular case to look at anything in the real

02:22:53 10   world to determine whether or not, you know, what the

02:22:58 11   assumptions would have been.  Like I said, back in 2018,

02:23:04 12   when you're looking at what would a reasonable valuator, how

02:23:09 13   would they have adjusted that model?

02:23:11 14   Q.    Okay.  So, if I were to hypothetically tell you that

02:23:15 15   CLM had tripled its business since 2018, tripled its

02:23:21 16   profits, tripled its revenues, you would say that's

02:23:25 17   completely irrelevant and you shouldn't look at that in

02:23:27 18   deciding whether your model is valid or not?

02:23:29 19   A.    Again, that's not -- no, I don't think that -- I

02:23:35 20   don't think that gives you any information about how a model

02:23:40 21   in 2018 should be adjusted for competition.

02:23:43 22   Q.    Okay.  You did hear the testimony because you were in

02:23:46 23   Court that CLM's membership is up?  You heard that, from 45

02:23:53 24   to 50,000?

02:23:54 25   A.    I did.

02:23:54 1    Q.    Correct?  And you heard Ms. Blume testify yesterday

02:23:57 2    that CLM's financial trends were all positive in 2019 and

02:24:01 3    even into 2020 right up until the point of the pandemic.

02:24:04 4    You heard her testimony about that yesterday?

02:24:05 5    A.    I recall looking at those numbers and seeing that the

02:24:10 6    2019 numbers were below what they had projected, but I do

02:24:15 7    believe there was a positive trend.

02:24:20 8    Q.    Right up until the point of the pandemic; right?

02:24:23 9    That was her testimony yesterday?

02:24:24 10   A.    I believe that was her testimony.  Yes, but, again, I

02:24:28 11   think she -- she clarified that that -- although a positive

02:24:33 12   trend in sales, that it was lower than projected.

02:24:41 13   Q.    So, you maintain that the VRC based its initial

02:24:44 14   valuation on the assumption of a non-compete agreement;

02:24:48 15   right?

02:24:48 16   A.    Again, I think, as I have now stated a number of

02:24:54 17   times, that the VRC based its valuation on assumptions that

02:25:01 18   were provided to it by The Institutes, specifically by

02:25:06 19   Mr. Scheidt, and that that embodied in it an assumption that

02:25:12 20   the sellers would not be competing.

02:25:15 21   Q.    That's true, isn't it, that when VRC did its

02:25:18 22   valuation, that the non-compete agreement didn't even exist;

02:25:22 23   right?

02:25:22 24   A.    I agree that it certainly didn't exist in the form

02:25:27 25   that it was signed.  Yes, I agree.

02:25:29 1  Q.    Or did any non-compete agreement in any form exist at

02:25:33 2  the time of the initial valuation?

02:25:35 3  A.    I remember there was discussion yesterday about a

02:25:39 4  specific timing, but certainly -- so, I don't know at what

02:25:43 5  point in time.  Someone mentioned -- I know there was

02:25:46 6  discussion about when that might have first come up in

02:25:50 7  discussions, be they internal or negotiations with

02:25:55 8  Mr. Potter.  But I certainly have an understanding that the

02:26:01 9  non-compete, as it was in the final contract, you know,

02:26:04 10  certainly had not been signed at that point in time, and I

02:26:07 11  hadn't seen it written down in that form, either.

02:26:11 12  Q.    So, there's two VRC reports; right?

02:26:14 13  A.    Correct.

02:26:14 14  Q.    And the first one is the one -- was the one that was

02:26:17 15  used for valuation purposes for the purchase; correct?

02:26:20 16  A.    Correct.

02:26:20 17  Q.    And then the second one was issued after the

02:26:23 18  purchase, and it was done for accounting purposes; correct?

02:26:26 19  A.    Correct.

02:26:28 20  Q.    And you have both of them up there with you?

02:26:29 21  A.    Yes.  Let me just double-check if this is -- yes.

02:26:47 22  Q.    So, can you take a look at the first VRC report, the

02:26:50 23  one that was actually used to calculate the -- to help

02:26:54 24  calculate the purchase price.  Do you have that one?

02:26:56 25  A.    I do.

02:26:58 1    Q.    Can you direct me in that report to any mention of a

02:27:03 2    non-compete agreement?

02:27:06 3    A.    I don't believe there is mention, specific mention of

02:27:10 4    a non-compete in there.

02:27:12 5    Q.    Okay.  So, if I understand your theoretical

02:27:17 6    adjustment model, it assumes that the Defendants competed

02:27:21 7    with The Institutes for the full -- full five-year period of

02:27:25 8    the non-compete; correct?

02:27:26 9    A.    I'm sorry.  Could you say that again?

02:27:28 10   Q.    Sure.  Your theoretical adjustment model assumes that

02:27:32 11   the Defendants competed with The Institutes for the full

02:27:36 12   five-year period of the non-compete?

02:27:38 13   A.    That they would compete during the full five-year

02:27:42 14   time period, yes.

02:27:43 15   Q.    But even under the Plaintiffs' version of facts,

02:27:46 16   that's not what happened here, is it?

02:27:48 17   A.    If you're -- I'm not sure what you're referring to.

02:27:54 18   Q.    Well, do you have any evidence that the Defendants

02:27:56 19   started competing with The Institutes the day after the

02:27:58 20   non-compete was signed?

02:27:59 21   A.    I certainly have an understanding of the fact that

02:28:06 22   there was the Cannabis and Hemp Conference.  We've been

02:28:08 23   talking about it, and that the planning started sometime

02:28:11 24   before.  I don't have -- I -- I can't recall seeing a

02:28:15 25   specific date when planning or outreach specifically started

02:28:20 1    for that conference.

02:28:21 2    Q.    And that conference was October 2019; right?

02:28:24 3    A.    I believe that's correct.

02:28:27 4    Q.    And the contract is June 2018?

02:28:30 5    A.    Correct.

02:28:31 6    Q.    So, do you have any evidence of competitive activity

02:28:36 7    in July of 2018?

02:28:37 8    A.    Again, as I said before, I don't have specific

02:28:42 9    information about when the planning, and the outreach and

02:28:46 10   the discussions started for that particular conference.

02:28:50 11   Q.    So, your answer would be the same if I asked you

02:28:52 12   August 2018, September, October, et cetera?

02:28:54 13   A.    Correct.

02:28:55 14   Q.    But your model assumes that the competition was for

02:28:58 15   the full five years?

02:28:59 16   A.    Correct.  As a -- going back in time and looking at

02:29:04 17   how a -- I, as a valuation expert, would look at

02:29:10 18   incorporating competition, it wouldn't be known exactly what

02:29:15 19   that competition would -- you know, exactly -- and, like I

02:29:19 20   said, I haven't seen evidence of exact -- that I can recall

02:29:23 21   of exactly what day specific outreach was made, for example,

02:29:28 22   to Wilson Elser.

02:29:30 23   Q.    And doesn't it matter at all in calculating the

02:29:33 24   benefit of the bargain when or how many times the

02:29:39 25   non-compete was actually violated?  I mean, is that

02:29:42 1  completely irrelevant to your model?

02:29:44 2  A.     I would say because COVID intervened and that,

02:29:53 3  therefore, looking back in time, the fact that there was a

02:30:01 4  diminution in value and there would have been a lower

02:30:06 5  purchase price agreed to, we can't look at what happened

02:30:10 6  when we have the COVID that intervened to inform how

02:30:16 7  evaluation would have been adjusted, which for both the

02:30:23 8  $20 million purchase price, of course, did not contemplate

02:30:25 9  COVID, but neither would an alternative valuation.

02:30:30 10 Q.     So, wouldn't, "COVID intervened" also be a basis to

02:30:34 11 just not accept your model, either?  I mean, how can you

02:30:38 12 model anything with COVID?

02:30:39 13 A.     Because I didn't model COVID, nor did I need to model

02:30:47 14 COVID.  What I was looking at was what the valuation model

02:30:51 15 looked like that was done in 2018 which served as the basis

02:30:55 16 for the purchase price and how that would have changed with

02:31:01 17 an alternative view of competition.

02:31:04 18 Q.     Okay.  So, you did two different models to come up

02:31:10 19 with your damages and write a theoretical adjustment and an

02:31:13 20 actual revenue adjustment?

02:31:15 21 A.     Correct.

02:31:15 22 Q.     And the theoretical adjustment is the only one that

02:31:17 23 you're basing your testimony on today; right?

02:31:19 24 A.     Correct.

02:31:21 25 Q.     And I think we've established that you're -- by

02:31:24 1    theoretical adjustment, you're referring to an adjustment

02:31:26 2    that you made to the VRC valuation model; right?

02:31:29 3    A.    Agreed.

02:31:32 4    Q.    And you assumed that the Defendants would compete

02:31:34 5    with the CLM and that what he wrote -- that they would -- he

02:31:37 6    wrote the market share that is assumed in the VRC model?

02:31:41 7    A.    Yes.

02:31:42 8    Q.    And you assumed that each year that the Defendants

02:31:44 9    competed, that they would siphon off members and customers

02:31:48 10   at a rate such that in five years competition from the

02:31:52 11   Defendants would diminish CLM's revenue and cash flows to 50

02:31:55 12   percent of the projected values, assuming no competition;

02:31:58 13   correct?

02:31:59 14   A.    Correct.

02:32:01 15   Q.    And you said that that 50-percent reduction was

02:32:04 16   consistent with the economic principles found in academic

02:32:07 17   literature; right?

02:32:08 18   A.    Correct.

02:32:09 19   Q.    And the one that you're relying on is the -- what you

02:32:12 20   refer to as the standard Cournot model of competition.

02:32:16 21   Those are your words; right?

02:32:17 22   A.    Correct.

02:32:19 23   Q.    And you described the model in your report; right?

02:32:21 24   A.    Yes.

02:32:24 25   Q.    And you -- and you cite to a specific treatise for

02:32:28 1    your description of the model; right?

02:32:29 2    A.    I believe I -- I cite to something.  I have to go

02:32:35 3    back and look at the specific aspects.  And I believe in my

02:32:38 4    report I may have additional citations as well.

02:32:40 5    Q.    Sure.  Why don't you take a look, if you could, at

02:32:43 6    your report on Page 31, Footnote 121.  Do you see that?

02:33:12 7    A.    I do.

02:33:13 8    Q.    And that is the footnote that describes the academic

02:33:16 9    treatise that you are relying on for your description of the

02:33:19 10   Cournot model; correct?

02:33:20 11   A.    Yes.

02:33:21 12   Q.    And that is Industrial Organization by Jeffrey Church

02:33:26 13   and Roger Ware; correct?

02:33:28 14   A.    Correct.

02:33:29 15   Q.    2000 Edition?

02:33:32 16   A.    Yes.

02:33:36 17   Q.    Would you like a copy of the book or copies of the

02:33:40 18   pages that you cited?

02:33:41 19   A.    I'd be happy to have a copy of the book, I guess.

02:33:46 20   Q.    Okay.

02:33:47 21   A.    Whatever you want to --

02:33:48 22   Q.    Maybe I should ask you -- maybe you don't need the

02:33:50 23   book.  Let me ask you first:  And you cited Pages 231 to

02:33:59 24   256; correct?

02:34:00 25   A.    Correct.

02:34:02 1  Q.    And that's a chapter called "Classic Models of

02:34:07 2  Oligopoly"; correct?

02:34:07 3  A.    Correct.

02:34:08 4  Q.    And that chapter attempts to answer -- do you recall

02:34:13 5  that that chapter attempts to answer the following two

02:34:16 6  questions, the first of which is:  "How are prices and

02:34:19 7  output determined when there are a small number of firms

02:34:23 8  producing a homogeneous -- identical -- product?  If you

02:34:27 9  were the product manager for Johnny Walker, how would you

02:34:30 10 set its price for determining how much you would like to

02:34:32 11 produce and sell?"

02:34:33 12         Do you recall that that is the first of the two

02:34:36 13 questions that are being answered in the chapter that you

02:34:38 14 cited?

02:34:39 15 A.    I have not memorized the chapter.

02:34:40 16         THE COURT:  Yeah.  I don't think you can really

02:34:43 17 expect that, Mr. Denn.

02:34:44 18         MR. DENN:  I was just trying to follow the rules

02:34:46 19 of evidence, Your Honor.

02:34:46 20 BY MR. DENN:

02:34:47 21 Q.    Would it help refresh your recollection if I gave you

02:34:49 22 the chapter of the book that you cited?

02:34:52 23 A.    Yes.

02:34:57 24         MR. DENN:  May I approach the witness?

02:34:58 25         THE COURT:  Yeah, yeah.  Sorry.

BY MR. DENN:

02:35:08 1

02:35:13 2 Q.    So, if you can look at Page 232 of the book that you

02:35:17 3 have cited for supporting your description of the model that

02:35:21 4 you used, did I correctly read the first question as to what

02:35:26 5 questions that chapter is going to answer?

02:35:28 6 A.    It is what it is.  I don't recall what you said

02:35:34 7 before.  I didn't have this here to compare.  So --

02:35:36 8 Q.    Sure.

02:35:37 9 A.    -- if you're asking me to compare, I can't do that in

02:35:40 10 real time.

02:35:40 11 Q.    I'm talking about the top of Page 232.  It says, "In

02:35:44 12 this chapter, we considered the following two questions."

02:35:47 13 And the first question is:  "How are prices and output

02:35:50 14 determined when there are a small number of firms producing

02:35:53 15 a homogeneous -- identical -- product?  If you were the

02:35:56 16 product manager for Johnny Walker, how would you set its

02:35:58 17 price to determine how much you would like to produce and

02:36:01 18 sell?"

02:36:01 19         Is that correct?

02:36:02 20 A.    Yes.

02:36:03 21 Q.    And then the second question is:  "What determines a

02:36:05 22 firm's market power in an oligopoly"; correct?

02:36:08 23 A.    That's part of the second bullet point.

02:36:11 24 Q.    Do you want me to read the whole thing?

02:36:15 25         THE COURT:  It's up to you, Mr. Denn.

02:36:18 1  BY MR. DENN:

02:36:18 2  Q.    Is there something that I've left out that you think

02:36:20 3  is important?

02:36:21 4  A.    Well, the authors had the entire bullet point.  So

02:36:26 5  you were asking me, is that the second question.  I was

02:36:28 6  just --

02:36:28 7  Q.    Okay.

02:36:28 8  A.    -- referring to the fact that you hadn't read it

02:36:31 9  completely.

02:36:32 10  Q.    Well, if there's anything you think you need to add

02:36:34 11  to provide additional context, then please feel free to add

02:36:38 12  on to what I read.

02:36:40 13  A.    Well, the complete bullet point says, "What

02:36:43 14  determines a firm's market power in an oligopoly?  Why did

02:36:47 15  the FTC decide that the merger would lead to an unacceptable

02:36:50 16  increase in market power?  How did the FTC determine that

02:36:53 17  divestiture of the Dewar and Bombay brands would be an

02:36:57 18  acceptable remedy?  How does efficiency depend on the number

02:36:59 19  and cost structure of competitors?"

02:37:02 20  Q.    Okay.  And that's the second question?

02:37:04 21  A.    Second -- yes, second question, yes.

02:37:10 22  Q.    Okay.  And then on Page 233, there's a new section

02:37:14 23  that is titled for the first time "Cournot."  Correct?

02:37:18 24  A.    Yes.

02:37:22 25  Q.    And, again, you described in your report the model

02:37:24 1    that you were using as the standard Cournot model of

02:37:27 2    competition; correct?

02:37:29 3    A.    Yes.

02:37:32 4    Q.    And in this treatise that you rely on for that, it

02:37:35 5    states, "In game-theoretic terms, Cournot set forth the

02:37:38 6    simple static game, one in which the strategies of firms are

02:37:42 7    how much output to produce and sell.  The rules/assumptions

02:37:46 8    of this duopoly game are very simple:

02:37:49 9              "Products are homogeneous.

02:37:51 10             "Firms choose output.

02:37:53 11             "Firms compete with each other just once and

02:37:55 12   they make their production decisions simultaneously.

02:37:58 13             "There is no entry by other producers."

02:38:00 14             Correct?

02:38:01 15   A.    Yes.

02:38:02 16   Q.    And that is -- that is this author's description of

02:38:05 17   the standard Cournot model; correct?

02:38:07 18   A.    As it says, it talks about how Cournot considered

02:38:17 19   a -- a problem of how much spring water two firms in

02:38:21 20   competition would sell, and that's the -- the simple sort of

02:38:26 21   set of assumptions that he used in his initial -- in his

02:38:33 22   initial model.  Yes, I agree.

02:38:35 23   Q.    And you used the simple model to come up within the

02:38:37 24   50-50 split; right?

02:38:39 25   A.    I agree.

02:38:40 1   Q.      So, what I just -- what I just read are the

02:38:42 2   requirements of the simple model that you used; right?

02:38:47 3   A.      Yes, I agree.  In general terms, that's right.  Yes.

02:38:57 4   Q.      And now, you would -- you would agree that BIH's

02:39:02 5   products and CLM's products are not homogeneous; correct?

02:39:05 6   A.      Well, I agree that they're not completely

02:39:10 7   homogeneous.  And you'll note that, in fact -- and here,

02:39:14 8   they're even talking about in this chapter, you know,

02:39:16 9   looking at a merger of, I guess it's Guinness, Johnnie

02:39:22 10  Walker, Dewar's White Label.  I'm not a drinker, so I don't

02:39:27 11  -- but I have a sense that not everybody would consider

02:39:30 12  those to be totally homogeneous.  So, the model, obviously,

02:39:33 13  can be expanded.  And in this particular case, when you have

02:39:38 14  a situation in which the second firm is -- or the second

02:39:45 15  entity is -- would be, you know, either run by or have

02:39:53 16  involvement by Mr. Potter who actually created the first

02:39:55 17  entity, the competition there, as I said, would be, you

02:40:01 18  know, what economists call the next closest competitor.  And

02:40:05 19  that would be consistent with what we're talking about here

02:40:07 20  under the Cournot model.

02:40:10 21  Q.      Would it -- that's not the same thing.  Similar is

02:40:12 22  not the same thing as homogeneous, is it?

02:40:15 23  A.      As I said, Cournot's original model certainly was a

02:40:20 24  very -- included just homogeneous products, but it has since

02:40:24 25  been expanded to include, you know, products that are

02:40:28 1    relatively similar.  In this case, we have a situation where

02:40:32 2    I -- in my estimation, that would be the right application.

02:40:37 3    Q.    Yeah, but that's -- well, you just testified about

02:40:39 4    two minutes ago that that's not the application that you did

02:40:41 5    here.  You said you used the simple model, which is the

02:40:44 6    original homogeneous products and those other three

02:40:47 7    requirements that I listed.

02:40:48 8         So, maybe there are other versions of the

02:40:50 9    Cournot model, but you didn't use those.  You used the

02:40:54 10   simple standard one; correct?

02:40:55 11   A.    As I said, I used the basic Cournot model, and then

02:41:01 12   looked at whether or not the assumptions were -- could be

02:41:05 13   properly applied to the situation in this case.

