IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THE AMERICAN INSTITUTE FOR
CHARTERED PROPERTY CASUALTY
UNDERWRITERS and THE INSTITUTES,
LLC,

     Plaintiffs,

     v.

ADAM POTTER and BUSINESS
INSURANCE HOLDINGS, INC.,

     Defendants.

Civil Action No. 19-1600-RGA

## TRIAL OPINION

Barry M. Klayman, COZEN O'CONNOR, Wilmington, DE; Robert W. Hayes, Matthew J.
Siegel, COZEN O'CONNOR, Philadelphia, PA,

     Attorneys for Plaintiffs.

Matthew P. Denn, DLA PIPER LLP, Wilmington, DE; Christopher Oprison, DLA PIPER LLP,
Miami, FL,

     Attorneys for Defendant Business Insurance Holdings, Inc.

Seth Niederman, FOX ROTHSCHILD LLP, Wilmington, DE; Robert S. Tintner, Nathan M.
Buchter, FOX ROTHSCHILD LLP, Philadelphia, PA,

     Attorneys for Defendant Adam Potter.

September 15, 2022

ANDREWS, U.S. DISTRICT JUDGE:

On June 1, 2018, Plaintiffs The American Institute for Chartered Property Casualty

Underwriters and The Institutes, LLC (together, "Plaintiffs") entered into an asset purchase

agreement ("APA") with Claims Pages, LLC ("CP"), C&E MGMT and Planning, Inc. ("C&E"),

CLM Group, Inc. ("CLM"), Adam Potter, and Moxie HC, LLC.   (PTX 13).   Pursuant to the

APA, Plaintiffs acquired substantially all of the assets of CP, C&E, and CLM.   (*Id.* at 4).   The

APA contains non-compete and non-solicitation provisions which generally prohibit "each

Selling Party"[1] from competing with the "Sellers' Businesses."   (*Id.* at 31, § 6.12(a)–(b)).

Plaintiffs brought this suit against Defendants Adam Potter and Business Insurance

Holdings, Inc. ("BIH"), alleging that they breached the non-compete and non-solicitation

provisions of the APA.   (D.I. 48).   BIH asserted five cross-claims against Potter.   (D.I. 146 at

52–58).   By trial, only BIH's cross-claim for negligent misrepresentation remained.   (*See* D.I.

329).   I held a three-day bench trial on Plaintiffs' breach of contract claim and BIH's negligent

misrepresentation cross-claim.   (D.I. 332–334).[2]

I have considered the parties' post-trial submissions.   (D.I. 325, 327, 328, 329, 330, 331).

Having considered the documentary evidence and testimony, I make the following findings of

fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

---

[1] The APA defines the term "Selling Parties" as "the Companies, Adam Potter and Moxie."
(PTX 13 at 50).   The "Companies" are CP, C&E, and CLM.   (*Id.* at 4).   C&E changed its name
to Business Insurance Holdings, Inc. ("BIH").   (Tr. at 252:4–6 (Potter)).   Potter then sold BIH
to Beacon Intercontinental Group, Inc. on September 1, 2019.   (PTX 18).   In rejecting BIH's
motion to dismiss the contract claim, this Court held that the non-compete and non-solicitation
provisions of the APA still apply to BIH despite its new ownership.   (D.I. 137 at 5–6).
[2] I cite to the trial transcript as "Tr."   The trial transcript is consecutively numbered.

## I.   PLAINTIFFS' BREACH OF CONTRACT CLAIM

### A.   Findings Of Fact

1.   "Claims and litigation management" is not limited to post-loss activities. "Content related to claims and litigation management" includes content related to the prevention, handling, and defense of claims or litigation.

2.   The Cannabis and Hemp ("C&H") Conference, Long Term Care Webinar, Long Term Care Conference, and Cyber Security Webinar provided content related to claims and litigation management and targeted claims and litigation management professionals.

3.   Plaintiffs would not have entered into the APA, or would have paid a lower price for the businesses, if Plaintiffs knew Defendants would compete with Plaintiffs.

4.   When Potter introduced Mr. Acunto to his sister, Ms. Posner, Potter knew that Ms. Posner planned to discuss the formation of an entity that would compete with CLM.

5.   Mr. Acunto assisted in the formation of ClaimsX.   BIH had a strategic partnership with ClaimsX.

6.   Potter solicited Wilson Elser as a sponsor for BIH's C&H Conference.

### B.   Conclusions of Law

In order to prevail on their breach of contract claim, Plaintiffs must prove by a preponderance of the evidence: (1) the existence of a contract; (2) a breach of the contract; and (3) resulting damage to Plaintiffs.   *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003); *Zimmerman v. Crothall*, 62 A.3d 676, 691 (Del. Ch. 2013).

Plaintiffs allege three breaches of the APA by Potter and BIH.   First, Plaintiffs allege that Potter and BIH breached the non-compete provision by hosting and planning certain conferences.   Second, Plaintiffs allege that Potter and BIH breached the non-compete provision by assisting in the formation of ClaimsXchange ("ClaimsX").   Third, Plaintiffs allege that Potter and BIH breached the non-solicitation provision by soliciting Wilson Elser as a conference sponsor.   Potter and BIH do not dispute that the restrictive covenants in the APA are valid and

2

enforceable.  (*See* D.I. 327, 328).   They only dispute the second and third elements of
Plaintiffs' breach of contract claim.