02:41:09 14   Q.    Even though you concede that CLM and BIH's products

02:41:14 15   are not homogeneous; correct?

02:41:16 16   A.    I agree, but I -- in my estimation, they are --

02:41:19 17   they're looking -- again, from the time of 2018 and how

02:41:25 18   someone modeling competition would look at a situation in

02:41:30 19   which a -- an individual who had just created a business and

02:41:40 20   if that person competed, what would be the right way to

02:41:43 21   think about the way in which those products would compete

02:41:49 22   would be that they would be either homogeneous or very, very

02:41:52 23   similar enough such that the model is appropriate.

02:41:56 24   Q.    Okay.  But you added the very similar part, right?

02:41:58 25   That's not what it says in the treatise that you rely on?

02:42:01 1    A.    Again, as I -- I believe I made -- this may be one of

02:42:08 2    the prior reports, but that the Cournot model has been

02:42:11 3    expanded and -- and, you know, looking at and used quite

02:42:15 4    often in situations where the product is not necessarily

02:42:19 5    just a homogeneous product.  In fact, we have an example of

02:42:22 6    it right here in this chapter.

02:42:23 7    Q.    Well, sure.  I see -- I see stuff later in this

02:42:27 8    chapter that I don't even understand with algebra, and

02:42:30 9    quadratics and things like that.  So, there's clearly other

02:42:34 10   versions, but you've testified that the version that you

02:42:36 11   used is not any of those.  It's the simple one; right?

02:42:41 12   A.    I agree.  And then the -- the -- the job of the

02:42:45 13   person doing the valuation, as I did, was to see whether or

02:42:49 14   not the -- the facts of the specific case are -- are close

02:42:54 15   enough to such that the model is applicable, and that's what

02:42:57 16   I did.

02:42:58 17   Q.    Okay.  So, we've established, number one, products

02:43:00 18   not homogeneous.

02:43:02 19            Do these firms compete with each other just one

02:43:08 20   time and make their production decision simultaneously?

02:43:10 21   A.    Again, that's another space in which -- no, they

02:43:17 22   don't compete with each other, just one time.  Obviously,

02:43:20 23   there are multiple aspects of competition, but that the

02:43:24 24   Cournot model can take that into account.

02:43:27 25   Q.    But not the model that you used?

02:43:30 1  A.     Again, it would -- it would lead to the same

02:43:33 2  conclusion in terms of the Cournot model.  In this case,

02:43:38 3  that's -- again, there are determinations that need to be

02:43:42 4  made any time we do modeling in terms of how one applies

02:43:46 5  that model.

02:43:47 6  Q.     But the model that you applied here -- and I don't

02:43:50 7  mean to keep rehashing, but I want to make sure we stay

02:43:53 8  focused.  You applied the standard Cournot model for which

02:43:55 9  I'm reading the requirements out loud?

02:43:57 10  A.     Again, I used the standard Cournot model and then I

02:43:59 11  determined, looking at the facts of this case, whether or

02:44:02 12  not those factors would allow me to -- and whether or not

02:44:10 13  the model was appropriate in light of the facts of this

02:44:15 14  case.

02:44:15 15  Q.     Okay.  And there's also an assumption, no entry by

02:44:18 16  other producers.  Is there no entry by other producers in

02:44:21 17  the marketplace that BIH and CLM are in?

02:44:24 18  A.     Again, as of -- I understand that now since then

02:44:31 19  there has been entry possibly by ClaimsXchange, and I know

02:44:36 20  there's been a lot of discussion about that.  But, again,

02:44:39 21  looking at the time of the valuation model and looking at

02:44:44 22  how would I, as an economist, think about modeling entry of

02:44:49 23  a -- an individual who had just developed a business and who

02:44:55 24  had then sold it and not -- whether or not that person ended

02:45:02 25  up going into business themselves and competing or whether

02:45:05 1    through another entity, again, looking at that in terms of

02:45:11 2    sitting in a 2018 time frame and looking at a valuation, it

02:45:19 3    was my determination that the Cournot model, would be the

02:45:24 4    proper way of looking at how to model that in a valuation

02:45:29 5    context.

02:45:34 6    Q.    So the way that you come up with 50 percent using the

02:45:37 7    standard Cournot model, is that demonstrated in this graph

02:45:41 8    on Page 237 of the chapter that you relied on for the

02:45:45 9    quantities of the two producers ending up being equal?

02:45:49 10   A.    Yes.  Yes, you can see it there.

02:46:07 11   Q.    Okay.

02:46:07 12   A.    Yeah.

02:46:08 13   Q.    So -- so when you come up with this 50-50 split, you

02:46:13 14   are using the standard Cournot model that goes with that

02:46:15 15   graph, you're not using a more -- a more sophisticated or

02:46:20 16   nuanced version of it that might involve other calculations

02:46:23 17   or other equations; correct?

02:46:26 18   A.    I agree that I'm using a simple Cournot model, yes,

02:46:30 19   looking at how would someone have modeled this back in 2018.

02:46:35 20   That's right.

02:46:35 21   Q.    And it's not a standard Cournot model.  It is the

02:46:38 22   standard Cournot model; right?  There's only one?

02:46:43 23         If you're going do variations on it, then it's

02:46:46 24   not the standard Cournot model anymore.

02:46:54 25   A.    I'm just having trouble with sort of the specific

02:47:01 1   terms that you want to use.  I would consider it still to be

02:47:06 2   a standard Cournot model even to the extent that some of the

02:47:14 3   assumptions are slightly varied.  But, again, it's always in

02:47:23 4   modeling a question of looking at what is known at the time,

02:47:28 5   like 2018, and saying what model is going to best assist me

02:47:33 6   in thinking about the -- how to implement the effect of a

02:47:38 7   change, for example, in this case, of competition.

02:47:47 8   Q.    I think you testified that the Department of Justice

02:47:51 9   sometimes uses the Cournot model, correct?

02:47:54 10  A.    Correct.

02:47:54 11  Q.    And when they use it for comparing two firms, does it

02:47:58 12  always end up 50-50?

02:47:59 13  A.    Again, oftentimes when the -- when the Department of

02:48:06 14  Justice is using this, they look at competition that's

02:48:10 15  already happened.  At least that's -- I can't speak for

02:48:13 16  everything that the DOJ does, but in times when I have

02:48:17 17  interacted with the DOJ using the Cournot model, it has been

02:48:20 18  looking at what has happened in the market in the past.  So,

02:48:26 19  that is -- that is a different exercise than we're talking

02:48:31 20  about.  We can actually look and see what has happened in

02:48:33 21  that market in the past, but that's not what we have here.

02:48:38 22        Here, it's a question of in 2018 looking

02:48:42 23  forward.  So, it's -- they use the model, but they use it,

02:48:46 24  you know, as I've seen them use it in merger review, which

02:48:50 25  is looking at what has happened in the past to then look at

02:48:54 1    what would then happen in the future.

02:48:56 2    Q.    Is there any mathematical calculation or graph or

02:49:00 3    anything else in your report showing how you adjusted the

02:49:04 4    Cournot model as it's described in the treatise that you

02:49:08 5    rely on?

02:49:08 6    A.    No.

02:49:18 7    Q.    We were talking about assumptions that had to be made

02:49:22 8    about what the scope of the non-compete was.  Do you recall

02:49:24 9    that?

02:49:24 10   A.    Yes.

02:49:30 11   Q.    You heard Mr. Scheidt -- you said you were here

02:49:32 12   yesterday when Mr. Scheidt testified?

02:49:33 13   A.    Yes.

02:49:35 14   Q.    And he's the person that you relied upon -- well,

02:49:38 15   he's the person that VRC relied upon for the revenue

02:49:42 16   projections; correct?

02:49:43 17   A.    I agree.

02:49:45 18   Q.    And it sounds like he's the person that you relied

02:49:47 19   upon from The Institutes for describing what the non-compete

02:49:51 20   meant; correct?

02:49:52 21   A.    I certainly spoke with him about -- about

02:49:59 22   competition.  I don't know that I spoke with him about --

02:50:03 23   again, I took the allegations as -- as given.  I can't

02:50:07 24   remember whether I spoke to him about his interpretation of

02:50:11 25   a clause in a contract.  I don't understand him to be

02:50:15 1    available to be a lawyer, at least not in his current

02:50:17 2    position.

02:50:18 3    Q.    Okay.  Well, you testified that although the

02:50:20 4    non-compete's not mentioned in the VRC report, that it's

02:50:24 5    incorporated into it anyway because they use Mr. Scheidt's

02:50:27 6    numbers, and he embedded his interpretation of the

02:50:32 7    non-compete into those numbers; right?

02:50:34 8    A.    Again, I think I've said this now multiple times.  My

02:50:42 9    understanding and assumption is that the assumption of lack

02:50:45 10   of competition was certainly embedded in those numbers, not

02:50:50 11   necessarily a particular interpretation of a clause in a

02:50:54 12   contract.

02:50:55 13   Q.    Well, you heard me ask Mr. Scheidt yesterday, right,

02:50:58 14   that he wasn't assuming that there would be no competition

02:51:01 15   from anyone ever anywhere.  You heard that; correct?

02:51:04 16   A.    I agree.

02:51:05 17   Q.    He made a very specific assumption about what the

02:51:09 18   non-compete meant when he was coming up with his numbers for

02:51:11 19   VRC.

02:51:12 20        Do you recall that?

02:51:12 21   A.    If you can show me the testimony.  I don't remember

02:51:18 22   exactly what he said on that particular point.

02:53:02 23        MR. DENN:  Can we put up Pages -- can we start

02:53:08 24   with Page 146 from yesterday' transcript?

02:53:10 25

BY MR. DENN:

Q.    So, Dr. Meyer, looking at Page 146 from yesterday --
and you were in Court for this.  Mr. Scheidt is asked,
"Because obviously there's still going to be competition
generally.  So what precise -- what competition did you
assume when you generated these numbers was not going to
exist?

            "Answer:  The same conferences that are given,
that claims college, all the CLM annual events, the
similarities of those conference, it -- there wouldn't be
offered by another competitor.

            "Question:  So if I'm understanding your
testimony correctly, you simply assumed that the specific
events that CLM was putting on, that those would not be
duplicated?

            "Answer:  That's correct."

            Do you recall hearing him testify to that
yesterday?

A.    You've now refreshed my recollection.  Yes.

Q.    So, when Mr. Scheidt is putting together these
revenue estimates, all that he was assuming, based on his
own testimony, is that the defendants would not put on the
specific named events that is CLM was already putting on;
correct?

A.    Well, I'm just looking down below because I think he

02:54:25 1  clarifies further they wouldn't be in competition against

02:54:28 2  us.  I can't remember, you know, the entirety of this line

02:54:33 3  of questioning.

02:54:34 4  Q.    Sure.  It said my question is -- well, let's -- the

02:54:38 5  whole thing.  "You simply assumed" --

02:54:43 6          MR. DENN:  Can you go back a little?

02:54:43 7  BY MR. DENN:

02:54:44 8  Q.    "You simply assumed that the specific events that CLM

02:54:47 9  was putting on, that those not be duplicated?

02:54:50 10          "Answer:  That's correct.

02:54:51 11          "Question:  And it was that assumption that you

02:54:52 12  made when you came up with these estimates that projected

02:54:54 13  3 percent, 3 percent, 3 percent in reaching it; right?

02:54:57 14          "Answer:  Right.

02:54:58 15          "Question:  It was simply that those specific --

02:55:00 16  those specific named events that CLM had been doing

02:55:02 17  previously, that they would not be --

02:55:04 18          "Answer:  They would continue on.  They wouldn't

02:55:06 19  be -- they wouldn't be competition against us, correct."

02:55:09 20          So, you heard him say that; right?

02:55:14 21  A.    Yes.  And that's the -- yeah, no competition against

02:55:17 22  us.  If I can just see further because I think there was a

02:55:20 23  continuation --

02:55:20 24  Q.    Sure.

02:55:20 25  A.    -- of this?

02:55:34 1  Q.    Let me know when you get to the part where the Court

02:55:42 2  tells me to wrap it up.

02:55:56 3         So, his interpretation of the non-compete that

02:55:59 4  you've testified he built into the numbers that he gave to

02:56:03 5  VRC is completely different from anything that you have

02:56:07 6  testified that you assumed it to be; correct?

02:56:09 7  A.    I'm not going to -- I certainly see what he said, and

02:56:22 8  I also see that he talked about competition and extended

02:56:25 9  competition.  It was certainly -- I mean, that's more in

02:56:31 10 line with what I would call discussing about sort of the

02:56:36 11 nature of -- of the lack of competition.

02:56:41 12 Q.    So it's your testimony that what he said yesterday

02:56:44 13 were the assumptions that he built into those numbers, that

02:56:46 14 that matches up precisely with what you assumed the

02:56:49 15 non-compete to be when you were doing your analysis?

02:56:52 16 A.    I'm sorry, can you -- I didn't catch your question.

02:56:56 17 Q.    Sure.  Are you saying that what Mr. Scheidt testified

02:56:59 18 to yesterday as to how he interpreted the non-compete, that

02:57:02 19 that corresponds to how you interpreted the non-compete when

02:57:05 20 you were doing your analysis?

02:57:06 21 A.    Again, I've said this a number of times.  I didn't

02:57:14 22 make any sort of legal determination -- I'm not a legal

02:57:17 23 expert -- as to the non-compete.  My understanding of the --

02:57:27 24 of the assumption is underlying the projections were in line

02:57:33 25 with what he said, I think, sort of Lines 14 and 15, they

02:57:37 1   wouldn't be -- it wouldn't be competition against us.

02:57:40 2   That's what I -- is my understanding of what I recall the

02:57:47 3   assumption as being, at least as I understood them, as I was

02:57:51 4   working with that valuation.

02:57:55 5   Q.    Dr. Meyer, CLM was not the only business that

02:57:58 6   Mr. Potter sold to The Institutes, correct?

02:58:00 7   A.    Correct.

02:58:01 8   Q.    And those other businesses presumably had some value

02:58:03 9   to CLM also?  To The Institutes, also, I apologize.  That's

02:58:12 10  my question, though.  Those other businesses that he sold,

02:58:14 11  they also had some value; right?

02:58:15 12  A.    Correct.

02:58:17 13  Q.    So, some part of that purchase price was for the

02:58:19 14  other businesses, presumably; correct?

02:58:22 15  A.    I agree.  It was all of them together, yes.

02:58:24 16  Q.    But you didn't make any effort in putting together

02:58:27 17  your model to try to separate out those businesses so you

02:58:29 18  could determine the specific value of CLM; correct?

02:58:32 19  A.    I did not separate those out, and I discussed that --

02:58:37 20  I think we had a discussion in the deposition, and I

02:58:40 21  discussed it in the report as well.

02:58:43 22  Q.    You would agree that it is impossible to try to

02:58:46 23  calculate The Institutes' lost profits in this case based on

02:58:50 24  lost revenues; correct?

02:58:51 25  A.    I believe because of COVID it's not possible to do a

02:58:57 1    lost profits analysis in this particular case, yes.

02:59:07 2    Q.    And, Dr. Meyer, you served as a testifying expert in

02:59:10 3    over a hundred cases; correct?

02:59:11 4    A.    I believe I have submitted, yes, over a hundred

02:59:17 5    expert reports, yes.

02:59:19 6    Q.    Aren't there some cases where even if there's a

02:59:22 7    finding of liability there's just no way to calculate

02:59:24 8    damages?

02:59:24 9    A.    I imagine that's the case from a legal perspective.

02:59:31 10   Again, I'm not a legal expert.  But I generally have that

02:59:35 11   sense, yes.

02:59:39 12   Q.    Your damages estimate in this case is -- what is your

02:59:45 13   damages estimate, your final damages estimate in this case?

02:59:48 14   A.    Let me just make sure that I have the numbers exactly

02:59:52 15   right.  Six point -- rounded to the nearest hundred thousand

02:59:58 16   dollars, 6.7 to $8 million.

03:00:01 17   Q.    Okay.  Now, it was your understanding when you

03:00:07 18   rendered your opinion that Mr. Potter was going to stay

03:00:09 19   actively involved in BIH operations after September of 2019;

03:00:14 20   correct?

03:00:14 21   A.    I can't recall whether I specifically had that

03:00:36 22   assumption.  If you have some place to point me to, it might

03:00:40 23   refresh my recollection.  I can't recall that to that degree

03:00:43 24   of specificity.

03:00:44 25   Q.    Well, leave the date aside.  I think you testified

03:00:46 1    today that you assumed that Mr. Potter was going to continue

03:00:49 2    to be involved with BIH; correct, and lend his expertise to

03:00:53 3    BIH's efforts?

03:00:54 4    A.    Again, no, I think I -- I didn't specifically say

03:01:00 5    that today.  And what I think I was talking about, if I

03:01:04 6    think I'm thinking about the same thing you're thinking

03:01:06 7    about is that competition could be from any one of the

03:01:11 8    selling entities, you know, as -- however that's defined and

03:01:17 9    I know there might be disagreement about that.  But however

03:01:21 10   that's -- however that's defined.  So it doesn't necessarily

03:01:24 11   have to be Mr. Potter's -- you know, individual --

03:01:28 12   individually still involved, at least not from the

03:01:33 13   standpoint of my damages model.

03:01:36 14   Q.    Did I not hear you testify earlier that part of your

03:01:39 15   analysis involved Mr. Potter using his contacts in the

03:01:43 16   industry to siphon off customers even after the sale?

03:01:46 17   A.    Yes, I -- I believe I testified something to that

03:01:53 18   effect, yes.

03:01:54 19   Q.    Okay.  So you're -- so then you did need to assume

03:01:57 20   that he continued to be involved in the company, again, for

03:02:00 21   your -- for your assumptions in your model to be correct?

03:02:03 22   A.    No, I disagree.

03:02:07 23   Q.    Okay.  I thought you just said that you did assume

03:02:11 24   that in putting your model together, that he would stay

03:02:15 25   involved with the company.

03:02:16 1    A.    Is there some place in particular that you'd like to

03:02:19 2    point me, because I don't -- that certainly is not an

03:02:22 3    assumption that I recall making at the time, that his

03:02:26 4    specific involvement had to stay within a specific company.

03:02:31 5    Q.    Okay.  Well, we can come back to that.

03:02:33 6          Your opinion in this case isn't really what's

03:02:49 7    likely to happen; correct?  It's what adjustments The

03:02:52 8    Institutes would have made to the purchase price back in

03:02:55 9    2018 if The Institutes had thought that the defendants would

03:02:57 10   be competing; correct?

03:02:59 11   A.    I agree.  It's what -- what their value would --

03:03:05 12   valuation would have been had they understood that there

03:03:09 13   would actually be competition, yes.

03:03:11 14   Q.    So you're not trying to model what's actually going

03:03:13 15   to happen necessarily.  You're trying to -- you're trying to

03:03:15 16   predict what different decision the The Institutes would

03:03:20 17   have made in 2018 if they had different information;

03:03:23 18   correct?