### 1.   Conferences

Plaintiffs allege that Potter violated the non-compete provision of the APA by planning
and organizing the Cannabis and Hemp ("C&H") Conference in 2019.   Plaintiffs allege that BIH
violated the non-compete provision by hosting the C&H Conference, Long Term Care Webinar,
Long Term Care Conference, and Cyber Security Webinar.[3]

The non-compete provision of the APA provides:

> During the period beginning on the Closing Date and ending the fifth (5th) anniversary of
> the Closing Date (the "Non-Compete Period"), each Selling Party covenants and agrees
> not to, and shall cause its Affiliates not to, directly or indirectly, and anywhere in the United
> States, conduct, manage, operate, engage in or have an ownership interest in any business
> or enterprise engaged in any activities that are otherwise competitive with any of the
> Sellers' Businesses as conducted as of the Closing Date, except that during the Non-
> Compete Period any Selling Party, or any other party listed on Schedule 6.12, may
> undertake the activities set forth on Schedule 6.12 attached hereto (collectively, the
> "Permitted Activities").

(PTX 13 at 31, § 6.12(a)).

In ruling on the parties' cross-motions for summary judgment, I construed the non-
compete provision as prohibiting "Defendants from offering a specialty conference that provides
content related to claims and litigation management or that targets claims and litigation
management professionals."   (D.I. 304 at 5; D.I. 311 at 2 ("I determined that the APA's non-
compete provisions were unambiguous."")).   Plaintiffs and Potter both challenge this
construction in their post-trial briefing.   Plaintiffs argue that the non-compete prohibits all
specialty conferences related to the insurance industry generally.   (D.I. 325 at 18–23).   Potter

---

[3] Plaintiffs also presented evidence of BIH's cancelled Intellectual Property Conference.  (*See*
PTX 24).   But since this conference was never held, there is no basis for a resulting breach of
contract claim.

argues that the non-compete only prohibits the specific specialty conferences that CLM had offered as of the closing date.   (D.I. 328 at 23–25).

Plaintiffs and Potter are simply rehashing arguments I have already rejected.   (*See* D.I. 304 at 5; D.I. 320 at 2).   The plain language of the APA makes clear that CLM's business is limited to the claims and litigation management industry.   (*See* PTX 13 at 4 ("CLM is engaged in the business of operating as a national trade association for the *claims and litigation management industries*, as more specifically set forth in Schedule A . . . ." (emphasis added)); PTX 14 at 52 (Schedule A) (defining "CLM Business" as "A professional association in the insurance industry with more than 45,000 professionals in the *claims resolutions and litigation management industries*, offering different types of memberships, with local chapters across the United States." (emphasis added))).   Further, the definition of "CLM Business" in the APA is not limited to the specific past product offerings of CLM.   I therefore see no reason to reconsider my previous construction.

I acknowledge that the specific language in my construction regarding "content related to claims and litigation management" and "target[s] [] claims and litigation management professionals" appears in Schedule 6.12 as an exception to the "Permitted Activities."   (PTX 14 at 154).   Potter contends that I therefore should only consider the content and target audience of the accused activities when determining whether the accused activities are "Permitted Activities."   (D.I. 328 at 15).   I disagree.   The contracting parties clearly viewed any activity that provides claims and litigation management content or that targets claims professionals as competitive with CLM's business, or they would not have included this as an exception to the Permitted Activities.   Therefore, this contractual language informs the meaning of "activities that are otherwise competitive with any of the Sellers' Businesses as conducted as of the Closing

4

Date."  (PTX 13 at 31, § 6.12(a)); *see N. Am. Leasing, Inc. v. NASDI Holdings, LLC*, 276 A.3d

463, 467 (Del. 2022) ("When interpreting a contract, this Court will give priority to the parties'

intentions as reflected in the four corners of the agreement, construing the agreement as a whole

and giving effect to all its provisions." (citation and internal quotation marks omitted)).

The parties next dispute what constitutes "content related to claims and litigation

management."   Plaintiffs argue that claims and litigation management includes "pre-loss" and

"post-loss" activities.  (D.I. 325 at 16–17).   Defendants argue that claims and litigation

management includes only "post-loss" activities, i.e., activities after a claim has occurred.   (D.I.

327 at 25–26; D.I. 328 at 20–23).

"Claims and litigation management" is not defined in the APA.   Thus, I look to the trial

evidence to determine its meaning.  *See U.S. Legal Support, Inc. v. Lucido*, 2021 WL 4940823,

at *5 (Del. Ch. Oct. 22, 2021) ("When a contract's plain meaning, in the context of the overall

structure of the contract, is susceptible to more than one reasonable interpretation, courts may

consider extrinsic evidence . . . includ[ing] 'overt statements and acts of the parties, the business

context, prior dealings between the parties, business custom and usage in the industry.'" (citation

omitted)).

Potter testified that there are "two main aspects" to the insurance industry: "pre-loss" and

"post-loss."  (Tr. at 577:1–3 (Potter)).   "Pre-loss" involves assessing and analyzing risk, while

"post-loss" involves responding to a claim after it occurs.   (Tr. at 577:4–18 (Potter)).   He

testified that, while there is some overlap, there is a "faint line" between the two where "people

are on one side or the other."   (Tr. at 577:19–578:11 (Potter)).   But it is unclear where I should

draw this arbitrary "faint line."

The evidence at trial shows that there is considerable overlap between pre-loss and post-loss activities.   Tina Pernie, CLM's former Chief Operating Officer, testified that claims administration involves both pre-loss and post-loss considerations.   (Tr. at 315:9–18 (Pernie)). She also testified that "litigation management" includes both pre-loss and post-loss activities. "There's some litigation management that has to . . . occur pre-loss, because you have to know who your panel counsel are. You have to have established billing guidelines. You have to potentially have a system through which they're going to submit their bills once it becomes a loss." (Tr. at 316:21–317:20 (Pernie)).   Peter Miller, CEO of The Institutes, similarly testified, "[P]art of claims litigation, claims in general is to say: How do I avoid them; right? So, in other words, if I get a claim, a rational question to me would be: Well, can I avoid this claim? So, that's a pre-loss sort of activity."  (Tr. at 30:17–21 (Miller)).