03:03:23 19   A.    Yes.  I mean, as I mentioned in my report, maybe it

03:03:31 20   will be the case -- and I believe we've heard testimony

03:03:34 21   from -- I believe it was from Mr. Miller earlier yesterday

03:03:38 22   that they may not have even gone through with this

03:03:41 23   transaction.  But to the extent that they would have or we

03:03:46 24   can think about the value that they received from the

03:03:49 25   transaction under the assumption of competition that's what

Meyer - Cross

1  I was looking at.  But I certainly, I did mention in my

2  report -- and we heard here today that that alternative was

3  also a possibility.

4  Q.    But the analysis that you showed us today, you are

5  trying -- you are readjusting the VRC model using your

6  50 percent reduction; correct?

7  A.    Correct.

8  Q.    So you're essentially trying to predict what VRC

9  would have done if they had different information; correct?

10  A.    Again, we addressed this earlier.  I mean, I'm not

11  saying what VRC specifically would have done, but what I, as

12  I'm coming in afterwards and saying, Okay, as someone doing

13  valuation, how would I have adjusted that model?  I mean, I

14  didn't specifically talk to anyone at VRC, so that's a --

15  maybe it's a distinction without a difference, but --

16  Q.    Well, I think it's an important difference, so let's

17  focus on it.  You said in your report -- and I'm referring

18  to Page 31 of your report -- "The assumption of a 50 percent

19  reduction in cash flow of the theoretical adjustment is

20  consistent with general economic principles found in the

21  academic literature, and as such, it is reasonable to assume

22  that such an assumption would have informed an assessment of

23  value at the time of the negotiation under assumptions of

24  competition from defendants."

25              Do you see that in your report?

03:05:07 1  A.    It sounds like something I probably wrote, but I -- I

03:05:11 2  didn't follow where you were.  I apologize.

03:05:14 3  Q.    Page 31.

03:05:33 4  A.    I think on Page 30, perhaps, but --

03:05:35 5  Q.    Okay.  Maybe I'm wrong.  Page 30.

03:05:38 6         Yeah, you're correct, it's Page 30.

03:05:42 7         So that's what you were trying to do in your

03:05:45 8  report?  Those were your words?

03:05:46 9  A.    I agree.

03:05:47 10 Q.    So you were trying to determine how VRC would have

03:05:49 11 done its analysis differently with different information?

03:05:56 12 A.    I think I answered this just a moment ago in that it

03:06:03 13 is, as I said here, What is a reasonable assumption that

03:06:07 14 would have informed an assessment of value?

03:06:10 15 Q.    And it's VRC that was doing the assessment of value?

03:06:15 16 A.    VRC did the assessment of value in 2018, yes.

03:06:19 17 Q.    So what you're trying to determine is if they had

03:06:21 18 different information, what different number would they have

03:06:24 19 come up with; correct?

03:06:26 20 A.    Again, this may be a distinction without a

03:06:30 21 difference, but I'm not specifically -- I didn't

03:06:33 22 specifically interview VRC.  It is -- it's what my

03:06:37 23 determination was, as someone who does valuations, of what

03:06:40 24 would a reasonable adjustment to that model have been.

03:06:45 25 Q.    Well, I know that's -- you know, that's kind of my

03:06:47 1    point.  Instead of doing all this, why didn't you just call

03:06:51 2    VRC and ask them, How would this have changed your analysis?

03:06:54 3    A.    I certainly did not have access to VRC.

03:06:59 4    Q.    You couldn't pick up the phone and just call them?

03:07:01 5    A.    I certainly am not in the habit of picking up the

03:07:06 6    phone if I've been engaged in a -- in a matter with any

03:07:11 7    other entities that have -- you know, such as VRC, no.

03:07:18 8    Q.    Why wouldn't you -- we talked earlier about fact

03:07:22 9    checking your models.  I mean, wouldn't the simplest, most

03:07:25 10    direct way to check your model for these folks whose numbers

03:07:29 11    you're rerunning would be to call them and say, If you had

03:07:32 12    known this when you did these numbers, what would you have

03:07:34 13    done differently?

03:07:35 14    A.    I certainly didn't do that.

03:07:39 15    Q.    And the reason you didn't do that is?

03:07:41 16    A.    Again, in -- in litigation matters when I'm retained,

03:07:48 17    it's -- I certainly do not -- I get third party -- or I look

03:07:54 18    at publicly available information, but I'm not -- I don't

03:07:57 19    typically call a company like the situation that you're

03:08:03 20    talking about.

03:08:05 21    Q.    And yet, your entire analysis is based on how you

03:08:08 22    assumed that they did their work?

03:08:09 23    A.    My analysis is based on the work that I actually saw,

03:08:16 24    and my assessment of a reasonable adjustment.

03:08:23 25    Q.    I -- I want to come back to -- and this may be my

03:08:28 1    last set of questions for you -- the discussion that we had

03:08:32 2    about the number of events or the scope of events not

03:08:38 3    mattering to your analysis.  Do you recall that?

03:08:41 4    A.    Yes.

03:08:45 5    Q.    And you said that the number of times the non-compete

03:08:49 6    was violated, knowing that number wouldn't change your

03:08:52 7    analysis at all?

03:08:53 8    A.    Again, it's the -- the expectations at the time of

03:08:59 9    the -- of 2018.  So the specific number of times would not

03:09:06 10   affect how the ability of the sellers to compete would

03:09:13 11   affect the valuation.

03:09:16 12   Q.    And the type of violation doesn't matter to your

03:09:20 13   analysis?  It doesn't matter if it was one word that was

03:09:24 14   side said during one panel or something far greater in

03:09:27 15   scope?  That doesn't change your analysis at all?

03:09:29 16   A.    My analysis is about the ability of the sellers to

03:09:35 17   compete generally, in whatever way they thought was -- was

03:09:41 18   best for them.

03:09:43 19   Q.    So under your model, if BIH had one person mention

03:09:51 20   claims and litigation management at one panel in the fourth

03:09:56 21   year of the non-compete, your model would produce exactly

03:10:00 22   the same damages result for that as if BIH had had a hundred

03:10:05 23   conferences entitled, We Want Claims and Litigation

03:10:08 24   Professionals, and put that as the splash screen on their

03:10:11 25   website?  Your model would result in the same damages number

03:10:14 1   in either case; right?

03:10:17 2   A.    I disagree.  I mean, what I looked at was the -- the

03:10:22 3   specific non-compete that -- or I'm sorry -- the specific

03:10:26 4   competition that occurred, and the concerns about

03:10:29 5   competition if, in fact, BIH is allowed to compete in a way

03:10:36 6   that's not allowed under the -- under the non-compete

03:10:42 7   clause, and is in such a way that, you know, that it -- that

03:10:49 8   it chooses to compete.  I mean, it's the one making those

03:10:52 9   decisions.

03:10:53 10  Q.    But you just told me under oath two minutes ago that

03:10:56 11  it didn't matter, that the scope of the violation didn't

03:10:58 12  matter and the number of the violations didn't matter in

03:11:00 13  terms of the number that your model produced.

03:11:03 14  A.    Again, what I'm looking at is what the expectations

03:11:07 15  would have been in 2018 of knowing that BIH would have the

03:11:16 16  ability to -- to compete as it saw fit.

03:11:50 17            MR. DENN:  I don't have anything further,

03:11:52 18  Your Honor.

03:11:58 19            THE COURT:  Mr. Niedermeyer (sic).

03:11:59 20  BY MR. NIEDERMAN:

03:12:22 21  Q.    Good afternoon, Dr. Meyer.  My name is

03:12:25 22  Seth Niederman.  We've met before.

03:12:26 23            THE COURT:  And I'm sorry, Mr. Niederman.  It

03:12:28 24  looks like I keep --

03:12:30 25            MR. NIEDERMAN:  It's -- I get it all the time.

03:12:31 1 You can imagine being in a fraternity in college,

03:12:35 2 Neidermeyer was my nickname, so no apology needed.

03:12:37 3        THE COURT:  Well, no, there is an apology

03:12:40 4 because it really is -- people ought to call each other by

03:12:45 5 their right names, so I'm sorry about that.

03:12:48 6        MR. NIEDERMAN:  Thank you, Your Honor.

03:12:49 7 BY MR. NIEDERMAN:

03:12:50 8 Q.    Dr. Meyer, you'd agree with me that your opening

03:12:52 9 expert report, in its application of the Cournot model,

03:12:57 10 relied on the assumption that the only competition in the

03:13:00 11 marketplace comes from the defendants; correct?

03:13:07 12 A.    In general, the only competition?  No, I would

03:13:15 13 disagree with that.  But in terms of the specific

03:13:18 14 competition to the -- the CLM, the additional competition to

03:13:24 15 the CLM revenue in the VRC report, yes, the additional

03:13:31 16 competition would be from -- whether it be from the sellers,

03:13:35 17 whether that be from BIH, or whether that be from

03:13:40 18 Adam Potter himself or however.  I understand there's

03:13:42 19 different -- disagreement about, you know, exactly where

03:13:48 20 that -- who's allowed to compete and who's not.

03:13:50 21 Q.    Do you recall in your rebuttal expert report -- or I

03:13:53 22 should say -- sorry -- the defendants' rebuttal expert

03:13:57 23 reports, at least Mr. Devor pointed out that there are other

03:14:01 24 competitors to CLM in the marketplace, and he pointed out a

03:14:05 25 number of them, including one referred to as PLUS, P-L-U-S,

03:14:09 1    which stands for the Professional Liability Underwriting

03:14:12 2    Society, and PLRB, Property and Liability Revenue Bureau.

03:14:17 3    Do you recall that in that report?

03:14:18 4    A.    I do.

03:14:19 5    Q.    And in your reply report, you took the position that

03:14:22 6    these aren't really competitors of the CLM; correct?

03:14:26 7    A.    I agree.  I looked into those particular competitors

03:14:31 8    and spoke with, I believe it was Ms. Blume at The

03:14:36 9    Institutes, about them, yes.

03:14:37 10   Q.    And you were taking that position in your reply

03:14:40 11   report to dispute the position in the rebuttal reports that,

03:14:45 12   in fact, there were other competitors in the marketplace

03:14:48 13   beyond the plaintiff and, allegedly, the defendants in this

03:14:52 14   case; correct?

03:14:53 15   A.    Well, as I said, you know, the -- the projections in

03:14:58 16   the VRC report incorporated the existing level of

03:15:06 17   competition.  So I understood that there was existing, in

03:15:12 18   general, competition for sponsor dollars, for example.  I

03:15:17 19   discussed that in the context of probably both my reports,

03:15:21 20   maybe?  I don't know off -- I haven't committed them to

03:15:25 21   memory, but I certainly discussed that aspect.

03:15:27 22        So the question, the operative question, is the

03:15:29 23   incremental competition.  But then in response to

03:15:34 24   Mr. Devor's -- I believe it was Mr. Devor's rebuttal

03:15:39 25   report -- I specifically looked at those entities that he

03:15:43 1  spoke about.  But in any case, whether they -- whether they

03:15:48 2  actually compete or not, to some degree, that is all baked

03:15:53 3  in, if you will, to the VRC numbers.

03:15:55 4      So, yes, I did look specifically at what he

03:16:00 5  said, but that degree of competition doesn't affect my

03:16:07 6  analysis in this case.

03:16:10 7  Q.    And, Dr. Meyer, have you had an opportunity to review

03:16:14 8  an offer of proof that was submitted by plaintiffs in this

03:16:17 9  case?  And if you don't know what I'm referring to, I'm

03:16:20 10 happy to bring it up on the screen for you to take a look

03:16:22 11 at.  It was a pleading filed in this case.

03:16:24 12 A.    If you could.  I've reviewed a lot of documents.

03:16:27 13 Q.    Certainly.

03:16:27 14      MR. NIEDERMAN:  If we could bring that up.

03:16:58 15      And if you can go to the first page first,

03:17:00 16 please.

03:17:00 17      MR. HAYES:  Your Honor, I object.  This is an

03:17:02 18 attorney-offered document.  Yesterday, you were not willing

03:17:04 19 to allow us to point to designations of the attorneys.  You

03:17:10 20 said we were not going to have any attorneys involved in the

03:17:12 21 case, so I would object on that basis.

03:17:13 22      THE COURT:  All right.  Well, I'm going to let

03:17:16 23 Mr. Niederman do this.

03:17:18 24      MR. NIEDERMAN:  Thank you, Your Honor.  And just

03:17:19 25 so the -- for the Court's record, this is Docket Number 313,

03:17:23 1    offer of proof of plaintiffs in this case filed on

03:17:31 2    June 13th.

03:17:31 3              And if you can go down to the section with the

03:17:35 4    highlighting.

03:17:35 5    BY MR. NIEDERMAN:

03:17:37 6    Q.    And so, you can just take a moment to just read the

03:17:40 7    portion that's highlighted on the screen.  In fact, I'll

03:17:43 8    read it into the record.

03:17:44 9              It says, "So while the CLM is the pre-eminent

03:17:47 10   professional association for claims and litigation

03:17:49 11   management professionals, its specialty conferences and

03:17:53 12   webinars face competition from other professional events for

03:17:56 13   advertising and sponsorship dollars, faculty and attorney

03:18:00 14   fellow participation.

03:18:01 15             "For instance, a court reporting or expert firm

03:18:04 16   advertising or sponsoring a CLM seminar may also advertise

03:18:09 17   at or sponsor other professional conferences drawing

03:18:12 18   litigation counsel, such as those offered by Defense

03:18:15 19   Research Institute and Product Liability Advisory Council."

03:18:19 20             Do you see that, what I just read from?

03:18:22 21   A.    I do.

03:18:22 22   Q.    And doesn't -- you'd agree with me that this

03:18:25 23   paragraph indicates that the CLM competes with at least two

03:18:29 24   other entities Defense Research Institute and the Product

03:18:34 25   Liability Advisory Council?

03:18:34 1    A.    Well, I don't know -- I have -- I don't know who

03:18:37 2    wrote this.  I don't know what the context is, what the --

03:18:41 3    so I'm not sure how to interpret that.  If I can have some

03:18:46 4    more information or have a chance to look at the whole

03:18:48 5    thing, I might be able to answer your question, but --

03:18:50 6    Q.    Well, focusing on the language in this paragraph, it

03:18:52 7    talks about competition faced by the CLM and it identifies

03:18:57 8    two entities that it competes with; correct?

03:19:01 9              THE COURT:  So, Dr. Meyer, have you ever heard

03:19:04 10   of the Defense Research Institute or the Product Liability

03:19:09 11   Advisory Council?

03:19:11 12             THE WITNESS:  I don't recall those two

03:19:14 13   particular -- I mean, I'm certain I've heard -- I heard

03:19:18 14   those names, at least Defense Research Institute, here in

03:19:21 15   court.  I recall those coming up, but I'd have to check back

03:19:25 16   to my reports.

03:19:26 17             THE COURT:  So, Mr. Niederman, what I -- what

03:19:28 18   I'm not going to allow you to do is to say, This is the

03:19:32 19   truth and, Dr. Meyer, you know, either agree with it or

03:19:37 20   you're a liar.  But I will let you ask her about that to see

03:19:41 21   what she actually believes or knows herself.

03:19:45 22   BY MR. NIEDERMAN:

03:19:49 23   Q.    Do you -- well, let me ask it this way, if the Court

03:19:51 24   would permit me.

03:19:52 25             If these two entities, the Defense Research

03:19:56 1    Institute and Product Liability Advisory Council, were, in

03:19:59 2    fact, competitors of the CLM, would that undercut your

03:20:04 3    application of the Cournot model?

03:20:06 4    A.    No, I don't think it would.  I mean, I specifically

03:20:11 5    talk in my report about the fact that there is general

03:20:16 6    competition for sponsorship dollars.  But, as I mention, I

03:20:21 7    believe, in my either direct or cross-examination, what I'm

03:20:24 8    looking at is the particular niche, and we've heard quite a

03:20:29 9    bit about it in this courtroom.  So, no, this would not

03:20:32 10   undercut my -- my analysis.

03:20:35 11   Q.    If I could direct you to paragraph 25 of your report.

03:20:56 12         Okay.  And if you could take a look, and I want

03:21:00 13   to refer you to Page 13.  You were wondering previously

03:21:07 14   about an assumption about Mr. Potter's continued involvement

03:21:09 15   with BIH.  Do you recall that testimony with Mr. Denn?

03:21:15 16   A.    Yes.

03:21:18 17   Q.    And does this refresh your recollection about any

03:21:21 18   assumptions concerning Mr. Potter's continued involvement

03:21:25 19   with BIH -- or with BIH, excuse me?

03:21:30 20   A.    What it says here is, you know, it has a list of

03:21:52 21   specific activities that I understand are part of the

03:21:57 22   allegations, including, and you can -- I don't need to read

03:22:04 23   them off but the organizing and promoting of the BIH

03:22:08 24   conferences and, as you said, Mr. Potter's continued

03:22:10 25   involvement, I didn't intend that -- well, yes, certainly

03:22:17 1    any involvement in BIH in affiliation with Mr. Potter in the

03:22:22 2    operation of establishment operation of ClaimsXchange, and I

03:22:28 3    specifically refer to the complaint.  So, yes, that

03:22:31 4    certainly is one of the -- one of the elements, although I

03:22:35 5    don't have specific dates on here on Mr. Potter's

03:22:37 6    involvement with BIH.

03:22:40 7    Q.    Was there something you were going to say about your

03:22:41 8    intention in putting that language in this paragraph?

03:22:44 9    A.    Well, what I was going to say is I just can't recall,

03:22:47 10   as I'm sitting here today, what specific dates I had in mind

03:22:52 11   with that term "continued."  I'd have to look back.

03:22:58 12   Whatever the actual involvement was was what I had in mind.

03:23:06 13            MR. NIEDERMAN:  Nothing further, Your Honor.

03:23:07 14   Thank you.

03:23:08 15            THE COURT:  All right.  Mr. Hayes, do you have

03:23:15 16   anymore?

03:23:16 17            MR. HAYES:  I do, Your Honor.

03:23:17 18            THE COURT:  Well, before that, Dr. Meyer, let me

03:23:19 19   just ask you a couple of questions.

03:23:21 20            So, would it be fair to look at what you

03:23:30 21   testified to or and you had done as your expert analysis

03:23:35 22   that the -- the value of the non-compete clause in the sale

03:23:44 23   of the businesses was, you know, between 6.7 and $8 million?

03:23:52 24            THE WITNESS:  You know, I've thought about

03:23:55 25   whether -- I wouldn't characterize it as the value of the

03:23:58  1    non-compete.  I would characterize it as, you know, the

03:24:06  2    damage from this -- from the violation of the non-compete.

03:24:11  3    It's maybe a -- again, sort of a hair-splitting difference.

03:24:17  4            THE COURT:  Well, the -- so some of these

03:24:20  5    questions I ask, because even though you're an economist, I

03:24:23  6    have to decide some legal issues that go along with it.  And

03:24:27  7    so, I think what you're saying when you're saying you had

03:24:35  8    6.7 to $8 million is that, you know, effectively the

03:24:43  9    plaintiffs, The Institutes, would have paid either $20

03:24:53 10    million more or less minus 6.7 to 8 to buy this business if

03:25:00 11    there had been no non-compete clause.  And they had expected

03:25:05 12    full competition from Mr. Potter.