Even Steve Acunto, director and officer of BIH, testified, "[I]f I were a claims professional, let's just say, I would want to understand what a hemp producer did if I were going to be faced with defending a policy in three years . . . ."  (Tr. at 789:23–790:2 (Acunto)). Further, CLM's membership includes risk managers, not just professionals who handle claims post-loss.   (Tr. at 167:5–10 (Blume); Tr. at 318:12–25 (Acunto); Tr. at 578:12–579:3 (Potter); *see also* Tr. at 31:11–14 (Miller) (testifying that it is "very common" for "persons serving as risk managers" to also have "some responsibility for handling claims for their company")).

I therefore cannot say that "claims and litigation management" is limited only to post-loss activities.   While the trial testimony shows that claims and litigation management primarily involves handling claims after they occur (post-loss), it is clear that professionals in this space are also concerned with how to avoid these claims in the future (pre-loss).   Thus, I find that

6

"content related to claims and litigation management" includes content related to the prevention, handling, and defense of claims or litigation.   (*See* D.I. 325 at 16).[4]

I find that Plaintiffs have proven by a preponderance of the evidence that the C&H Conference, Long Term Care Webinar, Long Term Care Conference, and Cyber Security Webinar provided content related to claims and litigation management and targeted claims and litigation management professionals.   One of the sessions at the C&H Conference was titled "Cannabis Exposure: A Peek Down the Rabbit Hole."   (PTX 23 at 6).   The session description provided:

> The cannabis exposure is often difficult to evaluate due to rapidly emerging risks in a highly regulated industry and lack of access to significant data. This panel of experienced cannabis professionals will attempt to shed light on the various cannabis exposures to date, and how these will involve [sic] in the future.

(*Id.*).   The slides from this session referenced "Fire Claims," "Theft Claims," "Product Liability," "CBD Claims," "Professional Liability," and "Civil RICO Litigation."   (*Id.* at 19–34; Tr. at 429:9–20 (Kett); *see also* Tr. at 409:12–15 (Kett) (testifying that the content in this session would appeal to claims and litigation management professionals)).   In an anonymous post-conference survey, one conference attendee noted, "I enjoyed the forms panel and the claims trends panel as that pertains to what I do."   (PTX 97 at 8).   Further, two of the panelists for this session were claims professionals.   One was a "claims manager" for Golden Bear Insurance, and another was a "claims supervisor" at Canopius US (a cannabis insurer).   (PTX 23 at 6; Tr. at

---

[4] Potter argues that if I interpret "content related to claims and litigation management" to include pre-loss activities, it would write out many of BIH's agreed-upon "Permitted Activities" in Schedule 6.12 of the APA.   (D.I. 328 at 21).   I do not think that is the case.   Relevant here, Schedule 6.12 provides that BIH is permitted to present "Events and Award Programs as follows" and lists six specific events.   (PTX 14 at 153–54).   My interpretation of "claims and litigation management" does not preclude BIH from presenting these events.

422:3–423:7 (Kett)).   Based on this, I find that the C&H Conference provided content related to claims and litigation management.

The same is true for the other conferences.   The 2021 Long Term Care Webinar "discussed claims arising in the long-term care setting," including "slips and falls."   (Tr. at 344:5–18 (Kenner); PTX 32 at 2–3).   One of the panelists was a litigation attorney at Wilson Elser.   (Tr. at 345:1–4 (Kenner); PTX 32 at 2–3; *see also* Tr. at 345:22–346:7 (Kenner) (agreeing that this panelist was a claims and litigation management professional)).

The 2021 virtual Long Term Care Conference "was marketed to address slips and falls, which are the number one injury claim, abuse and neglect, . . . and litigation trends and trial experiences."   (Tr. at 346:9–347:7 (Kenner); PTX 28 at 1; *see also* Tr. at 347:4–11 (Kenner) (agreeing that these topics would appeal to claims and litigation management professionals)). Keith Kenner, a publisher at BIH, agreed that many of the speakers at this conference were claims and litigation management professionals.   (Tr. at 347:12–348:20 (Kenner)).

The 2021 Cyber Security Webinar provided content on "how companies should respond if they are hit with a cyber attack or their system is compromised," a post-loss activity.   (Tr. at 349:6–22 (Kenner); PTX 26).   The panelists for this webinar included the co-chair of the "Insurance Recovery and Counseling Practice" at a law firm and the "Chiefs Claims Officer" at an insurance company.   (PTX 26; Tr. at 349:23–350:20 (Kenner) (agreeing that these panelists are claims and litigation management professionals)).

I also find that Plaintiffs have shown that these conferences targeted claims and litigation management professionals.   BIH sent out advertising for the C&H Conference to a marketing list provided by Wilson Elser, a law firm in the claims and litigation industry.   (Tr. at 364:1–25 (Kenner); Tr. at 399:19–401:7 (Kett); Tr. at 638:20–629:15 (Potter) (testifying that Wilson Elser

8

works with both "risk managers" and "claims people")).   Marketing the conference to claims and litigation management professionals certainly constitutes targeting them.   The disclaimer on the C&H Conference webpage stating, "This conference was not developed and is not intended for claims and litigation management professionals," does not change my conclusion.   (PTX 23 at 1).   BIH still reached out to these professionals to invite them to the conference.   In fact, Plaintiffs presented evidence that there were at least seven claims professionals that attended the C&H Conference, despite this disclaimer.   (Tr. at 352:15–355:3 (Kenner)).

Mr. Kenner testified that after a person attends a BIH event, they remain on BIH's mailing list for future events.   (Tr. at 355:4–10 (Kenner)).   Thus, these claims professionals who attended the C&H Conference were on the mailing list for future BIH events, including the Long Term Care Webinar, Long Term Care Conference, and Cyber Security Webinar.   Given this, I find that these conferences targeted claims and litigation management professionals.

Therefore, Plaintiffs have proven that Potter and BIH breached the non-compete provision of the APA by hosting these conferences.