03:25:10 13            THE WITNESS:  Or I would say if they -- if they

03:25:12 14    knew that Mr. Potter was going to violate that, or the

03:25:16 15    sellers, I guess, whether or not that would have been no

03:25:21 16    non-compete or just that he would violate it in the way that

03:25:24 17    he allegedly violated it.

03:25:26 18            THE COURT:  Right, but you seem -- from what I

03:25:30 19    gathered is you assume for the sake of your analysis that

03:25:34 20    he's violated as much as a person can possibly violate a

03:25:38 21    non-compete clause.

03:25:39 22            THE WITNESS:  As much as he would want to, yes.

03:25:42 23            THE COURT:  Well, it's funny you say as much as

03:25:46 24    he would want to because I wrote that down because you said

03:25:49 25    something -- you said, I think, earlier he had the ability

03:25:53 1   to compete as he saw fit, and that suggests to me that if

03:26:00 2   the -- if after the deal went through Mr. Potter said -- you

03:26:15 3   know, actually what that suggests to me is if there had been

03:26:18 4   no non-compete clause in the sales agreement and Mr. Potter

03:26:25 5   had just gone and moved to a cave somewhere for the next

03:26:30 6   five years, you would still be saying that the damages are

03:26:34 7   6.7 -- not that the damages, but that the value of what the

03:26:43 8   plaintiff purchased was 6.7 to $8 million less than what

03:26:46 9   they paid.

03:26:48 10             THE WITNESS:  And, Your Honor, no, I don't think

03:26:50 11  so.  I think this is where -- so, for example, this hasn't

03:26:55 12  really come up, but the post-VRC valuation, right, speaks to

03:27:00 13  value of non-compete.  And in there, it says something --

03:27:04 14  and I don't have this memorized -- to the effect of, well,

03:27:06 15  we're not going to put any value on this because we don't

03:27:09 16  think he's going to compete.  And that's where the

03:27:13 17  distinction comes from in my mind.  Right?  Because it's not

03:27:16 18  just its effect on the business, but also whether or not

03:27:20 19  it's going to happen.  So, when you -- we're looking at

03:27:23 20  valuing contracts and there's a clause which might be in

03:27:26 21  there, but maybe isn't what we would call -- at least what I

03:27:30 22  would call from an economic perspective a binding

03:27:34 23  constraint.  It's not something that is changing anyone's

03:27:37 24  behavior.  Then it might not have any economic value.

03:27:42 25             So that's -- so I think if we knew that

03:27:44 1    Mr. Potter was going to go and sit in a cave, then I would

03:27:47 2    say no, there's no -- and that's, I think, what --

03:27:50 3    essentially what VRC as in without the flourish of -- the

03:27:57 4    rhetorical flourish of the cave was saying in its

03:28:00 5    post-acquisition valuation when it said, "No, we're not

03:28:02 6    going to put any value on the non-compete because we don't

03:28:04 7    think it's going to happen."

03:28:05 8            So, it doesn't -- it's not going to bite into

03:28:07 9    anybody's business whether or not there's a non-compete or

03:28:10 10   not.

03:28:15 11           THE COURT:  So, I guess one of the things that

03:28:17 12   I'm trying to think about is, and it's related to some of

03:28:24 13   the questions that Mr. Denn was asking, is whether -- and

03:28:38 14   I'm not going to try to summarize what the answer was I

03:28:41 15   thought that you gave to Mr. Denn because I'm hoping to --

03:28:48 16   because I don't mean to be as cross-examination like as he

03:28:53 17   was.  But if -- if -- if this trial were taking place a year

03:29:02 18   and a half from now, okay, and the five years was up and

03:29:09 19   what had happened is there had been no violations of the

03:29:13 20   non-compete for four and a half years and then the

03:29:18 21   four-and-a-half -- four-and-a-half-year mark, Mr. Potter

03:29:26 22   started up the competing business, Business International

03:29:29 23   competed and everybody competed and it violated the

03:29:32 24   non-compete, would the analysis that you've done make any

03:29:38 25   sense as to what your damages were?

03:29:42 1          You know, if you --

03:29:43 2          THE WITNESS:  Yeah, I mean, it's a good

03:29:47 3  question.  If we actually knew that there was no competition

03:29:50 4  and then, you know, a day too early, right, they came in and

03:29:54 5  started competing, that would be a different analysis.

03:29:57 6  Right?  Because then you would say, okay, go back to the

03:29:59 7  valuation and would you then put in competition, you know,

03:30:04 8  over the whole time period when you know that the violation

03:30:09 9  is, like, one -- you know they came in a day too early.  But

03:30:12 10 that's not what we have here.  Right?  We have competition

03:30:15 11 starting and then, of course, one of the real vexing issues,

03:30:21 12 of course, is COVID; right?  We all know that that then

03:30:25 13 changed things such that, you know, the real world doesn't

03:30:31 14 give you a full picture after 2020 of what happens,

03:30:34 15 especially in conferences.

03:30:37 16          So then you take yourself back and say, okay,

03:30:39 17 sitting there in 2018 and you're negotiating a contract and

03:30:44 18 you know that, you know, I'm not -- you know, I don't have a

03:30:50 19 legal -- we talked about this; right -- interpretation, but

03:30:56 20 you go into a contract and say, I think that person's going

03:30:59 21 to sit out of this space and, therefore, I'm willing to pay

03:31:03 22 a certain amount.  And then come to find out, well, that

03:31:07 23 person isn't sitting out of that space.

03:31:10 24          Then you're sitting there in 2018 and you say,

03:31:13 25 well, how do I think about that?  How do I think about this

03:31:16 1    new value?  And there, I think, that's where, you know,

03:31:20 2    looking at, okay, I think this person -- you know, if they

03:31:24 3    think they can compete and they are going to continue to,

03:31:28 4    you know, put on conferences, they can really bite into my

03:31:32 5    business.  They -- they're the closest competitor that I'll

03:31:35 6    ever have is the person who just sold me a business.

03:31:38 7    There's no one closer than that so how am I going to think

03:31:40 8    about valuing that?  And that's really the exercise that I

03:31:44 9    undertook.

03:31:47 10           THE COURT:  But it seems to be kind of a binary

03:31:51 11   decision that you've made because you say, well, yes, okay,

03:31:57 12   it's one day before the five-year was up.  This model, this

03:32:02 13   method of analysis wouldn't really work.  And yet there's

03:32:08 14   some point where -- and at various times I thought you said,

03:32:16 15   because we're looking at this from the perspective of 2018,

03:32:22 16   in some ways, like, there's -- and maybe I'm wrong about

03:32:27 17   this -- that what actually happened after the deal went

03:32:31 18   through, other than there was some competition, didn't

03:32:35 19   matter.

03:32:36 20           THE WITNESS:  Well, I would say, look if we

03:32:37 21   didn't have COVID in between, then maybe we could have just

03:32:41 22   looked at what happened.  I think the problem is that we

03:32:43 23   have this completely disruptive event.  Right?  So,

03:32:50 24   therefore, I don't think we can look at what actually

03:32:53 25   happened.  I don't think that sheds light on sort of the

03:32:57 1  change in value that comes about because of the non-compete

03:33:01 2  being violated or hot.

03:33:02 3       THE COURT:  But the change in value -- and so,

03:33:07 4  that gets to the change of value because, as I understand

03:33:11 5  what I think your basic factual analysis is, is that VRC did

03:33:22 6  a valuation -- and I might be oversimplifying here -- and

03:33:28 7  the purchase price was very, very close to that valuation.

03:33:33 8       THE WITNESS:  That's right.

03:33:35 9       THE COURT:  And so, therefore, to figure out

03:33:36 10 what the purchase price would have been if there had been

03:33:40 11 different assumptions, you can sort of use the VRC model,

03:33:44 12 plug in those different assumptions, come to some different

03:33:47 13 number and feel fairly confident that that would be the

03:33:51 14 purchase price or close to it, as close as you could get.

03:33:55 15 Is that a fair characterization of your basic conceptual

03:34:00 16 framework?

03:34:00 17      THE WITNESS:  Well, I would say yes, with the --

03:34:04 18 with the caveat that I don't think I went all the way to

03:34:06 19 say, "Look, I can tell you for sure what the alternative

03:34:09 20 purchase price would be."

03:34:09 21      THE COURT:  No, nobody is saying that.

03:34:10 22      THE WITNESS:  But it's certainly -- it's the top

03:34:12 23 end of a bargaining range; right, between two parties.  If

03:34:15 24 I'm only going to get $8 million out of -- out of -- or $12

03:34:19 25 million out of an agreement, I'm not willing to pay more

03:34:22 1   than 12 million.  So it's an upper end of a bargain range,

03:34:25 2   and so -- and since in reality we saw the price pretty close

03:34:29 3   to that upper end, right, to the value that VRC came to.

03:34:35 4   It's not unreasonable to say, "Yeah, the price probably

03:34:38 5   would have been around that level," but I didn't have to

03:34:41 6   come all the way to that --

03:34:43 7            THE COURT:  And so --

03:34:44 8            THE WITNESS:  -- end point.

03:34:45 9            THE COURT:  And so, because the VRC -- the

03:34:47 10   actual VRC started with, that was all -- it was done in

03:34:52 11   March of 2018, so it had to be prospective.  You're -- you

03:35:00 12   did this in 2021 when you did your analysis.  And in the

03:35:09 13   end, the numbers you've come up with, they're -- it seems to

03:35:14 14   me, but you can tell me if I'm wrong, that it's not entirely

03:35:26 15   perspective what you've done because -- well, actually maybe

03:35:30 16   it is because how much competition the Defendants actually

03:35:38 17   did offer or would have offered but for COVID, you aren't

03:35:47 18   taking that into account.  You're just assuming that they

03:35:50 19   did whatever the -- whatever the Plaintiffs say makes them

03:35:59 20   liable?

03:36:02 21            THE WITNESS:  I agree with you that it's a

03:36:04 22   forward-looking exercise.  It's a prospective exercise.

03:36:09 23   What I looked at -- I certainly did look at the actual

03:36:16 24   competition that occurred to the extent of saying, as you

03:36:20 25   sort of said in your earlier question, are we talking about

03:36:23 1    the kind of thing that is, you know, oh, gosh, darn, we came

03:36:27 2    in a day too early or there's kind of one thing here or

03:36:31 3    there, or is this a situation, at least from the standpoint

03:36:35 4    of the allegations, right, which is what I have to -- that's

03:36:37 5    what I have to work under, sort of direct competition for --

03:36:42 6    and going after the same kinds of folks that we're trying to

03:36:46 7    target at our conferences, from the standpoint of -- I'm

03:36:49 8    saying "we," because I'm talking about --

03:36:51 9              THE COURT:  I know who you mean by "we."

03:36:53 10             THE WITNESS:  -- doing a -- doing a valuation;

03:36:55 11   right?  How much are we willing -- how much are we, The

03:36:58 12   Institutes, willing to pay for -- if we know that they're

03:37:02 13   going to be -- that BIH is going to be putting on

03:37:06 14   conferences that directly target our sponsors and -- and our

03:37:12 15   attendees?

03:37:13 16             So, yes, I agree it is sort of general

03:37:19 17   competition, looking forward, but it is -- it's based on

03:37:25 18   the -- at least my understanding of the way that The

03:37:31 19   Institutes perceives the actual competition that has

03:37:34 20   occurred and is expected to occur with the upcoming

03:37:39 21   conferences as well.

03:37:40 22             THE COURT:  I think I have just one more

03:37:44 23   question, and it's on a different topic.  So, one of the

03:37:49 24   things that you've done is say because of the Cournot model

03:37:56 25   basically looking at this as a duopoly, you use a certain

03:38:01 1  amount of judgment that it gets down to 50 percent in five

03:38:05 2  years.  If this were, I don't know what the word is, but a

03:38:08 3  three-company thing where the Defendants were the new

03:38:15 4  company, but there are already two companies, only one of

03:38:19 5  whom had the non-compete, what would the Cournot model say

03:38:28 6  as to what the eventual outcome of the market would be, and

03:38:33 7  would that affect how fast you'd get to whatever that

03:38:40 8  equilibrium would be?

03:38:40 9          THE WITNESS:  So, in terms of the speed, no, the

03:38:42 10  Cournot model doesn't speak to that.  But I -- I don't quite

03:38:46 11  understand -- could you just -- I'm sorry, Your Honor, but

03:38:49 12  just one more time, just set up the competition that you

03:38:52 13  think occurred before and after.

03:38:56 14          THE COURT:  Right.  So, just --

03:38:57 15          THE WITNESS:  Start with --

03:38:58 16          THE COURT:  -- a hypothetical is you have two

03:39:00 17  companies, they're in this line of work, the line of work

03:39:03 18  we're interested in, and, I guess, the sellers sell one of

03:39:10 19  the companies to plaintiffs, and then they enter the

03:39:14 20  competition themselves.

03:39:18 21          THE WITNESS:  Well, so then what that would mean

03:39:22 22  is, originally, if there are two players and they are

03:39:27 23  splitting the market already, and then when a third comes

03:39:30 24  in, the market can get split three ways.  But, again, so

03:39:37 25  that would be -- so you would be going from half to a third.

Meyer - Redirect

03:39:42  1    But, remember, what we're looking at here is

03:39:45  2  only the revenues of the CLM, the projected revenues of the

03:39:50  3  CLM.  So we're not starting with the half.  Or maybe --

03:39:53  4  maybe I should say we are starting with the half, depending

03:39:56  5  on how you want to look at it, right, because we're only

03:39:59  6  starting with that portion.

03:40:06  7    THE COURT:  I guess, maybe the point that I was

03:40:09  8  thinking of and I wanted to see whether you think I'm right

03:40:13  9  or not is that if there were a duopoly to begin with and

03:40:19 10  then you had a third player enter, the amount that either

03:40:22 11  member of the duopoly would lose would be proportionately

03:40:28 12  less because they are essentially going from 50 percent to

03:40:32 13  33 percent?

03:40:33 14    THE WITNESS:  That's correct.

03:40:33 15    THE COURT:  Okay.

03:40:34 16    THE WITNESS:  So instead of losing a half, they

03:40:36 17  would essentially lose a third.  That's right.

03:40:39 18    THE COURT:  All right.  Mr. Hayes.

03:40:39 19    REDIRECT EXAMINATION

03:40:39 20  BY MR. HAYES:

03:40:54 21  Q.    Directing your attention to your testimony in

03:40:57 22  response to one of the Court's questions.  If Mr. Potter had

03:41:04 23  refused to agree to a non-compete, what would be the reason

03:41:15 24  -- how would that affect the valuation of the business if -

03:41:18 25  so you have the VRC report.  We'll assume that they assumed

03:41:23 1    he's not going to compete.  They come up with a number.

03:41:26 2           Mr. Potter refuses a non-compete.  What would be

03:41:29 3    the effect of the valuation -- on the valuation?

03:41:35 4    A.    Well, as I said, you know, one thing that I certainly

03:41:39 5    have heard, and this doesn't, maybe, quite get to your

03:41:42 6    question, but I think it's an important preamble is that,

03:41:45 7    perhaps, the deal wouldn't have been done at all.

03:41:48 8    Q.    Right.

03:41:48 9    A.    But in terms of the VRC valuation, with Mr. Potter

03:41:55 10   not having a non-compete, that would be essentially, you

03:41:59 11   know, allowing him to fully compete, and then the

03:42:04 12   adjustments as I've made them would -- would follow from

03:42:08 13   that.

03:42:09 14   Q.    Now, under that scenario, could the plaintiffs or

03:42:12 15   could The Institutes, in that circumstance, know what

03:42:15 16   Mr. Potter was going do, you know, the extent to which he

03:42:18 17   was going to compete, whether he's -- could they know that?

03:42:22 18   A.    Are you asking in 2018?

03:42:24 19   Q.    Yes.

03:42:25 20   A.    No.  In fact, I -- my understanding is they thought

03:42:28 21   he wasn't going to compete.

03:42:31 22   Q.    And that --

03:42:31 23   A.    Yeah.  And they wouldn't have -- and knowing that he

03:42:34 24   was going to compete, because maybe he didn't have a

03:42:38 25   non-compete, I believe they couldn't have known exactly what

03:42:41 1    the nature of that was.

03:42:42 2    Q.    Okay.  So, I mean, what I was focusing on, you're

03:42:44 3    saying is knowing -- knowing that Mr. Potter was going to

03:42:47 4    compete -- as I understood your testimony, you're saying,

03:42:49 5    knowing Mr. Potter was going to compete, that would affect

03:42:52 6    the valuation.  And what I'm asking is just assume he had

03:42:56 7    said, I refuse to sign the non-compete and the plaintiffs

03:43:00 8    don't know what he's going to do thereafter.  Would that

03:43:05 9    have the same effect on the valuation?

03:43:08 10   A.    And I would say yes.  That would be yes.

03:43:18 11   Q.    So then would it be -- if -- when he is free to

03:43:22 12   compete, is it the risk of that competition that affects the

03:43:26 13   valuation, rather than the actual competition itself?

03:43:30 14   A.    I would say the risk of the competition and that risk

03:43:44 15   action materializing.  So you could have a risk of

03:43:49 16   something --

03:43:50 17        THE WITNESS:  -- Your Honor, we were talking

03:43:51 18   about this before, where he goes and sits in a cave, there's

03:43:54 19   no non-compete.  There is, I guess, a risk.  It's, you know

03:43:58 20   hypothetical, but it's never actually going to happen.  So

03:44:01 21   that's not what we're talking about here.  But a risk that

03:44:04 22   actually then does materialize, yes, I agree.

03:44:06 23   BY MR. HAYES:

03:44:06 24   Q.    Right.  But okay -- but so -- in other words, taking

03:44:09 25   a different example.  If you were buying a company from the

03:44:11 1  estate of the founder, you don't have to worry about its

03:44:14 2  competition, right, so who cares about a non-compete; right?

03:44:18 3  And so in this instance, they don't know if Mr. Potter is

03:44:21 4  going to, but he's fully able to compete.  Is it the risk

03:44:24 5  that he will do that that affects the valuation?

03:44:27 6  A.    I agree.  If he actually -- right.

03:44:32 7  Q.    Okay.

03:44:35 8         MR. HAYES:  Now, if we could put up the

03:44:46 9  agreement, please, which I believe is Exhibit 13, Plaintiffs

03:44:51 10 Exhibit 13.  And if we could go to 612-A, please, in the

03:45:02 11 non-compete provision.

03:45:11 12        It's on Page 28.  Sorry.

03:45:11 13 BY MR. HAYES:

03:45:16 14 Q.    Now, we've gone over this a lot, and so I don't want

03:45:19 15 to belabor it, but this agreement precludes -- this

03:45:25 16 provision, do you understand -- I ask you to assume that

03:45:31 17 this provision prevents any competition with a, quote,

03:45:34 18 selling businesses; okay?  For the purpose of my question.