Defendants argue that Plaintiffs have failed to prove any resulting damage from this breach—the third element of the breach of contract claim.   "[W]hen a contract is breached, expectation damages can be established as long as the plaintiff can prove the *fact* of damages with reasonable certainty."   *Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1111 (Del. 2015).   Plaintiffs assert that they lost the benefit of their bargain because they bought the assets at a higher price than they would have paid if they had known Defendants would compete.

Mr. Miller testified that The Institutes would not have proceeded with the transaction if they thought that Defendants would compete, or they "would have paid a substantially reduced price."   (Tr. at 46:6–20, 64:4–65:2 (Miller)).   In an email to the chair of The Institutes' board,

9

Mr. Miller recommended that The Institutes offer $20 million for the purchase of Potter's

businesses, identifying the non-compete as a key term of the transaction.   (Tr. at 35:14–39:11

(Miller); PTX 10).   The evidence proves that Plaintiffs would have paid a lower price for the

assets if they knew Defendants would compete—i.e., Plaintiffs were deprived the benefit of their

bargain.   Accordingly, I find that Plaintiffs have proven the fact of damages with reasonable

certainty.   *See Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc.*, 2021 WL 1592473,

at *10 (Del. Ch. Apr. 23, 2021) (finding that the plaintiff proved the fact of damages with

reasonable certainty because the evidence showed that the plaintiff would not have invested in

the company if the defendant had not misrepresented the extent to which it would compete).

I therefore find that Plaintiffs have proven their breach of contract claim with respect to

the conferences by a preponderance of the evidence.

### 2.    ClaimsX

Plaintiffs argue that Defendants violated the non-compete provision of the APA by

assisting in the formation of ClaimsX.   ClaimsX was formed by Potter's sister, Sydney Posner.

(Tr. at 49:2–6 (Miller); Tr. at 619:1–2, 622:14–17 (Potter)).   ClaimsX is a professional

association of claims and litigation management professionals that directly competes with CLM.

(Tr. at 48:21–49:1 (Miller); Tr. at 186:6–187:19 (Blume); Tr. at 304:8–305:2 (Acunto); Tr. at

369:13–370:2 (Campbell)).

Potter introduced Ms. Posner to Mr. Acunto.   (Tr. at 620:9–10 (Potter)).   He testified

that he made the introduction with the hope that Mr. Acunto would hire Ms. Posner, not because

he intended for them to form ClaimsX.   (Tr. at 620:12–621:5 (Potter)).   The evidence at trial,

however, shows that Potter knew Ms. Posner planned to discuss the formation of a joint venture.

On September 26, 2019, Mr. Acunto sent Potter an email "[r]ecapping" his earlier meeting with

10

Potter, with a bullet point stating "Sydney – 10:00 a.m. Tuesday here re: JV."   (PTX 86; Tr. at

836:4–837:1 (Acunto) (stating that "JV" stands for "joint venture")).   Potter responded to this

email, "I can provide you with Sydney's contact info, but I can[not] be involved in any

discussions."   (PTX 86; *see also* Tr. at 849:23–850:5 (Acunto) ("We did discuss [Ms. Posner's

plan to set up ClaimsX], he did introduce me to her, and he was aware of her intention, I

believe.")).   I find that when Potter introduced Mr. Acunto (and thus, BIH) to Ms. Posner, he

knew she planned to create a competing entity.   Thus, through this introduction, Potter assisted

in the formation of an entity that directly competed with CLM.   This is a breach of the non-

compete provision.

Mr. Acunto and BIH were even more involved with ClaimsX.   Mr. Acunto testified that

he helped Ms. Posner form ClaimsX.   (Tr. at 807:25–808:2, 810:4–6 (Acunto); *see also* PTX 93

at 1 (memorandum written by Acunto identifying ClaimX's purpose as "serving the best interests

of the insuring public, insurers, claims professionals, and attorneys and other individuals

participating in the fair resolution of insurance claims")).   Mr. Acunto and his wife, Carole

Acunto, served as officers and directors of the corporation.   (Tr. at 810:7–14 (Acunto); PTX 20

at 2).   ClaimsX and BIH had a "strategic partnership" which involved BIH offering free

subscriptions to ClaimsX members in order to generate new memberships.   (Tr. at 310:2–14

(Acunto)).   ClaimsX listed BIH as its strategic partner on its website until at least August 4,

2021.   (PTX 27; Tr. at 357:5–22 (Kenner)).   Based on this evidence, I find that Plaintiffs have

shown that BIH violated the non-compete provision based on its involvement with ClaimsX.

Plaintiffs, however, have failed to show any damage resulting from Defendants'

involvement in the formation of ClaimsX.   Ms. Pernie testified, "Anecdotally, through

conversations that I have had with the sales team, I believe that there are a handful of sponsors

11

that [CLM] ha[s] lost business from that have decided to move over to ClaimsXchange."   (Tr. at

331:20–332:3 (Pernie)).   She specifically identified CoventBridge and SEA as entities that

moved over to ClaimsX.   (*Id.*).   Ms. Pernie's speculative testimony does not show by a

preponderance of the evidence that Plaintiffs suffered any resulting damages.   Although there is

evidence that CoventBridge and SEA reduced their spend with CLM from 2018 to 2021 (Tr. at

51:8–14 (Miller)), there is no evidence showing that any reduced support was due to ClaimsX.

In fact, Plaintiffs did not present any evidence showing that CoventBridge or SEA were even

sponsors of ClaimsX.   Further, Mr. Miller testified that he was not aware of any customers or

sponsors CLM lost to ClaimsX.   (Tr. at 100:4–19 (Miller); *see also* Tr. at 216:8–217:9

(Blume)).   Given this, I find that Plaintiffs have failed to show that they suffered any damages

resulting from Defendants' involvement in ClaimsX.[5]   I therefore find that Plaintiffs have failed

to prove that Potter and BIH breached the non-compete provision of the APA by assisting in the

formation of ClaimsX.