03:45:38 19        Now, let's say you had a business that was in

03:45:43 20 three markets, and the non-competition provision only

03:45:48 21 affected one of those markets, as an economist, would that

03:45:55 22 affect your opinion from an economic point of view when

03:45:58 23 you're analyzing the non-compete?

03:46:00 24 A.    Well, it depends the degree to which those different

03:46:07 25 markets are related to one another.

03:46:09 1    Q.    Okay.

03:46:09 2    A.    So it might; it might not.

03:46:12 3    Q.    Okay.

03:46:12 4    A.    I can't answer that.

03:46:13 5    Q.    All right.  Now, this -- this provision also set --

03:46:16 6    the selling businesses are defined in Schedule A; correct?

03:46:20 7    A.    The selling party, I -- I think so.  Oh, selling

03:46:26 8    businesses, yes, seller's businesses.  I believe they are.

03:46:29 9    Q.    Okay.  All right.

03:46:30 10            So now, I'm going to ask you to assume that, you

03:46:33 11    know, The Institutes say that the selling businesses are

03:46:35 12    defined to include any specialty conferences, and it's later

03:46:41 13    determined that, no, the selling businesses are more

03:46:47 14    limited -- a more limited set of specialty conferences.  As

03:46:52 15    an economist, would that affect your opinion?

03:46:55 16            Since it's still -- sorry.

03:46:57 17    A.    I would say as a very, sort of, high-level matter, it

03:47:10 18    depends, but what I would say is what you have to look at is

03:47:15 19    the, sort of, the inter relationship between those.  And

03:47:18 20    what I mean -- and this certainly was something that I

03:47:21 21    looked at in my report -- is the degree to which

03:47:25 22    The Institutes, for example, were looking -- and this comes,

03:47:30 23    I believe, it was from the board presentation and some other

03:47:33 24    documents as well -- was looking for the conferences to help

03:47:42 25    it with its other businesses; right?

03:47:44 1      Not only the other aspects of the CLM assets,

03:47:48 2  like the claims pages, for example, but also it's other

03:47:52 3  businesses that are outside of CLM.  So you get people to a

03:47:56 4  conference, and then you're able to market to them all your

03:47:59 5  other businesses.  So the interrelationship means that there

03:48:04 6  is a -- there is a relationship between how much competition

03:48:08 7  there is in one space and what happens to revenue in

03:48:11 8  another, and that's what I was referring to -- I think, came

03:48:15 9  up either in direct or on cross.

03:48:30 10 Q.    Now, with respect to the Cournot model, when you

03:48:37 11 refer to homogeneous products or services, do they have to

03:48:40 12 be the exact same products or services to be homogeneous?

03:48:45 13 A.    Again, you know, if we want to take the, sort of,

03:48:50 14 extreme version of that word, maybe; maybe not.  I don't

03:48:53 15 know.  I'm not -- I'm not a, sort of, scholar of that sort

03:48:57 16 of thing.  But when I think about the Cournot model and

03:49:00 17 knowing how it's applied, it's -- it's similar products.

03:49:05 18 It's products that essentially, you know, compete against

03:49:08 19 each other and that are similar.

03:49:09 20      And as I said, you know, even in the textbook

03:49:11 21 they talk about, you know, looking at one kind of liquor and

03:49:15 22 another kind of liquor.  I don't understand how people will

03:49:19 23 drink them and think that they're identical, but they're --

03:49:22 24 you know, they're similar enough such that we can think

03:49:25 25 about competition between them.  So --

03:49:27 1    Q.    Okay.  And -- and is this understanding of what's

03:49:33 2    similar -- what is a homogeneous product, is that a whole

03:49:38 3    new Cournot model is, or is that just a development of the

03:49:41 4    Cournot model?

03:49:42 5    A.    Well, again, it's -- you know, in this situation,

03:49:47 6    right, we're talking about looking at the valuation that's

03:49:51 7    done before any of this activity, any of the competing

03:49:56 8    activity occurs, right before the acquisition or right

03:49:59 9    around the time of the acquisition.  So the question is:

03:50:02 10   You know, how would you think about -- how would you, as

03:50:05 11   someone doing a valuation, think about competition from

03:50:10 12   someone who just sold you the business.  And so that would

03:50:14 13   be -- you know, it would very much be within a standard

03:50:17 14   Cournot model.

03:50:18 15   Q.    Okay.  And have you -- and have you applied the

03:50:22 16   Cournot model previously where you were looking at similar

03:50:25 17   products?

03:50:26 18   A.    Yes.

03:50:26 19   Q.    Are you aware of the literature looking at the -- the

03:50:30 20   Cournot model the same way?

03:50:32 21   A.    Yes, I think I've cited some of it in my reply report

03:50:35 22   as well.

03:50:37 23   Q.    Now, you were asked questions on cross as to why you

03:50:44 24   didn't go to VRC and ask them what they would have done in

03:50:51 25   the new assumptions.  But what were you basically changing

03:50:56 1    from the VRC report to your calculation of the purchase

03:51:02 2    price in the "but-for world"?

03:51:05 3    A.    So two things that I was changing.  One was to bring

03:51:09 4    the present value to June instead of March.  So that's just

03:51:14 5    a mechanical calculation.  I -- and like I said, I used

03:51:19 6    them -- not only their numbers, but also the way that they

03:51:22 7    structured their valuation to try to keep it as consistent

03:51:25 8    in that -- just in terms of how they constructed it as

03:51:29 9    possible.  And then I just applied the competition factor

03:51:33 10   that we've been talking about.

03:51:34 11   Q.    So the numbers that you changed, whose numbers were

03:51:36 12   they?  Were they VRC's or Mr. -- well, I'll ask:  Whose

03:51:41 13   numbers were they?

03:51:41 14   A.    Well, they were certainly VRC's, in terms of coming

03:51:46 15   from their report, but I understand that those were given to

03:51:49 16   VRC from Mr. Scheidt.

03:51:50 17   Q.    Okay.  Are you aware of VRC rendering any opinion or

03:51:55 18   -- strike that.

03:51:56 19           Are you aware of VRC providing any financial --

03:52:03 20   financial performance results?  In other words, any

03:52:06 21   projection to what the performance, the financial

03:52:08 22   performance, would have been?

03:52:11 23           That probably wasn't a very great question, so

03:52:13 24   let me try again.

03:52:14 25           Are you aware of VRC providing any projecting --

03:52:20 1  providing any projected financial results of operations?

03:52:22 2  A.     In terms of them independently coming up with

03:52:27 3  projections --

03:52:28 4  Q.     Right.

03:52:28 5  A.     -- independent of what Mr. Scheidt -- what they

03:52:30 6  received from Mr. Scheidt?

03:52:31 7  Q.     Yes, correct.

03:52:32 8  A.     No, I don't.

03:52:33 9           MR. HAYES:  Okay.  That's all the questions on

03:52:34 10 direct, Your Honor.  We'd just move Dr. Meyer's report and

03:52:40 11 rebuttal reports into evidence.  I believe that's Exhibit --

03:52:43 12          THE COURT:  Well, we don't just admit reports.

03:52:46 13          MR. HAYES:  Okay.

03:52:47 14          THE COURT:  The various tables that you put up

03:52:51 15 on the screen, though, which I would find to be helpful if

03:52:54 16 they were in evidence.

03:52:54 17          MR. HAYES:  Okay.  So I will move -- pardon me.

03:52:58 18 One second.

03:53:04 19          So I'll move -- I move into evidence

03:53:07 20 Exhibits 8A, 8B, 8C, 8D, 8E, and F.

03:53:22 21          THE COURT:  Well, 8A and 8B are not tables.

03:53:25 22          MR. HAYES:  Okay.  I'm sorry.

03:53:27 23          THE COURT:  8C is a table.  8D appears to be a

03:53:30 24 table.  I don't need 8E.  8F is a table.

03:53:38 25          MR. HAYES:  Okay.

03:53:39 1    THE COURT:  I think maybe those are the ones I

03:53:40 2  was thinking about.

03:53:41 3    Mr. Denn?

03:53:42 4    MR. HAYES:  Okay.  That's fine.

03:53:43 5    MR. DENN:  We do not object to the tables,

03:53:45 6  Your Honor, only to the reports.

03:53:47 7    THE COURT:  All right.  So, you can check to see

03:53:49 8  if there's something else, Mr. Hayes, but I will take 8c, 8d

03:53:54 9  and 8f.  Okay?

03:53:58 10    MR. HAYES:  Okay.

03:53:58 11    (Plaintiffs' Exhibit Nos. 8c, 8d and 8f were

03:53:58 12  admitted into evidence.)

03:53:58 13    THE COURT:  Those are the three that are tables

03:54:00 14  that are in the binders that you gave me.

03:54:03 15    MR. HAYES:  Okay.

03:54:03 16    THE COURT:  Okay.  Is there anything more from

03:54:05 17  you, Mr. Denn?

03:54:06 18    MR. DENN:  Briefly, if I could, Your Honor.

03:54:07 19    THE COURT:  Yeah.  Are you all right, Dr. Meyer?

03:54:11 20  You've been up there a long time.

03:54:13 21    THE WITNESS:  I'm fine.  Maybe a little more

03:54:15 22  water.

03:54:15 23    RECROSS-EXAMINATION

03:54:15 24  BY MR. DENN:

03:54:16 25  Q.    Dr. Meyer, you still have the treatise that you used

03:54:18  1   as the basis for your report with you?

03:54:19  2   A.      I believe you gave me a chapter of it.  Yes, I have

03:54:22  3   it.

03:54:23  4   Q.      If you could look at Page 232 of the treatise that

03:54:27  5   you used.

03:54:30  6   A.      What page?  I'm sorry.

03:54:31  7   Q.      232.

03:54:35  8   A.      Yes.

03:54:36  9   Q.      And the third -- the bullet point that starts at the

03:54:40 10   third line down where the authors are talking about

03:54:45 11   homogeneous products.

03:54:48 12   A.      I'm sorry.  I don't see where --

03:54:50 13   Q.      Do you see the sentence that says, "How are prices

03:54:53 14   and output determined when there are a small number of firms

03:54:56 15   producing a homogeneous -- identical -- product?"

03:54:59 16           Do you see that?

03:55:00 17   A.      Yes.

03:55:01 18   Q.      So, that is how these authors define the term;

03:55:03 19   correct?

03:55:04 20   A.      Again, in the next sentence, they are talking about

03:55:09 21   Johnnie Walker, which as I understand it and looking at

03:55:16 22   their example, is a product that might be similar to other

03:55:22 23   liquors, but I wouldn't call it necessarily identical.  So,

03:55:25 24   I think there's an understanding that the model is -- can be

03:55:31 25   extended in that way.

03:55:32 1  Q.    Did I read that sentence correctly?

03:55:34 2  A.    I believe you did.

03:55:36 3              MR. DENN:  Nothing further, Your Honor.

03:55:38 4              THE COURT:  All right.  I think we're done.

03:55:40 5  Right?

03:55:41 6              Dr. Meyer, you're done.  Watch your step getting

03:55:43 7  down.

03:55:44 8              All right.  So, we'll be in recess for

03:55:47 9  15 minutes.

03:55:48 10             Mr. Denn, have a good evening.  Good luck to

03:55:51 11 you.

03:55:52 12             DEPUTY CLERK:  All rise.

03:56:23 13             (Recess was taken.)

04:13:28 14             DEPUTY CLERK:  All rise.

04:13:35 15             THE COURT:  All right.  Please be seated.  Let's

04:13:37 16 continue.

04:13:39 17             MR. HAYES:  Plaintiffs rest, Your Honor.

04:13:41 18             THE COURT:  All right.  Who's going first for

04:13:45 19 the Defendants?

04:13:45 20             MR. OPRISON:  Your Honor, we have a couple of

04:13:47 21 motions to make.  I believe Mr. Tintner is going to make a

04:13:50 22 motion before we start in our cases.

04:13:52 23             THE COURT:  All right.  Well, go ahead.  Take as

04:13:54 24 little time as possible.

04:13:56 25             MR. TINTNER:  Yes, Your Honor.  Your Honor,

04:14:05 1    actually we're going to make two motions, one to exclude

04:14:08 2    Dr. Meyer's testimony.

04:14:09 3              THE COURT:  All right.  Well, that's denied.

04:14:11 4              MR. TINTNER:  Understood.

04:14:12 5              THE COURT:  What's the other one?

04:14:13 6              MR. TINTNER:  The other one is a motion for

04:14:15 7    judgment under Rule 52(c).  Plaintiffs' case has rested.  We

04:14:20 8    do not believe the Plaintiffs have met their burden to

04:14:22 9    establish either a violation of restrictive covenant or

04:14:26 10   damages associated with that, at least as to Mr. Potter.

04:14:29 11             I'll, obviously, let Mr. Oprison make the

04:14:32 12   argument as to Business Insurance.  We do not believe that

04:14:35 13   the Cannabis Conference and the introduction of Mr. Potter's

04:14:40 14   sister, Ms. Posner, to Steve Acunto qualifies as any sort of

04:14:46 15   violation of Mr. Potter's restrictive covenant.  And we,

04:14:50 16   therefore, believe that they can't establish liability as to

04:14:53 17   Mr. Potter.

04:14:54 18             And certainly with respect to damages, you

04:14:57 19   understand we do not believe that a hypothetical analysis of

04:15:01 20   what the damages might be from 2018, without taking into

04:15:04 21   account COVID, the fact that there was hardly any

04:15:09 22   competition even alleged, let alone other competition in the

04:15:13 23   marketplace, all of that could have been done and reduced

04:15:16 24   the total amount.  But, instead, Dr. Meyer rests exclusively

04:15:20 25   on that window of 6.8 million to $8 million, which is

04:15:24  1    entirely hypothetical, and we do not believe it accurately

04:15:28  2    reflects what could be potentially damages associated with

04:15:32  3    what limited competition has been alleged.

04:15:35  4             But, obviously, as I've already argued to the

04:15:37  5    Court, we do not believe they've met the burden of proof

04:15:40  6    that they would need to by the preponderance of the evidence

04:15:43  7    to show that there's been a violation.  So, for that reason,

04:15:45  8    I would request that the Court grant judgment under rule --

04:15:49  9    Federal Rule of Civil Procedure Rule 52(c).

04:15:52 10             We would be happy to support that finding by the

04:15:54 11    Court with appropriate findings of fact and conclusions of

04:15:57 12    law that we would submit as soon as the Court would want it.

04:16:00 13             THE COURT:  All right.  Well, that's denied.

04:16:02 14             MR. TINTNER:  Understood, Your Honor.

04:16:07 15             MR. OPRISON:  Your Honor, I'm going to, just for

04:16:08 16    the record, put it on for Mr. Acunto's company, BIH.  We are

04:16:14 17    similarly situated in a lot of respects, but otherwise, I

04:16:17 18    think there's some -- there's some significant differences

04:16:19 19    in terms of where the damages or the liability goes in terms

04:16:23 20    of what was done and whether or not it constitutes as

04:16:26 21    targeting claims in litigation management professionals.

04:16:29 22             We certainly believe that there's no evidence

04:16:31 23    that -- that having individuals, say, seven individuals out

04:16:36 24    of 218 on a list that nobody knows how it was comprised for

04:16:40 25    BIH's cannabis and hemp seminar in 2019 constitutes

04:16:45 1   targeting.  We certainly don't think that having

04:16:48 2   professionals teach a claims 101 session or a component of a

04:16:52 3   session, one session at a conference, it constitutes content

04:16:56 4   related to claims in litigation management.

04:16:58 5          That's not what we believe Your Honor's Order

04:17:02 6   required the Plaintiffs to show.  They certainly didn't

04:17:05 7   carry their burden to show that either a specialty

04:17:07 8   conference about claims was ever offered or claims

04:17:10 9   litigation management was ever offered.

04:17:11 10          Certainly can't show that there were any

04:17:13 11   targeting.  No evidence came out about that.

04:17:15 12          Mr. Miller's testimony didn't elicit that.  Mr.

04:17:20 13   Acunto's testimony on cross didn't establish that.

04:17:23 14   Mr. Potter's testimony on cross didn't establish that.

04:17:26 15   Ms. Blume's testimony certainly didn't establish that.

04:17:29 16          There was a lot about what CLM did and her great

04:17:32 17   experience working for the company, but certainly nothing

04:17:34 18   about what happened afterwards that would constitute -- in

04:17:37 19   fact, nobody testified, Your Honor.  Nobody testified about

04:17:41 20   the content of any of those conferences and sessions that

04:17:44 21   occurred.  Nobody at The Institutes or CLM knew what

04:17:47 22   happened.

04:17:48 23          They could have known.  They could have talked

04:17:50 24   to people.  They could have offered evidence.  They could

04:17:52 25   have attended those webinars and those conferences.  They

04:17:55 1  chose not to do it.  No evidence whatsoever about what

04:17:58 2  actual content was offered to show that there was violation

04:18:02 3  of the non-compete.

04:18:03 4          And then, Your Honor, we would echo

04:18:06 5  Mr. Tintner's argument on damages.  As to BIH, I think we've

04:18:10 6  all heard Dr. Meyer's testimony here.  This is a courtroom,

04:18:14 7  not a classroom.  We're not talking about theoretical

04:18:17 8  damages.  You have to root it in reality.

04:18:20 9          There is no evidence that BIH's activities after

04:18:24 10  2019 when Mr. Acunto took over that company ever led to any

04:18:28 11  damages.  In fact, all the evidence points the other way.

04:18:31 12  Increased membership.  Increased sponsors.

04:18:35 13          COVID, yes, took them out of commission for a

04:18:37 14  while, but there's no evidence whatsoever -- Mr. Miller said

04:18:41 15  that -- of any individual lost customer or sponsor,

04:18:44 16  Your Honor.

04:18:45 17          And so, for that, despite what Dr. Meyer was

04:18:47 18  trying to put on here, there's certainly no evidence of any

04:18:50 19  actual damages, which is an essential element of the breach

04:18:53 20  of contract claim.  So, we'd ask for judgment for, as a

04:18:56 21  matter of law, as to BIH under Rule 52.

04:19:00 22          THE COURT:  All right.  Thank you.  Denied.

04:19:03 23          Okay.  Let's go.

04:19:06 24          MR. TINTNER:  Your Honor, Mr. Potter would like

04:19:08 25  to call himself.

04:19:09 1    THE COURT:  Okay.  So, Mr. Potter, you remain

04:19:23 2 sworn from when you were called before.

04:19:24 3    Okay.  Do you understand that?

04:19:26 4    THE WITNESS:  Yes, Your Honor.  Thank you.

04:19:28 5    DIRECT EXAMINATION

04:19:28 6 BY MR. TINTNER:

04:19:28 7 Q.    Good afternoon.  Could you state your full name for

04:19:30 8 the record?

04:19:30 9 A.    Sure.  Adam Wade Potter.

04:19:33 10 Q.    What is your current profession, Mr. Potter?

04:19:35 11 A.    I'm retired.

04:19:38 12 Q.    Do you do anything at present that relates to the

04:19:41 13 insurance industry generally?