### 3.   Non-Solicitation Provision

Plaintiffs argue that Defendants violated the non-solicitation provision of the APA when

Potter, on behalf of BIH, contacted Wilson Elser to be a sponsor of the C&H Conference.   The

non-solicitation provision of the APA provides:

> With the exception of Permitted Activities, during the Non-Compete Period, each Selling
> Party shall not, and shall cause its Affiliates not to, directly or indirectly, call-on, solicit or
> induce, or attempt to solicit or induce, any customer or other business relation of Buyer for
> the provision of products or services related to any of Sellers' Businesses or in any other
> manner that would otherwise interfere with the business relationship between Buyer and
> its customers and other business relations.

(PTX 13 at 31, § 6.12(b)).

---

[5] There was some evidence that board members left CLM for ClaimsX (Tr. at 699:17–22
(Horowitz)), but the parties have stipulated that Plaintiffs are not seeking damages for lost board
members.   (D.I. 196).

Defendants first argue that Wilson Elser was not a "customer or other business relation of Buyer," which the APA defines as "The Institutes."   (D.I. 328 at 26–27; PTX 13 at 4). Defendants reason that, when the APA was signed, Wilson Elser was a sponsor of BIH and CLM, not The Institutes.   (D.I. 328 at 26–27).   The plain language of the non-solicitation provision, however, is not limited to customers of Buyer as of the closing date.   Instead, it applies to the solicitation "any customer or other business relation of Buyer for the provision of products or services related to any of Sellers' Businesses."   (PTX 13 at 31, § 6.12(b)).   Once the deal closed, CLM became part of The Institutes.   (*See* Tr. at 251:16–252:2 (Potter)).   Thus, CLM's sponsors and customers became The Institutes' sponsors and customers.   I therefore find that Wilson Elser was a "customer or other business relation of Buyer" within the scope of the non-solicitation provision.

The evidence shows that Potter reached out to Ian Stewart at Wilson Elser to ask about the emerging cannabis industry in general and whether a conference would be successful.   (Tr. at 248:3–12, 599:19–600:20 (Potter); *see* PTX 45).   Mr. Stewart then suggested that Wilson Elser should sponsor the C&H Conference.   (Tr. at 249:14–21, 600:21–601:3, 637:15–638:10 (Potter)).   The fact that it was Mr. Stewart who suggested to Potter that Wilson Elser sponsor the conference, and not the other way around, makes no difference.   Potter indirectly solicited Wilson Elser's involvement by calling Mr. Stewart and telling him that he was planning a new specialty conference on cannabis and by accepting Mr. Stewart's invitation to sponsor the conference.   Thus, Plaintiffs have shown that Potter, acting on behalf of BIH, violated the non-solicitation provision.

13

Plaintiffs, however, have failed to prove that they suffered any resulting damage from this solicitation.   The evidence makes clear that Wilson Elser still sponsors CLM events.   (Tr. at 99:9–20 (Miller); Tr. at 191:8–15, 200:16–22, 207:21–24 (Blume)).   While Mr. Miller testified that Wilson Elser "diminished the amount that they spent in sponsorship" (Tr. at 99:6–8 (Miller)), there is no evidence that this reduced sponsorship is due to Potter's solicitation.

I therefore find that Plaintiffs have failed to prove their breach of contract claim with respect to the non-solicitation provision.

## II.   APPROPRIATE RELIEF

### 1.   Monetary Damages

Plaintiffs must "present a reasonable and factually supported basis for determining damages." *Medek v. Medek*, 2009 WL 2005365, at *12 (Del. Ch. July 1, 2009).   "Plaintiffs must prove their damages by a preponderance of the evidence." *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch.), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010).   "[W]hen acting as the fact finder, this Court may not set damages based on mere 'speculation or conjecture' where a plaintiff fails to adequately prove damages." *Id.*

Plaintiffs' expert Dr. Christine Meyer testified that Plaintiffs suffered damages between $6.7 and $8.0 million because of Defendants' breach of the non-compete provision.   (Tr. at 473:7–13 (Meyer)).   To calculate Plaintiffs' benefit-of-the-bargain damages, Dr. Meyer determined the difference between the amount Plaintiffs paid for the CLM assets and the value of the CLM assets actually received by Plaintiffs (which is lower due to Defendants' competition).   (Tr. at 448:10–20 (Meyer)).

Plaintiffs based their purchase price on an initial valuation performed by Valuation Research Corporation ("VRC") on March 5, 2018.   (Tr. at 31:15–36:10 (Miller); PTX 11).

14

This initial valuation was based on CLM's "future expected earnings projections." (Tr. at 33:19–34:21 (Miller); Tr. at 452:5–12 (Meyer)). Jeffrey Scheidt, CFO of The Institutes, provided VRC with these income projections. (Tr. at 122:15–124:6 (Scheidt)). Mr. Scheidt testified that these projections were based on the assumption that Potter and his affiliates would not compete with CLM post-acquisition. (Tr. at 125:11–127:6, 146:15–147:15 (Scheidt)).

Dr. Meyer adjusted these revenue projections to estimate an alternative valuation assuming competition from Defendants. (Tr. at 456:16–461:3 (Meyer)). Specifically, Dr. Meyer applied the simple Cournot model, which assumes "that a next-closest competitor entering a niche space is expected to essentially take half" of the market. (Tr. at 461:4–467:22 (Meyer)). Accordingly, Dr. Meyer adjusted the VRC revenue projections assuming that CLM would lose 50% of its sales by December 31, 2022. (Tr. at 499:6–22 (Meyer)).

Dr. Meyer applied the simple Cournot model as described in "Industrial Organization" by Jeffrey Church and Roger Ware. (Tr. at 512:8–16 (Meyer)). This treatise states that the "rules/assumptions" of this simple Cournot model include: "Products are homogeneous. Firms choose output. Firms compete with each other just once and they make their production decisions simultaneously. There is no entry by other producers." (Tr. at 516:4–15 (Meyer)).