04:19:42 14 A.    No.

04:19:44 15 Q.    Are you currently in the litigation and -- I'm sorry,

04:19:49 16 claims and litigation management space.

04:19:51 17 A.    I am not.

04:19:53 18 Q.    And how long have you been out of that space?

04:19:54 19 A.    Out of that space since June 1st, 2018.

04:19:59 20 Q.    And what was the triggering event for you exiting

04:20:02 21 that space?

04:20:02 22 A.    Entering into an Asset Purchase Agreement with The

04:20:05 23 Institutes.

04:20:06 24 Q.    Okay.  Are you currently in the risk management or

04:20:12 25 business insurance industry?

04:20:12 1    A.      I am not.

04:20:13 2    Q.      And how long have you been out of that industry?

04:20:14 3    A.      Since I signed the agreement to sell the company in

04:20:19 4    September of 2019.

04:20:21 5    Q.      And that was the sale of Business Insurance to

04:20:24 6    Beacon?

04:20:24 7    A.      That is correct.

04:20:26 8    Q.      Thank you.

04:20:26 9            Did you do anything for Business Insurance after

04:20:29 10   you sold the company to Beacon?

04:20:31 11   A.      For a short period of time, I did some administrative

04:20:36 12   functions, teaching them how to use the computer, teaching

04:20:39 13   them various things about the operations of the business.

04:20:43 14   And also Steve called on me to assist in trying to convince

04:20:48 15   Jeremy to stay at Business Insurance.

04:20:50 16   Q.      And when did that all happen?  What time period?

04:20:52 17   A.      It was all done by mid-October of 2019.

04:20:56 18   Q.      Do you plan to go back into either industry?

04:20:58 19   A.      I do not.

04:21:00 20   Q.      Why not?

04:21:00 21   A.      Because I'm very active in what I'm doing today.

04:21:04 22   Q.      What are you doing today?  Tell the Court.

04:21:06 23   A.      So, I'm doing a number of things.  First is I

04:21:08 24   proposed the largest affordable housing project in Long

04:21:15 25   Island in Sag Harbor.  That would be a 100,000-square-foot,

04:21:18 1    79-unit building.  So, I'm working with the State and with

04:21:22 2    developers to make sure that that happens.

04:21:24 3             The other thing I've done is I've purchased a

04:21:28 4    few businesses there, a convenience store.  I purchased a

04:21:31 5    restaurant.  And I'm also working with Ukraine relief.  I'm

04:21:35 6    hosting a Ukranian family at my house and also providing

04:21:38 7    other relief to Ukraine.

04:21:41 8    Q.    Have you solicited any customers, members or business

04:21:45 9    associates of the CLM since you sold it in June of 2018?

04:21:48 10   A.    I have not.

04:21:50 11   Q.    And that's been for the last four consecutive years?

04:21:53 12   A.    That is correct.

04:21:55 13   Q.    Just so we're clear, would you have any need to

04:21:57 14   solicit, contact or involve yourself with any customer,

04:22:00 15   members, business associates of the CLM?

04:22:03 16   A.    No.

04:22:05 17   Q.    Have you competed with the CLM since you sold it in

04:22:07 18   June of 2018?

04:22:08 19   A.    I have not.

04:22:10 20   Q.    Do you have an ownership interest in any business or

04:22:12 21   enterprise that competes with the CLM since June of 2018?

04:22:16 22   A.    I do not.

04:22:18 23   Q.    Do you operate, manage or engage in activities that

04:22:21 24   compete with the CLM?

04:22:22 25   A.    I do not.

Potter - Direct

04:22:23 1    Q.      Do you have a restrictive covenant?

04:22:25 2    A.      Yes.

04:22:26 3    Q.      And where is that contained?

04:22:27 4    A.      It's contained in the Asset Purchase Agreement, a

04:22:30 5    non-compete Section 1.2 of the Asset Purchase Agreement.

04:22:34 6    Q.      Have you violated the restrictive covenant?

04:22:36 7    A.      I have not.

04:22:37 8    Q.      What businesses did you sell through the Asset

04:22:40 9    Purchase Agreement?

04:22:40 10   A.      I sold three businesses:  I sold CLM Group, Inc.; I

04:22:43 11   sold C&E Management; and I sold Claims Pages.

04:22:47 12   Q.      Did you create a competing organization to compete

04:22:51 13   with the CLM?

04:22:51 14   A.      I did not.

04:22:53 15   Q.      Tell the Court -- the Court hasn't heard too much.

04:22:55 16   What is Claims Pages or what was Claims Pages when you owned

04:22:58 17   it?

04:22:58 18   A.      Claims Pages was like a telephone book, and it was

04:23:01 19   for claims adjusters, and it was things that they may need.

04:23:05 20   For example, a house has a flood.  Who do I call to do a

04:23:11 21   restoration of that house in, you know, Mississippi?  And it

04:23:14 22   would be by state, by area within the states, and it was the

04:23:19 23   Yellow Pages about the providers of that.

04:23:21 24           That morphed into an online directory and also a

04:23:25 25   news source, basically not creating new news, but using

04:23:30 1    other news sources and consolidating that on the website.

04:23:34 2    Those were the main focuses of Claims Pages.

04:23:36 3    Q.    Do you know if The Institutes is still operating

04:23:40 4    Claims Pages?

04:23:40 5    A.    I believe they are.

04:23:41 6    Q.    Do you own or participate in some way in an

04:23:45 7    organization that competes with Claims Pages?

04:23:47 8    A.    I do not.

04:23:47 9    Q.    What about C&E Management, what does that -- what

04:23:51 10   does that do or what did that do?

04:23:52 11   A.    C&E Management basically did two -- well, did one

04:23:56 12   thing.  It booked conferences for CLM and Business

04:24:00 13   Insurance.  And why I say "booked it" is because when you go

04:24:06 14   to host an event at a hotel, the hotel will say, Okay, we

04:24:10 15   have a hundred rows to give you, we have conference space,

04:24:13 16   and it will cost you, you know, "X" dollars.  And you say,

04:24:16 17   Well, that's great.  And as an organization, I'm going to

04:24:19 18   book that.

04:24:20 19          Now, if I do it through a third party, the hotel

04:24:22 20   will pay that third party a commission.  So even though you

04:24:26 21   own both organizations, that hotel will pay the commission

04:24:30 22   to the third party, and you will then pay the rate or

04:24:34 23   whatever the charge is to the hotel.  So I set this up to

04:24:37 24   basically get the commissions from the hotel.  You're paying

04:24:40 25   the same rate, and it's a separate arm of the hotel that

04:24:44 1    gives you the commission.  So I set it up to take advantage

04:24:47 2    of -- of the system.

04:24:49 3    Q.    Now, you sold C&E Management to The Institutes?

04:24:52 4    A.    I did.

04:24:52 5    Q.    Okay.  Are they still operating C&E Management?

04:24:55 6    A.    They told me they were not.

04:24:56 7    Q.    Let's talk about the CLM.  How did you start the CLM?

04:24:59 8    A.    CLM was started as the CEB, and it was started by me

04:25:03 9    and my dog on the couch.  I came up with the idea and

04:25:09 10   started the organization.

04:25:11 11   Q.    And what was that organization created to do?

04:25:13 12   A.    It was -- it was Council on Ethical Billing.  It was

04:25:16 13   a very limited scope.  It was basically putting in policies

04:25:20 14   and procedures on how to bill ethically for attorneys.

04:25:23 15   Q.    Why did you expand it?

04:25:25 16   A.    Because our board said, This is very limited in

04:25:28 17   scope.  We had some, you know, great support behind it.  We

04:25:32 18   had -- for example, Janet Reno was our first keynote

04:25:35 19   speaker.  So we had some great support behind it, but they

04:25:38 20   said, Listen, there's only so much you can do to talk about

04:25:41 21   ethical billing.  Really, the space that you need to belong

04:25:43 22   in is really morph it into the high realm, which is

04:25:46 23   litigation management.  And so, litigation management became

04:25:50 24   our focus.

04:25:51 25        And I think there's a misnomer because in the

04:25:54 1  last couple days, I've heard litigation and litigation

04:25:56 2  management.  They're two very different things.

04:25:59 3       So litigation management is typically held by

04:26:02 4  either an insurance company person or department, or it's

04:26:06 5  held by a corporation.  Those two individuals or those two

04:26:11 6  departments are litigation management, and what they do is

04:26:14 7  -- I'm going to give you an -- AIG, for example.  AIG spends

04:26:18 8  $1.8 billion a year on hiring outside defense counsel.

04:26:22 9       So they say, Hey, if I could put in some

04:26:25 10 policies and procedures and parameters for my outside

04:26:29 11 counsel, how do I pick outside counsel?  What do I need to

04:26:32 12 tell them?  Can they charge for travel?  Can they not charge

04:26:35 13 for travel?  Can I do an audit of their bills?

04:26:39 14      That's what a litigation manager does.  It looks

04:26:41 15 at the grand scheme of things.  It doesn't -- they're not in

04:26:46 16 the courtroom.  They look at, How do we manage our overall

04:26:49 17 book of business?  Versus a litigator, which we have plenty

04:26:54 18 here today, or an attorney, which is also in litigation.

04:26:56 19 Q.    So describe who, in essence, participated with you in

04:27:00 20 the CLM when it evolved into the organization that it became

04:27:04 21 in June of 2018?

04:27:06 22 A.    So yeah.  So from the civic counsel and litigation

04:27:09 23 management, we then worked into claims and litigation

04:27:11 24 management.  So -- I'm sorry.  Your question again?

04:27:13 25 Q.    Who were the participants in the organization with

04:27:16  1    you?  Can you describe them for the Court?

04:27:17  2    A.    Yeah.  So we had members and we had fellows, and

04:27:20  3    members were basically outside defense counsel and firms,

04:27:24  4    and fellows were everybody else that typically touches a

04:27:27  5    claim or has something to do with a claim.  It could be a

04:27:30  6    claims manager.  It could be a litigation manager.  In a

04:27:35  7    small area, it could be a risk manager.  It could be a

04:27:39  8    vendor.  So anybody that's on, kind of, the post-loss side

04:27:44  9    of a claim.

04:27:44 10    Q.    Did you limit the CLM fellows to people who were

04:27:48 11    exclusively in the insurance defense or claims industries?

04:27:50 12    A.    Well, anybody -- like, even a vendor could sign up,

04:27:56 13    and they may not necessarily be in that industry, but

04:27:59 14    servicing that industry, yes.

04:28:03 15    Q.    Could you be a risk manager, for example, and become

04:28:05 16    a CLM fellow?

04:28:06 17    A.    Sure.

04:28:07 18    Q.    And did -- were there, in fact, risk managers who

04:28:11 19    belonged as fellows to the CLM?

04:28:13 20    A.    There were a very limited number.

04:28:16 21    Q.    Can you explain why there were a limited number?

04:28:18 22    A.    So I was a risk manager at three different companies,

04:28:21 23    and in each one of those companies, claims reported to me.

04:28:25 24    Very rarely -- actually, I never went to a claims conference

04:28:28 25    as a risk manager.  That wasn't my focus.

04:28:31  1          There are two main aspects, if you will, to the

04:28:34  2     insurance industry.  I'm going to talk in broad terms, and

04:28:37  3     I'm going to call them pre-loss and post-loss.

04:28:40  4          So pre-loss is a risk manager, is an insurance

04:28:43  5     company underwriter.  They're the people that say, Wait,

04:28:47  6     wait.  What are all the risks out there?  How do I insure

04:28:51  7     against that risk?  How do I mitigate that risk?

04:28:53  8          And that's also safety.  How do I ensure that

04:28:56  9     those risks -- those claims don't happen again to make sure

04:28:59 10     my risk profile is lower?  That's all on the pre-loss side.

04:29:04 11          And then you have the post-loss.  The post-loss

04:29:06 12     is after a claim occurs.  What happened?  Well, that's where

04:29:09 13     the claims and litigation get put into place.  So you have

04:29:13 14     people that will say, Well, what's my first notice of loss?

04:29:16 15     How quickly can I respond to a claimant?  What are the

04:29:19 16     payment parameters that I have to abide by?  There's 50

04:29:22 17     states.  There's 50 different rules.  I, as a claims

04:29:26 18     professional, need to know what those rules are.

04:29:29 19     Q.   Is there overlap?

04:29:29 20     A.   Between those two?

04:29:32 21     Q.   Yes.

04:29:33 22     A.   Absolutely, because if I'm an underwriter at an

04:29:36 23     insurance company, and I'm coming up with a new product --

04:29:38 24     you know, let's say cannabis, for example -- I need to know

04:29:41 25     what the potential claims are so I know either to limit my

04:29:46 1  policy, or if I'm going to offer a broad policy, I need to

04:29:49 2  know how much to charge.  And the only way I'm going to know

04:29:51 3  that is to understand what the potential claims may be.  So,

04:29:56 4  yes, there's overlap.

04:29:57 5        From a -- from a claims perspective, Hey, I need

04:30:00 6  to know, is this covered by an insurance policy?  Is it not

04:30:03 7  covered by an insurance policy?  So, there's overlap, but

04:30:07 8  not a lot.  It's typically a line and that line is, I

04:30:10 9  wouldn't even say in the sand.  It's a line, maybe a faint

04:30:13 10  line, and the people are on one side or the other, and the

04:30:16 11  industries support one side or another.

04:30:20 12  Q.    Now, I may have asked you this.  There were risk

04:30:23 13  managers who belonged to the CLM when you owned it; correct?

04:30:26 14  A.    Yes, there were.  When I sold CLM, we calculated

04:30:30 15  there were a total of 200 -- a little less than 200, and

04:30:32 16  that was after we went through an extensive process.  Back

04:30:37 17  in 2014, our board said, We need to be more fully inclusive.

04:30:41 18  Let's get more risk managers.

04:30:43 19        So we started offering tracks at sessions.  We

04:30:46 20  started trying to recruit risk managers.  And the biggest --

04:30:50 21  well, there was a number of obstacles.  One is there were so

04:30:54 22  many organizations out there that tailored to risk managers.

04:30:57 23  There was -- there's RIMS, there's Business Insurance,

04:31:00 24  there's a number that just want risk managers.

04:31:03 25        So for three years, we tried to get a lot of

04:31:06 1   risk managers.  And at the end of the day, when we sold the

04:31:10 2   -- we sold to The Institutes, we had just under 200 risk

04:31:14 3   managers.

04:31:14 4   Q.     Is that out of the 45,000 members that you estimate?

04:31:17 5   A.     That's correct.

04:31:19 6   Q.     Now, you heard -- you were in the courtroom when

04:31:21 7   Ms. Blume testified; is that -- is that true?

04:31:24 8   A.     That was, yes.

04:31:24 9   Q.     Okay.  And you heard her say that there were 3,000

04:31:27 10  risk managers in the CLM?

04:31:28 11  A.     Yes.  And so I took that and I said, That doesn't

04:31:31 12  make any sense.  Because, first, we look at an organization

04:31:36 13  like RIMS.  RIMS is the Risk Insurance Management Society.

04:31:40 14  They've been around for 75 years, and they have 5,000 risk

04:31:45 15  managers in the United States.

04:31:47 16         If you think about how many companies are in the

04:31:48 17  United States, very few actually have risk managers, maybe

04:31:51 18  the Fortune 1000 will have risk managers.  So I was confused

04:31:56 19  because if RIMS, who's been around for 75 years and focused

04:31:59 20  on risk management for those 75 years, has 5,000 U.S.

04:32:04 21  members, how was the CLM able to grow from 200 to 3,000 in a

04:32:10 22  few years?

04:32:11 23         So I went back on the website of CLM.  The

04:32:14 24  public website.  I don't have any, you know, secret access.

04:32:17 25  And on the website there is something called Areas of

Potter - Direct

04:32:21 1  Practice.  And so I clicked Areas of Practice, and you can

04:32:24 2  select Risk Management, and up will appear who has selected

04:32:30 3  risk managers as the area of practice.  And lo and behold,

04:32:33 4  it lists 50 at a time.  The first 50 that came up were

04:32:37 5  attorneys, and there were many more attorneys that selected

04:32:39 6  risk management.

04:32:40 7         The next list of fellows, there were 50 that

04:32:43 8  came up, but if you look at the titles, 98 percent of the

04:32:48 9  titles that I looked at had to do with claims.  So they may

04:32:52 10 say the area of expertise is risk management because they

04:32:55 11 either work in the risk management department or they know a

04:32:59 12 risk manager or they've worked with a risk manager.  But at

04:33:01 13 the end of the day, I fully believe that's where they're

04:33:04 14 capturing their data is, 3,000 people have selected a box

04:33:08 15 which has not been verified that this is risk management.

04:33:12 16 Q.    Now, you also heard -- you were in the courtroom when

04:33:15 17 Mr. Miller testified; is that correct?

04:33:16 18 A.    That is correct.

04:33:17 19 Q.    Okay.  And you heard him talk about whether members

04:33:20 20 paid fees to join the CLM.  And that may be presently, but

04:33:25 21 as of 2018, did members pay fees to join the CLM?

04:33:28 22 A.    Absolutely, they did.  Now, remember, members are

04:33:31 23 attorneys, and the attorneys always paid, and the fellows

04:33:35 24 didn't.  And I secured -- I mean, roughly, I want to say, 12

04:33:40 25 to 15 percent of our overall revenue was paid by members.

04:33:46 1    It was the membership revenue.

04:33:48 2             And what -- immediately after I sold in June of

04:33:52 3    '18, from 2007 to 2018, we did not increase our membership

04:33:59 4    pricing.  It was 485 for an individual, 685 for a firm, and

04:34:05 5    995 for a -- for a large firm member.

04:34:09 6             Immediately after I sold, within six months, the

04:34:12 7    CLM increased -- increased membership 50 percent cost to the

04:34:17 8    attorneys.

04:34:17 9    Q.    Can you describe who the CLM sponsors were?

04:34:20 10   A.    CLM sponsors were anybody that wanted to get in front

04:34:23 11   of a claims person, someone in litigation management or an

04:34:27 12   attorney; right?

04:34:28 13            So, you may have someone like Esquire Deposition

04:34:31 14   Services.  Esquire wanted to get in front of large counsel

04:34:33 15   because they wanted to get them using them as their

04:34:36 16   deposition services company.  So it was anybody that wanted

04:34:41 17   to sell to that market.  It may have been attorneys because

04:34:44 18   they wanted, you know, claims people to use them as their

04:34:47 19   counsel.

04:34:49 20   Q.    Can you describe what the CLM events were in June of

04:34:52 21   2018?

04:34:52 22   A.    Sure.  So we -- we articulated everything that the

04:34:57 23   CLM did in 2018.  So you're asking me specifically about

04:35:01 24   events or --

04:35:01 25   Q.    I'm talking about in general.  We'll pull up the

04:35:04 1    schedule in a minute.

04:35:05 2    A.    Sure.  So, we did a number of things.  First, we had

04:35:07 3    events.  We had events on the local level.  We had over,

04:35:11 4    three -- I think it was a number of chapters.  It was a

04:35:14 5    little less than a hundred, but those hundred chapters did

04:35:17 6    about 300 local events on an annual basis.