These required assumptions, however, are not present in this case. Dr. Meyer admitted that the conferences are not homogeneous and that Plaintiffs and Defendants competed more than once. (Tr. at 517:3–519:24 (Meyer)). Dr. Meyer explained that the Cournot model has since been expanded to include similar, non-homogeneous products and to account for multiple instances of competition, but Dr. Meyer did not apply these expanded versions of the Cournot model. (*Id.*). She applied the simple Cournot model described in the treatise. (*Id.*).

15

Further, CLM has multiple competitors, not just BIH.   (Tr. at 370:3–13, 370:25–371:15 (Campbell)).   But Dr. Meyer's 50-50 split assumes that there are only two competitors in the market.   For example, she testified that if a new competitor entered a two-player market, then the market would be split three ways.   (Tr. at 552:16–553:17 (Meyer)).   So, when the third party enters the market, the existing companies' market shares would go from 50% to 33% rather than from 100% to 50%.   (*Id.*).   Given that the trial evidence shows that CLM has multiple competitors, I do not think Dr. Meyer's assumption that Defendants' competition would result in CLM losing 50% of its business was reasonable.

Additionally, Dr. Meyer's analysis was based on the ability of Defendants to compete generally, not the actual competition by Defendants.   (Tr. at 535:5–536:16 (Meyer)).   On the surface, actual competition by Defendants had no effect on Plaintiffs.   (*See, e.g.*, Tr. at 212:14– 17 (Blume) (testifying that CLM's financial trends were positive in 2019 and 2020 until the pandemic)).   Thus, Dr. Meyer offered no opinions about the actual effect of Defendants' competition.   Indeed, Dr. Meyer testified that the number of non-compete violations or the type of violation would not change her damages calculation.   (Tr. at 535:5–536:16 (Meyer)).   So, if Defendants only held one conference that included one session related to claims and litigation management, Dr. Meyer would still assert that Plaintiffs suffered up to $8 million in damages.   I find this incredible.

I find that Plaintiffs have failed to prove the amount of their damages with the required certainty.   Dr. Meyer's methodology was flawed as the basic assumptions of the simple Cournot model she applied did not fit the facts of this case.   Thus, I decline to award Plaintiffs compensatory damages.

"Even if compensatory damages cannot be or have not been demonstrated, the breach of a contractual obligation often warrants an award of nominal damages." *Ivize of Milwaukee, LLC v. Complex Litig. Support, LLC,* 2009 WL 1111179, at *12 (Del. Ch. Apr. 27, 2009). "Nominal damages are 'not given as an equivalent for the wrong, but rather merely in recognition of a technical injury and by way of declaring the rights of the plaintiff. Nominal damages are usually assessed in a trivial amount, selected simply for the purpose of declaring an infraction of the Plaintiff's rights and the commission of a wrong.'" *Id.* (citation omitted). Plaintiffs have proven that Defendants breached the non-compete provision of the APA by hosting certain conferences.   I therefore grant nominal damages in the amount of one dollar against each Potter and BIH.

### 2.   Injunctive Relief

Plaintiffs request an injunction enforcing the restrictive covenants of the APA for another five years.   (D.I. 325 at 30–33).

I decline to award injunctive relief against Potter.   The evidence at trial shows that Potter is no longer in the insurance industry.   (Tr. at 569:10–571:25 (Potter)).   Thus, there is no competitive behavior to enjoin.   Plaintiffs did present evidence that BIH plans to expand its conference offerings.   (*See* Tr. at 285:7–287:6 (Acunto); Tr. at 342:12–25, 348:21–349:5, 350:21–351:11, 352:4–7, 358:3–13 (Kenner); PTX 32 at 1; PTX 74).   Thus, injunctive relief against BIH may be appropriate.

To merit a permanent injunction, Plaintiffs "must demonstrate: (1) actual success on the merits, (2) irreparable harm, and (3) that the balance of the equities weighs in favor of issuing the injunction." *Kan-Di-Ki, LLC v. Suer*, 2015 WL 4503210, at *25 (Del. Ch. July 22, 2015).

17

By proving that BIH breached the non-compete provision of the APA by hosting certain conferences, Plaintiffs have demonstrated actual success on the merits.   Plaintiffs have also demonstrated irreparable harm because Section 6.12(d) of the APA provides, "Each Selling Party shall not contest that Buyer's remedies at law for any breach . . . of this Section 6.12 will be inadequate, and that Buyer shall be entitled to seek an injunction."   (PTX 13 at 32, § 6.12(d)); *Del. Elevator, Inc. v. Williams*, 2011 WL 1005181, at *15 (Del. Ch. Mar. 16, 2011) ("In Delaware, a contractual stipulation to irreparable harm does not force the Court's hand but is sufficient to support injunctive relief.").   Further, as shown above, the extent of the harm suffered by Plaintiffs is difficult to quantify.   *See Tristate Courier & Carriage, Inc. v. Berryman*, 2004 WL 835886, at *13 n.147 (Del. Ch. Apr. 15, 2004) ("The harms resulting from competition by someone bound by a noncompetition agreement are frequently found to be irreparable.").

As to the balance of equities, BIH argues, "Imposition of a five-year injunction based on two events that occurred soon after the APA was signed would violate basic principles of equity and fairness."   (D.I. 327 at 31).   The injunction, however, is not only based on two events. Plaintiffs showed that BIH violated the non-compete provision of the APA by hosting several conferences and that BIH plans to continue these conferences.   I find that the balance of hardships favors an injunction.   An injunction would advance Plaintiffs' economic interests, as it would give Plaintiffs the opportunity to exploit the assets it acquired through the APA without competition from BIH.   I do not think any harm BIH might suffer from an injunction would outweigh the harm to Plaintiffs if an injunction did not issue.