04:35:21 7          Then we had specialty conferences, and there

04:35:24 8    were ten of those.  And they stayed constant.  There were

04:35:28 9    ten for a long period of time.

04:35:30 10         And then on top of that, we had our annual

04:35:34 11   conference.  And our annual conference, again, was once a

04:35:37 12   year in different locations, and it attracted about 2,000

04:35:40 13   people.

04:35:41 14         And from our annual conference is where we made

04:35:44 15   the majority of the money for all of our events.

04:35:49 16   Q.    Well, how many people approximately attended the CLM

04:35:51 17   annual conference?

04:35:53 18   A.    2,000.

04:35:53 19   Q.    And who attended these events?

04:35:56 20   A.    Who attended?  That's the attorneys.  Claims and

04:36:00 21   litigation management professionals.  There were some others

04:36:02 22   as well.  Did a risk manager here and there attend?

04:36:05 23   Absolutely.  Did they want to teach once in a while?

04:36:08 24   Absolutely.  But that was a very -- I mean, again, we had

04:36:12 25   200 out of 45,000 members.  It was a very small percent of

04:36:16 1  people that were involved as risk managers.

04:36:19 2  Q.    Was the -- was the attendance of the events closed in

04:36:23 3  any way?

04:36:23 4  A.    Closed?

04:36:26 5  Q.    To certain people who would want to attend.

04:36:29 6  A.    Sure.  So, attorneys, we limited the number.  There

04:36:32 7  was always multiple attorneys because if you think, we have

04:36:35 8  a lot of claims and litigation management people in the

04:36:39 9  room.  They want to get in front of them.  So, we said, we

04:36:41 10 need to create a balance.  We can't have 90, you know,

04:36:45 11 attorneys and ten claims people because the claims people

04:36:48 12 are no longer going to come.  So, we always -- we always

04:36:51 13 worked really hard to get to a 50-50 balance.

04:36:53 14      We also said any vendor, in order to attend, you

04:36:57 15 have to sponsor.  You have to pay your way.  So -- excuse

04:37:02 16 me.  So, vendors couldn't just, you know, inundate the

04:37:07 17 conference with, you know, lots of people.

04:37:09 18      And we also limited the number of vendors that

04:37:12 19 could come.  And many times we caught vendors.  So, we

04:37:16 20 caught attorneys that tried to sneak into our conferences,

04:37:19 21 and we kicked them out, and we suspended their membership.

04:37:23 22 Q.    Now, you heard a lot about this throughout the trial.

04:37:25 23 Was there competition in the marketplace for the CLM when

04:37:29 24 you owned it?

04:37:30 25 A.    Huge competition.  You know, in fact, on Claims

04:37:34 1    Pages, you know, one of the organizations that I sold, we

04:37:38 2    had a listing of all organizations on there in the United

04:37:42 3    States.  And 400 organizations.  Some are local, like you

04:37:47 4    may have the Atlanta Claims Association, but that competed

04:37:51 5    directly with our Atlanta chapter.

04:37:53 6              Then you may have a state organization.  You

04:37:56 7    could have, you know, the New York Claims Association.  That

04:37:58 8    would compete directly with our New York chapter.

04:38:01 9              And then you would have regional -- regional

04:38:05 10   claims associations, and then you would have national ones.

04:38:08 11   There's some very predominant national ones, like the PLRB.

04:38:12 12   So, the PLRB, we tried to merge with a number of times.  We

04:38:17 13   contacted and contacted -- we --

04:38:17 14   Q.    Let me just stop there.  Tell the Court what PLRB is.

04:38:21 15   A.      Property Loss Research Bureau.  And they do the exact

04:38:25 16   thing that the CLM does.  And so, we tried to merge with

04:38:28 17   them.  We recognize that they were, you know, one of our

04:38:31 18   most significant competitors.  And then during the Asset

04:38:35 19   Purchase Agreement, part of the condition and part of the

04:38:39 20   earn-out was I had to help and supply information so that

04:38:42 21   The Institutes could buy PLRB and merge that in with the CLM

04:38:47 22   and create a much larger organization.  That's just one.

04:38:51 23             There were a lot more.  There was -- there is

04:38:55 24   National Association of Insurance Adjusters.  There is

04:39:00 25   Parent Conferences.  There is The Gavel.  There are just so

04:39:02 1    many national organizations competing against CLM.

04:39:07 2            We did things differently, and that's why we

04:39:11 3    grew to our size.  We were known as innovators.  We didn't

04:39:14 4    just do the same thing over and over again.  We always made

04:39:18 5    things fresh and new.  And I think that's what people

04:39:22 6    enjoyed about coming to our conferences.

04:39:23 7    Q.    Well, you heard Dr. Meyer testify.  Would you agree

04:39:26 8    that CLM had a unique and specific place in the marketplace

04:39:30 9    that nobody else competed?

04:39:32 10   A.    Oh, no.  No.  When we started, especially in the

04:39:37 11   claims space, we were viewed as the newbie.  What are you

04:39:41 12   doing?  There's so many already in this industry.  You can't

04:39:44 13   do this.

04:39:45 14           In fact, one of the legal organizations didn't

04:39:47 15   like what we were doing and sent a cease and desist, which

04:39:51 16   was dismissed, because they all saw us as a new and growing

04:39:55 17   competitor, and they were afraid of what we were going to

04:39:58 18   become.

04:39:58 19   Q.    Now, let's talk about Business Insurance.

04:40:00 20   A.    Yes.

04:40:00 21   Q.    Was Business Insurance a competitor of the CLM?

04:40:03 22   A.    No.  It was -- it was never a competitor of the CLM.

04:40:06 23   Q.    And can you explain?

04:40:07 24   A.    CLM was complementary, right?  So, I owned CLM, and

04:40:13 25   CLM was in the claims space, you know, this side of the

04:40:16  1    equation.  And now, I bought Business Insurance, and

04:40:19  2    Business Insurance was on this side.

04:40:20  3          So, now, I had a huge grasp of the entire

04:40:24  4    industry.  I had the pre-loss side and the post-loss side.

04:40:29  5    While there was overlap, there was never competition.  You

04:40:33  6    know, in fact, there were claims people that went to BI

04:40:37  7    events for many years, but there was never competition

04:40:39  8    between the two because people were in their lanes.

04:40:42  9          You know, if you are a civil attorney versus a

04:40:46 10    criminal attorney, you're going to go to civil attorney

04:40:48 11    claims -- conferences or criminal.  Now, you may go over and

04:40:52 12    cross the fence once in a while, but for the -- most of the

04:40:55 13    time, you're going to stay in your lanes, which is exactly

04:40:58 14    what happens in the insurance industry, because claims

04:41:01 15    people have to justify.  This is true.  Claims are on the

04:41:07 16    lowest rung of the insurance industry, and everything a

04:41:11 17    claims person does has to be justified.

04:41:13 18          So, if they're going to go a conference, they

04:41:15 19    have to justify, why am I going to that conference.  And

04:41:19 20    they need to submit huge reasons why.  So, they couldn't

04:41:22 21    just say, well, I'm going to BI or I'm going to The

04:41:26 22    Institutes, or I'm going to a RIMS conference.  That wasn't

04:41:29 23    acceptable, and it isn't acceptable today.

04:41:33 24    Q.    What was Business Insurance in the business of doing

04:41:36 25    when you owned it?

04:41:37 1  A.     Predominantly, two things.  It was a source of news

04:41:43 2  and information.  So, we had a publication.  We had

04:41:47 3  webinars.  We had White Papers.  All ways of getting

04:41:51 4  information and news out to our audience.

04:41:54 5          The second thing that we did, we had events and

04:41:58 6  awards ceremonies.  And for -- I think we had -- the World

04:42:03 7  Captive Forum was in existence for 33 years now.  Women to

04:42:08 8  Watch was in existence pre-CLM.  So, there were a number of

04:42:11 9  events that we did annually, and then we were always

04:42:14 10 developing new because, you know, people knew me.  They knew

04:42:17 11 I was -- I'm -- how can I expand -- again within my lanes,

04:42:21 12 how can I expand our offerings?

04:42:23 13 Q.     Was there overlap between what the CLM did and

04:42:26 14 Business Insurance did during the period that you owned

04:42:28 15 them?

04:42:29 16 A.     Again, it was complementary.  There may have been a

04:42:35 17 little overlap.  For example, we did co-hosted events,

04:42:39 18 right.  So, we had an event, and it was brought up earlier,

04:42:43 19 a workers' compensation event.  Well, traditionally in our

04:42:46 20 -- in the CLM workers' compensation event, it would get

04:42:49 21 claims and litigation management people or attorneys.

04:42:51 22         Well, now my goal was -- now that I owned, you

04:42:54 23 know, both -- a broader spectrum of the industry, let me

04:42:56 24 start marketing to that side of the industry and start

04:43:01 25 including content for those individuals.

04:43:04 1  Q.    Can you explain the difference for the Court between

04:43:07 2  risk managers and claims professionals?  I know you covered

04:43:09 3  a little bit about this, but very specifically.

04:43:11 4  A.    So, specifically, and again, I was a risk manager in

04:43:14 5  three different industries and in three different

04:43:17 6  organizations.  So, a risk manager looks at the overall

04:43:21 7  company and says, what are my risks?  I need to know

04:43:26 8  everything about that risk.

04:43:28 9        When I was at Continental Airlines, I was risk

04:43:32 10  management, ground safety, and claims.  And the CEO, Gordon

04:43:36 11  Bethune, came down into my office and he said, "You know

04:43:39 12  more about this company than any other person in this

04:43:41 13  company."

04:43:41 14        I said, "That's my job, Gordon," because in

04:43:44 15  order to understand how bags get loaded onto the plane, in

04:43:47 16  order to understand how catering gets loaded onto the plane,

04:43:50 17  in order to understand, you know, what happens when you have

04:43:53 18  a 911 event, you need to understand every operation in this

04:43:58 19  company.  And that's what I did.

04:44:00 20        And you also need to understand the financial

04:44:02 21  aspect.  So, now that I understand it, I can either do a

04:44:05 22  captive, I can do risk financing, I can buy insurance.

04:44:09 23  There's ways I can protect the company.

04:44:12 24        Now, we look at the claims people.  Claims

04:44:15 25  people reported to me in every role that I've had.  They're

04:44:18 1    responsible for how do I handle a claim once it happens?

04:44:22 2    What are the things I need to do under the law to make sure

04:44:25 3    I'm abiding by the different laws?  I don't want bad faith.

04:44:29 4    How do I pay people?  How can I settle a claim before an

04:44:33 5    attorney gets involved?  Because we know once an attorney

04:44:36 6    gets involved, the claim value goes up.  So, how do I work

04:44:39 7    within my parameters to settle a claim to make it most

04:44:43 8    efficient for everybody involved?

04:44:45 9    Q.    Can you explain the difference for the Court between

04:44:47 10   pre-loss and post-loss?

04:44:49 11   A.    I am -- again, it falls, within risk manager and

04:44:52 12   claims manager, but pre-loss is that line.  And here is how

04:44:56 13   to protect the company.  What are the exposures from an --

04:44:59 14   on an insurance side?  Again, what products am I going to

04:45:03 15   offer, how I'm going to offer those policies, what I'm going

04:45:06 16   to charge for those policies?

04:45:08 17            Oops, there's a loss.  Now, let's go over to the

04:45:10 18   claims side; right?  This is the post-loss side.  How am I

04:45:13 19   going to respond to that loss?  Who are the attorneys I'm

04:45:15 20   going to select?  What am I going to pay those attorneys?

04:45:18 21   It's all on the post-loss side.

04:45:21 22   Q.    Now, would you say that risk managers are interested

04:45:24 23   in post-loss issues as well?

04:45:26 24   A.    Sure.

04:45:27 25   Q.    In what way?

04:45:29 1    A.    So, they need to understand what those losses are in

04:45:35 2    order to avoid them in the future.  So, good example, I am

04:45:41 3    at Continental Airlines, and my claims department tells me,

04:45:46 4    "You know, lately we've been having a lot of bag problems,

04:45:50 5    not bag problems, people loading the baggage, handlers

04:45:54 6    having a lot more back injuries than normal.  What is going

04:45:58 7    on?"

04:45:58 8            So, I'm like, "okay.  Thank you for that

04:46:00 9    information.  Keep handling those claims."

04:46:01 10           Now, in my pre-loss side -- on my safety side,

04:46:04 11   they go out and they say, "Wait.  We just hired -- we just

04:46:06 12   put all these new back braces in place, and these back

04:46:09 13   braces aren't working."

04:46:10 14           So, now let's figure out what the right thing is

04:46:13 15   to avoid those claims in the future.  So, you need to know

04:46:17 16   what your claims experience is to either insure differently,

04:46:22 17   or take a higher deductible, or eliminate those claims

04:46:27 18   altogether.

04:46:28 19   Q.    Now, did either the CLM or Business Insurance limit

04:46:32 20   or prevent individuals from attending their events once they

04:46:36 21   registered?

04:46:36 22   A.    Once they registered?

04:46:40 23   Q.    Once they signed up for the event.

04:46:42 24   A.    Well, they wouldn't have limited once they signed up.

04:46:48 25   Q.    But did they limit before?

04:46:49 1  A.    Yes, absolutely.

04:46:50 2  Q.    And how did they limit?

04:46:51 3  A.    So CLM would limit the number of attorneys that could

04:46:55 4  come, and CLM would limit the number of vendors that could

04:46:58 5  go.  But if you are -- if you were an insurance claims

04:47:04 6  person or if you were a litigation manager, the door was

04:47:06 7  always open.  In fact, we created such -- I think Anne Blume

04:47:10 8  alluded to this the other day -- we created such a demand

04:47:13 9  that we had a 2,000-person conference, and we said no more

04:47:17 10 than a thousand attorneys would come.  And we opened

04:47:20 11 registration December 1st at eight o'clock in the morning,

04:47:22 12 and by noon we had to close registration because we had the

04:47:25 13 thousand attorneys.

04:47:26 14     Now, we got so many nasty emails from people on

04:47:29 15 the West Coast saying the people on the East Coast had an

04:47:32 16 advantage because it was five o'clock in the morning; right?

04:47:34 17 So we limited the number.

04:47:37 18     For Business Insurance, it was also -- there was

04:47:41 19 categories of people, and there were limitations placed on

04:47:44 20 categories as well.

04:47:45 21 Q.    And what -- give an example of the limitations that

04:47:49 22 you had.

04:47:49 23 A.    So vendors, we didn't want any overflow with vendors,

04:47:53 24 so we had a different model there where vendors, instead of

04:47:55 25 paying the $99, we charged vendors $1,500 to come.  So

04:48:01 1   similar to the CLM, but there were still differences as

04:48:04 2   well.

04:48:04 3   Q.    So, let's talk about the events that the CLM put on

04:48:08 4   at the time of the sale in June of 2018.  You referenced

04:48:12 5   them.  Were there set specialty conferences?

04:48:14 6   A.    There were.

04:48:15 7   Q.    Okay.  What were they?

04:48:16 8   A.    Product Liability Conference.  We had a Claims

04:48:21 9   College.  We had that Litigation Management Institute that

04:48:23 10  was developed, right, with Columbia Law School.  We had a

04:48:29 11  Workers' Compensation Conference.  We had a Hotel,

04:48:31 12  Restaurant, Retail, and Hospitality Conference.  We had a

04:48:35 13  Bad Faith Conference.  So those are six of the ten that we

04:48:38 14  had.

04:48:39 15  Q.    Was there a Medical-Legal Summit?

04:48:41 16  A.    The Medical-Legal Summit was started in 2014 or '15

04:48:46 17  and lasted two years.  We did that with the hopes of

04:48:51 18  increasing our risk management population, and it was

04:48:54 19  stopped.  We didn't -- we didn't continue it, and it was

04:48:57 20  stopped, I think, in -- 2016 was the last year.

04:49:00 21  Q.    Okay.  Was it -- was it part of the CLM's businesses,

04:49:03 22  as you understood it, as of the closing date?

04:49:05 23  A.    Absolutely not.  And none of the financial

04:49:07 24  information from the Medical-Legal Summit would have been

04:49:11 25  included in the information provided to The Institutes.

Potter - Direct

04:49:13 1    Q.    And if you recall, is the Medical-Legal Summit listed

04:49:16 2    in Schedule A to the Asset Purchase Agreement?

04:49:18 3    A.    It's not because it wasn't -- it wasn't current.  It

04:49:22 4    was years old when we stopped and discontinued it.

04:49:25 5    Q.    And who created Schedule A to the Asset Purchase

04:49:29 6    Agreement?

04:49:29 7    A.    I did.

04:49:30 8    Q.    And who scheduled -- who created Schedule 6.12 of the

04:49:35 9    Asset Purchase Agreement?

04:49:35 10   A.    I created the first part of it.  I can't -- I can't

04:49:39 11   say I created all the legal wording, but I created the first

04:49:42 12   part about what Business Insurance does.

04:49:43 13   Q.    As of the closing date, did the CLM offer a Cannabis

04:49:50 14   and Hemp Conference?

04:49:50 15   A.    No, it did not.

04:49:51 16   Q.    Did the CLM, as of the closing date, offer a Cannabis

04:49:55 17   and Hemp product or service, as you understood it?

04:49:58 18   A.    No, it did not.  Sorry.

04:49:59 19          No, it did not.

04:50:00 20   Q.    Was the topic of cannabis discussed at other CLM --

04:50:04 21   CLM conferences?

04:50:04 22   A.    It may have been, but only in relation to claims

04:50:10 23   handling.  So once a claim already happens, what do you do?

04:50:16 24   For example -- and I'm sorry.  I give a lot of examples.

04:50:19 25   For example, if I am working in a workers' compensation

04:50:22 1    claim area and someone comes to work high and they fall and

04:50:27 2    get injured, do I have culpability for that?  How do I

04:50:31 3    handle that claim?  That is different than, you know, than

04:50:36 4    handling a cannabis exposure in today's environment for a

04:50:42 5    company.

04:50:42 6    Q.    And did the Cannabis and Hemp Conference that

04:50:45 7    Business Insurance put on in October 2019 overlap with any

04:50:50 8    topic or issue, as you recall, that the CLM had done as of

04:50:54 9    the closing date in June of 2018?

04:50:56 10   A.    It did not.

04:50:57 11   Q.    Was the Cannabis and Hemp Conference that Business

04:51:00 12   Insurance put on, was that targeted for claims and

04:51:03 13   litigation management professionals?

04:51:05 14   A.    It was not.

04:51:06 15   Q.    Can you explain?

04:51:07 16   A.    So we knew our audience.  Our audience, as many

04:51:12 17   people have testified earlier, is insurance and risk

04:51:16 18   management individuals.  And we knew that we needed to

04:51:18 19   attract those people and offer content for those people, and

04:51:22 20   so that's what we did.  We -- we did not want and we did not

04:51:27 21   venture into the claims arena.