I therefore find that Plaintiffs are entitled to injunctive relief against BIH.

18

Next, I must determine the proper scope of the injunction.   Plaintiffs generally argue that

BIH should be enjoined from "engaging in competitive activities for five years."   (D.I. 325 at

30–33).   This directive is too broad.   Instead, I will enjoin BIH from offering specialty

conferences that provide content related to claims and litigation management or that target

claims and litigation management professionals, consistent with the above discussion.

I will limit the length of this injunction to two years from its entry.   Plaintiffs bargained

for five years of compliance with the non-compete provision.   (PTX 13 at 31, § 6.12(a)).   BIH

began breaching in October 2019, approximately one year and four months after the Closing

Date (June 2018).   The next alleged breach did not occur until May 2021, approximately one

year and seven months later.   (*See* PTX 32 at 2)   Given this, Plaintiffs only received the benefit

of the non-compete provision for roughly three years.   Thus, I think an injunction for two years

will appropriately provide Plaintiffs the benefit of their bargain.

### 3.   Attorneys' Fees

Delaware follows the American Rule, which provides that each party is responsible for

paying its own litigation fees.   *Mahani v. Edix Media Grp., Inc.*, 935 A.2d 242, 245 (Del. 2007).

"An exception to this rule is found in contract litigation that involves a fee shifting provision."

*Id.*   Plaintiffs argue that this exception applies in this case due to the APA's indemnity

provisions.   (D.I. 325 at 33–34).   In Delaware, however, "indemnity agreements are presumed

not to require reimbursement for attorneys' fees incurred as a result of substantive litigation

between the parties to the agreement absent a clear and unequivocal articulation of that intent."

*Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2020 WL 7861336, at *5

(Del. Ch. Dec. 31, 2020) (quoting *Senior Hous. Cap., LLC v. SHP Senior Hous. Fund, LLC*,

2013 WL 1955012, at *44 (Del. Ch. May 13, 2013)), *aff'd sub nom. Herzog v. Great Hill Equity Partners IV, LP*, 269 A.3d 983 (Del. 2021).

Plaintiffs argue that Sections 9.2 and 9.7, read together, create a broad right to indemnify for attorneys' and expert witness fees resulting from any breach.   (D.I. 325 at 33).   Section 9.2 of the APA provides:

> Indemnification of Buyer. The Selling Parties shall, jointly and severally, from and after the Closing, defend, indemnify and hold harmless Buyer . . . from, against, for and in respect of and pay any and all Losses suffered, sustained, incurred or required to be paid by any such party arising out of or resulting from:
>
> (a) any breach of any representation, warranty, covenant or agreement of any Selling Party contained in this Agreement or in any Ancillary Agreement . . . ;
>                                   * * *
> (f) the enforcement by any Buyer Indemnified Party of any of its rights under this Section 9.2 or any other indemnification covenant contained in this Agreement.

(PTX 13 at 35, § 9.2).   Section 9.7 defines "Losses" to include "all reasonable attorneys', . . . and expert witness' fees incurred in connection therewith[.]"   (*Id.* at 37, § 9.7).

I do not think these provisions reflect a "clear and unequivocal" intent to shift fees in "first-party" actions, i.e., actions between the contracting parties.   The APA's indemnity provisions include similar language to the indemnity provision in *Deere & Co. v. Exelon Generation Acquisitions, LLC*, 2016 WL 6879525 (Del. Super. Ct. Nov. 22, 2016).   In *Deere*, the relevant provision of the Purchase Agreement provided:

> From and after the Closing, [Exelon] shall indemnify, defend and hold harmless [Deere] . . . from and against any and all Losses incurred by [Deere] by reason of, arising out of, resulting from or related to: . . . (ii) any breach or nonperformance of any of the covenants or agreements of [Exelon] contained in this Agreement.

*Id.* at *1 (alterations in original).   The Court found that this language was insufficient to justify attorneys' fees because it did not show the requisite "intent to create a clear and unequivocal agreement to shift fees in first-party actions."   *Id.* at *2; *see also Chase Manhattan Mortg. Corp.*

20

*v. Advanta Corp.*, 2005 WL 2234608, at *22 (D. Del. Sept. 8, 2005) (denying attorneys' fees based upon similar indemnification provision).

Plaintiffs argue that *Deere* is distinguishable, because the APA includes certain language not present in *Deere*. (D.I. 331 at 18–19). Specifically, Section 9.5 provides that the limitations on indemnification specified therein do not apply to "any breaches of covenants in Article VI." (PTX 13 at 36, § 9.5(a)). Plaintiffs reason that the parties would not have included this exemption if claims for breaches of Article VI were not subject to the indemnity obligations. (D.I. 331 at 19). I do not think this language shows a clear and unequivocal intent to extend the indemnity to first-party claims. The indemnity provision in *Deere* similarly provided indemnification for losses resulting from "any breach or nonperformance of any of the covenants." *Deere*, 2016 WL 6879525, at *1. Yet, the Court there still found that the indemnity provision did not extend to first-party actions. *Id.* at *2.

Therefore, Plaintiffs are not entitled to attorneys' fees or expert witness fees under Article IX of the APA.

### 4.    Pre- and Post-Judgment Interest

Delaware law governs the determination of pre- and post-judgment interest as the breach of contract was governed by Delaware law. "Under Delaware law, a party is entitled to prejudgment interest when the amount of damage is calculable, and such interest has been awarded in breach of contract cases." *U.S. for Use of Endicott Enters. Inc. v. Star Brite Constr. Co.*, 848 F. Supp. 1161, 1169 (D. Del. 1994). Under DEL. CODE. ANN. tit. 6, § 2301(a), "Where there is no expressed contract rate, the legal rate of interest shall be 5% over the Federal Reserve

21

discount rate including any surcharge as of the time from which interest is due." I therefore will award Plaintiffs pre-judgment interest at the aforementioned rate.[6]

Post-judgment interest is governed by 28 U.S.C. § 1961. Section 1961(a) provides, "Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." I find that post-judgment interest is appropriate here and order it be paid at the aforementioned rate.