04:51:30 22            And, in fact, when I got the first

04:51:33 23   cease-and-desist, I was really upset because I had a

04:51:38 24   friendly relationship with Pete Miller, I had a friendly

04:51:41 25   relationship with Kate Horowitz, and I had a friendly

04:51:45 1    relationship with them.  And one of the first things you

04:51:47 2    learn in claims handling is before you go to an attorney,

04:51:51 3    before you do anything, you just pick up the phone and you

04:51:54 4    call somebody.  And you say, You've done this.  What do you

04:51:59 5    have to say?  Fix it.  I never got that call.

04:52:02 6         We were on friendly terms.  And so, I was so

04:52:05 7    aggravated.  You know, the first thing I did was pick up the

04:52:09 8    phone and called Kate.  She didn't answer.  I sent her an

04:52:11 9    email.  I said, "Kate, let's talk about this."

04:52:13 10        And her response was, "We need to let the

04:52:16 11   lawyers handle it."  So, I was visibly upset because I

04:52:20 12   wasn't competing with the CLM, and I had no desire to

04:52:23 13   compete with the CLM.

04:52:24 14   Q.    Well, what did you believe -- with respect to the

04:52:27 15   planning of the cannabis conference, what did you believe

04:52:30 16   was the content?

04:52:31 17   A.    The content was all related to insurance and risk

04:52:35 18   management.  It was banking.  It was let's go visit a seller

04:52:42 19   of marijuana.  Let's look at how do we -- how do we insure a

04:52:49 20   grower, topics that the CLM would never have put on.

04:52:55 21   Q.    Do you know whether -- now, you sold Business

04:52:59 22   Insurance before the event occurred; is that correct?

04:53:01 23   A.    That is correct.

04:53:04 24   Q.    Do you know whether any claims and litigation

04:53:06 25   management professionals attended the Cannabis Conference?

Potter - Direct

04:53:08  1    A.      From what I've seen, yes, there were a few.

04:53:11  2    Q.      Do you know whether outside counsel were permitted to

04:53:13  3    attend the Cannabis and Hemp Conference?

04:53:15  4    A.      The only outside counsel that was allowed was Wilson

04:53:18  5    Elser.  And this is -- again, was a very different model

04:53:21  6    from the CLM.  We would never have restricted any conference

04:53:24  7    to one attorney.  We were the claims industry.  We couldn't

04:53:28  8    restrict it to just one attorney.

04:53:30  9            In the BI model, we could, and we did.  So,

04:53:34 10    that's what we did.  It was only one attorney allowed or one

04:53:37 11    firm allowed at the Cannabis and Hemp Conference.

04:53:40 12    Q.      And I think you may have seen a copy of the list or

04:53:43 13    some of the list of the attendees.  Who were the majority of

04:53:47 14    the attendees, as you understood it?

04:53:49 15    A.      It was insurance companies and risk managers.  That

04:53:52 16    was the BI -- that was the BI audience or it is the BI

04:53:57 17    audience.

04:53:57 18    Q.      Did the Cannabis and Hemp Conference deal with claims

04:54:00 19    and litigation management issues?

04:54:03 20    A.      It did not.  Like the example I gave you earlier, an

04:54:07 21    underwriter needs to know what type of claims could exist in

04:54:11 22    order to ensure and provide a policy for that.  We never --

04:54:16 23    the topics at that -- one topic was never intended and, to

04:54:21 24    my knowledge, did not talk about how to handle a claim once

04:54:24 25    a claim happens.  It talked about the types of claims that

04:54:28  1  you need to worry about, how to ensure or how to protect

04:54:32  2  your company against -- excuse me.

04:54:35  3  Q.    Now, after you got the cease and desist letters from

04:54:38  4  The Institutes, did you insist that the planners of the

04:54:42  5  conference remove claims content?

04:54:44  6  A.    No, I didn't insist they do that.  I suggested they

04:54:49  7  do it and I -- I guess "insist" was the right word.  I

04:54:54  8  didn't think it was necessary, but, again, I'm still

04:54:57  9  friendly with these guys.  I don't know why they're upset

04:55:00 10  with me.  So, I said, you know what, let me do as much as I

04:55:03 11  can to show that this is not for their audience.  So, I put

04:55:07 12  a disclaimer on the website which I came up with myself.  I

04:55:10 13  changed all of the claims' wording so -- to show that it's

04:55:14 14  exposure related.  It's not claims related.

04:55:17 15  Q.    Do you think that actually changed content, though?

04:55:20 16  A.    No, and it wasn't intended to change the content.

04:55:26 17  Q.    Let me just be clear:  Were you on the Advisory Board

04:55:30 18  for the Cannabis Conference?

04:55:31 19  A.    No, and I didn't know anybody on the Advisory Board.

04:55:34 20  Q.    Were you involved -- other than perhaps involvement

04:55:38 21  in the creation of the idea, were you involved in the

04:55:41 22  planning of the conference?

04:55:42 23  A.    I was not, and I wasn't even involved in the creation

04:55:45 24  of the idea.

04:55:46 25  Q.    Who -- who created the idea?

04:55:48  1    A.      So, I asked Gavin Souter to come up with a list of

04:55:52  2    companies we could acquire and a list of conferences we

04:55:56  3    could acquire and new topics.  And I think we saw that email

04:55:59  4    earlier.  So, I looked at all of those topics, and I said,

04:56:02  5    "Hey, cannabis and Hemp, that could be a good one to do."

04:56:07  6    Q.      Have claims professionals in the past attended

04:56:10  7    Business Insurance events during the time that you owned

04:56:13  8    Business Insurance?

04:56:13  9    A.      Claims professionals, absolutely.

04:56:17 10    Q.      As far as you understood, did claims professionals

04:56:20 11    continue to attend Business Insurance events through the

04:56:23 12    time that you sold Business Insurance?

04:56:24 13    A.      Sure.  Absolutely.

04:56:27 14    Q.      And you don't know today whether they attended events

04:56:30 15    or what events are going on?

04:56:31 16    A.      No, but, again, it would be a very limited number of

04:56:36 17    claims, but that wasn't our audience.

04:56:37 18    Q.      In your estimation, did the Cannabis and Hemp

04:56:40 19    Conference focus on pre-loss or post-loss issues?

04:56:42 20    A.      100 percent pre-loss issues.

04:56:45 21    Q.      I'm sorry.  You faded out.

04:56:46 22    A.      I'm sorry.  100 percent pre-loss issues.

04:56:49 23    Q.      And do you know how much the Cannabis and Hemp

04:56:52 24    Conference generated in revenue for Business Insurance?

04:56:54 25    A.      I think we saw earlier.  I think it was $104,000,

04:56:57 1  which I think generated between 10 and $15,000 in profit.

04:57:01 2  Q.      Do you know how many people attended the event?

04:57:04 3  A.      234, if I remember the spreadsheet, what it said.

04:57:07 4  Q.      And did you see on the spreadsheet how many people

04:57:09 5  were identified as claims based on their

04:57:12 6  self-identification?

04:57:13 7  A.      I want to say five or seven.

04:57:17 8  Q.      Who was the primary sponsor for the Cannabis and Hemp

04:57:20 9  Conference?

04:57:20 10 A.      Wilson Elser.

04:57:22 11 Q.      Was there anyone specifically at Wilson Elser?

04:57:23 12 A.      I don't remember the attorney's name, but there was

04:57:29 13 the person that was the co -- co-lead of the cannabis and

04:57:34 14 hemp practice area.  I think it was Ben -- I don't remember

04:57:37 15 his name.

04:57:37 16 Q.      Was it Ben Heller?  Does that sound --

04:57:40 17 A.      No, that's -- I don't think that's the right name.

04:57:43 18 I'm not sure.

04:57:44 19 Q.      How did the -- how did the connection to Wilson Elser

04:57:48 20 arise with respect to the Cannabis and Hemp Conference?

04:57:51 21 A.      So, I saw what Gavin suggested and there were

04:57:55 22 conferences.  Oh, we should buy this conference.  We should

04:57:58 23 buy that.  And I'm like, we can't buy those.  Those violate

04:58:01 24 everything about my non-compete.  It had to do with claims.

04:58:04 25 I'm, like, no, we can't do that.

04:58:05 1       So, as I looked down, I saw cannabis and hemp,

04:58:08 2   and I said, hey, I -- look, somebody who I'm very good

04:58:10 3   friends with, and we see each other regularly.  We send

04:58:13 4   Christmas cards to each other's families.  And that guy's

04:58:16 5   name was Ian Stewart, and he worked at Wilson Elser.

04:58:18 6       So, I picked up the phone.  I said, "Hey, Ian.

04:58:22 7   We are looking at a bunch of new conferences, and one of the

04:58:25 8   things we're looking at is cannabis and hemp.  I want to get

04:58:29 9   your, you know, insight of the industry.  You do cannabis

04:58:32 10  and hemp.  Would this be a good conference?  Is this -- what

04:58:34 11  are the competition?  Where else can we go?  Is there

04:58:37 12  something we should buy instead or should we -- you know,

04:58:40 13  should we do this?"

04:58:41 14      He knew everything or a lot about the cannabis

04:58:43 15  and hemp industry.  And so I said, "Hey, it would be great

04:58:48 16  if you could share that information with me."  And he did,

04:58:51 17  and then we talked about other things as well, families.  We

04:58:53 18  talked about the U.S. Insurance Awards.

04:58:56 19      And that was it.  We had no idea at that point

04:59:00 20  we were going to be doing a Cannabis and Hemp Conference.

04:59:03 21  Q.    At some point did Mr. Stewart express interest in

04:59:06 22  becoming more involved in the Cannabis Conference?

04:59:08 23  A.    Yeah, his sales side came out.  So, I think the next

04:59:11 24  day or the day after, he writes me and says, "Oh, wait a

04:59:14 25  second, if you're going do a Cannabis and Hemp Conference,

04:59:17 1  we want to be involved.  We want to sponsor.  We want to do

04:59:19 2  as much as we can with that because we would want to be seen

04:59:22 3  as the predominant firm in the cannabis and hemp space."

04:59:26 4  Q.     Was Mr. Stewart a member of Business Insurance?

04:59:28 5  A.     He was -- is or was as of the closing date.

04:59:32 6  Q.     Was Mr. Stewart a member of the CLM?

04:59:34 7  A.     Yes, he was or is.

04:59:36 8  Q.     To your knowledge, was Mr. Stewart a member of The

04:59:40 9  Institutes?

04:59:40 10  A.     No, he was not.

04:59:43 11  Q.     Is your understanding Mr. Stewart has continued to

04:59:46 12  participate in events and membership with both the CLM and

04:59:49 13  Business Insurance?

04:59:51 14           MR. HAYES:  Objection.

04:59:52 15           THE WITNESS:  Yes.

04:59:52 16           THE COURT:  I don't know how he could know that

04:59:54 17  other than by hearsay.

04:59:56 18           THE WITNESS:  Can I answer?

04:59:59 19           THE COURT:  So, don't answer --

04:59:59 20           MR TINTNER:  I'll re -- I'll ask --

05:00:01 21           THE COURT:  -- but Mr. Tintner, if you have some

05:00:03 22  other questions.

05:00:03 23  BY MR. TINTNER:

05:00:04 24  Q.     Do you have any other personal knowledge of whether

05:00:06 25  Mr. Stewart remains involved with the CLM?

05:00:08 1    A.    Yes.

05:00:09 2    Q.    Okay.  Do you have any personal knowledge of whether

05:00:11 3    Mr. Stewart is still involved with Business Insurance?

05:00:13 4    A.    I do not have knowledge of that, and I have knowledge

05:00:18 5    of the CLM because I went on the CLM website, and he's

05:00:21 6    listed as the primary person for the Cannabis Conference for

05:00:24 7    the CLM.  For the Cannabis Committee for the CLM.

05:00:29 8    Q.    Did the CLM have a Cannabis Committee during the time

05:00:31 9    that you owned it up until the time that you sold it in June

05:00:34 10   of 2018?

05:00:34 11   A.    It did not.  It was not something we were

05:00:37 12   contemplating as well.

05:00:39 13   Q.    You heard about -- you heard Mr. Miller testify about

05:00:43 14   two companies called CoventBridge and SEA.  Do you remember

05:00:48 15   that testimony?

05:00:48 16   A.    Absolutely.  I know both of the companies very well.

05:00:51 17   Q.    And Mr. Miller, without -- I'm not going to

05:00:54 18   characterize his testimony, but in essence, he said that

05:00:58 19   they reduced their sponsorship at CLM.

05:01:00 20         Do you remember hearing that?

05:01:01 21   A.    Yes, I do.

05:01:02 22   Q.    Was CoventBridge a sponsor of any Business Insurance

05:01:07 23   event during the time that you owned Business Insurance?

05:01:08 24   A.    No.  No matter how hard I tried to also convince them

05:01:11 25   to come over to Business Insurance, because I knew them both

05:01:14 1    at the same time, they said, "Adam, our space is claims and

05:01:18 2    litigations management.  We don't have an insurance and risk

05:01:21 3    management practice.  So, we are staying in claims and

05:01:24 4    litigation management.  And we did -- Business Insurance did

05:01:26 5    not sell anything to CoventBridge or SEA."

05:01:30 6    Q.     Okay.  So, would any reduction in revenue associated

05:01:35 7    with CLM have anything to do with Business Insurance?

05:01:38 8    A.     It would not.

05:01:39 9    Q.     Would it have anything to do with you?

05:01:40 10   A.     No.  And coming from someone that owned both

05:01:46 11   companies, I was taken back because, as the CEO, if one of

05:01:51 12   my largest customers says, I am going to cut my spend

05:01:56 13   80 percent, 50 percent, I would call them and say, customer

05:01:59 14   service 101, "What did we do wrong?  Did we not address your

05:02:04 15   needs?  Did something happen?"

05:02:06 16          And that would be the first thing I would do,

05:02:08 17   and I'd get the sales reports.  I'd look at those.  And I'm

05:02:11 18   active in the business.  So, that's -- as a CEO, you know,

05:02:15 19   it's my bottom line.  I need to protect my bottom line, so

05:02:18 20   I'm going to pick up the phone, or I'm going to call them,

05:02:20 21   or I'm going to email them, or I'm going to meet them.  I'm

05:02:23 22   going to do something, as the head of the company, to save

05:02:26 23   the revenue.  And that's why I didn't understand that.

05:02:28 24   Q.     Did the amount of the sale price for the CLM, Claims

05:02:32 25   Page and C & E have anything to do with the restrictive

05:02:34 1   covenant, as you understood it?

05:02:36 2   A.     Absolutely not.

05:02:37 3   Q.     Why? How can you say that?

05:02:38 4   A.     Because we negotiated back and forth verbally, and

05:02:42 5   then Kate Horowitz sent me an email, which we've seen

05:02:46 6   earlier, and it told me what the biggest stumbling points or

05:02:50 7   what the biggest points were of the deal. And I said to her

05:02:54 8   in a subsequent email, I said, "Okay. I know how slowly

05:02:59 9   your counsel works, and we want to get this deal done

05:03:03 10   quickly. So, we're going to do something that -- that

05:03:05 11   typically isn't done. Typically when a transaction happens,

05:03:08 12   the buyer presents the seller with a contract. But in this

05:03:12 13   case, we will present you with a contract within three days

05:03:16 14   because we know your counsel moves slowly."

05:03:18 15         And I was really annoyed at her counsel at that

05:03:21 16   time.

05:03:21 17         So, I said, "We'll present you with a contract."

05:03:23 18   So, we presented them with a contract. It was a stock

05:03:27 19   purchase contract, and it did not include a non-compete. It

05:03:32 20   took them over 30 days to respond and every -- every few

05:03:39 21   days I was calling Kate. "What's going on? What's going

05:03:41 22   on?" "Well, our counsel is working on it."

05:03:43 23         I'm like, in this -- in -- in the transaction

05:03:46 24   industry which I've worked for, I've consulted to,

05:03:48 25   transactions happen like this. Attorneys don't take family

05:03:52 1  leave.  Attorneys are working until midnight to make

05:03:55 2  something happen.  So, we finally got the contract a month

05:03:59 3  later.

05:04:00 4          And when we got the contract, it did two things.

05:04:03 5  The first thing it did was it said, "Whoa, whoa.  We don't

05:04:07 6  want a Stock Purchase Agreement.  We want an asset

05:04:10 7  purchase."  And then it also said, "We're also entering a

05:04:13 8  non-compete."

05:04:14 9          Now, the price had already been established over

05:04:16 10  a month earlier, and there was no mention of a non-compete.

05:04:20 11  And all of a sudden, we're getting this back.  And, in fact,

05:04:23 12  what was interesting is they then subsequently increased

05:04:26 13  their price because they realized that they were -- those

05:04:30 14  two items were an issue.  And so, they increased their

05:04:34 15  price.

05:04:35 16  Q.    When The Institutes made --

05:04:37 17          THE COURT:  No, no.  I think we're about done

05:04:39 18  for today.

05:04:39 19          All right.  You can pick it up tomorrow morning

05:04:42 20  at 8:30.

05:04:44 21          MR. TINTNER:  Certainly, Your Honor.

05:04:45 22          THE COURT:  Or do you have one or two more

05:04:47 23  questions to finish?

05:04:48 24          MR. TINTNER:  No, unfortunately, I don't.

05:04:50 25          THE COURT:  Okay.  Well, we're done for the day.

05:04:53 1    All right.  So, see you all tomorrow.

05:04:54 2                MR. HAYES:  Can we just ask the Defendants who

05:04:57 3    their witnesses are going to be tomorrow?

05:04:58 4                THE COURT:  Sure.  I'm curious myself.  I assume

05:05:03 5    that Mr. Acunto is one possibility.  The two damages experts

05:05:07 6    or are two more possibilities.

05:05:08 7                Is there anybody else?

05:05:09 8                MR. TINTNER:  There's a -- we're going to show a

05:05:11 9    little bit of a video from -- that was not

05:05:13 10   counter-designated, very short.  And we are calling

05:05:16 11   Ms. Horowitz as a cross because she's going to be here

05:05:18 12   tomorrow.  She is a CLM representative.

05:05:21 13               MR. HAYES:  Okay.  And you're putting on both of

05:05:23 14   the damage experts?

05:05:24 15               MR. TINTNER:  I'm not.  I'm putting on mine.

05:05:27 16               MR. HAYES:  I'm sorry.

05:05:28 17               MR. TINTNER:  Yes.

05:05:29 18               MR. HAYES:  Both parties are putting on their

05:05:31 19   damages experts?

05:05:32 20               MR. TINTNER:  Correct.

05:05:33 21               THE COURT:  All right.  You can step down.

05:05:36 22               THE WITNESS:  Thank you.

05:05:36 23               THE COURT:  All right.  See you all tomorrow.

05:05:38 24               DEPUTY CLERK:  All rise.

05:05:52 25               (Court was recessed at 5:05 p.m.)

1          I hereby certify the foregoing is a true and

2    accurate transcript from my stenographic notes in the

3    proceeding.

4                    /s/ Heather M. Triozzi
                     Certified Merit and Real-Time Reporter
5                    U.S. District Court

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25