## III.   BIH'S NEGLIGENT MISREPRESENTATION CROSS-CLAIM

### A.   Findings of Fact

1.   Potter told Mr. Acunto that BIH was not subject to the non-compete once it was sold to Beacon Intercontinental. Potter told Mr. Acunto that the C&H Conference would not violate the non-compete.

2.   Mr. Acunto did not ask Potter for a copy of the non-compete or Plaintiffs' demand letters.

3.   Mr. Acunto's reliance on Potter's statements when deciding to host the C&H Conference was not reasonable.

### B.   Conclusions of Law

BIH asserts a cross-claim against Potter for negligent misrepresentation.[7] This claim is governed by Connecticut law. To establish liability for negligent misrepresentation, BIH must show by a preponderance of the evidence: "(1) that [Potter] made a misrepresentation of fact (2) that [Potter] knew or should have known was false, and (3) that [BIH] reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result." *Stuart v. Freiberg*, 116 A.3d

---

[6] The appropriate date for determining the Federal Reserve discount rate is October 24, 2019, which is when Defendants first breached the APA.

[7] BIH voluntarily dismissed its cross-claim for fraud without prejudice. (Tr. at 845:7–14).

22

1195, 1204 (Conn. 2015) (citation omitted).   BIH asserts that Potter negligently misrepresented the scope of the non-compete provision by telling Mr. Acunto that BIH was not subject to the non-compete and that the C&H Conference did not breach the non-compete.   (D.I. 329 at 2).

Potter initially argues that BIH should be judicially estopped from asserting its cross-claim.   (D.I. 330 at 1–2).   Potter reasons that BIH has previously asserted that it is not subject to the non-compete, so it cannot now argue that Potter misrepresented the fact that BIH was not subject to the non-compete.   (*Id.*).   This argument makes no sense.   BIH has not taken inconsistent positions.   BIH raised arguments in defense of Plaintiffs' breach of contract claim. I have since rejected these arguments and have found liability.   BIH's arguments on its cross-claim are consistent with this finding of liability.   Thus, judicial estoppel is not appropriate here. *See G-I Holdings, Inc. v. Reliance Ins. Co.*, 586 F.3d 247, 262 (3d Cir. 2009) ("[I]n our Circuit judicial estoppel is generally not appropriate where the defending party did not convince the District Court to accept its earlier position.").

I will thus address the merits of BIH's cross-claim.   Mr. Acunto's company Beacon Intercontinental acquired BIH from Potter on September 1, 2019.   (Tr. at 264:5–265:7 (Acunto); PTX 18 (Stock Purchase Agreement)).   Prior to this sale, Potter told Mr. Acunto that the non-compete provisions of the APA would not apply to BIH after the sale.   (Tr. at 272:2–10 (Acunto); PTX 18 at 25 (Schedule 3.09)).   Potter also told Mr. Acunto that he had received demand letters from Plaintiffs stating that the planned C&H Conference was in violation of the non-compete provisions.   (Tr. at 633:25–634:24 (Potter)).   But Potter told Mr. Acunto that these claims were not "meritorious," because "the conference, in fact, did not deal with claims." (Tr. at 847:20–848:6, 852:16–19 (Acunto); Tr. at 871:10–872:22 (Potter)).   Potter also told Mr. Acunto that he had made changes to the conference to avoid any violations.   (Tr. at 785:2–786:1

23

(Acunto)).   After the sale, but before the C&H Conference, Potter gave Mr. Acunto a copy of Plaintiffs' initial complaint in this case, which alleged that the C&H Conference violated the non-compete provisions.   (Tr. at 869:13–870:6 (Potter); D.I. 1).

Despite this, BIH still held the C&H Conference.   Mr. Acunto testified that he relied on Potter's representations that the C&H Conference did not violate the APA because Potter was a "responsible businessman with a great reputation" and extensive experience in the field.   (Tr. at 276:12–277:5, 849:7–13 (Acunto)).   He further testified that he relied on Potter because "he said he would indemnify us if anything resulted from it adverse to us."   (Tr. at 848:14–17 (Acunto); *see also* PTX 18 at 10 (indemnification provision in Stock Purchase Agreement); Tr. at 275:4–18 (Acunto)).

BIH has failed to show by a preponderance of the evidence that Mr. Acunto's reliance on Potter's representations was reasonable.   Mr. Acunto never asked Potter for a copy of the non-compete provisions or Plaintiffs' demand letters.   (Tr. at 272:17–20, 273:15–274:1, 848:21–23 (Acunto)).   Further, although Mr. Acunto was represented by counsel during the closing of the sale, he never raised Plaintiffs' demands with his lawyers.   (Tr. at 274:9–19, 860:10–862:12 (Acunto)).   I do not think it was reasonable for Mr. Acunto to rely solely on Potter's (a non-lawyer) legal interpretation of the APA.

I therefore find that BIH has failed to prove its negligent misrepresentation claim against Potter, because any reliance was not reasonable.

## IV.   CONCLUSION

Plaintiffs have proven by a preponderance of the evidence that Potter and BIH breached the non-compete provision of the APA by planning and hosting certain conferences.   The Court

24

grants nominal damages in the amount of one dollar against each Potter and BIH, in addition to pre- and post-judgment interest.   The Court grants injunctive relief against BIH.

BIH has failed to prove its negligent misrepresentation cross-claim against Potter by a preponderance of the evidence.

The parties shall jointly submit a final judgment consistent with this memorandum opinion within one week.   The parties shall also jointly submit a proposed injunction consistent with this memorandum opinion at the same time.

.